Dion W. Hayes (VSB No. 34304)
Patrick L. Hayden (VSB No. 30351)
James P. McElligott, Jr. (VSB No. 14109)
Regina J. Elbert (VSB No. 71118)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

---------------------------------------------------------x
In re:                                                    :    Chapter 11
                                                          :
Greenbrier Hotel Corporation, et al.,                     :    Case No. 09-31703(KRH)
                                                          :
                        Debtors.                          :
---------------------------------------------------------x

## AFFIDAVIT OF BRUCE ROSENBERGER, VICE PRESIDENT OF HUMAN RESOURCES OF GREENBRIER HOTEL CORPORATION, IN SUPPORT OF MOTION PURSUANT TO SECTION 1113 OF THE BANKRUPTCY CODE

I, Bruce Rosenberger, being duly sworn, hereby depose and state as follows:

1.    My name is Bruce Rosenberger. I am the Vice President of Human Resources for Greenbrier Hotel Corporation ("**The Greenbrier**") and have worked at The Greenbrier resort in White Sulphur Springs, West Virginia since March, 2004. Among my responsibilities are overseeing and/or participating in the human resource functions at the resort, including non-union and union personnel and industrial relations matters, employee benefits, hiring and personnel actions, compensation, design and oversight of salary, wages, and benefits, labor agreement administration, and

participation in collective bargaining sessions on behalf of The Greenbrier. To my best recollection, I have attended all, or the vast majority of, master collective bargaining agreement bargaining sessions from November 2007 through the present between The Greenbrier and The Greenbrier Council of Labor Unions ("**GCLU**" or "**The Council**"). The GCLU is presently comprised of eight[1] unions that represent The Greenbrier's unionized employees. The master collective bargaining agreement contains terms applicable to all of The Greenbrier's unionized employees. The Greenbrier is also party to agreements with each of the GCLU unions. These agreements are sometimes referred to as "addenda" to the master collective bargaining agreement. The Greenbrier's proposals for new collective bargaining agreements ("**CBAs**") propose that the master agreement supersede the addenda.

2.  The Greenbrier is a luxury five-diamond resort that provides multiple luxury amenities to its guests. The resort at full capacity has over 700 rooms. There have been over 1,500 employees of the resort at full staffing. For the period of April 2007 through March 2008, The Greenbrier employed an average of 965 employees each month, including an average of 176 salaried non-union employees and an average of 368 hourly non-union employees. There are currently approximately 900 employees who are represented by The Greenbrier's labor unions, approximately 387 of whom are currently on furlough as a result of a January 2009 reduction in force in which approximately 105 non-union employees were also furloughed. The Greenbrier has had a collective

---

[1] The Security Union was the ninth member of the GCLU when The Greenbrier offered its proposals pursuant to section 1113 of the Bankruptcy Code on March 20, 2009. The Security Union has recently withdrawn from the GCLU and on April 8, 2009 reached a new collective bargaining agreement with The Greenbrier ("New Security CBA"), subject to approval by this Court. See *infra*, paragraph 46.

2

bargaining relationship with The Security Union and the eight unions that currently comprise the GCLU since my tenure began at the resort and upon information and belief for decades before that.

3. As described in more detail below, the wages and benefits required under the current CBAs are far above market levels, as compared both to comparable jobs at other businesses in the geographic region and comparable jobs at other luxury resorts in the United States. New CBAs are needed consistent with the proposals served on the unions by The Greenbrier pursuant to section 1113 of the Bankruptcy Code, because, without such new CBAs, The Greenbrier cannot continue to accomplish the going-concern sale contemplated by the "stalking horse" Asset Purchase Agreement with Marriott. That Agreement provides for a sale of The Greenbrier's assets as a going concern under section 363 of the Bankruptcy Code in connection with a Chapter 11 plan. See Exhibit 1 (Marriott Asset Purchase Agreement). Such a sale is the only realistic means for The Greenbrier resort to continue as a going concern. The Greenbrier has structured the sale in such a manner that a purchaser will offer employment to employees of The Greenbrier, will recognize The Greenbrier's unions, and assume new collective bargaining agreements negotiated by The Greenbrier and its unions. It is my belief and understanding that no purchaser would be willing to assume The Greenbrier's current CBAs, and the Marriott's agreement to purchase and operate the resort is conditioned on The Greenbrier reaching new CBAs acceptable to Marriott. The Greenbrier is filing this motion because it has not yet been able to reach all the necessary new CBAs as I explain in this Affidavit.

## THE 2003 COLLECTIVE BARGAINING AGREEMENTS

3

4. The Greenbrier is presently party to the following CBAs:

   a. The Living Collective Bargaining Agreement between The Greenbrier and The Council of Labor Unions, Effective February 1, 2003 ("**Master CBA**"). See Exhibit 2.

   b. The Living Collective Bargaining Agreement between The Greenbrier and Communication Workers of America (CWA), Effective February 1, 2003 ("**CWA CBA**") See Exhibit 3.

   c. The Living Collective Bargaining Agreement between The Greenbrier and Hotel and Restaurant Employees AFL-CIO Local Union 863, Effective February 1, 2003 ("**UNITE HERE CBA**"). See Exhibit 4.

   d. The Living Collective Bargaining Agreement between The Greenbrier and International Brotherhood of Electrical Workers Local Union 466, Effective February 1, 2003 ("**IBEW CBA**"). See Exhibit 5.

   e. The Living Collective Bargaining Agreement between The Greenbrier and Maintenance Workers Local Union 1182, Effective February 1, 2003 ("**Maintenance CBA**"). See Exhibit 6.

   f. The Living Collective Bargaining Agreement between The Greenbrier and The International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada AFL-CIO, Effective February 1, 2003 ("**Stage CBA**"). See Exhibit 7.

   g. The Living Collective Bargaining Agreement between The Greenbrier and The International Union of Painters and Allied Trades District Council 53 Local Union 891, Effective February 1, 2003 ("**Painters CBA**"). See Exhibit 8.

   h. The Living Collective Bargaining Agreement between The Greenbrier and The Mid-Atlantic Regional Council of Carpenters Local Union 1911, Effective February 1, 2003 ("**Carpenters CBA**"). See Exhibit 9.

    i.    The Living Collective Bargaining Agreement between The Greenbrier and The Security Union, Effective February 1, 2003 ("**2003 Security CBA**"). See Exhibit 10.[2]

    j.    The Living Collective Bargaining Agreement between The Greenbrier and The United Association of Journeymen, Plumbers and Pipefitters and Apprentices Local 625, Effective February 1, 2003 ("**Plumbers CBA**"). See Exhibit 11.

5.    The 2003 collective bargaining agreements negotiated with The Council and the nine local unions were reached in January of 2003. Those ten agreements were set to expire on January 31, 2008. The parties agreed to extend the CBAs until February 28, 2008 in hopes of coming to new agreements, but no agreement was reached. From February 29 to June 20, 2008, the parties had no labor agreements or extensions in place. On June 20, 2008, the parties agreed to extend the terms of the 2003 contracts through January 4, 2009. As January 4 approached, the parties agreed to another extension through January 4, 2010. The Greenbrier has long desired to negotiate successor agreements with the labor unions and The Council and continues to do so.

## FINANCIAL INFORMATION PROVIDED TO UNIONS

6.    On August 16, 2007, The Greenbrier invited The Council to participate in an information session to brief union leaders "on the business climate we are confronting" prior to negotiations and to begin negotiations at any point after September 14, 2007 for successor collective bargaining agreements. See Exhibit 12 (August 16, 2007 Letter to Unions). At the session, The Greenbrier provided the union representatives with a PowerPoint presentation, attached hereto as Exhibit 13. The data

---

[2] As noted in footnote 1, The Security Union has recently withdrawn from the GCLU and reached the New Security CBA, subject to approval by this Court. See *infra*, paragraph 46.

5

provided to the unions showed that the last year The Greenbrier earned an operating profit was 2002. It further showed that since 2003, and without interruption, The Greenbrier has performed at a loss. As Exhibit 13 clearly showed the unions, the resort lost approximately $3.8 million in 2003, $5.7 million in 2004, $15.6 million in 2005, and $14.3 million in 2005. Thus the unions have known since August 2007 that The Greenbrier lost approximately $37.3 million over calendar years 2003 through 2006.

7. The first collective bargaining session with The Council for the new CBAs was November 29, 2007. Since that time The Greenbrier has negotiated with The Council 43 times in formal session on the Master CBA (applicable to all the GCLU unions) and has engaged in additional negotiations with each of the nine local unions with respect to each union's specific addenda contract.

8. On December 4, 2007, in another effort to help the unions understand The Greenbrier's precarious financial circumstances, The Greenbrier informed The Council during collective bargaining that it was willing to provide The Council with a detailed report on The Greenbrier's financial condition. The parties negotiated a Confidentiality Agreement on or about January 30, 2008, attached hereto as Exhibit 14, and The Greenbrier promptly provided The Council's designees (individuals selected by The Council with financial expertise) with a detailed report of its financial condition for the year of 2007 on January 31, 2008. That report disclosed approximately $17 million in losses in 2007, in addition to the losses suffered in previous years.

9. On February 25, 2008 The Greenbrier provided The Council's designees with supplemental financial data for 2004, 2005, 2006, and 2007 pursuant to the Confidentiality Agreement. In addition and without request, on October 13, 2008 The

Greenbrier provided The Council's designees with financial data for the first two financial quarters of 2008 pursuant to the Confidentiality Agreement. On February 6, 2009, The Greenbrier provided The Council with its complete 2008 financial report pursuant to the Confidentiality Agreement. That report disclosed approximately $37.3 million in losses.

10. On March 23, 2009, The Greenbrier provided The Council with financial data for January and February 2009, showing monthly losses of $3.7 million and $4.97 million respectively. See Exhibit 15 (March 23, 2009 Correspondence to Unions).

11. The Council has never stated that the financial information provided by The Greenbrier was inaccurate or inadequate in any respect.

### UNIONS' FAILURE TO MAKE NECESSARY CONCESSIONS

12. Since February 2003, while the terms of the present agreements have been in place, the resort has lost over $90 million. Guest nights at the resort declined by 8% between 1999 and 2006 and, as the general economy weakened, by an additional 29% between 2006 and 2008. See Exhibit 16 (Financial Analysis of Proposed Collective Bargaining Agreements and Bridge to Profitability prepared by Protiviti, Inc. ("**Financial Analysis**"), p. 4). Between 2003, the year the CBAs were implemented, and 2008, annual guest nights have declined by 35%. See Exhibit 16 (Financial Analysis, p. 4).

13. Since June 12, 2008, The Greenbrier and the GCLU unions[3] have accomplished only one tentative agreement: on February 12, 2009, The Greenbrier agreed to The Council's proposal on the bonus program for union employees. The majority of the unaccepted proposals are unaccepted because the GCLU unions insist

---

[3] The Security Union recently withdrew from the GCLU. See *infra*, paragraph 46.

7

upon full or partial benefits for part time employees. Having lost over $90 million since the 2003 contracts have been in place, The Greenbrier cannot afford to pay part time employees full time or partial benefits as demanded by these unions.

14. In January 2008, the unions publicized a strike vote that substantially discouraged potential guests from staying at the resort. See Exhibit 17 (Undated *Register-Herald* Article). In an effort to avoid the harm to its revenue and retain scheduled reservations, on May 29, 2008, The Greenbrier proposed a "no strike/no lockout" agreement to The Council so that potential guests could make plans to stay at The Greenbrier without fear of a labor dispute disrupting or cancelling their stay. The agreement would prohibit the unions from striking and the resort from locking out the employees for a set duration. See Exhibit 18 (May 30, 2008 Email to Unions). The Council refused the offer. Eventually, The Council offered to agree to the proposal but only if all other portions of all ten collective bargaining agreements, excepting arbitration, were extended. The Greenbrier agreed to this proposal and, on June 20, 2008, the no strike/no lockout agreement was executed through January 4, 2009 as described herein. See Exhibit 19 (June 20, 2008 No Strike/No Lockout Agreement).

15. Immediately upon accomplishing the no strike/no lockout agreement, The Greenbrier notified its guests and the public through a mutually agreed press release that an agreement was in place at The Greenbrier that included a no strike obligation and encouraged guests to retain their reservations and make reservations without fear of a labor dispute. See Exhibit 20 (News Articles and Notice to Guests Regarding June 20, 2008 No Strike/No Lockout Agreement).

16. As January 4, 2009 neared, The Greenbrier faced the same dilemma. Guests were again put on notice that, after January 4, 2009, there was a possibility that no contracts would be in place and a labor dispute would arise. See Exhibit 21 (Undated Notice to Guests Regarding Ongoing Labor Issues). However, on December 15, 2008, The Council and The Greenbrier executed a second no strike/no lockout agreement similar to the first, but in addition, The Greenbrier conceded to arbitrate discharge cases. See Exhibit 22 (December 15, 2008 No Strike/No Lockout Agreement). Again, subsequent to execution of the second no strike/no lockout agreement, The Greenbrier advised guests that an agreement had been accomplished and that no threat of a labor dispute existed. See Exhibit 23 (Notice to Guests Regarding December 15, 2008 No Strike/No Lockout Agreement).

17. In November of 2008, as had been the case since February of 2008, the predominant issues in bargaining were eligibility for benefits and the health care proposal. The parties spent many formal and sidebar sessions seeking to agree on health benefits. The focal points of the bargaining have been whether part time employees merit full time health care benefits, what level of benefits should be offered, and what level of contributions is appropriate for those benefits. The GCLU unions have insisted for months that they have offered proposals that would "save" The Greenbrier "millions" of dollars. While it may be technically accurate that, over the course of the entire term of the contract, the proposals would save the resort funds, the reality is that the contract savings as a whole would not be enough to enable The Greenbrier to avoid operating at a loss or facilitate a sale. For example, The Council's current health proposal made on March 5, 2009, which it estimated would save The Greenbrier approximately $8.4

million over the duration of the contract proposal, would not produce sufficient savings to cover the losses experienced by The Greenbrier in January and February of 2009 alone. See Exhibit 24 (March 5, 2009 Counterproposal) & Exhibit 25 (February 6, 2009 Counterproposal).

18. Since August of 2007, the GCLU unions have persistently refused to agree to the concessions needed to sell or operate The Greenbrier profitably, even though these unions are well aware of The Greenbrier's adverse financial situation. On September 9, 2008, *The Register-Herald* quoted Peter Bostic, the Business Representative of UNITEHERE! Local 863 stating "It has become clear out of the 11 months of negotiating that the workers are facing demands that we cannot afford and the company does not have the revenue for these jobs based on current levels." See Exhibit 26 (September 9, 2008 *Register-Herald* Article). On September 11, the same publication quoted Mr. Bostic as stating at a county commission meeting "That's how dire the situation is. We are essentially asking you to help us save our jobs." See Exhibit 27 (September 11, 2008 *Register-Herald* Article). On September 15, Mr. Bostic was quoted by *The Times West Virginian* as stating "I don't want to put the impression out there that there's doomsday on the horizon . . . but common sense tells you that a company cannot continue to take million-dollar losses year after year and expect to stay in business." See Exhibit 28 (September 15, 2008 *Times West Virginian* Article).

19. On November 21, 2008, Harold Bock, The Council's chief bargaining spokesperson, invited The Greenbrier to make a comprehensive proposal that identified what ". . . you all think you can live with and see what we can do." Mark Carter, The

10

Greenbrier's labor counsel, responded almost immediately that The Greenbrier was in dire circumstances and that the proposal would reflect that.

20. On January 9, 2009, The Greenbrier announced plans to furlough approximately 650 employees, nearly one-half of its workforce. As I explained to the unions in a letter that month, the larger than normal seasonal layoffs were necessitated by The Greenbrier's financial crisis, including its substantially decreased revenues. See Exhibit 29 (January 30, 2009 Letter to Unions).

21. Over the past year, as negotiations have continued and The Greenbrier's financial situation has worsened, The Greenbrier has been forced to reduce and consolidate its management staff. In 2008 and 2009, The Greenbrier has lost through attrition, job elimination, or layoff 52 salaried, non-union employees, including 14 salaried positions that were converted to hourly positions as a cost reduction measure in 2009. See Exhibit 16 (Financial Analysis, p. 15).

22. As described in the March 19, 2009 First Day Affidavit of Michael McGovern, the Chief Financial Officer for The Greenbrier (Docket No. 19), The Greenbrier retained the firm of Goldman Sachs in August 2008 to explore strategic options for The Greenbrier. As The Greenbrier's financial circumstances worsened, in late 2008, The Greenbrier retained Protiviti, Inc. to serve as financial advisor for restructuring and a potential Chapter 11 filing. In late 2008 and early 2009, it became increasingly clear that future operation of The Greenbrier required a going concern sale, and such a sale required modification of the 2003 union agreements. By mid-January 2009, The Greenbrier was projecting losses for that month alone of approximately $4 million. Despite more seasonal furloughs than normal, the resort continued to experience

11

greater losses due to lower than normal reservation rates for January and continuing expenses. Given the substantial operating losses of 2008, the unwillingness of The Greenbrier's indirect parent to fund further losses indefinitely, and the fact that potential purchasers indicated an unwillingness to acquire The Greenbrier with the 2003 labor agreements in place, it became evident that a going concern sale and continued operations required market-based labor contracts that would be acceptable to a purchaser, which would necessarily be less generous than the proposals on the table at that time.

23. Accordingly, having been invited by the unions to submit new comprehensive proposals and realizing that a prospective purchaser would not be willing to assume the existing CBAs, The Greenbrier withdrew its then current bargaining proposals on January 19, 2009 and advised the unions that comprehensive proposals would soon be provided. See Exhibit 30 (January 19, 2009 Letter to Unions). On January 27, 2009, the resort offered a comprehensive proposal for the Master CBA that required further concessions in the areas of eligibility for full time benefits (Art. 8), Health Care (Art. 44), Vacation (Art. 30), and Daily Overtime (Art. 57). See Exhibit 31 (January 27, 2009 Master Proposal). Seven of the unions responded to this proposal unconstructively by filing unfair labor practice charges with the National Labor Relations Board, even though the unions had invited new proposals. See Exhibit 32 (Unfair Labor Practice Charges).

24. The Greenbrier's January 27, 2009 proposal included changes to the terms of the resort's participation in the union-sponsored multiemployer health plan under which the resort currently provides free or low-cost health benefits to its hourly employees, both union and non-union, as well as to many of its non-union salaried

employees. In 2008, The Greenbrier employed an average of 164 non-union salaried employees each month, 69 of whom were also eligible for health insurance coverage under this same multiemployer health plan. If the resort adopts this proposal, non-union hourly and salaried employees participating in this multiemployer health plan may be subject to the same changes in premiums and coverage that The Greenbrier's union employees experience, if the resort continues its previous practice of maintaining these non-union employees in the same plan with the same premium levels as its union employees.

25. The Greenbrier presently sponsors both a union pension plan and a non-union pension plan. The resort's January 27, 2009 proposal would freeze future benefit accruals under the union pension plan. Although the resort has been proposing to freeze that plan since January 2008, the impending sale or liquidation of the resort has made the imminent cessation of future benefit accruals under both the union pension plan and non-union pension plan a foregone conclusion, because no potential purchasers (including Marriott) have been willing to continue benefit accruals under either pension plan. If the resort is sold, accruals under both pension plans will cease as of the effective date of the sale, if the plans are not sooner frozen. Likewise, accruals under both plans will cease if employees lose their jobs as the resort liquidates.

26. The Greenbrier also offered Art. 62, dealing with the Employee Cafeteria, and eliminating "Duty Meals" – a system whereby the resort provides free meals to all employees. Simply put, facing an immediate liquidity crisis, The Greenbrier concluded it could no longer afford the system currently in place whereby the resort provides free

13

meals to all employees at a cost of over $740,000 annually. See Exhibit 31 (January 27, 2009 Master Proposal).

27. On February 12, 2009, The Greenbrier followed up on the January 27, 2009 Master CBA proposal with individual proposals for each of the nine unions. See Exhibits 33-41 (February 12, 2009 Individual Union Proposals).

28. The resort's January 27, 2009 Master CBA proposal contained concessions which included improvements to the dental plan along with modest increases to employee contributions for dental coverage. On February 12, 2009, the resort accepted The Council's proposal on a bonus plan for hourly employees, offered a four-year versus a five-year contract duration, and proposed successorship language.

29. On February 13, 2009, The Greenbrier formally informed the unions that the resort was seeking a buyer. See Exhibit 42 (February 13, 2009 Letter to Harold Bock).

30. Negotiations continued, and The Greenbrier's losses in February 2009 were $4.97 million. However, The Council still showed no sign of agreeing to concessions that are essential to The Greenbrier's continuing operation.

## SECTION 1113 PROPOSALS TO UNIONS

31. Faced with accumulated unsecured debt owed to its indirect parent of approximately $91 million, with no ability to repay such debt and the absence of any realistic opportunity to break even or show a profit in the foreseeable future under its current labor obligations, The Greenbrier sought protection under Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. Section 101 *et seq.* (the "**Bankruptcy Code**"), on March 19, 2009. See Bankruptcy Petition (Docket No. 1).

32.    On the same day that The Greenbrier filed for bankruptcy, March 19, 2009, I personally emailed and called all of the GCLU unions to advise them of The Greenbrier's Chapter 11 filing and the Asset Purchase Agreement with Marriott, including its requirement for new collective bargaining agreements acceptable to the Marriott. See Exhibit 43 (March 19, 2009 Email to Unions). In my March 19 email, I specifically requested that the unions meet with The Greenbrier "as soon as possible to continue our negotiations and suggest that we meet for Master CBA bargaining on Monday, March 23, 2009." See Exhibit 43 (March 19, 2009 Email to Unions).

33.    On Friday March 20, 2009, The Greenbrier's labor counsel, Dinsmore & Shohl, LLP emailed The Greenbrier's proposals pursuant to section 1113 of the Bankruptcy Code (the "**Section 1113 Proposals**") to each of the unions and repeated the request to meet the following Monday to negotiate. See Exhibit 44 (March 20, 2009 Letters to Unions). The Greenbrier's labor counsel added that "[i]f the date, time, or place is not agreeable, The Greenbrier will agree to any reasonable change suggested." See Exhibit 44 (March 20, 2009 Letters to Unions).

34.    On March 20, 2009, pursuant to Bankruptcy Code Section 1113(b)(1)(A), The Greenbrier made written proposals to The Council in connection with the Chapter 11 proceedings that contain the necessary modifications for new collective bargaining agreements to allow for The Greenbrier's successful reorganization through a sale of its assets as a going concern. The proposals are identical to the proposals that The Greenbrier previously provided to The Council on January 27 and February 12, 2009, with the exception of the correction of a few minor errors in the UNITE HERE! Local 863 addenda identified by the parties during bargaining and certain agreements reached

15

with The Security Union during bargaining. See Exhibits 45-54 (March 20, 2009 Proposals), Exhibit 31 (January 27, 2009 Master Proposal) & Exhibits 33-41 (February 12, 2009 Individual Union Proposals).

35. The chart attached hereto as Exhibit 55 summarizes the significant changes to the 2003 collective bargaining agreements proposed by The Greenbrier in its Section 1113 Proposals of March 20, 2009.

36. Along with the Section 1113 Proposals provided on March 20, 2009, The Greenbrier provided the unions with the Chapter 11 Petition (Docket No. 1), the McGovern Affidavit (Docket No. 19), Protiviti's expert Financial Analysis of the Collective Bargaining Agreements and Bridge to Profitability dated March 20, 2009 (Exhibit 16), Statements of Income and Loss for the 12 month periods ending December 28, 2007 and December 26, 2008 (both of which had previously been made available through the Confidentiality Agreement), Statements of Income and Loss for the months of January and February 2009, and a Balance Sheet for The Greenbrier dated February 20, 2009. The GCLU has not requested further information or stated that this information was inadequate. UNITE HERE! Local 863 requested additional financial information on March 25 and April 2, 2009, which information was promptly provided, and The Greenbrier is in the process of responding to additional information requests from that union.

37. On March 24, 2009, The Greenbrier provided the unions with a copy of the Asset Purchase Agreement. See Exhibit 56 (March 24, 2009 Email to Harold Bock).

38. A copy of the debtor-in-possession financing agreement was provided to the unions on March 30, 2009. See Exhibit 57 (March 30, 2009 Email to Harold Bock).

39. On April 2, 2009, The Greenbrier emailed the unions The Greenbrier's Statements of Financial Affairs and Schedules of Assets and Liabilities. See Exhibit 58 (April 2, 2009 Email to Unions).

40. Since the filing of The Greenbrier's bankruptcy petition, The Greenbrier has continued to share detailed financial information with the unions and has offered to meet at any and all reasonable times with the unions and to confer in good faith with a view to reaching new collective bargaining agreements that will enable The Greenbrier to continue operations, accomplish its sale as a going concern, and continue providing good jobs to Greenbrier employees. See Exhibit 44 (March 20, 2009 Letters to Unions).

41. I personally participated in Protiviti's efforts to analyze The Greenbrier's collective bargaining agreements. I wholeheartedly share Protiviti's conclusions that The Greenbrier's labor costs are substantially above market and need to be substantially reduced along the lines of the Section 1113 Proposals if The Greenbrier is going to reorganize and accomplish a sale under the Asset Purchase Agreement. In my experience and based on my knowledge of the CBAs and The Greenbrier, The Greenbrier cannot be profitably operated unless new collective bargaining agreements are reached along the lines of The Greenbrier's Section 1113 Proposals. In my judgment, no one would purchase The Greenbrier with the 2003 CBAs in place.

### UNIONS' FAILURE TO MEET TO DISCUSS PROPOSALS

42. The GCLU did not respond to our March 19 and 20 requests for meetings until Monday, March 30, 2009. This belated response came eleven days after my March 19, 2009 request for a meeting "as soon as possible," which suggested a March 23, 2009 meeting. In a March 30, 2009 email to me, Harold Bock, International Vice President

and Regional Director of the Mid-Atlantic Region Joint Board of the UNITE HERE! union, did not identify any dates The Council would be available to negotiate. Instead, although Mr. Bock had known since March 19 that The Greenbrier wanted to meet "as soon as possible" and would meet at "any reasonable" time and place, Mr. Bock's email asked for my "calendar of available bargaining dates for the month of April" rather than identifying specific dates for negotiations. See Exhibit 59 (March 30, 2009 Email to Bruce Rosenberger). The Greenbrier promptly emailed Mr. Bock in response that The Greenbrier was available to negotiate all dates in April, with the only potential challenges being April 21 and 22, "but if those dates are desired we may be able to work something out." See Exhibit 59 (March 31, 2009 Email to Harold Bock). Belatedly, the GCLU on April 3, 2009 advised The Greenbrier that it would only be willing to meet April 15, 16, 22, 23, and 24. See Exhibit 60 (April 3, 2009 Email to Bruce Rosenberger). The Greenbrier immediately accepted, scheduling negotiation sessions for each of those dates. Exhibit 60 (April 3, 2009 Email to Harold Bock).

43. Also on April 3, 2009, UNITE HERE! Local 863 offered to meet for addenda bargain on eleven dates in April. The Greenbrier has conditionally accepted ten of those dates, and bargained with that union on April 7, 2009.

44. The United Association of Journeymen, Plumbers and Pipefitters and Apprentices Local 625 has requested and The Greenbrier has scheduled bargaining with that union for April 20, 2009.

45. Maintenance Workers Local Union 1182 has also offered nine addenda bargaining dates for April, and The Greenbrier is in the process of scheduling those dates.

46. This week, The Security Union withdrew from the GCLU and bargained

with The Greenbrier independently. An agreement was reached late in the evening on April 8, 2009 and ratified by members of The Security Union on that same date. See Exhibit 61 (Security CBA ratified April 8, 2009.) The New Security CBA incorporates the economic provisions of The Greenbrier's Section 1113 Proposals and none of the variances from those proposals would in my judgment have any material economic impact on The Greenbrier. I believe that this new CBA would be acceptable to a purchaser.

47. The Greenbrier hopes to eventually achieve acceptable CBAs with the GCLU and all Unions through the ongoing bargaining process.

48. In addition to providing the unions with detailed information concerning The Greenbrier's dire financial circumstances, The Greenbrier has further advised the unions that it will make reasonable efforts to comply with requests for additional information needed to evaluate the Section 1113 Proposals subject to subsection (d)(3) of section 1113 of the Bankruptcy Code. See Exhibit 44 (March 20, 2009 Letters to Unions). To date, the GCLU has made no requests for further information since receiving the Section 1113 Proposals.

49. Despite being fully advised of The Greenbrier's dire financial circumstances, despite the unions' knowledge of the need to reach new collective bargaining agreements that are acceptable to the Marriott, despite nearly seventeen months of bargaining, and despite having had ample financial information concerning The Greenbrier's financial circumstances and the Asset Purchase Agreement, and despite some bargaining progress just within the past few days with the UNITE HERE! Local 863 and The Security Union, the GCLU member unions without good cause have to date

refused to accept the Section 1113 Proposals, and have made no counter-proposals that would afford The Greenbrier the relief needed to survive and accomplish its sale as a going concern.

50. The Greenbrier has some of the most committed and talented group of union and non-union employees with whom I have ever been privileged to work. The resort also provides a guest experience unmatched in the region and matched by very few other luxury resorts in the United States. Unfortunately, due to economic circumstances and the GCLU unions' protracted unwillingness to date to work constructively to achieve market-based labor contracts, the continued business operation of The Greenbrier, its sale as a going concern, and its ability to continue as a major employer and tax-payer in Greenbrier County now depend on the result of The Greenbrier's Section 1113 Motion and the ultimate ability of The Greenbrier and the GCLU unions to reach agreement on new labor contracts in the next several weeks.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge, information, and belief, with appropriate reliance on The Greenbrier's officers, employees, and advisors.

Dated: April 9, 2009

_____
Bruce Rosenberger
Vice President of Human Resources for
Greenbrier Hotel Corporation