IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Greenbrier Hotel Corporation, et al., | : | Case No. 09-31703 (KRH) |
| | : | |
| Debtors. | : | Jointly Administered |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DISCLOSURE STATEMENT FOR JOINT PLAN OF GREENBRIER
HOTEL CORPORATION AND ITS DEBTOR AFFILIATES
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

---

McGUIREWOODS LLP
Dion W. Hayes (VSB No. 34304)
Patrick L. Hayden (VSB No. 30351)
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors and Debtors in
Possession

Dated: April 17, 2009

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS JUNE 11, 2009, UNLESS THE DEBTORS EXTEND THE DEADLINE PRIOR TO THE VOTING DEADLINE.  TO BE COUNTED, THE VOTING AGENT MUST RECEIVE YOUR BALLOT BEFORE THE VOTING DEADLINE.**

**THE DEBTORS PROVIDE NO ASSURANCE THAT THE DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS TO THE DISCLOSURE STATEMENT, THAT IS ULTIMATELY APPROVED IN THE CHAPTER 11 CASES (1) WILL CONTAIN ANY OF THE TERMS IN THE CURRENT DOCUMENT OR (2) WILL NOT CONTAIN DIFFERENT, ADDITIONAL, MATERIAL TERMS THAT DO NOT APPEAR IN THE CURRENT DOCUMENT.  THEREFORE, MAKING INVESTMENT DECISIONS BASED UPON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS IS *HIGHLY SPECULATIVE*, AND THE DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING SUCH INVESTMENT DECISIONS WITH RESPECT TO (1) THE DEBTORS OR (2) ANY OTHER PARTIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. PURPOSE AND EFFECT OF THE PLAN | 3 |
| | B. OVERVIEW OF CHAPTER 11 | 4 |
| | C. SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN | 4 |
| | D. PARTIES ENTITLED TO VOTE ON THE PLAN | 5 |
| | E. SOLICITATION PACKAGE | 6 |
| | F. VOTING INSTRUCTIONS | 7 |
| | G. THE CONFIRMATION HEARING | 8 |
| | H. CONFIRMING AND CONSUMMATING THE PLAN | 8 |
| II. | BACKGROUND | 9 |
| | A. OVERVIEW OF THE DEBTORS' BUSINESS | 9 |
| | B. THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE | 10 |
| III. | CHAPTER 11 CASES | 11 |
| | A. OVERVIEW — EVENTS LEADING TO THE CHAPTER 11 CASES | 11 |
| | B. ADMINISTRATION OF THE CHAPTER 11 CASES | 13 |
| | C. THE 1113 MOTION | 14 |
| | D. CLAIMS BAR DATE | 16 |
| | E. DEEMED SUBSTANTIVE CONSOLIDATION OF THE DEBTORS FOR PLAN PURPOSES ONLY | 17 |
| | F. THE MARKETING AND SALE PROCESS | 18 |
| | G. GREENBRIER SPORTING CLUB | 23 |
| | H. DESCRIPTION OF EXIT LOANS | 24 |
| | I. PENSION PLAN | 26 |
| | J. TREATMENT OF AVOIDANCE ACTIONS | 27 |
| IV. | SUMMARY OF THE JOINT PLAN | 27 |
| | A. INTRODUCTION | 27 |
| | B. ADMINISTRATIVE AND PRIORITY TAX CLAIMS | 28 |
| | C. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS | 29 |
| | D. ACCEPTANCE OR REJECTION OF THE PLAN | 34 |

# TABLE OF CONTENTS
(continued)

**Page**

|   | | |
|---|---|---|
| E. | MEANS FOR IMPLEMENTATION OF THE PLAN | 34 |
| F. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 38 |
| G. | PROVISIONS GOVERNING DISTRIBUTIONS | 40 |
| H. | THE PLAN ADMINISTRATOR | 42 |
| I. | PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS | 44 |
| J. | SUBSTANTIVE CONSOLIDATION | 46 |
| K. | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 47 |
| L. | SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS | 48 |
| M. | RETENTION OF JURISDICTION | 57 |
| N. | MISCELLANEOUS PROVISIONS | 58 |
| V. | THE SOLICITATION; VOTING PROCEDURES | 60 |
| A. | THE SOLICITATION PACKAGE | 61 |
| B. | VOTING INSTRUCTIONS | 61 |
| C. | VOTING TABULATION | 63 |
| VI. | CONFIRMATION PROCEDURES | 65 |
| A. | THE CONFIRMATION HEARING | 65 |
| B. | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | 66 |
| C. | IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION | 71 |
| D. | DISCLAIMER | 71 |
| VII. | PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE PLAN | 72 |
| A. | GENERAL | 72 |
| B. | CERTAIN BANKRUPTCY LAW CONSIDERATIONS | 72 |
| C. | FACTORS AFFECTING THE POTENTIAL RECOVERIES OF HOLDERS OF CLAIMS IN VOTING CLASSES | 74 |
| D. | THE DEBTORS MAY BE UNABLE TO CLOSE THE SALE TRANSACTION | 75 |

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| E. | THE BANKRUPTCY COURT MAY DECLINE TO MODIFY THE DEBTORS' COLLECTIVE BARGAINING AGREEMENTS | 75 |
| F. | THE BANKRUPTCY COURT MAY PERMIT REJECTION OF THE DEBTORS' COLLECTIVE BARGAINING AGREEMENTS WHICH MAY PERMIT THE UNIONS TO STRIKE | 75 |
| G. | FINANCIAL INFORMATION; DISCLAIMER | 75 |
| H. | FACTORS AFFECTING THE DEBTORS | 76 |
| I. | CERTAIN TAX MATTERS | 76 |
| J. | RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE | 77 |
| K. | LIQUIDATION UNDER CHAPTER 7 | 77 |
| VIII. | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES | 77 |
| A. | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS | 79 |
| B. | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO DEBTORS | 81 |
| IX. | CONCLUSION AND RECOMMENDATION | 81 |

## **EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | – | The Joint Plan of Greenbrier Hotel Corporation and Its Related Debtors Under Chapter 11 of the Bankruptcy Code |
| Exhibit B | – | Bidding Procedures Order |
| Exhibit C | – | Liquidation Analysis |
| Exhibit D | – | Letter from Debtors |
| Exhibit E | – | Marriott Purchase Agreement |

## I.      INTRODUCTION

The Debtors submit this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to Holders of Claims and Equity Interests[1] in connection with: (i) the solicitation of votes to accept or reject the *Joint Plan of Greenbrier Hotel Corporation and Its Related Debtors Under Chapter 11 of the Bankruptcy Code*, dated April 17, 2009, as the same may be amended from time to time (the "Plan"), which was filed by the Debtors with the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court") on April 17, 2009, and (ii) the Confirmation Hearing, which is scheduled for June 17, 2009, commencing at 11:30 a.m., Eastern Time  (the "Confirmation Hearing").[2] A copy of the Plan is attached hereto as <u>Exhibit A</u>.

**THE BOARD OF DIRECTORS OF EACH DEBTOR (COLLECTIVELY THE "BOARD") RECOMMENDS THAT ALL CREDITORS ENTITLED TO VOTE SUBMIT A TIMELY BALLOT VOTING TO ACCEPT THE PLAN.  THE BOARD HAS APPROVED THE FILING AND SOLICITATION OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.  THE BOARD BELIEVES THAT THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN BECAUSE: (I) IT PROVIDES FOR A LARGER DISTRIBUTION TO HOLDERS OF ALLOWED CLAIMS THAN WOULD OTHERWISE RESULT FROM A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE; AND (II) IT PROVIDES FOR NO DISTRIBUTION TO BE MADE TO EQUITY HOLDERS ON ACCOUNT OF SUCH EQUITY INTERESTS AND CANCELS SUCH EQUITY INTERESTS UPON THE CLOSING OF THE CHAPTER 11 CASES.  IN ADDITION, ANY ALTERNATIVE OTHER THAN CONFIRMATION OF THE PLAN COULD RESULT IN EXTENSIVE DELAYS AND INCREASED ADMINISTRATIVE EXPENSES RESULTING IN SMALLER DISTRIBUTIONS TO THE HOLDERS OF ALLOWED CLAIMS.  ATTACHED HERETO AS <u>EXHIBIT D</u> IS A LETTER FROM THE DEBTORS RECOMMENDING THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE ON THE PLAN, TIMELY SUBMIT BALLOTS TO ACCEPT THE PLAN.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED.  HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE**

---

[1]  As set forth in this Disclosure Statement, and pursuant to the Disclosure Statement Order (as hereinafter defined), only the Core Group (as hereinafter defined), all parties in interest on the 2002 List as of the Voting Record Date and all Holders of Claims in Classes 3, 4, and 5 who are entitled to vote on the Plan will receive this Disclosure Statement.  All other Holders of Claims and Equity Interests will receive a notice of the Disclosure Statement, which will provide details on how to procure copies of this Disclosure Statement.

[2] Unless otherwise defined herein, all capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

TERMS OF THE PLAN, INCLUDING, BUT NOT LIMITED TO, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THE CONTENTS OF THIS DISCLOSURE STATEMENT MAY NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, HOLDERS SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

SEE SECTION VII OF THIS DISCLOSURE STATEMENT ENTITLED "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE PLAN" FOR A DISCUSSION OF VARIOUS FACTORS TO BE CONSIDERED IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  CLAIM HOLDERS SHOULD NOT RELY UPON ANY INFORMATION, REPRESENTATIONS OR OTHER INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, NO SUCH FINANCIAL INFORMATION HAS BEEN AUDITED.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS AND CERTAIN FINANCIAL INFORMATION.  THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR

**AND ACCURATE; HOWEVER, YOU SHOULD READ THE PLAN IN ITS ENTIRETY. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION TO BE INCORPORATED HEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES; *PROVIDED*, *HOWEVER*, THE TERMS OF THE PURCHASE AGREEMENT BETWEEN THE DEBTORS AND A PURCHASER SHALL GOVERN IN THE EVENT OF ANY INCONSISTENCY BETWEEN IT AND THE PLAN.**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF INFORMING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN OR TO OBJECT TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

## A.    PURPOSE AND EFFECT OF THE PLAN

The primary purpose of the Plan is to provide for the sale of substantially all of the Debtors' assets to Marriott, its permitted assignee, or a third party who submits an offer that is higher and/or better than the terms of the Marriott Purchase Agreement. Pursuant to the Bidding Procedures Order, as defined and more fully set forth in Section III below, and also attached hereto as Exhibit B, the Debtors continue an active sale and marketing process designed to generate bidding for an auction of the Debtors' assets. As provided in the Bidding Procedures Order, the Debtors, in consultation with CSX Corporation ("CSX"), will consider all proposals to acquire substantially all of the Debtors' assets. It is possible that Marriott or its permitted assignee will not be selected as the Winning Bidder at the auction. In the case of any such transaction resulting from such auction any distributions paid pursuant to the Plan will be the same or greater than the distribution contemplated from the transaction with Marriott or its permitted assignee, unless the recipient of such distribution has agreed otherwise.

Upon and after the Effective Date, the Plan provides for a distribution of Cash to Holders of Allowed Claims entitled to distributions under the Plan. Under the Plan, CSX agrees that certain distributions to which it would be entitled on account of the CSX Unsecured Claims will be paid over first to Holders of Allowed Class 3 Claims, until such Holders of Allowed Class 3 Claims are paid in full in Cash without interest, and second to Holders of Allowed Class 5 Claims, until such Holders of Allowed Class 5 Claims are paid in full in Cash without interest. However, CSX has not guaranteed the payment of Allowed Class 3 Claims or Allowed Class 5 Claims in full in Cash.

B.    **OVERVIEW OF CHAPTER 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A plan may, as in this case, contemplate a liquidation of a debtor's assets.  The Bankruptcy Court's confirmation of a plan binds the debtor, any Person acquiring property under the plan, any Creditor or Equity Interest Holder of a debtor, and any other Person or Entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of such debt in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

C.    **SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

The following chart summarizes distributions to Holders of Allowed Claims and Allowed Equity Interests under the Plan.[3]  The recoveries set forth below are projected recoveries and may change based upon changes in Allowed Claims and proceeds available.

---

[3]  This chart is only a summary of the classification and treatment of Allowed Claims and Equity Interests under the Plan.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Equity Interests.

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Estimated Aggregated Amount of Allowed Claims or Equity Interests[4] | Estimated Percentage Recovery of Allowed Claims or Equity Interests without CSX Distribution[5] | Estimated Percentage Recovery of Allowed Claims or Equity Interests with CSX Distribution |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | TBD | 100% | 100% |
| 2 | Secured Claims | Unimpaired | $0.00 | 100% | 100% |
| 3 | Trade Claims | Impaired | $1.8 Million | 93.5% | 1.75% |
| 4 | CSX Unsecured Claims | Impaired | $94.5 Million | 0% | 1.75% |
| 5 | General Unsecured Claims[6] | Impaired | $1.0 Million | 1.75% | 1.75% |
| 6 | Equity Interests | Impaired | N/A | 0% | 0% |

## D.   PARTIES ENTITLED TO VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Holders of Claims not impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan. Holders of Impaired Claims or Equity Interests receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Secured Claims | Unimpaired | Deemed to Accept |

---

[4] Amounts set forth below are estimates only. The Allowance of Claims may be subject to litigation, and actual Allowed Claim amounts may differ from these estimated amounts.

[5] Under the Plan, CSX has agreed that certain distributions to which it would be entitled on account of the CSX Unsecured Claims will be paid over by the Plan Administrator first to the Holders of Allowed Class 3 Claims, until such Claims are paid in full in Cash, without interest, and then to Holders of Allowed Class 5 Claims, until such Claims are paid in full in Cash, without interest, as further described below.

[6] The estimated recovery set forth herein assumes that there are no insurance proceeds available to any Holders of Allowed Class 5 Claims. The Plan does not alter the ability of a Holder of an Allowed Class 5 Claim to recover under applicable insurance policies. However, no Holder of an Allowed Class 5 Claim will be permitted to recover more than the Allowed amount of its General Unsecured Claim.

| 3 | Trade Claims | Impaired | Entitled to Vote |
| 4 | CSX Unsecured Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests | Impaired | Deemed to Reject |

**E.      SOLICITATION PACKAGE**

The following materials constitute the Solicitation Package:

- the notice of the Confirmation Hearing;

- the appropriate Ballot(s) and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope;

- the Disclosure Statement with all exhibits, including the Plan, the Bidding Procedures Order and any other supplements or amendments to these documents which may be filed with the Bankruptcy Court;

- a letter to the Holders in each of the Voting Classes urging them to vote to accept the Plan (the form of which is attached hereto as <u>Exhibit D</u>); and

- the Disclosure Statement Order, which, among other things, (a) approves this Disclosure Statement as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code, (b) fixes a voting record date, (c) approves solicitation and voting procedures with respect to the Plan, (d) approves the form of the Solicitation Package and the notices to be distributed with respect thereto, and (e) schedules certain dates in connection therewith.

The above are collectively referred to as the "Solicitation Package".

The Core Group[7], all parties in interest who have appeared in the Chapter 11 Cases (the "2002 List") as of the Voting Record Date (as hereinafter defined) and all parties entitled to vote to accept or reject the Plan shall be served either paper copies or a CD-ROM containing the Disclosure Statement Order, the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan.  Any party who is served a CD-ROM but desires a paper copy of these documents may request a copy from the Debtors' Voting Agent by writing to Greenbrier Claims Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245 or calling (866) 381-9100.  The Solicitation Package (except the Ballots) can also be obtained by any party by accessing the Voting Agent's website at http://www.kccllc.net/greenbrier.  Moreover, all parties entitled to vote to accept or reject the Plan shall receive a Solicitation Package containing paper copies of the notice of the Confirmation Hearing, an appropriate Ballot, and the Solicitation Procedures (which shall be an exhibit to the order approving this Disclosure Statement)..

---

[7] "Core Group" has the meaning set forth in the Order Pursuant to Bankruptcy Code Sections 102 and 105(a), Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management, and Administrative Procedures approved by this Court on March 20 2009, [Docket No.  44].

6

The Plan Supplement will be filed by the Debtors on or before June 8, 2009.  When filed, the Plan Supplement shall be made available on the Voting Agent's website at http://www.kccllc.net/greenbrier.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement.  However, parties may request a copy of the Plan Supplement from the Debtors' Voting Agent by writing to Greenbrier Claims Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245 or calling (866) 381-9100.

F.      **VOTING INSTRUCTIONS**

Only the Holders of Allowed Claims in Classes 3, 4, and 5 Claims as of May [XX], 2009] (the "Voting Record Date") are entitled to vote to accept or reject the Plan, and they may do so by completing the Ballot and returning it in the envelope provided to the Voting Agent by the Voting Deadline.  Voting Instructions are attached to each Ballot.

The Debtors, with the approval of the Bankruptcy Court, have engaged Kurtzman Carson Consultants LLC ("KCC") 2335 Alaska Avenue, El Segundo, CA 90245, as the Claims and noticing agent and as the voting agent (the "Voting Agent") to assist in the solicitation process. The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.  The Voting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") as soon as practicable before the Confirmation Hearing.

The deadline to vote on the Plan is 4:00 p.m., Eastern Time, **June 11, 2009.**

---

BALLOTS

**Ballots must be actually received by the Voting Agent by the Voting Deadline by using the envelope provided, or by First Class Mail, Overnight Courier or Personal Delivery to:**

**Greenbrier Balloting Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245**

**If you have any questions on the procedures for voting on the Plan, please call the Voting Agent at the following telephone number: (866) 381-9100.**

---

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS OR EQUITY INTERESTS WITHIN A PARTICULAR PLAN CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT ITS VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASSES 3, 4, AND 5 WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES.  IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

**G.    THE CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for June 17, 2009, at 11:30 a.m., Eastern Time, (the "Confirmation Hearing Date") before the Honorable Kevin R. Huennekens, United States Bankruptcy Judge in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, Richmond, VA, 23219. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors, and certain other parties, on or before 4:00 p.m., Eastern Time, June 5, 2009 in accordance with the Disclosure Statement Order that accompanies this Disclosure Statement.  THE BANKRUPTCY COURT WILL NOT CONSIDER OBJECTIONS TO CONFIRMATION UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

The Debtors will publish the notice of the Confirmation Hearing, which will contain, among other things, the Confirmation Hearing Date and time, the Voting Record Date, the Voting Deadline, and the Plan Objection Deadline, in the *Charleston Gazette* and the *Charleston Daily Mail* in order to provide notification to those persons who may not receive notice by mail.

**H.    CONFIRMING AND CONSUMMATING THE PLAN**

It shall be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order.  In addition, certain other conditions contained in the Plan shall have been satisfied or waived pursuant to the provisions of Article XII of the Plan.

Following Confirmation, the Plan will be consummated on the Effective Date.

For further information, see Section IV hereof—"SUMMARY OF THE JOINT PLAN—Conditions Precedent to Confirmation and Consummation of the Plan."

## II.    BACKGROUND

### A.    OVERVIEW OF THE DEBTORS' BUSINESS

Greenbrier Hotel Corporation, its debtor-subsidiaries and its direct debtor corporate parent The Greenbrier Resort and Club Management Company (collectively the "Company"), own and operate The Greenbrier, an iconic four-star, AAA Five-Diamond resort located in White Sulphur Springs, West Virginia.  Originally founded in 1778, The Greenbrier is a national historic landmark and has long been known as one of the world's leading luxury resorts, hosting 26 U.S. presidents, various foreign dignitaries, and countless political and business leaders.

The Company offers more than five hundred hotel rooms and suites, as well as over two hundred rooms located in guest and estate house accommodations.  In addition, the Company offers extensive conference and meeting facilities, three championship golf courses, a 300-seat movie theatre, an eight-lane bowling alley, indoor and outdoor tennis courts, an award-winning 40,000 square-foot spa, an executive health and wellness clinic, and a wide variety of retail and dining options.

The Company maintains a web site – www.greenbrier.com – for, among other things, online hotel reservations, information about the Company, and customer service, as well as a reservations call center – (800) 453-4858 – for hotel and amenity reservations and for customer service.

In addition to the operation of The Greenbrier, certain of the Debtors are also involved in real estate development projects on property in close proximity to The Greenbrier estate.  For example, GHC owns an 80% interest in GSCDC, a non-debtor Delaware limited liability company.  GSCDC has developed a membership club, club facilities, amenities, and luxury residential neighborhoods on and near The Greenbrier estate known generally as "The Greenbrier Sporting Club."  As of the Petition Date, GSCDC owned approximately 126 unsold lots slated for residential development as part of The Greenbrier Sporting Club.  In addition, another Debtor herein—OWDC—owns certain real estate related to other residential developments on The Greenbrier estate.

The Company also houses the former United States Government Relocation Facility, which provided an emergency relocation center for the U.S. Congress to meet outside of Washington, D.C. in a secret underground bunker at The Greenbrier.  Originally constructed during the late 1950s, the U.S. government terminated its lease for the facility after *The Washington Post* reported on the location in a 1992 article.  Today, the Company offers tours of the underground facility, including the room where Congress was to convene in the event of an emergency.[8]

---

[8]    CSX IP, LLC leases certain space from GHC, including space in the bunker, and uses a portion of it to provide data storage services to various customers.  GHC owned CSX IP, LLC until early 2009, when it sold its

Approximately 39% of the Company's 2006 revenues were generated from the rental of rooms.  Approximately 31% of the Company's 2006 revenues were generated from sales of food and beverages throughout the Company's various facilities.  An additional 14% of the Company's revenues were generated through the use of the recreational facilities available at The Greenbrier, while 11% of the remaining revenues were generated from the retail establishments that are present at The Greenbrier.

The Company's restructuring goals have been to improve revenue, restructure Company management, reduce costs, and explore the sale of the Company to a potential purchaser.  Prior to the Petition Date, the Company undertook numerous initiatives to meet these goals.  The Company began to institute programs to increase room sales, cross-sell services, market room upgrades, and properly align room rates with the accommodations offered.  Likewise, the Company reduced its management and salaried workforce through attrition, job elimination, and lay-offs.  The Company negotiated extensively with its Unions in an effort to further reduce labor costs, but was unable to reach any material concessions prior to the Petition Date.  Prior to the Petition Date, Goldman Sachs conducted a strategic review of the Company's business and commenced marketing the Company's assets to potential purchasers.

## B.    THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

### 1.    CORPORATE STRUCTURE

GHC is the direct parent company of:  Greenbrier IA, Greenbrier G&T, OWCC, and OWDC.  GRCMC is the direct parent of GHC.  GRCMC is a wholly owned subsidiary of CSX Corporation, a publicly traded corporation that is not a debtor herein.  CSX's indirect ownership of The Greenbrier dates back nearly 100 years to 1910.

### 2.    ASSETS OF EACH DEBTOR

The Debtors' assets consist of the following:  GRCMC owns 100% of the Equity Interests of GHC and is party to certain Executory Contracts and/or Unexpired Leases.  GHC's primary assets are The Greenbrier, the personal property used in the operation of The Greenbrier, and the real property on which The Greenbrier is situated. GHC also owns 100% of the equity of each of the other Debtors, except GRCMC, and 80% of the equity of non-debtor GSCDC.  GHC is also party to numerous Executory Contracts and/or Unexpired Leases. Greenbrier IA owns certain trademarks and other intellectual property used in the operation of The Greenbrier.  Greenbrier IA also owns certain licenses and is party to certain Executory Contracts and/or Unexpired Leases.  Greenbrier G&T is the owner of certain retail business licenses, as well as being party to certain Executory Contracts and Unexpired Leases.  OWCC is the owner of certain retail business licenses, including certain liquor licenses, and is also party to certain Executory Contracts and/or Unexpired Leases.  OWDC owns certain real property and certain business licenses.  OWDC is also party to certain Executory Contracts and/or Unexpired Leases.

---

interest therein to a subsidiary of CSX, that is not a debtor in this proceeding, for the sum of $3.8 million, after CSX IP, LLC made a dividend payment of approximately $1.5 million to GHC.

### 3.    SUMMARY OF PREPETITION CAPITAL STRUCTURE

Prior to the Petition Date, the Company was not party to any bank credit facility or other traditional financing arrangement.  Rather, the Company funded its operations through Cash generated from business operations, and, as necessary, through an intercompany loan arrangement with CSX established under a Cash and Exposure Management Plan (the "Cash Management Plan"), which was adopted by resolution of CSX's board of directors on October 14, 1987.

Under the Cash Management Plan, the Company and certain other CSX subsidiaries were authorized to borrow necessary funds on an unsecured basis from CSX through a Cash pool account established exclusively for such intercompany borrowings (the "Cash Pool Account"). In the event one of the Debtors required access to funds beyond the Cash on hand, that Debtor would submit a request for an advance from the Cash Pool Account, and CSX would initiate a transfer from the Cash Pool Account to that Debtor and would simultaneously record an intercompany loan receivable due from that Debtor.  Likewise, if a Debtor generated Cash beyond its operating needs for any particular period, the Debtor would transfer such additional funds into the Cash Pool Account and reduce its intercompany accounts payable to CSX by the amount of that transfer.  Through this structure, the Company was able to access capital on favorable terms and without the need to provide collateral to secure advances.

As of the Petition Date, the Company net account payable outstanding to CSX from the Company through the Cash Pool Account totaled approximately $91 million (the "CSX Payable").  The CSX Payable is not secured by liens or security interests in or on any assets of the Debtors.  After the Petition Date, the Company no longer had access to funds through the Cash Pool Account.

Prior to the Petition Date, to provide further access to liquidity, GHC and CSX Business Management, Inc. ("Business Management") were parties to that certain Receivables Purchase Agreement dated as of June 15, 1992 (the "RPA").  Under the RPA, Business Management agreed to purchase certain accounts receivable arising from the operation of The Greenbrier, and to receive certain yields and fees in connection therewith.  The RPA was terminated by the parties as of December 26, 2008, and all amounts due thereunder have been deemed satisfied by Business Management thereunder.

The Company also purchases certain goods and services on credit in the ordinary course of business from various suppliers and vendors in order to operate the Company.  As of the Petition Date, the Debtors were generally current with suppliers and vendors, and the Debtors estimate that their aggregate unsecured, prepetition Trade Claims do not exceed $2 million.

## III.    CHAPTER 11 CASES

## A.    OVERVIEW — EVENTS LEADING TO THE CHAPTER 11 CASES

For decades, The Greenbrier remained a popular destination resort and a profitable business for CSX.  While The Greenbrier was never a core component of the overall business of CSX (primarily rail and intermodal transportation currently), CSX retained ownership of The

Greenbrier given its historical positive earnings and its legacy within the CSX corporate structure.

In the last several years prior to the Petition Date, however, the Debtors have suffered substantial operating losses. In the last five years alone, the Debtors incurred aggregate Cash and operating losses in excess of $90 million. These substantial losses were largely attributable to three factors: (i) extraordinary and above-market labor costs, (ii) an overall decline in the luxury resort market due to broader economic trends, and (iii) increased capital expenditures necessary to maintain The Greenbrier's status as a world-class luxury resort.

First, the Debtors were unable to substantially reduce labor costs prior to the Petition Date because a significant number of the Debtors' employees are subject to Collective Bargaining Agreements and no agreement with the Unions could be reached on reducing such labor costs. In 2008, expenditures for wages and benefits exceeded 72% of all revenues generated by Debtors. The industry standard for expenditures for wages and benefits is approximately 35% to 40% of revenue.

Second, there has been a drastic decline in the luxury resort market due to the broader economic recession. The credit and financial crisis that has caused the current global recession has struck the luxury resort and hotel market particularly hard. Discretionary spending for goods and services such as those provided by the Debtors has fallen precipitously. This economic downturn has resulted in a significant reduction in the number of large corporate and group events that have come to The Greenbrier, thus depriving The Greenbrier of a significant source of operating revenues. Largely as a result of these trends, as well as uncertainty perceived by various groups of guests about the Debtors' labor negotiations with the Unions, the Debtors' annual revenues fell in 2008 by more than twenty-five percent (25%) from their 2007 levels, and are projected to continue falling through 2009.

Finally, the Company, in 2006 and 2007, undertook substantial renovations of The Greenbrier's hotel accommodations, facilities, and infrastructure. While these efforts were essential to maintain the status of The Greenbrier as a world-class resort, they proved untimely given the unforeseen credit and financial crisis commencing almost immediately after completion of these renovations. Given this ensuing decline in business, the Debtors have been unable to recoup the costs of these capital expenditures.

As a result of these factors, and several others, the Company endured negative EBITDA each of the four years leading up to the bankruptcy filing: -$7,422,000 in 2005; -$6,284,000 in 2006; -$6,722,000 in 2007; and -$18,721,000 in 2008. Furthermore, because the Debtors were forced to borrow through the Cash Pool Account to fund operating costs and capital expenditures, the Debtors largely exhausted their ability to borrow further by vastly increasing the amount of the CSX Payable to the point that CSX could no longer justify further continuation of the Debtors' access to the Cash Pool Account, particularly in light of the Debtors' increasing operating losses.

The steady deterioration of their liquidity position forced the Debtors to seek chapter 11 protection as they restructured their operations and their balance sheet, in an effort to return to profitability. On March 19, 2009, each of the Debtors filed a voluntary petition for relief under

12

the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1008 of the Bankruptcy Code.

**B.**     **ADMINISTRATION OF THE CHAPTER 11 CASES**

During the initial stages of the Chapter 11 Cases, the Debtors devoted substantial efforts to stabilizing their operations and restoring their relationship with guests, vendors, customers, employees and utilities that had been impacted by the commencement of the Chapter 11 Cases. The Bankruptcy Court also granted the Debtors' request to be treated as small business debtors as such term is defined in 11 U.S.C. § 101(51).  In connection with the Bankruptcy Court's determination that the Debtors should be treated as small business debtors, the Bankruptcy Court also found that no statutory committee should be appointed in these cases.  Each of the Debtors remains a small business debtor.

**1.**     **FIRST DAY ORDERS**

Shortly after the Petition Date, the Bankruptcy Court entered several orders authorizing the Debtors to pay certain prepetition Claims and continue certain prepetition programs.  These orders were designed to ease the strain on the Debtors' relationships with guests, employees, vendors, customers, and taxing authorities as a consequence of the commencement of the Chapter 11 Cases and to provide for an orderly transition into chapter 11.  The Bankruptcy Court entered orders authorizing the Debtors to, among other things, continue certain guest programs, pay substantially all of the Debtors' prepetition wages and certain benefits to employees, pay certain prepetition taxes and government charges, honor group deposits, and pay prepetition premiums necessary to maintain insurance coverage.

**2.**     **FINANCING**

On March 20, 2009, the Bankruptcy Court entered an order approving the DIP Facility with CSX Corporation, as DIP Lender, on an interim basis (the "Interim DIP Order").  The Interim DIP Order provided availability of up to $4,000,000 of debtor in possession financing to the Debtors.  After the final hearing to approve the DIP Facility, the Court entered, on April 10, 2009, the Final DIP Order, which provided $19,000,000 of availability in debtor in possession financing to the Debtors.  The amounts outstanding under the DIP Facility constitute super-priority Administrative Claims in the Chapter 11 Cases, and are also secured by liens on essentially all of the Debtors' assets, all in accordance with the Interim Order, the Final Order and the DIP Loan Credit Agreement.

The Final DIP Order established May 15, 2009 as the deadline for any party to challenge the validity, priority or amount of the CSX Payable in the approximate amount of $91 million, as further explained in the Final DIP Order.

The proceeds of the DIP Facility have been used to fund the ongoing Cash requirements of the Debtors during the Chapter 11 Cases.  Throughout the Chapter 11 Cases, the Debtors have worked diligently to ensure that the estates have sufficient liquidity to operate while they continued to evaluate their restructuring and transaction alternatives.

The DIP Facility contains numerous milestones that the Debtors must achieve in order to be able to continue to borrow under the DIP Facility. The DIP Lender required the milestones in order to provide for an expeditious resolution of these Chapter 11 Cases, while limiting the DIP Lender's exposure. If the Debtors fail to meet one or more of the milestones, the Debtors cannot borrow under the DIP Facility, and the DIP Lender can declare a default and accelerate the maturity of the loan. The milestones in the DIP Facility include, but are not limited to (i) the Bidding Procedures Order shall have been entered by April 13, 2009; (ii) the Debtors' pre-petition Collective Bargaining Agreements with the Unions shall have been rejected by June 1, 2009; (iii) an order approving a Sale Transaction shall have been entered by June 19, 2009; and (iv) a Sale Transaction shall have been consummated by June 30, 2009.

The DIP Facility maturity date, absent acceleration, is June 30, 2009.

### 3.   RETENTION AND SEVERANCE PROGRAMS

Prior to the Petition Date, the Company had entered into retention and severance agreements with numerous non-insider employees of the Company (the "Non-Insider Severance and Retention Program"). On April 10, 2009, the Bankruptcy Court entered an order authorizing but not directing the Debtors to make payments under the Non-Insider Severance and Retention Program as administrative expenses of the Debtors' bankruptcy estates to ensure that certain key employees would continue to provide essential services during the Chapter 11 Cases.

### 4.   EMPLOYMENT AND COMPENSATION OF PROFESSIONALS

To assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors employed, with authorization from the Bankruptcy Court, the following professionals: (a) McGuireWoods LLP, as counsel for the Debtors; (b) Protiviti, Inc., as financial advisors to the Debtors ("Protiviti"); (c) Dinsmore & Shohl LLP, as special labor counsel to the Debtors; (d) Huddleston Bolen LLP, as special corporate counsel to the Debtors; and (e) other professionals utilized by the Debtors in the ordinary course. The Bankruptcy Court entered orders approving the retention of each of the Retained Professionals.

## C.   THE 1113 MOTION

### 1.   THE UNIONS

GHC employs in excess of 1,000 individuals,[9] with approximately 900 of these employees being members of labor unions. GHC and each of the Unions[10] are party to

---

[9] Approximately 492 of these employees are currently on furlough as a result of a January 2009 reduction in workforce.

[10] The Unions are the Communication Workers of America (CWA), Hotel and Restaurant Employees AFL-CIO Local Union 863, International Brotherhood of Electrical Workers Local Union 466, Maintenance Workers Local Union 1182, The International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada AFL-CIO, The International Union of Painters and Allied Trades District Council 53 Local Union 891, The Mid-Atlantic Regional Council of Carpenters Local Union 1911, The Security Union and The United Association of Journeymen, Plumbers and Pipefitters and Apprentices Local 625. Each of these Unions have a separate collective bargaining agreement with GHC. The Greenbrier Council of Labor Unions ("GCLU"),

Collective Bargaining Agreements which contain, among other things, the terms of the wages and benefits that GHC pays its unionized employees.  The Collective Bargaining Agreements between GHC and the Unions were entered into in January of 2003.  The Collective Bargaining Agreements were set to expire on January 31, 2008.  However, prior to the Collective Bargaining Agreements' expiration, the Unions and GHC agreed to extend the Collective Bargaining Agreements until February 28, 2008 in the hope of reaching new agreements.   However, no new agreements were reached.  From February 29 to June 20, 2008, the Collective Bargaining Agreements were not in force.  On June 20, 2008, the Unions and GHC agreed to extend the terms of the Collective Bargaining Agreements through January 4, 2009.  As January 4, 2009, approached, the Unions and GHC agreed to an extension of the Collective Bargaining Agreements through January 4, 2010, their current expiration date.

In the 17 months prior to the Petition Date, GHC was actively negotiating with the Unions in an effort to obtain concessions in regard to the benefits that GHC was required to provide pursuant to the Collective Bargaining Agreements.  Likewise, GHC has continued to negotiate with the Unions after the Petition Date.  However, no agreement on reductions in benefits has been reached with the Unions, other than the Security Union, by the date of this Disclosure Statement.

### 2.     THE FINANCIAL BURDENS OF THE COLLECTIVE BARGAINING AGREEMENTS

The costs of the benefits provided to employees pursuant to the Collective Bargaining Agreements are far above market levels, as compared to the costs of such benefits at both comparable jobs at other businesses in the geographic region in which GHC operates and comparable jobs at other luxury resorts in the United States.  GHC's labor costs consumed approximately 73% of revenue in 2008, 60% of revenue in 2007, and 59% of revenue in 2006. In 2006, the industry standard for employee wages and benefits at comparable properties was approximately 35% to 40% of revenue.  The annual benefit costs for GHC have increased by 50%, from $15.7 million in 2002 to $23.5 million in 2006.  Moreover, during the time in which the Collective Bargaining Agreements have been in place, the Debtors have operated at an overall loss of over $90 million.  The Debtors simply cannot continue to sustain such losses. Based on the results of their marketing efforts, the Debtors believe that no Purchaser would purchase the Debtors' business without relief from the Collective Bargaining Agreements being obtained.

### 3.     THE 1113 MOTION

As part of their restructuring goals, discussed further below, GHC sought to negotiate with the Unions for seventeen months prior to the Petition Date in an effort to bring the Debtors' labor costs closer to market levels.  However, after more than 40 meetings with the Unions' negotiating body and numerous meetings with individual Unions, no agreement on new terms to the Collective Bargaining Agreements could be reached.  During the time in which the Debtors

---

consisting of the eight Unions, negotiated a 2003 Master Agreement with GHC.  The Security Union withdrew from the GCLU on or about April 8, 2009 before The Security Union negotiated its recent 2009 agreement with GHC.

were negotiating with the Unions, they also sought to institute their other restructuring goals, including the sale of the Debtors' business.

An additional aspect of the Debtors' restructuring goals, discussed further below, calls for the sale of the Debtors' operations as a going concern. It became evident, after consultation with the Debtors' advisors, that the Debtors' operations could not be sold without termination of, or significant modifications being made to, the Collective Bargaining Agreements to bring labor costs in line with market labor costs. Due to the unwillingness of any potential acquirer to purchase the Debtors' business as a going concern without relief from the onerous terms of the Collective Bargaining Agreements, it is a closing condition of the Marriott Purchase Agreement that GHC enter into Replacement Collective Bargaining Agreements acceptable to Marriott. It is expected that any other interested party that submits a Qualified Bid for the Purchased Assets would require Replacement Collective Bargaining Agreements to be in place or, perhaps, the rejection of the Collective Bargaining Agreements prior to consummating a Sale Transaction. It is also a condition of the DIP Facility that either A) Replacement Collective Bargaining Agreements acceptable to Marriott be entered into, or B) the Collective Bargaining Agreements be rejected by GHC, with the approval of the Bankruptcy Court, by June 1, 2009.

Due to these conditions and the Debtors' restructuring goals, GHC sought to negotiate Replacement Collective Bargaining Agreements with the Unions both prior to and after the Petition Date. However, GHC was only able to enter into one Replacement Collective Bargaining Agreement with one Union, the Security Union. Because GHC was not able to reach Replacement Collective Bargaining Agreements with each of the other Unions, the Debtors filed their motion for Rejection of Collective Bargaining Agreements Pursuant to Section 1113 of the Bankruptcy Code (the "1113 Motion") on April 9, 2009. The 1113 Motion provides for the rejection of the Collective Bargaining Agreements. As of the date of this filing, the 1113 Motion remains pending, and GHC continues to bargain for other Replacement Bargaining Agreements.

## D.    CLAIMS BAR DATE

By the order of the Bankruptcy Court dated March 20, 2009 (the "Bar Date Order"), and pursuant to Rule 3003(c)(3) of the Bankruptcy Rules, the Court set May 13, 2009 as the deadline by which proofs of Claim, including Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code, are required to be filed in these Chapter 11 Cases by Entities other than governmental units against the Debtors, and September 15, 2009 as the deadline for governmental units to file proofs of Claim (together the "Claims Bar Dates"). In accordance with the Bar Date Order, written notice of the applicable Claims Bar Dates was mailed to, among others, all Creditors listed on the Schedules and was published in the *Charleston Gazette* and the *Charleston Daily Mail*. A deadline by which administrative proofs of Claim are required to be filed with the Court has not been established as of the date of this Disclosure Statement. The Plan, if confirmed, provides that administrative proofs of Claim, other than Fee Claims, DIP Claims, and those based on liabilities incurred in the ordinary course of business, are required to be filed within 30 days after the Effective Date.

**E.      DEEMED SUBSTANTIVE CONSOLIDATION OF THE DEBTORS FOR PLAN PURPOSES ONLY**

The Plan provides for the substantive consolidation of the Debtors for purposes of classification, voting, and distribution only.  Substantive consolidation of affiliated Entities is an equitable remedy that involves the pooling of the assets and liabilities of the affected Entities so that such Entities are treated as if they were a single corporate and economic Entity for the stated purposes. Consequently, under the Plan, a Creditor of one of the Debtors will be treated as a Creditor of the substantively consolidated group of Debtors, and issues of individual corporate ownership of property and individual corporate liability on obligations are disregarded among the consolidated Entities for purposes of classification, voting, and distribution. While substantive consolidation in this manner will not affect the legal or organizational structure of the Debtors, such consolidation will cause the elimination and release of the Intercompany Claims, and may substantively affect the rights of Creditors.

The power to substantively consolidate the estates of affiliated debtors arises from the Bankruptcy Court's general equitable powers set forth in section 105 of the Bankruptcy Code. Among the factors considered by courts in determining the appropriateness of substantive consolidation are:  (i) whether there exists a substantial identity between the Entities to be consolidated; (ii) the necessity of substantive consolidation to avoid some harm or to achieve some benefit; (iii) whether Creditors dealt with the debtor Entities as a single economic unit and did not rely on their separate identities in extending credit; or (iv) whether the affairs of the debtors are so entangled that the consolidation will benefit all Creditors of the debtors estates. See United Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp., Inc.) 810 F.2d 270 (D.C. Cir. 1987).

Courts in this jurisdiction have also considered, among other factors, (i) the presence or absence of consolidated financial statements; (ii) the unity of interests and ownership between the various corporate Entities; (iii) the existence of inter-debtor guarantees on loans; (iv) the degree of difficulty in segregating and ascertaining individual assets and liabilities; and (v) the commingling of assets and business functions.  See In re Vecco Construction Industries, Inc., 4 B.R. 407 (Bankr. E.D. Va. 1980).

The Debtors believe that they satisfy the requirements for substantive consolidation because the Debtors have generally been dealt with as one economic unit and have been included in the consolidated financial statements of their corporate parent.  The benefits of such consolidation will also heavily outweigh any harm, and substantive consolidation will facilitate confirmation of the Plan and the similar and fair of treatment of Holders of Claims.  If the deemed substantive consolidation is not approved and, therefore, the Plan is not confirmed, the Debtors would need to commence the laborious process of crafting an alternative plan, or alternatively, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. The Debtors believe that either outcome will result in significant delays in and dilution of distributions to all Creditors.

## F.    THE MARKETING AND SALE PROCESS

Prior to seeking protection under the Bankruptcy Code, the Company had been marketing its business to potential purchasers in an attempt to meet its restructuring goals.  CSX retained Goldman Sachs in August of 2008 to aid in this marketing process.  After contacting numerous potential buyers, the Debtors—in consultation with CSX and their respective professionals—eventually negotiated an asset purchase agreement with Marriott.  After extensive good faith negotiations, substantially contemporaneous with the filing of these cases, the Debtors entered into the Marriott Purchase Agreement (a copy of which is attached hereto as Exhibit E) with Marriott that provides for Marriott or its permitted assignee to serve as "stalking horse bidder" in a sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code in connection with a chapter 11 plan.  On March 23, 2009, the Debtors filed a motion with the Bankruptcy Court seeking approval of their entry into the Marriott Purchase Agreement as well as the approval of certain sale and bidding procedures which procedures were approved by the Bankruptcy Court in the Bidding Procedures Order.  The motion seeking to approve the Bidding Procedures contemplated that a Sale Transaction would be approved in conjunction with confirmation of a chapter 11 plan.

### 1.    PRINCIPAL TERMS OF THE MARRIOTT PURCHASE AGREEMENT

Pursuant to the Marriott Purchase Agreement, the Debtors have agreed to sell substantially all of their assets, except certain Excluded Assets, to Marriott or its permitted assignee, subject to higher and/or better bids made by a Purchaser pursuant to the Bidding Procedures described in Section III.F.2. (Marriott Purchase Agreement §§ 2.01, 2.02).  A summary of the principal terms of the Marriott Purchase Agreement[11] is below.

Marriott has agreed, subject to certain adjustments provided for in the Marriott Purchase Agreement, to pay the Purchase Price or the Accelerated Payment to obtain the Purchased Assets.  The Purchase Price is defined as an amount equal to (a) five times the Average Net Operating Profit which Purchase Price, as adjusted pursuant to Section 2.03(f) of the Marriott Purchase Agreement, will be paid by Marriott or its permitted assignee to the Debtors no later than fifteen (15) days following the final determination of the Average Net Operating Profit in accordance with the provisions of Section 2.07 of the Marriott Purchase Agreement; provided, however, that in no event will the Purchase Price, prior to and without taking into account any adjustment thereto pursuant to Section 2.03(f) be less than $60,000,000 or more than $130,000,000; or (b) the Accelerated Payment (which shall be at least $60,00,000). (Marriott Purchase Agreement §§ 2.03, 2.07).  Marriott has also agreed to pay up to $50,000 in cure costs on account of assumed Executory Contracts and Unexpired Leases. (Marriott Purchase Agreement § 2.03(c)).

Marriott or its permitted assignee's payment of the Purchase Price will be secured by (i) a corporate guaranty from Marriott International, Inc. in favor of the Debtors in the amount of $60

---

[11] The summary is qualified in its entirety by reference to the provisions of the Marriott Purchase Agreement attached hereto as Exhibit E.  In the event of any inconsistencies between the provisions of the Marriott Purchase Agreement and the terms herein, the terms of the Marriott Purchase Agreement shall govern.  Defined terms used in this section but not previously defined in the Plan or this Disclosure Statement shall have the meanings ascribed them in the Marriott Purchase Agreement.

million, less the Deposit and certain other deductions, as applicable, and (ii) a perfected first priority security interest in, and lien on, the Purchased Assets (excluding the Membership Interests, except as and to the extent provided for in the Marriott Purchase Agreement), in the amount of $130 million. (Marriott Purchase Agreement § 2.03(e)). Marriott or its permitted assignee's obligation to repay amounts paid by Marriott International, Inc. on Marriott or its permitted assignee's behalf pursuant to the guaranty in favor of the Debtors for the Purchase Price will be secured by a second-priority lien in and on the Purchased Assets, (excluding the Membership Interests, except as and to the extent provided for in the Marriott Purchase Agreement). The liens in and on the Purchased Assets (and the Membership Interests as applicable) will be subject to an Intercreditor Agreement between GHC, as Collateral Agent for the Debtors, and Marriott International, Inc., as Junior Lender, in the form attached to the Marriott Purchase Agreement as Exhibit L. (Marriott Purchase Agreement, Exhibit L).

Under the terms of the Marriott Purchase Agreement, the Debtors are required to advance to Marriott or its permitted assignee the aggregate amount of $50 million (the "Seller Advances") to be funded over the two year period after the Closing of the Sale Transaction with Marriott or its permitted assignee to be used for Project Expenditures. (Marriott Purchase Agreement § 2.09(b)). Upon the confirmation of the Chapter 11 Plan and Closing of the Sale Transaction with Marriott or its permitted assignee, it is contemplated the Debtors will obtain Exit Loan #1 from the Exit Lender (an affiliate of CSX) to allow the Debtors to fund the Seller Advances. The Debtors will assign all right, title and interest in and to the Purchase Price, and the liens and guaranty securing it to the Exit Lender to secure their obligations under Exit Loan #1. A condition of extending Exit Loan #1 will be obtaining a release of CSX and its affiliates in the Chapter 11 Plan.

It is a condition to the parties' obligations to close under the Marriott Purchase Agreement that the Debtors enter into Replacement Collective Bargaining Agreements with the Unions (Marriott Purchase Agreement §§ 9.05, 10.10).

The Marriott Purchase Agreement further provides that certain representations and warranties of the Debtors and Marriott survive until the payment of the Purchase Price or the Accelerated Payment. The Debtors on the one hand and Marriott on the other have agreed to indemnify each other for breaches of certain of the representations and warranties contained in the Marriott Purchase Agreement and other specified matters.

There are certain conditions to the closing of the Sale Transaction with Marriott or its permitted assignee, including: (A) the Bankruptcy Court shall have entered the Sale Order, the Executory Contract Assumption and Assignment Order, the Bidding Procedures Order and the Confirmation Order, and such orders shall not have been rescinded, reversed, modified or stayed and the time period allowing for such action shall have expired (Marriott Purchase Agreement § 9.04); (B) Marriott shall have received the Survey and title insurance, none of which will have revealed a condition or conditions that could result in a Material Adverse Effect on the Debtors' business and Marriott shall have received the Phase II environmental report which shall not have revealed any condition or conditions the Remediation of which reasonably would be expected to cause Losses totaling, in the aggregate, more than Two Million Dollars ($2,000,000) (Marriott Purchase Agreement § 10.08); (C) the Debtors shall have delivered or caused to be delivered those items required pursuant to Section 10.09 of the Marriott Purchase Agreement (Marriott

19

Purchase Agreement § 10.09); (D) the Replacement Collective Bargaining Agreements with all of the Unions shall be in place as of the Closing of the Sale Transaction with Marriott or its permitted assignee, Marriott or its permitted assignee shall have agreed to assume such agreements as Assumed Contracts, and Marriott or its permitted assignee shall have agreed to comply with the requirements of the successorship provisions, if any, in the Replacement Collective Bargaining Agreements (Marriott Purchase Agreement § 10.10); (E) receipt of the GSCD Company Consent from the Current Member of GSCD Company, unless Marriott or its permitted assignee need not purchase the Membership Interests as a result of environmental conditions (Marriott Purchase Agreement § 10.11); (F) no Material Adverse Effect shall have occurred; and (G) other customary closing conditions.

The Marriott Purchase Agreement may be terminated at any time before the Closing of the Sale Transaction with Marriott or its permitted assignee, by mutual written consent of Marriott and Debtors. (Marriott Purchase Agreement § 11.01(a)(i)). The Marriott Purchase Agreement may be terminated by Marriott on the one hand, or Debtors on the other hand, (A) in the event of a Breach of the Marriott Purchase Agreement by the non-terminating party that remains uncured following fifteen (15) days notice from the terminating party of such Breach and that would result in the failure of any condition to the terminating party's obligations under the Marriott Purchase Agreement being satisfied or (B) if the satisfaction of any condition to such party's obligations under the Marriott Purchase Agreement has failed or becomes impossible or impracticable with the use of commercially reasonable efforts and the failure of such condition to be satisfied is not the result of a Breach by the terminating party. (Marriott Purchase Agreement § 11.01(a)(ii)). The Marriott Purchase Agreement may also be terminated at any time following the date that is ninety-two (92) days following the date of the Marriott Purchase Agreement, by either party if the transactions contemplated by the Marriott Purchase Agreement have not been consummated on or before such date (*i.e.,* June 18, 2009); provided, however, that the right to terminate the Marriott Purchase Agreement shall not be available to a party if such party is in Breach of Section 5.06 or Section 6.03 of the Marriott Purchase Agreement, as applicable; provided, further, however, that the Termination Date shall be automatically extended by a period of twenty-eight (28) days following the Termination Date (*i.e.,* July 16, 2009) if the conditions precedent set forth in Section 10.10 (regarding Replacement Collective Bargaining Agreements) and Section 10.11 (obtaining GSCD Company Consent) have been satisfied or waived as of the Termination Date. (Marriott Purchase Agreement § 11.01(a)(iii)).

**The Marriott Purchase Agreement was negotiated with Marriott specifically and contains provisions unique to Marriott that may not be available or appropriate for other parties.**

## 2.    BIDDING PROCEDURES

The Bidding Procedures are designed to ensure that the Debtors, their estates and their Creditors receive the highest and/or best value possible, in the context of these Chapter 11 Cases. The Bidding Procedures set forth a process whereby the Company, in consultation with CSX,

will continue to actively solicit competing proposals and will consider all proposals received, and the Bidding Procedures are summarized as follows:[12]

- Notice: The Debtors published the Sale Notice in the *Charleston Gazette* and the *Charleston Daily Mail*. The Debtors also served the Sale Notice and/or a copy of the Bidding Procedures Order with its exhibits on those parties denoted in the Bidding Procedures Order.

- Access to Diligence Materials: In order to participate in the auction process and obtain access to a virtual data room containing due diligence information and documents related to the Property, a party must (a) enter into a confidentiality agreement in form and substance reasonably acceptable to the Debtors and their counsel, and (b) provide (i) the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an Entity formed for the purpose of the Proposed Sale, Financials of the equity Holder(s) of the Potential Bidder, and (ii) such other form of disclosure evidencing the Potential Bidder's financial and non-financial ability to close the Sale, the sufficiency of which shall be determined by the Debtors in their reasonable discretion. Debtors or any of their respective representatives are not obligated to furnish any information to any person except a Qualified Bidder.

- Bids: To be eligible to participate in the Auction, each bidder must satisfy each of the following conditions: (a) the bid must be a written irrevocable offer from a Qualified Bidder containing written evidence of a commitment for financing or other evidence of an ability to consummate the Sale, subject to no conditions other than those set forth in the Marriott Purchase Agreement, in either event satisfactory to Debtors after consultation with CSX; (b) the bid must include evidence of authorization and approval from the Qualified Bidder's Board of Directors or comparable governing body indicating that the Qualified Bidder is duly authorized to perform the transactions in the bid and the Bidding Procedures; (c) the bid must be for the Property, or a portion thereof; (d) the bid must contain terms that are substantially the same or better than the terms of the Marriott Purchase Agreement with respect to the Property; (e) the bid must not request or entitle the bidder to any termination or break-up fee, expense reimbursement or similar type of payment (unless the Qualified Bidder is Marriott); (f) the bid must acknowledge and represent that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Property prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of the Property in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the

---

[12] The Bidding Procedures Order is attached hereto as Exhibit B. This summary refers to, and is qualified in its entirety by, the Bidding Procedures Order. The terms of the Bidding Procedures Order will govern in the event any inconsistency arises between this summary and Bidding Procedures Order. All capitalized terms used but not defined in this summary of the Bidding Procedures shall have the meanings ascribed to them in the Bidding Procedures Order.

Property, or the proposed transaction, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidding Procedures or the Marriott Purchase Agreement; (g) include a clean and blacklined version of an agreement for the purchase of the Property (the "Bidder Purchase Agreement") with (i) the clean version of the Bidder Purchase Agreement being a duly executed original signed by the Qualified Bidder and (ii) a blacklined version showing all proposed changes from the Marriott Purchase Agreement; (h) be accompanied by a deposit in the amount of $3,000,000; and (i) each bid must be received by the Debtors in writing on or before June 8, 2009 at 12:00 noon Eastern Time.

- Highest Bid Prior to Auction: No later than June 10, 2009, at 12:00 noon Eastern Time, the Debtors will notify all Qualified Bidders of the highest and best Qualified Bid and provide copies of all submitted bids to all Qualified Bidders.

- Auction: The Debtors will conduct an Auction on June 12, 2009 at 10:00 a.m. Eastern Time, if a Qualified Bid other than the Marriott Purchase Agreement is timely received.

- Selection of Winning Bidder: If another Qualified Bid is received and the Debtors conduct the Auction, the party who submits the highest and/or best bid at the Auction, to be determined in accordance with the Bidding Procedures Order, will be declared the Winning Bidder.  If no other Qualified Bid is received by June 8, 2009, the Debtors will not conduct the Auction and shall designate Marriott or its permitted assignee as the Winning Bidder.

- Bidding Protections: In certain instances, if a transaction is closed with a Third Party, certain fees and expenses as set forth in the Bidding Procedures Order and the Marriott Purchase Agreement may be paid to Marriott by the Debtors.

**3.    SALE PURSUANT TO PURCHASE AGREEMENT OTHER THAN THE MARRIOTT PURCHASE AGREEMENT**

**IN THE EVENT THAT A QUALIFIED BID OTHER THAN THE MARRIOTT BID SET FORTH IN THE MARRIOTT PURCHASE AGREEMENT IS SELECTED AS THE SUCCESSFUL BID, THE DEBTORS WILL NOT DISTRIBUTE A REVISED DISCLOSURE STATEMENT OR A REVISED PLAN OR SOLICIT ADDITIONAL VOTES ON THE PLAN.  BECAUSE THE DEBTORS WILL ONLY SELECT ANOTHER QUALIFIED BID AS THE SUCCESSFUL BID IF SUCH BID IS HIGHER AND/OR BETTER THAN MARRIOTT'S BID, ANY VOTE IN FAVOR OF THE PLAN WILL BE DEEMED TO BE A VOTE IN FAVOR OF THE PLAN AS BASED ON A BID THAT IS HIGHER AND/OR BETTER THAN MARRIOTT'S BID.**

The terms of the Marriott Purchase Agreement, including, without limitation, the Seller Advances component thereof and Exit Loan #1, were negotiated specifically with Marriott, and such terms are not necessarily available to other possible bidders.  The Debtors must rely on their ultimate parent company (a non-debtor herein) to arrange for the Exit Loans, which allow the

22

Debtors to provide the Seller Advances and to provide the Debtors with sufficient funds to make distributions to Creditors under the Plan, and to implement the Plan.  Under the circumstances, the Debtors have no feasible alternative lender to fund the Exit Loans other than the Exit Lender.

The structure of the Sale Transaction if a Purchaser other than a Purchaser under the Marriott Purchase Agreement is the Winning Bidder at the Auction may be different from the structure of the Sale Transaction contemplated under the Marriott Purchase Agreement.

For example, if an alternative transaction with a Winning Bidder contemplates a lesser amount of, or no, Seller Advances, then the amount of Exit Loan #1 may be reduced or eliminated.

Similarly, the amount of the Cash component of such an alternative transaction might reduce the amount of Exit Loan #2 necessary to have sufficient Plan Funds to implement the Plan – or Exit Loan #2 may be unnecessary altogether.

To the extent necessary, if the Winning Bidder is a Purchaser other than under the Marriott Purchase Agreement, and if the means of implementation of the Plan are materially different than those contemplated under the Marriott Purchase Agreement and described herein and in the Plan, then the Debtors anticipate filing a supplement to the Plan, which supplement will explain and describe such means of implementation.  The Debtors, however, will not file a revised Disclosure Statement or re-solicit votes on the Plan.  The payments to Creditors under the Plan are made from the Plan Funds.  The specific terms of a Purchase Agreement, and the specific terms of any Exit Loans, will have no negative effect on the Creditors' recoveries under the Plan.

In all instances, regardless of which entity is the Winning Bidder at the Auction, the Creditors will receive at least as much as is provided in the Plan and described herein.

## G.   GREENBRIER SPORTING CLUB

GHC owns an 80% interest in GSCDC, a non-debtor Delaware limited liability company. GSCDC has developed a membership club, club facilities, amenities, and luxury residential neighborhoods near The Greenbrier known generally as "The Greenbrier Sporting Club."  As of the Petition Date, GSCDC owned approximately 126 unsold lots slated for residential development as part of The Greenbrier Sporting Club.  It is a condition of the Marriott Purchase Agreement that consent to the assignment of the Membership Interests in GSCDC to Marriott is obtained.  If consent is not obtained, the Sale Transaction to Marriott or its permitted assignee may not close.  However, under certain circumstances, Marriott may choose not to acquire the Membership Interests.  In such instance, the Membership Interests may be vested with the Post-Confirmation Estates, to be liquidated by the Plan Administrator.

23

**H.      DESCRIPTION OF EXIT LOANS**

**1.      BASIC TERMS OF EXIT LOANS**

In order to fund the payments required by the Plan, the Debtors intend to obtain financing from the Exit Lender, under separate credit facilities in (i) the maximum principal amount of $50,000,000 under Exit Loan #1, and (ii) Exit Loan #2 in an amount to be set forth in the Plan Supplement.  Exit Loan #1 Loan Agreement and Exit Loan #2 Loan Agreement will each be filed as part of the Plan Supplement.  The description of the Exit Loans in this section is only a summary and, in the case of any conflict between this summary and the terms of the Exit Loans, the terms of Exit Loan #1 Loan Agreement and Exit Loan #2 Loan Agreement shall be controlling.

Exit Loan #1 will be used to fund the Seller Advances required to be made by the Debtors to the Purchaser under Section 2.08 of the Marriott Purchase Agreement.  The proceeds of Exit Loan #2 will be used (i) to refinance amounts outstanding under the DIP Facility, (ii) to fund the portion of the Plan Funds necessary to make payments to Creditors under the Plan, and (iii) for general corporate purposes of the Debtors and Plan Administrator, including the payment of the Wind-Down Expenses, as and to the extent provided for in the Plan.

**2.      CONDITIONS TO FUNDING**

Funding under Exit Loan #1 Loan Agreement is subject to the satisfaction or waiver of certain conditions, including, without limitation, the following: (i) entry of the Confirmation Order (which shall contain, among other things, a complete and unconditional release of any and all existing Claims against the Exit Lender and its Affiliates) and (ii) no Marriott Event (as defined in the Exit Loan #1 Loan Agreement) having occurred and continuing.  If the conditions to funding have been met, the Exit Lender shall fund amounts due under Exit Loan #1 Loan Agreement in accordance with the schedule set forth in Section 1(b) therein and, as pre-directed by the Debtors, such amounts shall be funded directly to Marriott (or its permitted assignee).

Funding under Exit Loan #2 Loan Agreement is subject to the satisfaction or waiver of certain conditions, including, without limitation, the following: (i) entry of the Confirmation Order (which shall contain, among other things, a complete and unconditional release of any and all existing Claims against the Exit Lender and its Affiliates), (ii) each representation or warranty made by the Debtors contained in any loan document required by Exit Loan #2 Loan Agreement shall be true and correct in all material respects, except to the extent that such representation or warranty expressly relates to an earlier date in which case such representation or warranty shall be true and correct in all material respects on and as of such earlier date, (iii) no default or event of default shall have occurred and be continuing or could reasonably be expected or anticipated to result from an advance under Exit Loan #2, and (iv) the making of advances under Exit Loan #2 shall not violate any requirement of applicable law in any material respect and shall not be subject to any injunction or stay.

**3.      PAYMENTS AND INTEREST RATE**

The Exit Loans will bear interest at a simple interest rate equal to ten percent (10%) per annum, compounded quarterly.  On the maturity date of each Exit Loan, the Debtors shall pay

the then outstanding principal amount of the Exit Loans, plus all accrued and unpaid interest thereon.  The Debtors have the right at any time and from from time to time to prepay the Exit Loans in whole or in part (without premium or penalty) and are required to make certain mandatory prepayments.  In accordance with the Marriott Purchase Agreement, the net amount of Marriott's deposit will be paid to the Exit Lender as a mandatory prepayment on account of the Exit Loans.

4.     **SECURITY**

The Debtors' obligations under the Exit Loans will be secured, *pari passu,* by a valid and perfected first priority lien and security interest in and on:

(a)     all of the present and future personal property and assets of the Debtors or the Post-Confirmation Estates, whether tangible or intangible and wherever located, including the Remaining Assets, the Plan Funds, the Purchase Price, the Assigned Agreements (as such term is defined in Exit Loan #1 Loan Agreement and Exit Loan #2 Loan Agreement and which shall include the Marriott Purchase Agreement, the Mortgage, the Guaranty and the Intercreditor Agreement, each as such term is defined in Exit Loan #1 Loan Agreement and Exit Loan #2 Loan Agreement), equipment, inventory and other goods, accounts receivable, securities and certificates of deposits, bank accounts, general intangibles, investment property, patents, trademarks, trade names, copyrights, chattel paper, documents and instruments; and

(b)     all proceeds and products of the property and assets described above, including without limitation, all distributions, dividends, Cash, rights, instruments and other property and proceeds from time to time received.

The lien to be granted on the Plan Funds and the Remaining Assets to secure Exit Loan #1 and Exit Loan #2 will be subject to the rights of the Plan Administrator to use the Plan Funds, in accordance with the terms of the Plan and Plan Supplement, including the Remaining Assets, to make the payments and distributions required under the Plan, including the Wind-Down Expenses.

5.     **REPAYMENT OF THE EXIT LOANS**

The Exit Loans will be repaid by the Purchase Price, and by any remaining Plan Funds (including the proceeds of the Remaining Assets), if any, after payment in full by the Plan Administrator of amounts payable under the Plan, including the Wind-Down Expenses.

The aggregate of the principal balances of the Exit Loans will be disclosed in the Plan Supplement.  If the minimum Purchase Price or the Accelerated Payment—$60 million, subject to certain deductions—is paid by the Purchaser under the Marriott Purchase Agreement, then the Exit Loans, with accrued interest, are not likely to be paid in full.  Similarly, if the maximum Purchase Price is paid at the maturity date (*i.e.*, after 7 years)—$130 million, subject to certain deductions—by the Purchaser under the Marriott Purchase Agreement, then the Exit Loans, with accrued interest, are not likely to be paid in full.

The residual amount, if any, of the Plan Funds, including the Remaining Assets (after payment of all amounts otherwise payable under the Plan), will also be available to pay any amount outstanding under the Exit Loans.

If the Exit Loans are satisfied in full from these sources, then the remaining amount of the Purchase Price, and the Plan Funds (including the Remaining Assets), if any, will be applied to the outstanding amount of the CSX Unsecured Claims.

However, it is highly unlikely, and it is not anticipated, that the aggregate of the Purchase Price and the residual amount of the Plan Funds (including the Remaining Assets), if any, will be sufficient to pay the Exit Loans in full. If, however, in the unlikely event that the Exit Loans are paid in full from these sources, and there are funds then available to be applied to the CSX Unsecured Claims, such application is justified because all obligations under the Plan will have been satisfied, and because the financial accommodations extended by CSX to the Debtors and its unsecured Creditors throughout the Chapter 11 Cases would have allowed the implementation of the Plan.

To the extent the Exit Loans or the CSX Unsecured Claims are not paid in full from the Purchase Price and any residual Plan Funds (including Remaining Assets), CSX and the Exit Lender shall have no recourse to the Debtors, the Post-Confirmation Estates or the Plan Administrator.

## I.   PENSION PLAN

GHC maintains two qualified defined benefit pension plans which are subject to the plan termination provisions of Title IV of ERISA (*i.e.*, most if not all of the benefits payable thereunder are guaranteed by the Pension Benefit Guaranty Corporation). These plans are: (i) the Greenbrier Hotel Corporation Pension Plan for Non-Agreement Employees, formerly known as the CSX Hotels, Inc. Pension Plan for Non-Agreement Employees (the "GHC Non-Agreement Plan"), and (ii) the Greenbrier Hotel Corporation Pension Plan for Union Employees, formerly known  as the CSX Hotels, Inc. Pension Plan for Union Employees (the "GHC Union Plan"). A small number of the Debtors' employees and former employees are also covered by the Special Retirement Plan of CSX Corporation and Affiliated Corporations (the "CSX Special Retirement Plan"), which is sponsored by CSX Corporation – it is not sponsored by any of the Debtors. However, the Debtors have been responsible for their allocable portion of the expenses relating to accruals for the Debtors' employees and former employees covered by the CSX Special Retirement Plan. The GHC Non-Agreement Plan, the GHC Union Plan and the CSX Special Retirement Plan are referred to collectively herein as the "Pension Plans."

Generally, the GHC Union Plan covers employees of the Debtors who are covered by the Collective Bargaining Agreements. The GHC Non-Agreement Plan generally covers employees of the Debtors not covered by Collective Bargaining Agreements.

The GHC Union Plan and the GHC Non-Agreement Plan will not be transferred to a Purchaser in a Sale Transaction. GHC is a part of CSX's controlled group and the Debtors anticipate that GHC will, subject to any applicable collective bargaining obligations, discontinue accruals under the GHC Union Plan, and transfer the sponsorship and administration of the GHC

Union Plan to Residual Enterprises Corp., another entity within CSX's controlled group.  The Debtors also anticipate that GHC will discontinue accruals under the GHC Non-Agreement Plan and will, with CSX's anticipated consent, cause the GHC Non-Agreement Plan to be merged into the CSX Pension Plan (an ongoing pension plan sponsored and administered by CSX which meets all of the applicable funding requirements under ERISA and the Internal Revenue Code). The Debtors anticipate that CSX will ensure that the Pension Plans satisfy all applicable funding obligations going forward. Thereafter, and upon confirmation of the Plan, the Debtors will have no further liability with respect to the Pension Plans, and no further obligation to contribute or pay benefits with respect to the Pension Plans.  The consummation of the events described in this paragraph shall be referred to as the "Pension Plan Events."

## J.     TREATMENT OF AVOIDANCE ACTIONS

The Debtors believe that the cost associated with seeking to recover on account of avoidance actions arising under chapter 5 of the Bankruptcy Code (*i.e.*, preference and fraudulent conveyance actions) would be cost prohibitive and would not produce a benefit to the Debtors' Estates.  However, the Debtors reserve all rights to assert section 502(d) of the Bankruptcy Code as a defense or as an objection to any Claim asserted against a Debtor.

## IV.    SUMMARY OF THE JOINT PLAN

## A.     INTRODUCTION

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN.  THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN.  THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.**

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY.  IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, HOWEVER, IT WILL BIND ALL CLAIM AND EQUITY INTEREST HOLDERS.**

The Plan is structured to provide recovery to unsecured Creditors in Voting Classes 3, 4 and 5 from the Unsecured Claims Fund as set forth in the Plan.   The Unsecured Claims Fund will be distributed to all Holders of Allowed Claims in Voting Classes 3, 4 and 5, Pro Rata.  In addition, under the Plan, the Holders of Allowed Class 4 Claims, CSX Unsecured Claims, have agreed that certain distributions to which they would be entitled on account of such Claims will be paid over by the Plan Administrator first, to Holders of Allowed Class 3 Claims until such Allowed Class 3 Claims are paid in full in Cash without interest, and second, to Holders of Allowed Class 5 Claims until such Allowed Class 5 Claims are paid in full without interest. However, CSX has not guaranteed the payment of Allowed Class 3 Claims or Allowed Class 5 Claims in full in Cash.

**B.**     **ADMINISTRATIVE AND PRIORITY TAX CLAIMS**

**1.**     **ADMINISTRATIVE CLAIMS**

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Claim, will be paid the full unpaid amount of such Claim in Cash by the Plan Administrator (a) on or as soon as practicable after the Effective Date; (b) if such Claim is Allowed after the Effective Date, on or as soon as practicable after the date such Claim is Allowed; or (c) upon such other terms as may be agreed upon by such Holder and the Plan Administrator, or otherwise upon an order of the Bankruptcy Court.  Administrative Claims will be paid from the Plan Funds.

*Bar Date for Administrative Claims*

Except as otherwise provided in Article II.A of the Plan or the Bar Date Order, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Plan Administrator, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable bar date will be forever barred from asserting such Administrative Claims against the Debtors, the Plan Administrator, or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Plan Administrator and the requesting party within 60 days after the Effective Date.

(a)     *Professional Compensation*

Retained Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Plan Administrator and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 30 days after the Effective Date; provided that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order. Objections to any Fee Claim must be Filed and served on the Plan Administrator and the requesting party within 60 days after the Effective Date. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

(b)     *Ordinary Course Liabilities*

Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business will not be required to File or serve any request for payment of such Administrative Claims, and such Claims will be paid when due in the ordinary course.

(c)     *Payment Under A Final Order Of the Bankruptcy Court*

Notwithstanding any provision in the Plan to the contrary, the Debtors and the Plan Administrator may pay any Claims authorized pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

**2.      DIP FACILITY CLAIMS**

The Allowed DIP Facility Claims will be paid in full in Cash on the Effective Date from the Plan Funds or will be afforded any other treatment agreeable to the Debtors and the DIP Lender.

**3.      PRIORITY TAX CLAIMS**

On the later of the Effective Date or the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive on account of such Claim, Cash in an amount equal to the amount of such Allowed Priority Tax Claim, which amounts will be payable by the Plan Administrator from the Plan Funds.

**C.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**1.      SUMMARY**

The Classes of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

(a)     *Summary of Classification and Treatment of Classified Claims and Equity Interests*

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Estimated Aggregated Amount of Allowed Claims or Equity Interests[13] |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | TBD |
| 2 | Secured Claims | Unimpaired | $0.00 |
| 3 | Trade Claims | Impaired | $1.8 Million |

---

[13]  Amounts set forth below are estimates only.  The Allowance of Claims may be subject to litigation, and actual Allowed Claim amounts may differ from these estimated amounts.

| 4 | CSX Unsecured Claims | Impaired | $94.5 Million |
| 5 | General Unsecured Claims | Impaired | $1.0 Million |
| 6 | Equity Interests | Impaired | – |

## 2. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

(a) *Class 1—Other Priority Claims.*

(i) *Classification*: Class 1 consists of the Other Priority Claims against the Debtors.

(ii) *Treatment*: The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered under the Plan. Unless otherwise agreed to by the Holders of the Allowed Class 1 Other Priority Claim and the Debtors, each Holder of an Allowed Class 1 Claim will receive, in full and final satisfaction of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on the Effective Date or as soon as practicable thereafter from the Plan Funds.

(iii) *Voting*: Class 1 is an Unimpaired Class, and the Holders of Allowed Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan; *provided, however*, that all Class 1 Claims will be subject to Allowance under the provisions of the Plan, including, but not limited to, Article X.

(b) *Class 2—Secured Claims.*

(i) *Classification*: Class 2 consists of the Secured Claims against the Debtors.

(ii) *Treatment*: Each Holder of an Allowed Class 2 Claim will receive, in full and final satisfaction of such Allowed Class 2 Claim, payment in full in Cash of any such Allowed Secured Claim on the Effective Date or as soon as practicable thereafter from the Plan Funds.

(iii) *Voting*: Class 2 is an Unimpaired Class, and the Holders of Allowed Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan;

*provided*, *however*, that all Class 2 Claims will be subject to Allowance under the provisions of the Plan, including, but not limited to, Article X.

(c)  *Class 3—Trade Claims*

(i)  *Classification*: Class 3 consists of the Holders of Trade Claims against the Debtors.

(ii)  *Treatment*: On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 3 Claim will receive, in full and final satisfaction of its Allowed Class 3 Claim, its Pro Rata share of the Unsecured Claims Fund.

(iii)  *Voting*.  Class 3 is Impaired, and Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

(d)  *Class 4—CSX Unsecured Claims*

(i)  *Classification*: Class 4 consists of the Holders of CSX Unsecured Claims.

(ii)  *Treatment*: On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 4 Claim will receive, in full and final satisfaction of its Allowed Class 4 Claim, its Pro Rata share of the Unsecured Claims Fund, subject to Articles III.E. and V.K. of the Plan.

(iii)  *Voting*: Class 4 is Impaired, and Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)  *Class 5—General Unsecured Claims*

(i)  *Classification*: Class 5 consists of the Holders of Class 5 General Unsecured Claims.

(ii)  *Treatment*: On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 5 Claim will receive, in full and final satisfaction of its Allowed Class 5 Claim, its Pro Rata share of the Unsecured Claims Fund.[14]

(iii)  *Voting*: Class 5 is Impaired, and Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

---

[14] The Holder of an Allowed Class 5 Claim may be able to recover from applicable insurance policies.  The Plan does not affect the Holder of an Allowed Class 5 Claim's ability to seek a recovery from such insurance policies. However, no Holder of an Allowed Class 5 Claim will be permitted to recover more than the Allowed amount of its General Unsecured Claim.

(f)    *Class 6 —Equity Interests*

    (i)    *Classification*: Class 6 consists of all Equity Interests in the Debtors.

    (ii)    *Treatment*: Because the value of the Debtors' assets is less than the total amount of their debts and liabilities, it is not anticipated that the Holders of Allowed Equity Interests will receive any distribution on account of such Equity Interests.  In the Confirmation Order, the Debtors will request that the Bankruptcy Court make a finding that the Equity Interests in the Debtors have no value as of the Effective Date.  On the date the Debtors are dissolved in accordance with Article V.D of the Plan, the common stock certificates and other instruments evidencing Equity Interests in the Debtors will be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby will be extinguished.

    (iii)    *Voting*: Class 6 is Impaired, and Holders of Class 6 Equity Interests are conclusively deemed to reject the Plan. Holders of Class 6 Equity Interests are therefore not entitled to vote to accept or reject the Plan.

## 3.    INTERCOMPANY CLAIMS

All Intercompany Claims will be cancelled as of the Effective Date, and Holders thereof will not receive a distribution under the Plan in respect of such Claims.

## 4.    SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## 5.    SPECIAL PROVISIONS REGARDING TREATMENT OF CSX UNSECURED CLAIMS

(a)    In consideration of the releases provided in Article XIII of the Plan and other good and valuable consideration, the Holders of each of the Allowed CSX Unsecured Claims have agreed with the Debtors that distributions from the Unsecured Claims Fund which would otherwise be payable to the Holders of the Allowed CSX Unsecured Claims pursuant to Article III.B.4 of the Plan will be paid by over by the Plan Administrator on behalf of the Holders of Allowed CSX Unsecured Claims first to the Holders of Allowed Trade Claims, as provided in Article III.B.3 of the Plan, until all Allowed Trade Claims are paid in full without interest, and next to the

Holders of Allowed General Unsecured Claims as provided in Article III.B.5 of the Plan, until all Allowed General Unsecured Claims are paid in full without interest. No Holder of an Allowed CSX Unsecured Claim will receive any distribution from the Unsecured Claims Fund until all Holders of Allowed Trade Claims and all Holders of Allowed General Unsecured Claims have been paid in full, without interest. Any such aggregate amounts paid over by the Plan Administrator on behalf of the Holders of the Allowed CSX Unsecured Claims to the Holders of the Allowed Trade Claims will be paid over to each such Holder in the proportion that such Holder's Allowed Trade Claim bears to all Allowed Trade Claims. Any such aggregate amounts paid over by the Plan Administrator on behalf of the Holders of the Allowed CSX Unsecured Claims to the Holders of the Allowed General Unsecured Claims will be paid over to each such Holder in the proportion that such Holder's Allowed General Unsecured Claim bears to all Allowed General Unsecured Claims. Any amount remaining in the Unsecured Claims Fund after distribution to all Holders of Allowed Trade Claims and all Holders of Allowed General Unsecured Claims in accordance with Article III.E.1 of the Plan will be paid to the Holders of each Allowed CSX Unsecured Claim in the proportion that each such Holder's Allowed CSX Unsecured Claim bears to all Allowed CSX Unsecured Claims.

(b)     Should the treatment of the Allowed CSX Unsecured Claims provided for in Article III.E.1 of the Plan be found to be impermissible, Article III.E.1 of the Plan will be automatically deleted from the Plan and Article III.E.1 of the Plan will be of no force or effect. The remaining terms of the Plan will remain in full force and effect. In such instance, Holders of Allowed Claims in Classes 3, 4, and 5 will receive distributions Pro Rata from the Unsecured Claims Fund pursuant to the terms of the Plan.

## 6.     SPECIAL PROVISIONS REGARDING THE PENSION PLANS

Upon the consummation of the Pension Plan Events, (i) the Pension Plans, all beneficiaries thereof, and the Pension Benefit Guaranty Corporation, will have no Claim against any Debtor on account of the Pension Plans and will receive no distribution under the Plan on account of the Pension Plans; and (ii) the Debtors will have no further liability with respect to the Pension Plans, and no further obligation to contribute or pay benefits with respect to the Pension Plans.

## 7.     SPECIAL PROVISION GOVERNING ASSUMED LIABILITIES

Upon the assumption of the Assumed Liabilities by the Purchaser pursuant to the Purchase Agreement, all Claims arising from Assumed Liabilities will be the responsibility of the Purchaser. No Holder of a Claim on account of an Assumed Liability will receive a distribution under the Plan on account of such Claim.

### D.    ACCEPTANCE OR REJECTION OF THE PLAN

#### 1.    VOTING CLASSES

Each Holder of an Allowed Claim in each of the Voting Classes will be entitled to vote to accept or reject the Plan.

#### 2.    ACCEPTANCE BY VOTING CLASSES

The Voting Classes will have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in that Class have voted to accept the Plan; and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in that Class have voted to accept the Plan.

#### 3.    PRESUMED ACCEPTANCE OF PLAN

Classes 1 and 2 are Unimpaired under the Plan, and will therefore be presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

#### 4.    PRESUMED REJECTION OF PLAN

Class 6 is Impaired, and will receive no distribution under the Plan and will therefore be presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

#### 5.    NON-CONSENSUAL CONFIRMATION

The Debtors reserve the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Class 6.  To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code; and/or (b) modify the Plan in accordance with Article XV.D of the Plan.

### E.    MEANS FOR IMPLEMENTATION OF THE PLAN

#### 1.    SALE OF ASSETS

(a)    *Consummation of Purchase Agreement*

On the Effective Date, the Debtors will consummate the Sale Transaction and, among other things, the Purchased Assets, including the Assumed Contracts, will be transferred to the Purchaser free and clear of all Claims, interests and Encumbrances, other than the Permitted Encumbrances, pursuant to the terms of the applicable Purchase Agreement, Sale Order and Confirmation Order.  Pursuant to the provisions of the Marriott Purchase Agreement, the payment of the Purchase Price will be secured by a lien on the Purchased Assets (including the Membership Interests, to the extent consent of the Current Member is obtained).

The consummation of a Sale Transaction with a Purchaser other than Marriott or its permitted assignee may be in accordance with terms that are substantially different from the Marriott Purchase Agreement.  However, the treatment of Creditors under the Plan will in no event be less favorable than the treatment described herein.

      (b)      *Execution of Exit Loan #1 Loan Agreement and Exit Loan #2 Loan Agreement*

In the event that a Sale Transaction is consummated with a Purchaser under the Marriott Purchase Agreement, on the Effective Date, should Marriott or its permitted assignee be the Purchaser, the Debtors will execute Exit Loan #1 Loan Agreement, Exit Loan #2 Loan Agreement, and all other ancillary and related agreements.  Pursuant to such agreements, the Debtors will collaterally assign their rights under the Marriott Purchase Agreement, including, without limitation, the right to receive the Purchase Price under the Marriott Purchase Agreement, and the liens securing such Purchase Price, to the Exit Lender to secure the obligations, *pari passu*, under the Exit Loans.  Additionally, all other assets of the Post-Confirmation Estates will secure the obligations, *pari passu*, under the Exit Loans. Notwithstanding the foregoing, the Plan Administrator may use the assets of the Post-Confirmation Estates, including, without limitation, the Plan Funds, but excluding proceeds of loans funded pursuant to Exit Loan #1 Loan Agreement, without the consent of any party, including the Exit Lender, to make the distributions provided under the Plan, and to pay its Wind-Down Expenses as provided in the Plan.

In the event that a Sale Transaction is consummated with a Purchaser other than under the Marriott Purchase Agreement, Exit Loan #1 and/or Exit Loan #2, in whole or in part, may not be a part of such Sale Transaction, in which case, the Debtors may not execute Exit Loan #1 Loan Agreement and/or Exit Loan #2 Loan Agreement, and related documents, or grant a lien on the Purchase Price or the Remaining Assets to secure the Exit Loans, as the case may be.

## 2.      PLAN ADMINISTRATOR

On the Effective Date, the Plan Administrator will be appointed and will act in accordance with the provisions of the Plan, including, without limitation, the provisions of Article VIII thereof.

## 3.      UNSECURED CLAIMS FUND

On the Effective Date, the Unsecured Claims Fund will be established in the amount of $1,700,000 from the Plan Funds.  The Plan Administrator will administer the Unsecured Claims Fund in accordance with the provisions of the Plan and of the Confirmation Order. The Unsecured Claims Fund will be the sole source of funding of the distributions to be made to Holders of Allowed Claims of any Unsecured Class, except as provided in Article V.K of the Plan.

## 4.      SUBSTANTIVE CONSOLIDATION

The Plan is predicated on the substantive consolidation of the Debtors for voting and distribution purposes only, all as set forth more fully in Article XI of the Plan.

5.      **CANCELLATION OF NOTES AND EQUITY INTERESTS**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments and other documents evidencing debt of each of the Debtors (other than those evidencing Exit Loan #1 and Exit Loan #2) will be cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be discharged, in exchange for the treatment afforded in the Plan.

The Debtors will request that the Bankruptcy Court make a finding that the Equity Interests in the Debtors have no value as of the Effective Date.  Upon the filing with the Bankruptcy Court, by the Plan Administrator, of a request to close the Bankruptcy Cases and for the entry of a final decree, each of the Debtors will be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that the Plan Administrator will file on behalf of each Debtor, with the office of the applicable secretary of state, a certificate of dissolution.  From and after the Effective Date, each of the Debtors will not be required to file any document, or take any other action, to withdraw its business operation from any state in which it was previously conducting its business operations.  On the date the Debtors are dissolved in accordance with Article V.D of the Plan, the common stock certificates and other instruments evidencing Equity Interests in the Debtors will be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby will be extinguished.

6.      **RETENTION OF OTHER ACTIONS BY POST-CONFIRMATION ESTATES AND PLAN ADMINISTRATOR**

Subject to Article XIII.F of the Plan, all Other Actions, along with any associated recoveries, proceeds and settlements, vest with and remain the property of the Post-Confirmation Estates to be administered by the Plan Administrator.

7.      **CORPORATE ACTION**

Upon the entry of the Confirmation Order, all matters provided for under the Plan and the Purchase Agreement involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders or the Debtors' boards of directors. On and after the Effective Date, the Plan Administrator will be authorized and directed to issue, execute and deliver the agreements, documents, and distributions contemplated by the Plan and the Purchase Agreement in the name of and on behalf of the Debtors.

8.      **CORPORATE GOVERNANCE**

On the Effective Date, the charters and by-laws of each Debtor will be deemed amended pursuant to the Plan, to the extent necessary, to require only one director and only one officer, who will be the same person.  Such person will be the Plan Administrator.  Likewise, the charters and by-laws of each Debtor will be deemed amended pursuant to the Plan to bar the issuance of non-voting equity securities as required by 11 U.S.C. § 1123(6).

9.      **D&O TAIL COVERAGE POLICIES**

On the Effective Date, the Debtors or the Plan Administrator will obtain sufficient tail coverage, in an amount consistent with the level of coverage existing prior to the Effective Date, for a period of six years under a directors' and officers' insurance policy for the current and former officers and directors of the Debtors utilizing the Plan Funds.

10.     **SOURCES OF CASH FOR PLAN DISTRIBUTION**

All Cash necessary for the Debtors or the Plan Administrator, as the case may be, to make payments pursuant to the Plan will be obtained from the Plan Funds.

11.     **RELEASE OF LIENS**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan, all Encumbrances (other than Permitted Encumbrances), interests, mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged.

Except as otherwise provided in the Purchase Agreement, on the Effective Date all Purchased Assets will be transferred to the Purchaser free and clear of all Claims, Encumbrances (other than Permitted Encumbrances) or interests pursuant to sections 105, 363, 365, 1123 and 1141(c) of the Bankruptcy Code.

12.     **REMITTANCE OF RESIDUAL ASSETS TO CSX**

All assets of the Post-Confirmation Estates, including, without limitation, the Purchase Price and the Plan Funds (including the proceeds of Remaining Assets, if any), remaining after the payment of all parties by the Plan Administrator in accordance with the terms of the Plan, and after payment by the Plan Administrator of all Wind-Down Expenses, will be remitted and absolutely assigned by the Plan Administrator to the Exit Lender and CSX (and the Plan Administrator will then absolutely assign its rights in the Marriott Purchase Agreement, the Mortgage, the Marriott Guaranty and related documents to the Exit Lender and CSX pursuant to assignment documents in form and substance satisfactory to the Exit Lender and/or CSX, as the case may be), first in payment of the Exit Loans, *pari passu*, and second in payment of the unsatisfied portion of the CSX Unsecured Claims.

13.     **CLOSING OF THE CHAPTER 11 CASES**

Upon the Plan Administrator's having made all payments under the Plan, and having performed all of its duties as provided in the Plan, except in regard to the Purchase Agreement and the Exit Loans, and upon the Plan Administrator's absolutely assigning its rights as provided in the preceding paragraph, then the Plan Administrator will apply to this Court for the closure of the Chapter 11 Cases.

14.    **EFFECTUATING    DOCUMENTS;    FURTHER    TRANSACTIONS; EXEMPTION FROM CERTAIN TRANSFER TAXES**

The chief executive officer or chief financial officer of each Debtor (or after the Effective Date, the Plan Administrator) will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and the Purchase Agreement. The secretary, any assistant secretary, or Plan Administrator of each Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146 of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax or similar tax: (1) the Sale Transaction; (2) the creation of any mortgage, deed of trust, lien or other security interest, or the exercise of any rights thereunder; (3) the making or assignment of any lease or sublease; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) bills of sale.

## F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(a)    *Assumption and Assignment of Assumed Contracts*

The Debtors will assume and assign the Assumed Contracts to the Purchaser pursuant to the terms of the Bidding Procedures Order and the Purchase Agreement.  The designation of a contract or lease as an Assumed Contract shall not be deemed an admission that such contract or lease constitutes an Executory Contract or Unexpired Lease. The Debtors may amend any Assumed Contract, with the consent of the counterparty to such Assumed Contract (if required pursuant to the terms of such Assumed Contract) and with the consent of the Purchaser, between the Confirmation Date and the Closing Date, without application to or approval of the Bankruptcy Court, and each such agreement, as amended, shall be an Assumed Contract.

(b)    *Assumption and Assignment of Retained Contracts*

The Debtors may assume and assign certain of the Retained Contracts.  Any Retained Contracts which the Debtors propose to assume and assign will be identified in the Plan Supplement.  The designation of a contract or lease as a Retained Contract shall not be deemed an admission that such contract or lease constitutes an Executory Contract or Unexpired Lease.

(c)    *Approval of Assumptions and Assignments*

The Executory Contract Assumption and Assignment Order, the Confirmation Order and the Sale Order shall constitute orders of the Bankruptcy Court approving the assumptions and assignments described in Article VI.A of the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date. The Bidding Procedures Order specifies the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed or assumed and assigned pursuant to the Plan of: (a) the Executory Contract or

Unexpired Lease being assumed or assumed and assigned; (b) the cure, if any, that the applicable Debtor believes would be required to be paid or performed in connection with such assumption; and (c) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the proposed cure.

## 2. EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED

On the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court or that is assumed or assumed and assigned pursuant to Article VI.A of the Plan, each Executory Contract and Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

## 3. CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES

All proofs of Claim arising from the rejection (if any) of Executory Contracts or Unexpired Leases must be filed with the Voting Agent on or before the later of: (a) the applicable Bar Date; (b) thirty (30) days after the date of entry of any order authorizing the rejection of an Executory Contract or Unexpired Lease; or (c) thirty (30) days after the effective date of the rejection of such Executory Contract or Unexpired Lease. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which proofs of Claim were not timely Filed within that time period will be forever barred from assertion against the Debtors or their Estates and property, or the Plan Administrator, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article XIII.G of the Plan.

## 4. CURE OF DEFAULTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES ASSUMED PURSUANT TO THE PLAN

All cures for Assumed Contracts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, a) by payment of such Cure Amount in Cash on or promptly after the Effective Date or on such other terms as the parties to each such Assumed Contract may otherwise agree, with all such amounts to be payable by the Debtors first from the Purchaser's Cure Payment, and, second, to the extent necessary, from the Plan Funds, and b) by curing such non-monetary default as is required.  All Cure Amounts will be in the amounts established in the Executory Contract Assumption and Assignment Order.

## 5. ASSUMPTION OF D&O INSURANCE POLICIES

As of the Effective Date, the Debtors' estates shall be deemed to have assumed the Debtors' directors' and officers' liability insurance policies, if any, pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the foregoing assumption of each of the directors' and officers' liability insurance

policies, if any. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the directors' and officers' liability insurance policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assigned to the Post-Confirmation Estates as to which no proof of Claim need be Filed.

## G.    PROVISIONS GOVERNING DISTRIBUTIONS

### 1.    DISTRIBUTIONS FOR CLAIMS ALLOWED AS OF THE EFFECTIVE DATE

Except as otherwise provided in the Plan or as may be ordered by the Bankruptcy Court, all distributions with respect to all Allowed Claims that are not Assumed Liabilities will be made by the Plan Administrator, as set forth in the Plan. As described in Article VIII of the Plan, the Plan Administrator will make distributions on the Effective Date or as soon as reasonably practicable thereafter to the respective Holders of Allowed Claims, and will make further distributions to Holders of Claims that subsequently are determined to be Allowed Claims, pursuant to the Plan.

### 2.    DELIVERY AND DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS

(a)    *Delivery of Distributions in General*

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims as of the Distribution Record Date will be made at the address of the Holder of such Claim as indicated on the records of the Debtors, as of the date such distribution is made. Except as otherwise provided in the Plan, the Plan Administrator will make distributions to Holders of Allowed Claims at the address for each such Holder indicated on the Debtors' records on the date of any such distribution; *provided*, *however*, that the manner of such distributions will be determined at the discretion of the Debtors or Plan Administrator, as the case may be; and provided further that the address for each Holder of an Allowed Claim will be deemed to be the address set forth in any proof of Claim filed by that Allowed Claim Holder.

(b)    *Distributions by Distribution Agent(s)*

The Debtors and the Plan Administrator, as applicable, will have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents, to facilitate the solicitation of votes on the Plan and distributions required under the Plan. As a condition to serving as a Distribution Agent, a Distribution Agent must (i) affirm its obligation to facilitate the prompt distribution of any documents or solicitation materials, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan, and (iii) waive any right or ability to setoff, deduct from, or assert any lien or encumbrance against the distributions required under the Plan that are to be distributed by such Distribution Agent. In consideration for waiving its rights to setoff, deduct from or assert any lien or encumbrance against such distributions, the Debtors or the Plan Administrator, as applicable, will pay all reasonable fees and expenses of such Distribution Agent. The Distribution Agent will submit detailed invoices to the Debtors or the Plan Administrator, as applicable, for all fees and

expenses for which the Distribution Agent seeks reimbursement without the need for further Bankruptcy Court approval. The Debtors or the Plan Administrator, as applicable, upon review of such invoices, will pay those amounts that the Debtors or the Plan Administrator, as applicable, in their sole discretion, deem reasonable, and will object in writing to those fees and expenses, if any, that the Debtors or the Plan Administrator, as applicable, deem to be unreasonable. In the event that the Debtors or the Plan Administrator, as applicable, object to all or any portion of a Distribution Agent's invoice, the Debtors or the Plan Administrator, as applicable, and such Distribution Agent will endeavor, in good faith, to reach mutual agreement on the amount of such disputed fees and/or expenses. In the event that the Debtors or the Plan Administrator, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party will be authorized to move to have such dispute heard by the Bankruptcy Court.

(c)   <em>Undeliverable Distributions</em>

(i)   Holding of Certain Undeliverable Distributions.

If any distribution to a Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable, no further distributions will be made to such Holder unless and until the Plan Administrator is notified in writing of such Holder's then current address. Undeliverable distributions will remain in the possession of the Plan Administrator, subject to Article VII.B.3.b, until such time as any such distributions become deliverable. Undeliverable Cash will not be entitled to any interest, dividends or other accruals of any kind. As soon as reasonably practicable, the Plan Administrator will make all distributions that become deliverable.

(ii)   Failure to Claim Undeliverable Distributions.

In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, 120 days after the Effective Date, the Plan Administrator will file with the Bankruptcy Court a listing of the Holders of undeliverable distributions. This list will be maintained for as long as the Chapter 11 Cases stay open. Any Holder of an Allowed Claim, irrespective of when a Claim became an Allowed Claim, that does not assert a Claim pursuant hereto for an undeliverable distribution (regardless of when not deliverable) within the later of (i) 150 days after the Effective Date, and (ii) 60 days after the date such Claim becomes an Allowed Claim, will have its Claim for such undeliverable distribution discharged and will be forever barred from asserting any such Claim against the Debtors, their estates, the Post-Confirmation Estates, the Plan Administrator or their respective property. In such cases any Cash held for distribution on account of such Claims will be property of the Plan Administrator, on behalf of the Debtors and the Post-Confirmation Estates, free of any restrictions thereon. Nothing contained in the Plan will require the Plan Administrator to attempt to locate any Holder of an Allowed Claim.

(d)   <em>Compliance with Tax Requirements/Allocations</em>

In connection with the Plan, to the extent applicable, the Plan Administrator will comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto will be subject to such withholding and reporting requirements.

For tax purposes, distributions received by Holders in full or partial satisfaction of Allowed Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

### 3.   TIMING AND CALCULATION OF AMOUNTS TO BE DISTRIBUTED

On the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim or as soon as practicable thereafter), each Holder of an Allowed Claim against the Debtors will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in Article X of the Plan. Except as otherwise provided in the Plan, or as required under applicable law, Holders of Claims will not be entitled to interest on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 4.   MINIMUM DISTRIBUTION

Any other provision of the Plan notwithstanding, the Plan Administrator will not be required to make distributions or payments of less than $50 (whether Cash or otherwise), and will likewise not be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

### 5.   SETOFFS

The Debtors and the Plan Administrator may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the Claims, Equity Interests, rights and Causes of Action of any nature that the Debtors or the Plan Administrator may hold against the Holder of any such Allowed Claim; *provided that* neither the failure to effect such a setoff nor the allowance of any Claim will constitute a waiver or release by the Debtors or the Plan Administrator of any such Claims, Equity Interests, rights and Causes of Action that the Debtors or the Plan Administrator may possess against any such Holder, except as specifically provided in the Plan.

## H.   THE PLAN ADMINISTRATOR

### 1.   GENERALLY

The powers, authority, responsibilities and duties of the Plan Administrator are set forth in the Plan.

## 2.    DESCRIPTION OF THE PURPOSE OF THE PLAN ADMINISTRATOR

### (a)    *Appointment of the Plan Administrator*

On the Effective Date, the Entity identified in the Plan Supplement will be appointed the Plan Administrator.  The Plan Administrator's duties will include, without limitation: (i) liquidating the Remaining Assets (including the Membership Interests, if applicable) with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of liquidation; (ii) objecting to and resolving Claims; (iii) paying Claims of Creditors when Allowed, as provided in the Plan; (iv) administering the Unsecured Claims Fund; (v) administering any rights and obligations under the Purchase Agreement; (vi) administering the Exit Loans, to the extent applicable; (vii) taking any other action necessary to effectuate the Plan and to effectuate the wind down of the Debtors' businesses; and (viii) upon the completion of such duties except in regard to the Purchase Agreement and the Exit Loans, as applicable, absolutely assigning any remaining rights under the Purchase Agreement, and any remaining assets in the Post-Confirmation Estates, including, without limitation, the Plan Funds, to the Exit Lender and CSX as provided in the Plan pursuant to assignment agreements in a form and substance satisfactory to the Exit Lender and/or CSX, as applicable and closing the Chapter 11 Cases.  The Plan Administrator may engage and pay professionals to assist and advise it in its duties under the Plan without further application to or order of this Court.

### (b)    *Funding Expenses of the Plan Administrator*

On and after the Effective Date, the Plan Funds will be under the direction and control of the Plan Administrator.  The Plan Administrator will disburse the Plan Funds, without further application to or order of this Court, to (i) satisfy the obligations of the Plan Administrator and the Estates after the Effective Date, incurred in accordance with the provisions the Plan and of the Confirmation Order, (ii) pay the Wind-Down Expenses, and (iii) make the distributions provided for pursuant to the Plan.

### (c)    *Re-vesting of Assets in the Post-Confirmation Estates*

On the Effective Date, the Remaining Assets will re-vest in the Post-Confirmation Estates, in accordance with section 1141 of the Bankruptcy Code, free and clear of all liens, Claims and Encumbrances, except as specifically provided in the Plan, in Exit Loan #1 Loan Agreement and Exit Loan #2 Loan Agreement.  The Remaining Assets will be administered by the Plan Administrator in accordance with the provisions of the Plan.

### (d)    *Distribution; Withholding*

The Plan Administrator will make distributions to the Creditors under the Plan, as provided in the Plan.  The Plan Administrator may withhold from amounts distributable to any Person any and all amounts, determined in the Plan Administrator's sole discretion, to be required by the Plan, any law, regulation, rule, ruling, directive or other governmental requirement.

43

(e)    *Insurance*

The Plan Administrator will maintain insurance coverage customary under chapter 11 bankruptcy plans for the protection of Persons acting as administrators under such chapter 11 plans on and after the Effective Date.

(f)    *Disputed Claims Reserve*

The Plan Administrator will maintain, in accordance with its powers and responsibilities under the Plan, a Disputed Claims Reserve. The Plan Administrator will, in its sole discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided in the Plan, as such Disputed Claims are resolved by Final Order, and such amounts will be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

(g)    *Termination of the Plan Administrator*

The duties, responsibilities and powers of the Plan Administrator will terminate upon (i) the completion of its duties under the Plan, (ii) the completion of the administration of, and distributions on account of, all Claims under the Plan, other than, with the consent of CSX and the Exit Lender, the CSX Unsecured Claims and the Claims of the Exit Lender, and (iii) the closing of the Chapter 11 Cases.

(h)    *Exculpation; Indemnification*

The Plan Administrator shall have no personal liability in regard to its obligations hereunder, and the Plan Administrator, its professionals and their respective representatives will be exculpated and indemnified pursuant to the terms of the Plan.

I.    **PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS**

1.    **RESOLUTION OF DISPUTED CLAIMS**

(a)    *Prosecution of Claims Objections*

The Debtors, prior to the Effective Date, and thereafter the Plan Administrator, will have the exclusive authority to file objections on or before the Claims Objection Bar Date, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether classified or otherwise. From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without application to or approval of the Bankruptcy Court. An objection is deemed to have been timely Filed as to all Tort Claims, any Claims of the Unions, any Claims arising under or related to the Collective Bargaining Agreements, any Claims related to GSCDC or to GHC's ownership of an Equity Interest in GSCDC, and any Claim related to or arising from pending litigation, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date. Each such Claim will remain a Disputed Claim until it becomes an Allowed Claim. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of a Claim if the Debtors or Plan

Administrator effect service in any of the following manners: a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; b) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of any Holder of a Claim in the Chapter 11 Cases.

(b)      <em>Claims Estimation</em>

Before the Effective Date, the Debtors, and after the Effective Date, the Plan Administrator, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(c)      <em>Payments and Distributions on Disputed Claims in General</em>

Notwithstanding any provision in the Plan to the contrary, except as otherwise agreed by the Plan Administrator in its sole discretion, no partial payments and no partial distributions will be made with respect to a Disputed Claim until the resolution of any such disputes by settlement or Final Order. On or before the date or, if such date is not a Business Day, on the next successive Business Day, that is 20 calendar days after the end of the calendar quarter in which a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim will receive all payments and distributions to which that Holder is then entitled under the Plan. Notwithstanding the foregoing, any Holder of both an Allowed Claim and a Disputed Claim in the same Class of Claims will not receive payment or distribution in satisfaction of any such Allowed Claim, except as otherwise agreed by the Plan Administrator in its sole discretion or ordered by the Bankruptcy Court, until all such Disputed Claims are resolved by settlement or Final Order. In the event that there are Claims that require adjudication or other resolution, the Debtors and the Plan Administrator reserve the right to, or shall upon an order of the Bankruptcy Court, establish appropriate reserves for potential payment of any such Claims.

## 2.      CLAIMS ALLOWANCE

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim will be deemed

45

Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Plan Administrator will have and will retain after the Effective Date any and all rights and defenses that the Debtors had with respect to any Claim as of the Petition Date. Notwithstanding Article XIII.F of the Plan, all Claims of any Person or Entity subject to section 502(d) of the Bankruptcy Code will be deemed disallowed as of the Effective Date unless and until such Person or Entity pays in full the amount that it owes such Debtor.

### 3.    CONTROVERSY CONCERNING IMPAIRMENT

If a controversy arises as to whether any Claims or any Class of Claims is Impaired under the Plan, the Bankruptcy Court will, after notice and a hearing, determine any such controversy before the Confirmation Date.

## J.    SUBSTANTIVE CONSOLIDATION

### 1.    CONSOLIDATION OF THE CHAPTER II CASES

The Plan contemplates and will effect the substantive consolidation of the Debtors into a single Entity solely for the purposes of voting and distributions under the Plan. Accordingly, on the Effective Date: (1) no distributions will be made under the Plan on account of the Intercompany Claims; and (2) each and every Claim against a Debtor will be deemed asserted against the consolidated Estates of all of the Debtors, will be deemed one Claim against and obligation of the deemed consolidated Debtors and their Estates and will be treated in the same Class regardless of the substantively consolidated Debtor. Notwithstanding the substantive consolidation in the Plan, substantive consolidation will not affect the obligation of each and every Debtor under 28 U.S.C. § 1930(a)(6) until a particular case is closed, converted or dismissed.

### 2.    SUBSTANTIVE CONSOLIDATION ORDER

The Plan will serve as a motion seeking entry of an order substantively consolidating the Debtors' Chapter 11 Cases as set forth in the Plan.  Unless an objection to substantive consolidation is made in writing by any Creditor affected by the Plan on or before the Plan Objection Deadline, an order substantively consolidating the Debtors' Chapter 11 Cases, including as part of the Confirmation Order, may be entered by the Bankruptcy Court.  In the event any such objections are timely filed, a hearing with respect thereto will be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide with the Confirmation Hearing.

### 3.    RESERVATION OF RIGHTS

The Debtors reserve the right at any time up to the conclusion of the Confirmation Hearing to withdraw their request for substantive consolidation, to seek Confirmation of the Plan as if there were no substantive consolidation, and to seek Confirmation of the Plan with respect to one or more Debtors even if Confirmation with respect to other Debtors is denied.

**K.     CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**1.     CONDITIONS PRECEDENT TO CONFIRMATION**

It shall be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order.  In addition, the following conditions shall have been satisfied or waived pursuant to the provisions of Article XII.C of the Plan:

(a)     The Plan, the Sale Order and the proposed Confirmation Order shall be in a form and substance reasonably acceptable to the Debtors; provided that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any of the foregoing.

(b)     The Plan Supplement, which shall be reasonably acceptable to the Debtors, shall have been filed, provided that if any party objects to the Plan Supplement, the Debtors may seek an expedited hearing before the Bankruptcy Court to address such objection.

**2.     CONDITIONS PRECEDENT TO CONSUMMATION**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XII.C of the Plan:

(a)     The Confirmation Order confirming the Plan, as the Plan may have been modified, shall have been entered and become a Final Order in a form and substance reasonably satisfactory to the Debtors, provided that if any party objects to the Confirmation Order, the Debtors may seek an expedited hearing before the Bankruptcy Court to address such objection.  The Confirmation Order shall provide that:

(i)     the Debtors, the Purchaser, the Exit Lender and the Plan Administrator are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan;

(ii)     the provisions of the Confirmation Order are non-severable and mutually dependent; and

(iii)     the Sale Order is incorporated as part of the Confirmation Order.

(a)     All documents and agreements necessary to implement the Plan shall have been, as applicable to each such document and agreement: (a) tendered for delivery; (b) all conditions precedent thereto shall have been satisfied; and (c) shall have been effected

or executed; which documents and agreements shall include, but not be limited to the Purchase Agreement, Exit Loan #1 Loan Agreement and Exit Loan #2 Loan Agreement.

(b)    All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable laws.

(c)    All conditions precedent to the obligations of the Debtors and the Purchaser in the Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof.

(d)    The Sale Order shall have been entered and become a Final Order.

(e)    The amounts payable at Closing by Purchaser in accordance with the Purchase Agreement shall have been paid.

(f)    The Closing Date (as defined in the Purchase Agreement) of the Sale Transaction shall have occurred.

## 3.    WAIVER OF CONDITIONS

The Debtors, in their discretion, and with the consent of the Exit Lender (which consent shall not be unreasonably withheld), may, at any time, waive any of the conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article XII of the Plan without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## 4.    EFFECT OF NON-OCCURRENCE OF CONDITIONS TO CONSUMMATION

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other parties in interest; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other parties in interest in any respect.

## L.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

## 1.    COMPROMISE AND SETTLEMENT

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and their respective distributions and treatments under the Plan take into account for and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code,

substantive consolidation or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence will be settled, compromised and released pursuant to the Plan, including for substantive consolidation purposes.  The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan, including all issues pertaining to Claims for substantive consolidation (which are settled by the distributions in the Plan) are (1) in the best interests of the Debtors and their Estates, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  In addition, the allowance, classification and treatment of Allowed Claims take into account any causes of action, Claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist: (1) between the Debtors and the Releasing Parties; and (2) as between the Releasing Parties (to the extent set forth in any Third Party Release).  As of the Effective Date, any and all such causes of action, Claims and counterclaims are settled, compromised and released pursuant to the Plan.  The Confirmation Order will approve all such releases of contractual, legal and equitable subordination rights, causes of action, Claims and counterclaims against each such Releasing Party that are satisfied, compromised and settled pursuant to the Plan.  Nothing in Article XIII.A of the Plan will compromise or settle in any way whatsoever, any Claims or Causes of Action that the Debtors, the Post-Confirmation Estates, or the Plan Administrator may have against the Non-Released Parties.

## 2.   RELEASES BY THE DEBTORS

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES, INCLUDING, BUT NOT LIMITED TO: (A) THE EXTENSIONS OF CREDIT UNDER THE DIP FACILITY AND THE EXIT LOANS AND THE TREATMENT OF THE CSX UNSECURED CLAIMS BY CSX; (B) THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT TO THE PLAN OR OTHERWISE; AND (C) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS AND DIRECTORS IN FACILITATING THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, AND IN VIEW OF THE INDEMNIFICATION PURSUANT TO ARTICLE XIII.E OF THE PLAN OF DEBTORS' FORMER OFFICERS AND DIRECTORS AS INDEMNIFIED PARTIES, EACH OF THE DEBTORS SHALL PROVIDE A FULL DISCHARGE AND RELEASE TO THE DEBTOR RELEASEES (AND EACH SUCH DEBTOR RELEASEE SO RELEASED SHALL BE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS) AND EACH SUCH DEBTOR RELEASEE'S RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE**

EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE
DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE
DEBTORS OR THE PLAN ADMINISTRATOR WOULD HAVE BEEN LEGALLY
ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR
THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER PERSON
OR ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON
BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES AND FURTHER
INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR
THE PLAN; *PROVIDED, HOWEVER*, THAT THE FOREGOING DEBTOR RELEASE
SHALL NOT OPERATE TO WAIVE OR RELEASE ANY OF THE DEBTOR
RELEASEES FROM ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND
PRESERVED BY THE PLAN OR PLAN SUPPLEMENT, NOR SHALL IT RELEASE
CSX OR EXIT LENDER FROM ANY OF THEIR OBLIGATIONS UNDER THE PLAN,
THE PENSION PLANS, EXIT LOAN #1 LOAN AGREEMENT, OR EXIT LOAN #2
LOAN AGREEMENT.

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE
CONTRARY, THE DEBTORS WILL NOT HAVE RELEASED NOR BE DEEMED TO
HAVE RELEASED BY OPERATION OF ARTICLE XIII.B OF THE PLAN OR
OTHERWISE ANY CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES,
ACTIONS, INTERESTS, REMEDIES, LIABILITIES OR CAUSES OF ACTION THAT
THEY, THE POST-CONFIRMATION ESTATES OR THE PLAN ADMINISTRATOR
MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES.

ENTRY OF THE CONFIRMATION ORDER WILL CONSTITUTE THE
BANKRUPTCY COURT'S APPROVAL, PURSUANT TO SECTION 363 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, OF THE DEBTOR
RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED
PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER,
SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE
DEBTOR RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE
CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING
GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY
THE DEBTOR RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND
ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D)
APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A
BAR TO THE DEBTORS OR PLAN ADMINISTRATOR ASSERTING ANY CLAIM
RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR
RELEASEES OR THEIR RESPECTIVE PROPERTY.

3.    THIRD PARTY RELEASE

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE
CONTRARY, ON THE EFFECTIVE DATE, EFFECTIVE AS OF THE EFFECTIVE
DATE, THE RELEASING PARTIES SHALL PROVIDE A FULL DISCHARGE AND
RELEASE (AND EACH ENTITY SO RELEASED SHALL BE DEEMED RELEASED
BY THE RELEASING PARTIES) TO THE DEBTOR RELEASEES, AND THEIR

**RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN; _PROVIDED, HOWEVER_, THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY OF THE DEBTOR RELEASEES FROM ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR PLAN SUPPLEMENT, NOR SHALL IT RELEASE CSX OR EXIT LENDER FROM ANY OF THEIR OBLIGATIONS UNDER THE PLAN, THE PENSION PLANS, EXIT LOAN #1 LOAN AGREEMENT, OR EXIT LOAN #2 LOAN AGREEMENT.**

**THE THIRD PARTY RELEASE SHALL HAVE NO EFFECT ON THE CLAIMS OF RELEASEES TREATED UNDER THE PLAN, TO THE EXTENT OF ALLOWANCE OF CLAIMS AND SATISFACTION OF CLAIMS PURSUANT TO THE PLAN.**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, THE RELEASING PARTIES SHALL NOT HAVE RELEASED NOR DEEMED TO HAVE RELEASED BY OPERATION OF THIS ARTICLE XIII.C OR OTHERWISE ANY CLAIMS OR CAUSES OF ACTION THAT THEY, THE DEBTORS, THE POST-CONFIRMATION ESTATES OR THE PLAN ADMINISTRATOR MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, _AND FURTHER_, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED BY THE THIRD PARTY RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR PROPERTY.**

**THE DIP LENDER, IN ITS CAPACITY AS SUCH, HEREBY RELEASES ALL CLAIMS, CAUSES OF ACTION, AND ANY OTHER DEBTS, OBLIGATIONS,**

**RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DIP LOAN CREDIT AGREEMENT, AGAINST THE DEBTOR RELEASEES.**

## 4.    EXCULPATION

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties will neither have nor incur any liability to any Person or Entity for any prepetition or postpetition act taken or omitted to be taken in connection with or related to formulating, negotiating, preparing, disseminating, implementing, administering the Plan or otherwise, the Plan Supplement, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or confirming or consummating the Plan; *provided*, *however*, that the provisions of Article XIII.D of the Plan shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; provided still further, that the foregoing Exculpation shall not apply to any acts or omissions expressly set forth in and preserved by the Plan or Plan Supplement.

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties will not include the Non-Released Parties, and the Plan will not exculpate nor be deemed to have exculpated the Non-Released Parties for any acts he has taken, whether in contemplation of the restructuring of the Debtors, in confirming or consummating the Plan, or otherwise.

## 5.    INDEMNIFICATION

(I) Effective as of the Effective Date, the Post-Confirmation Estates will indemnify and hold harmless, except as provided in the Plan Supplement, each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such parties arising from or related in any way to any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those arising from or related in any way to: (a) any action or omission of any such party in such party's capacity as an officer, director, employee or agent of, or advisor to any Debtor; (b) any disclosure made or not made by any Person to any current or former Holder of any indebtedness of the Debtors; and (c) any action taken or not taken in connection with the Chapter 11 Cases, or the Plan. In the event that any such party becomes involved in any action, proceeding or investigation brought by or against any

Person, as a result of matters to which the foregoing indemnity may relate, the Post-Confirmation Estates will promptly reimburse any such party for its reasonable legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof; *provided, however*, that the obligations of the Post-Confirmation Estates with respect to Article XIII.E of the Plan will be limited to the Plan Funds then on hand less all allocated but unpaid distributions to Holders of Allowed Claims and accrued and unpaid expenses required to be paid under the Plan, and *provided, further*, that, notwithstanding anything in the Plan to the contrary, the Plan will not indemnify nor be deemed to have indemnified the Non-Released Parties, whether for any matter to which Article XIII.E of the Plan pertains or otherwise.

(II) Effective as of the Effective Date, the Post-Confirmation Estates will indemnify and hold harmless, except as provided in the Plan Supplement, the Plan Administrator, and its professionals and their respective representatives, for all costs, expenses, loss, damage or liability incurred by any such parties arising from or related in any way to any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, from and after the Effective Date arising in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place after the Effective Date arising from or related in any way to the Chapter 11 Cases, the Debtors, the Post-Confirmation Estates and the Plan, including, without limitation, those arising from or related in any way to: (a) any action or omission of any such party in such party's capacity as an officer, director, employee or agent of, or advisor to any Debtor; (b) any disclosure made or not made by any Person to any current or former Holder of any indebtedness of the Debtors; and (c) any action taken or not taken in connection with the Chapter 11 Cases, or the Plan. In the event that any such party becomes involved in any action, proceeding or investigation brought by or against any Person, as a result of matters to which the foregoing indemnity may relate, the Post-Confirmation Estates will promptly reimburse any such party for its reasonable legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof; *provided, however*, that the obligations of the Post-Confirmation Estates with respect to Article XIII.E of the Plan shall be limited to the Plan Funds then on hand less all allocated but unpaid distributions to Holders of Allowed Claims and accrued and unpaid expenses required to be paid under the Plan.

(III) *Provided, however*, that the foregoing provisions of Article XIII.E of the Plan will have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

## 6.     PRESERVATION OF RIGHTS OF ACTION

(a)     *Maintenance of Causes of Action*

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date the Plan Administrator will retain all rights to commence and pursue, as appropriate, any and all

Other Actions, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases and all actions set forth in the Plan Supplement.

Except as otherwise provided in the Plan, the Purchase Agreement or the Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and Causes of Action, and which such Claims, rights and Causes of Action are Excluded Assets that the Debtors may hold against any Entity will vest upon the Effective Date in the Post-Confirmation Estates, to be administered by the Plan Administrator; *provided, however*, that neither the Debtors, the Post-Confirmation Estates, the Plan Administrator, nor any other party, shall pursue any Chapter 5 Claim which is an Excluded Asset; *provided, further* that notwithstanding any other provision of the Plan, the Debtors shall retain the right to object to the Allowance of any Claim pursuant to section 502(d) of the Bankruptcy Code.  The Plan Administrator, through its authorized agents and representatives, shall retain and may exclusively enforce any and all Other Actions. After the Effective Date, the Plan Administrator will have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all Other Actions, without the consent or approval of any third party and without any further application to or order of the Bankruptcy Court.

(b)   <em>Preservation of All Causes of Action Not Expressly Sold, Settled or Released</em>

Unless a Claim or Cause of Action against a Holder or other Person or Entity is acquired by Purchaser (and is not an excluded asset under the applicable Purchase Agreement) pursuant to the Purchase Agreement, or is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Sale Order and the Confirmation Order), subject to the terms of the Purchase Agreement, the Debtors expressly reserve such Claim or Cause of Action for later adjudication by the Debtors or the Plan Administrator (including, without limitation, Claims and Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the Debtor Release contained in Article XIII.B of the Plan) or any other Final Order (including the Confirmation Order).  In addition, under the Plan, the Debtors and Plan Administrator expressly reserve the right to pursue or adopt any Claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, unless such Claims are acquired by Purchaser pursuant to the Purchase Agreement.

7.      **INJUNCTION**

(a)     FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES WILL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE DEBTORS, THE EXIT LENDER OR THE PLAN ADMINISTRATOR, THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER SHAREHOLDERS, OFFICERS, DIRECTORS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

(b)     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, THE PURCHASE AGREEMENT OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES WILL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS IN POSSESSION, THE DEBTORS' ESTATES, THE PLAN ADMINISTRATOR, CSX, THE EXIT LENDER, ANY OF THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER SHAREHOLDERS, OFFICERS, DIRECTORS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE.

(c)     THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS IN THE PLAN WILL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS OR PROPERTIES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS WILL BE SATISFIED AND RELEASED IN FULL.

(d)     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, THE PURCHASE AGREEMENT OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PARTIES AND ENTITIES ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, ON

55

**ACCOUNT OF ANY DISTRIBUTION, CLAIM OR EQUITY INTEREST DEALT WITH IN THE CHAPTER 11 CASES AND RELEASED HEREBY, FROM:**

**(i)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY DEBTOR, THE PLAN ADMINISTRATOR, THE EXIT LENDER, CSX, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER SHAREHOLDERS, OFFICERS, DIRECTORS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), OR ANY OF THEIR SUCCESSORS AND ASSIGNS, OR ANY OF THEIR ASSETS AND PROPERTIES;**

**(ii)    ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY DEBTOR, THE PLAN ADMINISTRATOR, THE EXIT LENDER, CSX, AND ANY OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER SHAREHOLDERS, OFFICERS, DIRECTORS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR RESPECTIVE ASSETS AND PROPERTIES;**

**(iii)    CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST ANY DEBTOR, THE PLAN ADMINISTRATOR, THE EXIT LENDER, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER SHAREHOLDERS, OFFICERS, DIRECTORS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), OR THE PROPERTY OR ESTATE OF ANY OF THE FOREGOING; OR**

**(iv)    ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM ANY DEBTOR, THE EXIT LENDER, THE PLAN ADMINISTRATOR OR AGAINST THE PROPERTY OR ESTATE OF ANY DEBTOR, OR THE PLAN ADMINISTRATOR, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER SHAREHOLDERS, OFFICERS, DIRECTORS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), EXCEPT TO THE EXTENT A**

**RIGHT TO SETOFF, RECOUPMENT OR SUBROGATION IS ASSERTED WITH RESPECT TO A TIMELY FILED PROOF OF CLAIM.**

**(e)    BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM RECEIVING DISTRIBUTIONS PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE INJUNCTIONS SET FORTH IN ARTICLE XIII.G OF THE PLAN.**

**(f)    NOTWITHSTANDING ANYTHING TO THE CONTRARY IN ARTICLE XIII.G OF THE PLAN, ARTICLE XIII.G OF THE PLAN SHALL NOT ENJOIN ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY AGAINST THE NON-RELEASED PARTIES.**

## M.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Persons and Entities with respect to all matters related to the Chapter 11 Cases, the Post-Consummation Estates, the Debtors and the Plan as legally permissible, including, but not limited to, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XV.D of the Plan adding Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date, _provided_, _however,_ that the Plan Administrator shall reserve the right to commence actions in all appropriate jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Sale Transaction, and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Purchase Agreement, Sale Order, Exit Loan #1 Loan Agreement, Exit Loan #2 Loan Agreement, the Plan, the Confirmation Order, or any Person's or Entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce Article XIII.A, Article XIII.B, Article XIII.C, Article XIII.D, and Article XIII.E of the Plan;

10.     enforce the injunction set forth in Article XIII.G of the Plan;

11.     resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article XIII of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

12.     enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.     resolve any other matters that may arise in connection with or relate to the Purchase Agreement, Exit Loan #1 Loan Agreement, Exit Loan #2 Loan Agreement, the Plan, the Disclosure Statement, the Sale Order, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.     enter an order and/or Final Decree closing the Chapter 11 Cases.

## N.      MISCELLANEOUS PROVISIONS

### 1.      EFFECTUATING DOCUMENTS, FURTHER TRANSACTIONS AND CORPORATE ACTION

The Debtors and the Plan Administrator are authorized to execute, deliver, file or record such contracts, instruments, releases, security agreements, deeds of trust, mortgages, collateral assignments, conveyance or sale documents, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions hereof pursuant to the Plan.

Prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the shareholders or directors of the Debtors will be

deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable state law without any requirement of further action by the shareholders or directors of the Debtors.

## 2.    PAYMENT OF STATUTORY FEES

All fees payable pursuant to section 1930 of title 28 of the United States Code after the Effective Date, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid prior to the closing of the Chapter 11 Cases on the earlier of when due or the Effective Date, or as soon thereafter as practicable.

## 3.    MODIFICATION OF PLAN

Effective as of the date hereof, and subject to the limitations contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Plan Administrator, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  Any such modification shall be made subject to the reasonable consent of the Purchaser, provided that if any party objects to such modification, the Debtors, or the Purchaser may seek an expedited hearing before the Bankruptcy Court to address such objection.

## 4.    REVOCATION OF PLAN

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void; and (c) nothing contained in the Plan will: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

## 5.    SUCCESSORS AND ASSIGNS

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan will be binding on, and will inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

## 6.    RESERVATION OF RIGHTS

Except as expressly set forth in the Plan, the Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by a Debtor or any Person with respect to the Plan will be or will be deemed to be an admission or waiver of any

rights of: (a) any Debtor with respect to the Holders of Claims or Equity Interests or other parties in interest; or (b) any Holder of a Claim or other party in interest prior to the Effective Date.

## 7.    SECTION 1146 EXEMPTION

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant to the Plan, including, but not limited to the Sale Transaction and the granting, and subsequent assignment, of the Mortgage and the enforcement of any rights thereunder, will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment in the United States, and the Sale Order and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 8.    FURTHER ASSURANCES

The Debtors, the Purchaser, the Exit Lender, Plan Administrator, all Holders of Claims receiving distributions under the Plan and all other parties in interest will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

## 9.    SEVERABILITY

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term of provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; _provided_, _however_, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtors and the Purchaser, provided that the Debtors or the Purchaser may seek an expedited hearing before the Bankruptcy Court to address any objection to any of the foregoing.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## V.    THE SOLICITATION; VOTING PROCEDURES

The following briefly summarizes procedures to accept and confirm the Plan.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.  The notice of the Confirmation Hearing sets forth additional information regarding voting procedures.

## A.    THE SOLICITATION PACKAGE

The following materials constitute the Solicitation Package:

- the notice of the Confirmation Hearing;

- the appropriate Ballot(s) and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope;

- the Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents which may be filed with the Bankruptcy Court (other than the Plan Supplement);

- a letter to the Holders in each of the Voting Classes urging them to vote to accept the Plan (the form of which is attached hereto as <u>Exhibit D</u>); and

- the Disclosure Statement Order, which, among other things, (a) approves this Disclosure Statement as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code, (b) fixes a voting record date, (c) approves solicitation and voting procedures with respect to the Plan, (d) approves the form of the Solicitation Package and the notices to be distributed with respect thereto, and (e) schedules certain dates in connection therewith.

The Core Group, all parties in interest on the 2002 List as of the Voting Record Date and all parties entitled to vote to accept or reject the Plan shall be served paper copies or a CD-ROM containing the Disclosure Statement Order, the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan.  Any party who is served a CD-ROM but desires a paper copy of these documents may request a copy from the Debtors' Voting Agent by writing to Voting Agent by writing to Greenbrier Voting Agent, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245 or calling (866)381-9100.  The Solicitation Package (except the Ballots) can also be obtained by any party by accessing the Voting Agent's website at <u>www.kccllc.net/greenbrier</u>.  Moreover, all parties entitled to vote to accept or reject the Plan shall receive a Solicitation Package containing paper copies of the notice of the Confirmation Hearing, an appropriate Ballot, and the Solicitation Procedures (which shall be an exhibit to the order approving this Disclosure Statement).

The Plan Supplement will be filed by the Debtors on or before June 8, 2009.  When filed, the Plan Supplement shall be made available on the Voting Agent's website at <u>www.kccllc.net/greenbrier</u>.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement.  However, parties may request a copy of the Plan Supplement from the Debtors' Voting Agent.

## B.    VOTING INSTRUCTIONS

Only the Holders of Allowed Claims in Classes 3, 4, and 5 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the Ballot and

returning it in the envelope provided to the Voting Agent by the Voting Deadline.  Voting Instructions are attached to each Ballot.

The Debtors, with the approval of the Bankruptcy Court, have Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, as the Claims and noticing agent and as the Voting Agent to assist in the solicitation process.  The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.  The Voting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable before the Confirmation Hearing.

The deadline to vote on the Plan is 4:00 p.m., Eastern Time, **June 11, 2009**.

BALLOTS

Ballots must be actually received by the Voting Agent by the Voting Deadline by using the envelope provided, or by First Class Mail, Overnight Courier or Personal Delivery to:

Greenbrier Balloting Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

If you have any questions on the procedures for voting on the Plan, please call the Voting Agent at the following telephone number: (866) 381-9100.

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR PLAN CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT ITS VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASSES 3, 4 AND 5 WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES.  IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

For all Holders:

By signing and returning a Ballot, each Holder of a Claim in Classes 3, 4 and 5 will also be certifying to the Bankruptcy Court and the Debtors that, among other things,

- the Holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has cast the same vote with respect to all Claims in a single Class;

- no other Ballots with respect to the amount of the Claims have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are thereby revoked.

## C.    VOTING TABULATION

To ensure that a vote is counted, the Holder of a Claim should: (a) complete a Ballot; (b) indicate the Holder's decision either to accept or reject the Plan in the boxes provided on the Ballot; and (c) sign and timely return the Ballot to the address set forth on the enclosed prepaid envelope by the Voting Deadline.  A Holder with Claims in more than one Class may receive more than one Ballot and each such Ballot will be coded for the particular Class.  The Ballot may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at the time the Ballot is transmitted, Creditors should not surrender certificates, instruments, or other documents representing or evidencing their Claims.

The Ballot does not constitute, and shall not be deemed to be, a proof of Claim or an assertion or admission of a Claim.  Only the following Holders of Claims in Voting Classes shall be entitled to vote with regard to such Claims:

1.    the Holders of Claims for which proofs of Claims have been timely filed, as reflected on the official Claims register, as of the close of business on the Voting Record Date, with the exception of those Claims subject to a pending objection filed before the Voting Deadline, unless such Claims are allowed for voting purposes pursuant to an Order of the Bankruptcy Court; *provided* *however*, to the extent that the Debtors have reached a settlement on a Claim for which a proof of Claim has been timely filed, the terms of such settlement shall govern for purposes of determining the Holder of the Claim and the amount of the Claim;

2.    the Holders of scheduled Claims that are listed in the Debtors' Schedules, with the exception of those scheduled Claims that are listed as contingent, unliquidated or disputed Claims (excluding such scheduled Claims that have been superseded by a timely-filed proof of Claim); and

3.    the Holders of Claims arising pursuant to an agreement or settlement with the Debtors executed prior to the close of business on the Voting Record Date, as reflected in a court pleading, stipulation, term sheet, agreement, or other document filed with the Bankruptcy Court, in an Order entered by the Bankruptcy Court, or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court regardless of whether a proof of Claim has been filed.

The assignee of a transferred and assigned Claim (whether a timely-filed or scheduled Claim) shall be permitted to vote such Claim only if the appropriate transfer/assignment form has been noted on the Bankruptcy Court's docket as of the close of business on the Voting Record Date.

In tabulating votes, the following hierarchy shall be used to determine the Claim amount associated with each Creditor's vote:

1.      The Claim amount settled and/or agreed upon by the Debtors prior to the Voting Record Date, as reflected in a court pleading, stipulation, term sheet, agreement or other document filed with the Bankruptcy Court, in an Order entered by the Bankruptcy Court, or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court;

2.      The Claim amount Allowed (temporarily or otherwise) pursuant to a an Order of the Bankruptcy Court;

3.      The Claim amount contained on a proof of Claim that has been timely filed by the relevant Claims Objection Bar Date (or deemed timely filed by the Bankruptcy Court under applicable law), *provided*, *however*, that Ballots cast by Creditors whose Claims are not listed on the Debtors' Schedules, but who timely file proofs of Claim in unliquidated or unknown amounts that are not the subject of an objection filed before the Voting Deadline, will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, and will count as Ballots for Claims in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; *provided*, *further*, *however*, that to the extent the Claim amount contained in the proof of Claim is different from the Claim amount set forth in a court pleading, stipulation, term sheet, agreement, or other document filed with the Bankruptcy Court as referenced in the Solicitation Procedures (which shall be an exhibit to the order approving this Disclosure Statement), the Claim amount in the court pleading, stipulation, term sheet, agreement, or other document filed with the Bankruptcy Court shall supersede the Claim amount set forth on the respective proof of Claim;

4.      The Claim amount listed in the Debtors' Schedules, provided that such Claim is not scheduled as contingent, disputed or unliquidated and has not been paid; and

5.      In the absence of any of the foregoing, zero.

The Claim amount established pursuant to the hierarchy described above shall control for voting purposes only, and shall not constitute the Allowed amount of any Claim.

Ballots received after the Voting Deadline in connection with the Debtors' request for Confirmation of the Plan will not be counted.  The method of delivery of the Ballots to be sent to the Voting Agent is at the election and risk of each Holder of a Claim.  Except as otherwise provided in an Order of the Bankruptcy Court, a Ballot will he deemed delivered only when the Voting Agent actually receives the original executed Ballot.  Delivery of a Ballot to the Voting Agent by facsimile, E-mail or any other electronic means will not be accepted.  No Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Voting Agent), or the Debtors' financial or legal advisors.  The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the

Bankruptcy Code and the terms of the Plan regarding modifications).  If the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Plan confirmation which materially adversely affect distributions to the Voting Classes, the Debtors will disseminate additional solicitation materials and will extend the solicitation, in each case only to the extent directed by the Court.

If multiple Ballots are received from the same Creditor with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  Creditors must vote all of their Claims or Equity Interests within a particular Plan class either to accept or reject the Plan and may not split their vote.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the same class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a class for the purpose of counting votes.

A Person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity should indicate such capacity when signing and, if required or requested by the applicable nominee or its agent, the Voting Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to so act on behalf of such claimant or beneficial holder.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

The Debtors will file with the Bankruptcy Court, as soon as practicable prior to the Confirmation Hearing, the Voting Report.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.

## VI.    CONFIRMATION PROCEDURES

## A.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for June 17, 2009, at 11:30 a.m. Eastern Time before the Honorable Kevin R. Huennekens, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, Richmond, VA, 23219.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be Filed with the Bankruptcy Court and served on or before 4:00 p.m., Eastern time, June 5, 2009, in accordance with the Disclosure Statement Order that accompanies this Disclosure Statement.  THE BANKRUPTCY COURT WILL NOT CONSIDER OBJECTIONS TO CONFIRMATION UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.  Objections to confirmation of the Plan must be served upon:

| | |
|---|---|
| McGuireWoods LLP<br>Attn: Dion W.  Hayes<br>One James Center<br>901 East Cary Street<br>Richmond, Virginia 23219-4030 | Greenbrier Claims Processing Center<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, CA 90245 |
| Office of the United States Trustee<br>Eastern District of Virginia<br>701 E.  Broad St., Suite 4304,<br>Richmond, Virginia 23219-1888 | Hunton & Williams LLP<br>Attn: Benjamin C.  Ackerly<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, Virginia 23219-4074 |
| Greenbrier Hotel Corporation<br>300 W. Main Street<br>White Sulphur Springs, WV 24986 | |

The Debtors will publish the notice of the Confirmation Hearing, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline, and the Confirmation Hearing Date, in the *Charleston Gazette* and the *Charleston Daily Mail*.

## B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied.  If so, the Bankruptcy Court shall enter the Confirmation Order.  The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims, Other Priority Claims and Secured Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtors believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) they have complied or will have complied with all of the requirements of chapter 11; and (c) the Plan has been proposed in good faith.

*Best Interests of Creditors Test/Liquidation Analysis*

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that the Plan provides, with respect to each class, that each Holder of a Claim or Equity Interest in such Class either: (1) has accepted the Plan; or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if Debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the Cash proceeds (the "Liquidation Proceeds") that a

67

chapter 7 trustee would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case and the assets of such Debtor's Estate were liquidated; (b) determine the distribution ("Liquidation Distribution") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were Confirmed and Consummated.

In chapter 7 liquidation cases, unsecured Creditors and Equity Interest Holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:

- Secured Creditors (to the extent of the value of their collateral);

- Chapter 7 Administrative Claims;

- Chapter 11 Administrative Claims;

- Priority Creditors;

- Unsecured Creditors; and

- Equity Interest Holders.

As described in more detail in the Liquidation Analysis set forth in Exhibit C hereto, the Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan because, among other reasons, distributions in a chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a period in order for a chapter 7 trustee and its professionals to become knowledgeable about these Chapter 11 Cases and the Claims against the Debtors. In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. Furthermore, in a chapter 7 liquidation, the recovery on account of the CSX Unsecured Claims would not be paid over to the Holders of Allowed Trade Claims or Allowed General Unsecured Claims, which would likely substantially dilute any potential distributions on account of such Allowed Trade Claims and Allowed General Unsecured Claims.

*Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan contemplates that substantially all of the assets of the Debtors will be sold and that the Exit Loans and/or the proceeds of the assets will be paid to the Creditors on account of Allowed Claims pursuant to the terms of the Plan. Since no

68

further reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the financial feasibility requirement. The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

*Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims or Equity Interests that is impaired under the Plan accept the Plan. A Class that is not Impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless the Plan leaves unaltered the legal, equitable and contractual rights to which the Claim or Equity Interest entitles the Holder of that Claim or Equity Interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if holders of such equity interests holding at least two-thirds in amount actually voting have voted to accept the plan.

The Claims in Classes 1 and 2 are not Impaired under the Plan, and as a result the Holders of such Claims are deemed to have accepted the Plan.

Claims in Classes 3, 4 and 5 are Impaired under the Plan, and as a result, the Holders of such Claims are entitled to vote thereon. Pursuant to section 1129 of the Bankruptcy Code, the Claims in Classes 3, 4 and 5 must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Classes. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Equity Interests in Class 6 are also Impaired. The members of this class will not receive a distribution under the Plan, are deemed to have rejected the Plan, and are not entitled to vote on the Plan.

### *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if all impaired classes entitled to vote on the plan have not accepted it, if the plan has been accepted by at least one impaired class (without counting the votes of any insiders of the Debtors).

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an impaired class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate

unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to how other classes that have equal rank are treated. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including the effect of applicable subordination agreements between parties. Accordingly, a plan could treat two classes of unsecured Creditors differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by debtors or transferred to another Entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of such plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of such plan, equal to the allowed amount of such claim; or (b) the Holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan, on account of that equity interest, property of a value, as of the effective date of such plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled or (iii) the value of such interest; or (b) if the class does not receive such an amount as required under (a), no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Plan provides that if any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cram down" provisions of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit or schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination

requirement, all Classes under the Plan are provided treatment by the Debtors that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.

## C.    IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION

Any interested party desiring further information about the Plan should contact counsel for the Debtors: McGuireWoods LLP, One James Center, 901 East Cary Street, Richmond, Virginia 23219, Attn. Dion W. Hayes, Esq. (dhayes@mcguirewoods.com) or by phone at (804) 775-1000.

## D.    DISCLAIMER

In formulating the Plan, the Debtors have relied on financial data derived from books and records. The Debtors therefore represent that everything stated in the Disclosure Statement is true to the best of their knowledge. The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and therefore does not recommend whether you should accept or reject the Plan.

The discussion in the Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to Creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT IS, OR SHALL BE DEEMED TO BE, AN ADMISSION OR STATEMENT AGAINST INTEREST BY THE DEBTORS FOR PURPOSES OF ANY PENDING OR FUTURE LITIGATION MATTER OR PROCEEDING.

ALTHOUGH THE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF. THE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THE DISCLOSURE STATEMENT.

THE DEBTORS AND THEIR PROFESSIONALS ALSO HAVE MADE A DILIGENT EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT PENDING LITIGATION CLAIMS AND PROJECTED OBJECTIONS TO CLAIMS.  HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  *THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE LITIGATION CLAIMS AND PROJECTED OBJECTIONS TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAMS.*

## VII.   PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE PLAN

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

### A.   GENERAL

The following provides a summary of various important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.

### B.   CERTAIN BANKRUPTCY LAW CONSIDERATIONS

*Parties-in-Interest May Object To Debtors' Classification of Claims*

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Equity Interest in a particular class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such class.  The Debtors believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created five classes of Claims, each encompassing Claims that are substantially similar to the other Claims in each such class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

*Failure to Satisfy Vote Requirement*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar to or as favorable to the Creditors as those proposed in the Plan.

*The Debtors May Not Be Able to Secure Confirmation of the Plan*

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Creditor of the Debtors might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and the value of distributions to non-accepting Holders of Claims and Equity Interests within a particular Class under the Plan will not be less than the value of distributions such Holders would receive if Debtors were liquidated under chapter 7 of the Bankruptcy Code.  While there can be no assurance that these requirements will be met, the Plan contemplates a liquidation and, therefore, should satisfy the requirement that it will not be followed by a need for further financial reorganization.  In addition, the Debtors believe that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following liquidation under chapter 7 of the Bankruptcy Code on the Effective Date when taking into consideration all administrative Claims and costs associated with any such chapter 7 cases.

The confirmation of the Plan is also subject to certain conditions as described in Section VI hereof.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims.  The cases likely would be converted to cases under chapter 7.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms of the Plan as necessary for Confirmation.  Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

*The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan and the Final DIP Order, the Debtors reserve the right to object to the amount or classification of any Claim.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim as to the Allowed Amount of a Claim.  Any Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

*Nonconsensual Confirmation*

In the event any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if at least one impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. The Debtors believe that the Plan satisfies these requirements, and pursuant to the Plan, will request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code if necessary in the event at least one qualified impaired Class has accepted the Plan.

*Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur soon after the Confirmation Date, there can be no assurance as to such timing. The Effective Date of the Plan cannot occur until the Sale Transaction closes. The closing of the Sale Transaction is conditioned upon several events, including achievement of Replacement Collective Bargaining Agreements with the Debtors' Unions in forms reasonably acceptable to the Purchaser, and obtaining consents to the Sale Transaction from certain third parties. The occurrence of these events is, in part, beyond the control of the Debtors, and the Debtors can provide no assurance that such events will occur.

*Substantive Consolidation Risks*

The Plan is premised upon substantively consolidating the Debtors for purposes of voting, confirmation, and distribution. The Debtors can provide no assurance, however, that (a) the Bankruptcy Court will enter an order granting the Debtors' request for substantive consolidation contemplated by the Plan; or (b) the Bankruptcy Court will overrule any objection that a party-in-interest might have to such substantive consolidation.

*Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Debtors are substantively consolidated and whether the Bankruptcy Court approves the distributions based on the payment of CSX's recovery on account of the CSX Unsecured Claims to Holders of Allowed Trade Claims and Allowed General Unsecured as described in the Plan. The occurrence of any such contingencies could affect distributions available to Holders of Allowed Claims under the Plan. Such occurrence, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

## C.    FACTORS AFFECTING THE POTENTIAL RECOVERIES OF HOLDERS OF CLAIMS IN VOTING CLASSES

As emphasized at various points throughout this Disclosure Statement, the Debtors cannot state with any degree of certainty what recovery will be available to Holders of Claims in

Voting Classes. The Debtors cannot know with any certainty, at this time, the number or size of Claims in Voting Classes that will ultimately be Allowed. Accordingly, the recovery on account of such Claims cannot be determined with any certainty at this time.

**D.      THE DEBTORS MAY BE UNABLE TO CLOSE THE SALE TRANSACTION**

The Debtors currently anticipate that they will be able to close the Sale Transaction with Purchaser. There are many factors outside of the Debtors' control, however, that affect the Debtors' ability to close the Sale Transaction, including (i) the ability of the Debtors to achieve Replacement Collective Bargaining Agreements in a form reasonably acceptable to the Purchaser, and (ii) the ability of the Debtors to obtain necessary third party consents to the sale or transfer of certain of their assets. Moreover, it is possible that the Debtors may not be able to meet certain additional closing conditions or a Material Adverse Effect may occur, and that the Purchaser would elect to terminate the Sale Transaction as a result of these failures. Consequently, the Debtors can provide no assurance that they will be successful in consummating the Sale Transaction. Failure to close the Sale Transaction would prevent the Effective Date from occurring.

**E.      THE BANKRUPTCY COURT MAY DECLINE TO MODIFY THE DEBTORS' COLLECTIVE BARGAINING AGREEMENTS**

As described in Section III herein, to assist in their ability to close the Sale Transaction, the Debtors filed the 1113 Motion. The Debtors can provide no assurances that the Bankruptcy Court will grant the 1113 Motion. If the Bankruptcy Court does not grant the 1113 Motion and the Debtors are unable to consensually achieve Replacement Collective Bargaining Agreements that are reasonably acceptable the Purchaser, the Debtors may be unable to consummate the Sale Transaction. Failure to close the Sale Transaction would prevent the Effective Date from occurring.

**F.      THE BANKRUPTCY COURT MAY PERMIT REJECTION OF THE DEBTORS' COLLECTIVE BARGAINING AGREEMENTS WHICH MAY PERMIT THE UNIONS TO STRIKE**

As described in Section III herein, the Debtors have sought to reject the Collective Bargaining Agreements in the 1113 Motion. In the event that the Collective Bargaining Agreements are rejected, the Unions may strike. If the Unions strike, the Debtors can provide no assurances that a Sale Transaction could be consummated. Failure to close the Sale Transaction would prevent the Effective Date from occurring.

**G.      FINANCIAL INFORMATION; DISCLAIMER**

Although the Debtors have used their reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

**H.**    **FACTORS AFFECTING THE DEBTORS**

**1.**    **Litigation Risks**

From time-to-time, the Debtors are subject to Claims or litigation incidental to their business.  As of the date of the Disclosure Statement, the Debtors are not currently involved in any legal proceedings that, individually or in the aggregate, are expected to have a material effect on their business, financial condition, results of operations or Cash flows.  The Debtors' major pending litigation includes the following matter:

On March 21, 2008, the Debtors' former President, Paul C. Ratchford ("Ratchford"), filed a lawsuit in Greenbrier County, West Virginia against GHC, CSX, and certain employees of the Debtors and CSX.  In his complaint, Ratchford alleges breach of contract, wrongful discharge, and various other Claims relating to the Debtors' termination of Ratchford's employment.  The Debtors can provide no assurance regarding the resolution of this lawsuit and its effect, if any, on distributions under the Plan.

**2.**    **Environmental Liability Factors**

The Debtors are subject to federal, foreign, state and local laws and regulations governing the protection of the environment and occupational health and safety, including laws regulating the generation, storage, handling, use and transportation of hazardous materials; the emission and discharge of hazardous materials into soil, air or water; and the health and safety of their employees.

Compliance with federal, state and local provisions relating to the discharge of materials into the environment, or otherwise relating to the protection of the environment, has not had a material impact on the Debtors' capital expenditures, earnings or competitive position.  The Debtors are not currently aware of any significant liability exposure with respect to laws imposing liability for the cleanup of contaminated property to which they may have sent waste for disposal.

The Debtors own property which has been impacted by environmental releases.  The Debtors may be liable for costs associated with investigation and/or remediation of contamination.  The Debtors do not believe that the total costs associated with remediating environmental contamination will be substantial or material to the Debtors' financial condition, but the Debtors can make no assurances that such obligations will be immaterial.

**I.**    **CERTAIN TAX MATTERS**

For a summary of certain federal income tax consequences of the Plan to certain Holders of Claims and to the Debtors, see Section VIII below, entitled "Certain Federal Income Tax Consequences."

**J.     RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein.  The Debtors may subsequently update the information in this Disclosure Statement, but they have no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.  Further, the financial information contained herein, unless otherwise expressly indicated, is unaudited.  Finally, neither the U.S. Securities and Exchange Commission nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits thereto.

**K.     LIQUIDATION UNDER CHAPTER 7**

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests and the Debtors' liquidation analysis is set forth in Section VI above entitled "CONFIRMATION PROCEDURES" and Exhibit C.

**THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD LOOKING STATEMENTS AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

**VIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Creditors, including without limitation Holders of Trade Claims, CSX Unsecured Claims, General Unsecured Claims, and Equity Interests.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury

Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date hereof and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been or will be obtained, and the Debtors do not intend to seek a ruling from the IRS as to any of such tax consequences.  Consequently, there can be no assurance that the IRS will not successfully challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Claims that are not United States persons (as defined in the Internal Revenue Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, but not limited to, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies).  The following discussion assumes that Holders of Trade Claims, CSX Unsecured Claims, General Unsecured Claims, and Equity Interests hold such interests as "capital assets" within the meaning of Internal Revenue Code § 1221.  Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Trade Claims, CSX Unsecured Claims, General Unsecured Claims, and Equity Interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under state, local, or foreign tax law.

The Debtors continue to explore various possible alternative structures to maximize the going concern value of the Debtors' Estates.  In this regard, if the Debtors determine that an alternative structure should be implemented, the Plan may be modified to effectuate such alternate structure, provided that such modifications shall not adversely affect the treatment and recoveries of Holders of Claims and Equity Interests set forth herein.

**The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each Creditor, including without limitation, Holders of Trade Claims, CSX Unsecured Claims, General Unsecured Claims, and Equity Interests. All Creditors are urged to consult their own tax advisors as to the U.S. federal income tax consequences, as well as any applicable state, local, and foreign consequences, of the restructuring.**

**IRS Circular 230 Disclosure**

**To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the U.S. Internal Revenue Code.  The tax advice contained in this Disclosure Statement was written to support the promotion or marketing of the transactions described in this Disclosure Statement.  Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

A.    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS**

1.    **Consequences to Holders of Unsecured Claims**

Pursuant to the Plan, Holders of Trade Claims, CSX Unsecured Claims, and General Unsecured Claims (collectively the "Unsecured Claims") will be surrendered for Cash.  This will be treated as a taxable exchange under Section 1001 of the Internal Revenue Code.  Accordingly, Holders of the Unsecured Claims should recognize gain or loss equal to the difference between: (i) the fair market value of any Cash received in exchange for the Unsecured Claims; and (ii) the Holder's adjusted basis, if any, in the Unsecured Claims.  Such gain or loss should be capital in nature so long as the Unsecured Claims are held as capital assets (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Unsecured Claims were held for more than one year.  To the extent that a portion of the Cash received in exchange for the Unsecured Claims is allocable to accrued but untaxed interest, the Holder may recognize ordinary income.  See "Accrued But Untaxed Interest" below.

(a)    *Accrued But Untaxed Interest*

To the extent that any amount received under the Plan by a Holder is attributable to accrued but untaxed interest, such amount should be taxable to the Holder as ordinary interest income, if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.  Conversely, a Holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by the Debtors.

The extent to which amounts received by a Holder will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes.  However, the IRS could take the position that the consideration received by a Holder should be allocated in some way other than as provided in the Plan.  Holders of Trade Claims, CSX Unsecured Claims, and General Unsecured Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

(b)    *Market Discount*

Holders who exchange Trade Claims, CSX Unsecured Claims, or General Unsecured Claims for Cash may be affected by the "market discount" provisions of Internal Revenue Code Sections 1276 through 1278.  Under these rules, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Trade Claim, CSX Unsecured Claim, or General Unsecured Claim.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a Holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that Holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the Holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimus* amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount).

Any gain recognized by a Holder on the taxable disposition of Trade Claims, CSX Unsecured Claims, and General Unsecured Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Trade Claims, CSX Unsecured Claims, and General Unsecured Claims were considered to be held by a Holder (unless the Holder elected to include market discount in income as it accrued).

## 2.     Consequences to Holders of Equity Interests

Holders of Equity Interests that are cancelled pursuant to the Plan should be allowed a worthless stock deduction (unless such Holder had previously claimed a worthless stock deduction with respect to any Equity Interests and assuming that the taxable year that includes the Plan is the same taxable year in which such stock first became worthless) in an amount equal to the Holder's adjusted basis in the Equity Interests.  A worthless stock deduction is a deduction allowed to a Holder of a corporation's stock for the taxable year in which such stock becomes worthless.  If the Holder held Equity Interests as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset.

## 3.     Information Reporting and Backup Withholding

Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  Debtor will comply with all applicable reporting requirements of the Internal Revenue Code.

THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE

DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**B.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO DEBTORS**

The Sale Transaction will constitute a taxable sale of the Purchased Assets.  The Debtors will recognize gain or loss on the Sale Transaction equal to the difference between: (i) the fair market value of the Sale Proceeds and the Assumed Liabilities; and (ii) the Debtors' adjusted basis in the Purchased Assets.

**IX.      CONCLUSION AND RECOMMENDATION**

The Debtors believe the Plan is in the best interests of all Creditors and urge the Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Debtors' Voting Agent no later than **June 11, 2009**.

Dated April 17, 2009

Respectfully submitted,

GREENBRIER HOTEL CORPORATION

By:     /s/_____
Its:     President

THE GREENBRIER RESORT AND CLUB MANAGEMENT COMPANY

By:     /s/_____
Its:     President

GREENBRIER IA, INC.

By:     /s/_____
Its:     President

GREENBRIER GOLF AND TENNIS CLUB CORPORATION

By:     /s/_____
Its:     President

OLD WHITE CLUB CORPORATION

By:     /s/_____
Its:     President

THE OLD WHITE DEVELOPMENT COMPANY

By:     /s/_____
Its:     President

Prepared by:

Dion W.  Hayes (VSB No.  34304)
Patrick L.  Hayden (VSB No.  30351)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors
and Debtors in Possession