# Exhibit E

(Marriott Purchase Agreement)


(Part 1 of 3)

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**March 18, 2009,**
**as amended March 23, 2009**

**by and among**

**THE GREENBRIER RESORT AND CLUB MANAGEMENT COMPANY,**

**GREENBRIER HOTEL CORPORATION,**

**GREENBRIER GOLF & TENNIS CLUB CORPORATION,**

**GREENBRIER IA, INC.,**

**OLD WHITE CLUB CORPORATION,**

**THE OLD WHITE DEVELOPMENT COMPANY**

**and**

**MARRIOTT HOTEL SERVICES, INC.**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND USAGE OF CERTAIN TERMS............................................2
    1.01    Definitions...................................................................................................2
    1.02    Usage.........................................................................................................21
ARTICLE II SALE AND TRANSFER OF PURCHASED ASSETS; CLOSING .....................22
    2.01    Purchased Assets......................................................................................22
    2.02    Excluded Assets.......................................................................................23
    2.03    Consideration...........................................................................................25
    2.04    Liabilities.................................................................................................28
    2.05    Closing.....................................................................................................29
    2.06    Condition of Purchased Assets. ...............................................................29
    2.07    Calculation of Average Net Operating Profit .........................................30
    2.08    Company Funding of Certain Hotel Costs...............................................34
    2.09    Tax Treatment of Deposit and Purchase Price.........................................34
ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS .....................36
    3.01    Organization.............................................................................................36
    3.02    Power, Authorization and Non-Contravention. .......................................36
    3.03    No Violations; Compliance with Legal Authorizations; Governmental
                    Authorizations.........................................................................................37
    3.04    Litigation..................................................................................................38
    3.05    Sufficiency of Purchased Assets; Title; Real Property. ..........................38
    3.06    Absence of Certain Changes or Events....................................................40
    3.07    Brokers.....................................................................................................41
    3.08    Sufficiency of Funds. ..............................................................................41
    3.09    Tax Returns..............................................................................................41
    3.10    Environmental Matters.............................................................................41
    3.11    Organizations Lists. ................................................................................41
    3.12    Membership Interests...............................................................................42
ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER......................43
    4.01    Organization.............................................................................................43
    4.02    Power, Consents; Absence of Conflicts..................................................43
    4.03    Binding Agreement. .................................................................................44
    4.04    Brokers.....................................................................................................44
    4.05    Sufficiency of Funds. ..............................................................................44
ARTICLE V COVENANTS OF SELLERS.............................................................................44
    5.01    Advice of Changes. .................................................................................44
    5.02    Conduct of Business. ...............................................................................45
    5.03    Necessary Consents. ................................................................................47
    5.04    Litigation..................................................................................................48
    5.05    Employment Matters................................................................................48
    5.06    Satisfaction of Closing Conditions. ........................................................50
    5.07    Access to Information. .............................................................................50
    5.08    Casualty...................................................................................................51

ARTICLE VI COVENANTS OF PURCHASER .........................................................................53
    6.01    Advice of Changes. ..............................................................................................53
    6.02    Litigation. ............................................................................................................53
    6.03    Satisfaction of Conditions Precedent. .................................................................54
    6.04    Due Diligence Reports. ........................................................................................54
ARTICLE VII ADDITIONAL COVENANTS .......................................................................54
    7.01    Further Assurances. .............................................................................................54
    7.02    Confidentiality. ....................................................................................................55
    7.03    Liquor License. ....................................................................................................55
    7.04    Checked Baggage. ................................................................................................56
    7.05    Safe Deposit Boxes. ............................................................................................56
ARTICLE VIII BANKRUPTCY PROCEDURES, ETC. .......................................................56
    8.01    Filing of Sale Motion; Entry of Bidding Procedures Order; Sellers' Plan. ..........56
    8.02    Other Filings. ......................................................................................................56
    8.03    Assumed Contracts; Rejected Contracts. .............................................................57
    8.04    Bankruptcy Court Approval. ...............................................................................57
    8.05    Break-Up Fee; Expense Reimbursement; Deposit. .............................................58
    8.06    Certain Tax Matters. ...........................................................................................59
ARTICLE IX CONDITIONS TO OBLIGATIONS OF SELLERS ........................................60
    9.01    Accuracy of Representations and Warranties; Performance of Covenants. ..........60
    9.02    Compliance with Law. ........................................................................................61
    9.03    Government Consents. .........................................................................................61
    9.04    Bankruptcy Orders. .............................................................................................61
    9.05    Replacement Collective Bargaining Agreements. ...............................................61
    9.06    GSCD Company. .................................................................................................61
    9.07    Other Deliveries. .................................................................................................61
ARTICLE X CONDITIONS TO OBLIGATIONS OF PURCHASER ...................................62
    10.01   Accuracy of Representations and Warranties; Performance of Covenants. ..........62
    10.02   Absence of Material Adverse Effect. ...................................................................63
    10.03   Compliance with Law. ........................................................................................63
    10.04   Government Consents; No Injunction. .................................................................63
    10.05   Third-Party Consents; Assignments; Other Documents. ......................................63
    10.06   [Omitted] .............................................................................................................63
    10.07   Bankruptcy Orders. .............................................................................................63
    10.08   Title Insurance; Survey; Phase II. .......................................................................63
    10.09   Other Deliveries. .................................................................................................64
    10.10   Replacement Collective Bargaining Agreements.  ...............................................65
    10.11   GSCD Company Consent.  ..................................................................................65
ARTICLE XI TERMINATION; REMEDIES ........................................................................66
    11.01   Termination of Agreement. .................................................................................66
ARTICLE XII PRORATIONS ...............................................................................................67
    12.01   Prorations Generally. ..........................................................................................67
    12.02   Rules for Specific Items of Income and Expense. ...............................................68
    12.03   Interest. ................................................................................................................71
    12.04   Revenue Contracts and Reservations. .................................................................71
    12.05   Survival. ..............................................................................................................71

ARTICLE XIII INDEMNIFICATION........................................................................71
    13.01  Purchaser Indemnity. ..................................................................71
    13.02  Sellers Indemnity.  ......................................................................71
    13.03  Survival Period.  .........................................................................71
    13.04  Notice of Claim.  .........................................................................71
    13.05  Limitations. ................................................................................72
    13.06  Exclusive Remedy.  . ...................................................................73
    13.07  Satisfaction of Claims..................................................................73
    13.08  Contribution. ..............................................................................73
    13.09  Survival.  ....................................................................................74
ARTICLE XIV SELLERS' AGENT..........................................................................74
    14.01  Appointment and Reliance. .........................................................74
    14.02  Authority and Limitation of Liability.  .........................................74
    14.03  Disputes.  ...................................................................................75
ARTICLE XV MISCELLANEOUS............................................................................75
    15.01  Entire Agreement. .......................................................................75
    15.02  Assignment; Binding Upon Successors and Assigns...........................75
    15.03  No Third Party Beneficiaries. .......................................................76
    15.04  No Joint Venture. ........................................................................76
    15.05  Severability. ...............................................................................76
    15.06  Section Headings. ........................................................................76
    15.07  Amendment, Extension and Waivers...............................................77
    15.08  Survival of Representations, Warranties and Covenants......................77
    15.09  Public Announcement. ..................................................................77
    15.10  Governing Law. ...........................................................................77
    15.11  Jurisdiction; Venue; Waiver of Jury Trial. ......................................77
    15.12  Notices. ......................................................................................78
    15.13  Counterparts. ..............................................................................80
    15.14  Costs and Expenses......................................................................80
    15.15  Escrow Agent Provisions. .............................................................80

**Exhibits**

Exhibit A        Form of Bidding Procedures Order
Exhibit B        Form of Sale Order
Exhibit C        Deductions
Exhibit D        Chain Services
Exhibit E        Direct Deductions
Exhibit F        Central Office Services
Exhibit G        Marriott Guaranty
Exhibit H        First Mortgage
Exhibit I        Exit Term Loan #1 Agreement
Exhibit J        Exit Term Loan #1 Guaranty
Exhibit K        Second Mortgage
Exhibit L        Intercreditor Agreement
Exhibit M        Consent and Agreement

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is entered into as of March 18, 2009, and amended as of March 23, 2009.

**BY AND AMONG:**

(1)     Marriott Hotel Services, Inc., a corporation organized under the laws of Delaware (together with its successors and permitted assigns, "**Purchaser**");

(2)     Greenbrier Hotel Corporation, d/b/a The Greenbrier Resort, a corporation organized under the laws of the State of West Virginia (the "**Company**");

(3)     The Greenbrier Resort and Club Management Company, a corporation organized under the laws of the Commonwealth of Virginia ("**Parent**");

(4)     Greenbrier Golf & Tennis Club Corporation, a corporation organized under the laws of the State of West Virginia;

(5)     Old White Club Corporation, a corporation organized under the laws of the State of West Virginia;

(6)     Greenbrier IA, Inc., a corporation organized under the laws of the State of Delaware; and

(7)     The Old White Development Company, a limited liability organized under the laws of the State of West Virginia (The Old White Development Company, Greenbrier IA, Inc., Old White Club Corporation, Greenbrier Golf & Tennis Club Corporation, Parent and the Company are collectively the "**Sellers**" and each individually a "**Seller**").

Purchaser and Sellers are sometimes referred to herein individually as a "**party**" or collectively as the "**parties**".

**RECITALS:**

(A)     Sellers, either individually or collectively with one or more Sellers, own or lease the Real Property, including the Hotel commonly known as The Greenbrier Resort operated thereon, certain Tangible Personal Property used in connection therewith, the Membership Interests in GSCD Company, as well as certain other assets comprising the Purchased Assets.

(B)     Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser, the Purchased Assets upon the terms and subject to the conditions set forth in this Agreement.

(C)     Sellers have determined to file in United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**"), voluntary petitions to commence cases under chapter 11 of the Bankruptcy Code.

(D)     In anticipation of such filing, Sellers initiated discussions with Purchaser regarding Sellers' desire to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 105(a), 363 and 365, 1123(a)(5)(D),  1141(c), and the other applicable

provisions of the Bankruptcy Code, all of the Purchased Assets, together with the Assumed Liabilities, of the Sellers upon the terms and subject to the conditions set forth in this Agreement, and Purchaser desires to purchase and take delivery of such Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions.

(E)     The parties expect that the Purchased Assets will be sold pursuant to a Sale Order (defined below) of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and a Confirmation Order (defined below) confirming Sellers' Plan (defined below) and such Sale Order and Confirmation Order will include the assumption and assignment of certain executory contracts and liabilities thereunder under Sections 365 and 1123(b)(2) of the Bankruptcy Code and the terms and conditions of this Agreement.

(F)     Capitalized terms used in these Recitals shall have the meaning given such terms in Section 1.01 hereof.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND USAGE OF CERTAIN TERMS

1.01     Definitions.     For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.01:

"**Above Property Deductions**" has the meaning set forth in Section 2.07(a) hereof.

"**Accelerated Payment**" means any payment of the Fixed Payoff Amount in lieu of the then-remaining portion of the Purchase Price pursuant to Section 2.03(d)(i), (ii) or (iii).

"**Accounts Receivable**" means (a) all trade accounts receivable and other rights to payment from customers of the Business and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of products sold or services rendered to customers of the Business and the Sellers, and (b) all other accounts or notes receivable of the Business and the Sellers, and the full benefit of all security for such accounts or notes, and (c) any claim, remedy or other right related to any of the foregoing.

"**Actions**" has the meaning set forth in Section 14.02(e) hereof.

"**Affiliate**" means with respect to any Person, any Person that directly or indirectly, Controls, is Controlled by, or is under common Control with, such Person.

"**Agent**" has the meaning set forth in Section 14.01 hereof.

"**Aggregate Consideration**" has the meaning set forth in Section 2.09(d) hereof.

"**Agreement**" has the meaning set forth in the preamble.

2

"**Ancillary Agreements**" means either of or both of the "Sellers Ancillary Agreements" and the "Purchaser Ancillary Agreements" as the context requires.

"**Apportionment Time**" means 11:59 p.m. local time at the Hotel on the day preceding the Closing Date.

"**Asset Purchase**" has the meaning set forth in Section 2.09(b) hereof.

"**Assumed Contracts**" has the meaning set forth in Section 2.01(e) hereof.

"**Assumed Contracts Assignment**" has the meaning set forth in Section 9.07(c) hereof.

"**Assumed Cure Amounts**" means Cure Amounts totaling no more than Fifty Thousand Dollars ($50,000) in the aggregate.

"**Assumed Liabilities**" has the meaning set forth in Section 2.04(a) hereof.

"**Audit Firm**" shall mean a nationally recognized accounting firm that has not had any material relationship with the Sellers or Purchaser or any of their respective Affiliates at any time within the three (3) year period immediately preceding the Closing unless such requirement is waived by all parties.

"**Average Net Operating Profit**" means the average of the Net Operating Profit for Fiscal Years 2014 and 2015, as determined in accordance with Section 2.07 hereof.

"**Average Net Operating Profit Notice**" has the meaning set forth in Section 2.07(a) hereof.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bid Deadline**" means the date established in the Bidding Procedures Order as the deadline for submissions of Qualified Bids.

"**Bidding Procedures Order**" means an Order of the Bankruptcy Court, substantially in the form attached as Exhibit A hereto, that (a) approves Sellers' entrance into this Agreement and the Break-Up Fee and Expense Reimbursement on the terms and conditions set forth in Section 11.01(e) and (b) otherwise is in form and substance reasonably acceptable to Purchaser and that (i) conforms to the description set forth in Section 8.04(c), (ii) approves the provisions of Sections 5.02, 5.07, 8.01, and 8.05, and (iii) authorizes and directs Sellers to observe and perform their obligations under the Bidding Procedures Order.

"**Breach**" means any material breach of, or any material inaccuracy in, any representation or warranty or any material breach of, or failure to perform or comply in any material respect with, any covenant or obligation, in or of this Agreement or any other Contract, or any event that with the passing of time or the giving of notice, or both, would constitute such a material breach, inaccuracy or failure.

"**Break-Up Fee**" has the meaning set forth in Section 8.05 hereof.

"**Business**" means the business conducted by the Sellers, or any of them, on the date hereof, which shall include the ownership, leasing, operation and management of the Hotel as a going concern.

"**Business Day**" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks in New York, New York are permitted or required to be closed.

"**Central Office Services**" has the meaning set forth on Exhibit F attached hereto.

"**Chain Services**" has the meaning set forth on Exhibit D attached hereto.

"**Chapter 11 Cases**" means the voluntary cases that will be commenced by Sellers on the Petition Date under chapter 11 of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.05 hereof.

"**Closing Date**" has the meaning set forth in Section 2.05 hereof.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreements**" means those Contracts of the Company with the Unions dated February 1, 2003, whose terms have been extended by agreement to January 4, 2010, and which are designated as Collective Bargaining Agreements on Schedule 1.01(a) hereof.

"**Company**" has the meaning set forth in the preamble.

"**Company's Knowledge**" means the actual knowledge of the individuals, if any, holding the following positions with the Company (or if such positions have been discontinued their closest functional equivalent) on the date of this Agreement and/or on the Closing Date: President and Managing Director; Chief Financial Officer; Director of Finance; Vice President for Sales and Marketing; Director of Engineering; Vice President for Human Resources and Labor Relations; and General Manager of the Hotel. The individuals holding such positions (or their functional equivalent) as of the date of this Agreement are set forth on Schedule 1.01(b) hereof. The individuals holding such positions (or their functional equivalent) as of the Closing Date will be added to Schedule 1.01(b) hereof in accordance with Section 10.09(o) hereof.

"**Confidential Information**" has the meaning set forth in Section 7.02 hereof.

"**Confidential Materials**" means books, records or files (whether in a printed or electronic format) that consist of or contain any of the following: strategic plans for the Business containing proprietary Seller information; internal analyses; information regarding the marketing of the Business for sale; information relating to obtaining internal authorization for the sale of the Business by Sellers; attorney work product; attorney-client privileged documents; internal correspondence of Sellers related to any of the foregoing; documents, information and agreements relating to the Sellers' internal ownership and leasing structure for the Purchased Assets; or documents, information and agreements relating to Parent's stockholder.

"**Confidentiality Agreement**" has the meaning set forth in <u>Section 7.02</u> hereof.

"**Confirmation Order**" means an order of the Bankruptcy Court, confirming the Sellers' Plan, which order as entered shall be consistent with and incorporate the material terms of this Agreement and the Bidding Procedures Order.

"**Consumables**" means all opened and unopened food and alcoholic or non-alcoholic beverages located at the Hotel, excluding any alcoholic beverages that may not be legally transferred to Purchaser under Legal Requirements.

"**Contingent Deferred Purchase Price**" has the meaning set forth in <u>Section 2.09(d)</u> hereof.

"**Contract**" means, with respect to any Person, any written agreement, contract, subcontract, lease, license, sublicense, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, purchase order, work order, commitment, covenant, obligation, promise or undertaking of any nature to which such Person is a party or by which its properties or assets may be bound.

"**Control**" (including with correlative meaning, Controlled by and under common Control with) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Cure Amounts**" means amounts required to be paid in order to cure any pre-or post-petition monetary or other defaults under any Assumed Contracts in accordance with the provisions of Section 365 of the Bankruptcy Code, the Bidding Procedures Order, the Sale Order, the Executory Contract Assumption and Assignment Order and the Confirmation Order.

"**Current Member**" means DPS – WV, LLC (or the current legal and beneficial owner(s) of all of the membership interests in GSCD Company other than the Membership Interests).

"**De Minimus Amount**" means Fifty Thousand Dollars ($50,000).

"**Deductible**" means Five Hundred Thousand Dollars ($500,000).

"**Deductions**" has the meaning set forth in <u>Exhibit C</u> hereof.

"**Deposit**" has the meaning set forth in <u>Section 2.03(b)</u> hereof.

"**Direct Deductions**" means the categories of Deductions set forth on <u>Exhibit E</u> attached hereto, as such categories may from time to time be modified, increased or decreased by Manager (or Hotel owner if there is no Manager) consistent with modifications, increases or decreases generally applied to JW Marriott Hotels and Resorts in the continental United States and Canada or such other brand with which the Purchaser may affiliate the Hotel, recognizing that the Hotel will be operated under the name The Greenbrier Resort.

"**Disclosure Schedules**" means the Disclosure Schedules to this Agreement provided by the Sellers to Purchaser.

"**Effective Time**" means 11:59 p.m. on the Closing Date.

"**Employee Claims**" shall mean any and all claims (including all fines, judgments, penalties, costs, litigation and/or arbitration expenses, attorneys' fees and expenses, and costs of settlement with respect to any such claim) by any employee or employees of Manager against the Hotel owner or Manager with respect to the employment at the Hotel of such employee or employees. "Employee Claims" shall include, without limitation, the following:  (i) claims that are eventually resolved by arbitration, by litigation or by settlement; (ii) claims that also involve allegations that any applicable employment-related contracts affecting the employees at the Hotel have been breached; and (iii) claims that involve allegations that one or more of the Employment Laws has been violated; provided, however, that "Employee Claims" shall not include claims for worker compensation benefits or unemployment benefits.

"**Employment Laws**" shall mean any federal, state or local law (including the common law), statute, ordinance, rule, regulation, order or directive with respect to employment, conditions of employment, benefits, compensation, or termination of employment that currently exists or may exist at any time during the Term, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Workers Adjustment and Retraining Act, the Occupational Safety and Health Act, the Immigration Reform and Control Act of 1986, the Polygraph Protection Act of 1988 and the Americans With Disabilities Act of 1990.

"**Employee Plans**" means (a) all "employee benefit plans" (as defined in Section 3(3) of ERISA); (b) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and all collective bargaining agreements (other than Replacement Collective Bargaining Agreements described in Section 5.05(f)), and (c) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, section 125 cafeteria, dependant care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, in each case as to which the Company or any ERISA Affiliate has any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of the Sellers.

"**Encumbrance**" means any charge, claim (as defined in section 101(5)(A) and (B) of the Bankruptcy Code), debt, Liability, community property interest, condition, equitable interest, lien, option, pledge, charge, defect, adverse claim, security interest, mortgage, deed of trust, security interest, right of way, easement, covenant, encroachment, servitude, option, right of first refusal or similar restriction, including any restriction on use or reservation of any kind, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership of any kind whatsoever, whether or not any of the foregoing is liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, perfected, choate or inchoate, recorded, actual or contingent.

"**Environmental Claim**" means any investigation, claim, litigation, action, suit, proceeding, order, judgment, written notice or written demand arising under or relating to Environmental Law, including any such matter relating to (a) any actual, alleged or suspected failure to comply with any Environmental Law or to possess or comply with any Environmental

Permit, (b) any actual, alleged or suspected presence, Release or threatened Release of or exposure to any Hazardous Substance at any location, including any requirement or obligation to investigate, clean up or remediate any property or condition, (c) any actual or alleged contractual or other obligations arising under or relating to Environmental Laws, or (d) any personal injury, property damage, natural resources damage or other investigation, claim, litigation, action, suit, proceeding, order, judgment, written notice or written demand and any fines or penalties relating to any of the foregoing.

"**Environmental Law**" means any Legal Requirement, directive, rule, order, administrative ruling, decree, decision, judgment, interpretive guidance or requirement of any Governmental Authority (including any state, local, foreign or international counterparts or equivalents and any transfer of ownership notification or approval statutes) relating to: (i) the protection, investigation or restoration of the environment, human health and safety, or natural resources, (ii) the generation, handling, use, storage, treatment, transport, disposal, Release or threatened Release of any Hazardous Substance or (iii) noise, odor, vibration or wetlands protection.

"**Environmental Permit**" means any Governmental Authorization issued pursuant to any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that is a member of: (a) a "controlled group of corporations", as defined in Section 414(b) of the Code; (b) a group of entities under "common control", as defined in Section 414(c) of the Code; or (c) an "affiliated service group", as defined in Section 414(m) of the Code, or treasury regulations promulgated under Section 414(o) of the Code, any of which includes Sellers.

"**Escrow Agent**" has the meaning set forth in Section 2.03(b) hereof.

"**Excluded Assets**" has the meaning set forth in Section 2.02 hereof.

"**Excluded Contracts**" has the meaning set forth in Section 2.02(a) hereof.

"**Exclusivity Period**" has the meaning set forth in Section 5.09 hereof.

"**Executory Contract Assumption and Assignment Order**" means an Order of the Bankruptcy Court, which may be the Sale Order and must be in form and substance reasonably acceptable to Purchaser, that: (a) approves the provisions of Section 8.03(a); (b) authorizes Sellers, pursuant to Section 365 of the Bankruptcy Code, to assume and to assign to Purchaser, and Purchaser to assume, the Assumed Contracts; (c) determines that Purchaser has provided adequate assurance of future performance relative to the Assumed Contracts; and (d) establishes the amounts necessary to cure all defaults under the Assumed Contracts.

"**Exit Term Loan Agreement**" means the Exit Term Loan Agreement #1 dated as of the Closing Date by and between the Sellers and CSX Business Management, Inc., a Delaware corporation, in the form attached hereto as Exhibit I.

"**Exit Term Loan Guaranty**" means the Parent Guaranty dated as of the Closing Date executed by CSX Corporation, a Virginia corporation, in favor of Purchaser, in the form attached hereto as Exhibit J.

"**Expense Reimbursement**" has the meaning set forth in Section 8.05 hereof.

"**FF&E**" means furniture, furnishings, fixtures, soft goods, case goods, signage, audio-visual equipment, kitchen appliances, and equipment, including front desk and back-of-the house computer equipment.

"**FF&E Reserve**" means a reserve for additions, repair and replacement of FF&E.

"**Final Accounting**" has the meaning set forth in Section 12.01(b) hereof.

"**Fiscal Year**" means Marriott's Fiscal Year which, as of the Effective Time, ends at midnight on the Friday closest to December 31st in each calendar year; the new Fiscal Year begins on the Saturday immediately following said Friday, as the same may be changed in the future by Marriott, provided that Fiscal Years 2014 and 2015 shall consist of at least 52 weeks.

"**First Mortgage**" has the meaning set forth in Section 2.03(e) hereof.

"**Fixed Asset Supplies**" shall mean items included within "Property and Equipment" under the Uniform System of Accounts that may be consumed in the operation of the Hotel or are not capitalized, including, but not limited to, linen, china, glassware, tableware, uniforms, and similar items, used in the operation of the Hotel.

"**Fixed Payoff Amount**" means the Minimum Amount, as adjusted  pursuant to Section 2.03(f).

"**Force Majeure**" means acts of God, acts of terrorism, acts of the public enemy, labor disturbances, fire or explosion, war, insurrection, or any like causes beyond a party's reasonable control.

"**Furnishings**" means all furniture, fixtures, equipment, vehicles and other items of tangible personal property located at the Hotel and owned by any Seller (excluding the Consumables and Miscellaneous Hotel Assets).

"**GAAP**" means U.S. generally accepted accounting principles, applied on a consistent basis from period to period.

"**Governmental Authority**" means any:  (a) nation, state, commonwealth, province, territory, county, municipality or district; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"**Governmental Authorization**" means any approval, consent, ratification, waiver, license, permit or authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"**Gross Revenues**" means all revenues, receipts and income of every kind derived from operating the Hotel, which shall include any new or additional facilities or expansions after the Closing Date, and all departments and parts thereof, including, but not limited to:  income (from both cash and credit transactions) from rental of guest rooms, telephone charges, stores, offices, exhibit or sales space of every kind; license, lease and concession fees and rentals (not including gross receipts of licensees, lessees and concessionaires); proceeds from the sale of FF&E; income received by the Hotel from any gaming activities conducted at the Hotel (not including any gaming revenues received by any licensees, lessees or concessionaires with whom the owner of the Hotel has contracted to operate such gaming activities) (it being understood that Purchaser shall not be deemed to have breached any covenants under this Agreement, including the covenants set forth in <u>Section 2.07(d)</u>, to the extent the Hotel owner chooses not to pursue or maximize potential income generated by gaming activities); income from vending machines; income from parking; health club membership fees; food and beverage sales; all revenues from golf, spa, tennis and other recreational facilities of or related to the Hotel; wholesale and retail sales of merchandise; service charges; and proceeds, if any, from business interruption or other loss of income insurance (but excluding any amounts paid directly to the Manager by the insurer for loss of the Manager's fees or any other amounts payable to the Manager under the Hotel Management Agreement, if any, provided that the corresponding Deductions for such fees and other amounts payable to the Manager shall be decreased to reflect such direct payment to the Manager by the insurer); provided, however, that Gross Revenues shall not include the following:  distributions, payments or other consideration received in respect of the Membership Interests; gratuities to Hotel employees; federal, state or municipal excise, sales or use taxes or any other taxes collected directly from patrons or guests or included as part of the sales price of any goods or services; interest received or accrued with respect to the funds in the FF&E Reserve; any refunds, rebates, discounts and credits of a similar nature, given, paid or returned in the course of obtaining Gross Revenues or components thereof; insurance proceeds (other than proceeds from business interruption or other loss of income insurance); condemnation proceeds (other than for a temporary taking); or any proceeds from any sale or other disposition of the Hotel or from the refinancing of any debt encumbering the Hotel.

"**GSCD Company**" means The Greenbrier Sporting Club Development Company, LLC, a Delaware limited liability company.

"**GSCD Company Consent**" shall mean a written agreement executed by Purchaser and the Current Member, pursuant to which the Current Member consents to the transfer of the Hotel to Purchaser and the other transactions contemplated herein and either (a) (i) waives the Current Member's right to require the purchase of Current Member's membership interests in the GSCD Company upon a sale of the Hotel to Purchaser pursuant to Section 5.9(b) of the Operating Agreement of GSCD Company and (ii) agrees that Purchaser or its transferee is entitled to participate in the management of the GSCD Company, or (b) sets forth the terms agreed upon by the Current Member and Purchaser pursuant to which Purchaser has agreed to purchase the membership interests in the GSCD Company owned by the Current Member (it being understood that Purchaser shall not purchase the membership interests in the GSCD Company owned by the Current Member if Purchaser has exercised its option not to acquire the Membership Interests pursuant to <u>Section 10.08(d)</u> hereof or does not assume the Operating Agreement for GSCD Company).

"**GSCD Company Documents**" means collectively, (i) the Certificate of Formation for the Company as filed with the Secretary of State of the State of Delaware, and (ii) the Operating Agreement for GSCD Company, as amended.

"**Guest Ledger**" means all charges accrued to the open accounts of any guests or customers of the Hotel as of the Apportionment Time for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, and restaurant, bar or banquet services, or any other goods or services provided by or on behalf of the Sellers at the Hotel.

"**Hazardous Substance**" means:  (a) any material, substance or waste that is classified as "hazardous," "toxic," a "pollutant," a "contaminant," "radioactive" or words of similar meaning or effect under Environmental Laws; (b) any petroleum product or by-product, asbestos, asbestos-containing material, polychlorinated biphenyls, radioactive materials, radon, mold, urea formaldehyde insulation, or chlorofluorocarbons or other ozone-depleting substances; or (c) any substance, material or waste which by law requires special handling in its collection, storage, treatment or disposal.

"**Hotel**" means, collectively, (i) the Real Property and (ii) all right, title and interest of Sellers in and to the Furnishings, Consumables, Inventories, Miscellaneous Hotel Assets, assignable Governmental Authorizations relating to any of the foregoing, and assignable Intellectual Property Rights used or to be used in connection with the Hotel, but excluding the Confidential Materials, operated and known to the public as The Greenbrier Resort with an address of 300 West Main Street, White Sulphur Springs, West Virginia.

"**Hotel Abandonment**" means (i) any closure of the Hotel by the Purchaser or Marriott, as applicable, without any intention of resuming operation of the Hotel as a going concern or (ii) any closure, suspension or cessation of ongoing Hotel operations by the Purchaser or Marriott, as applicable, for a period of time in excess of 90 consecutive days, except (A) as a result of any Force Majeure event, (B) in connection with a temporary, seasonal closure for not more than one consecutive season (lasting not more than 120 consecutive days)  or three cumulative such seasons during the two-year period following the Closing Date or (C) to complete Hotel renovations and capital improvements.

"**Hotel Management Agreement**" means the management agreement or operating lease for the management of the Hotel by Marriott or any of its Affiliates in the event that Marriott or any of its Affiliates is not the Hotel owner and self-manages the Hotel.

"**Improvements**" means all buildings, improvements and fixtures, and components thereof, including the roof, foundation, load-bearing walls and other structural elements thereof; heating, ventilation, air conditioning, mechanical, electrical, plumbing and other building systems; environmental control, remediation and abatement systems; sewer, storm and waste water systems; irrigation and other water distribution systems; parking facilities; fire protection, security and surveillance systems; and telecommunications, computer, wiring and cable installations.

"**Indemnified Representations**" shall have the meaning set forth in <u>Section 13.03</u> hereof.

"**Inspection Activities**" has the meaning set forth in <u>Section 5.07</u> hereof.

"**Intellectual Property Rights**" means all worldwide industrial and intellectual property rights, including:  (a) patents, patent applications and patent rights; (b) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, domain names and other indicia of source and all goodwill associated therewith; (c) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (d) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections; (e) all source and object code, software, algorithms, architecture, structure, display screens, layouts, inventions, development tools; and (f) all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records, it being understood and agreed that all intellectual property rights associated with The Greenbrier Resort shall be included within the definition of "Intellectual Property Rights".

"**Intercreditor Agreement**" means the Intercreditor Agreement by and among the Company, as collateral agent for the Sellers, and Marriott, as Junior Lender, in the form attached hereto as <u>Exhibit L</u>, dated as of the Closing Date.

"**Interim Liquor Agreement**" has the meaning set forth in <u>Section 7.03(b)</u> hereof.

"**Inventoried Baggage**" has the meaning set forth in <u>Section 7.04</u> hereof.

"**Inventories**" means (i) all china, glassware, linens, silverware, kitchen and bar small goods, paper goods, guest supplies, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, laundry supplies, stationery, menus, uniforms, brochures and other promotional materials, and all other similar supplies and materials located at the Hotel and owned by any Seller, and (ii) all other inventories of the Business, wherever located, including all finished goods, sundry, gift shop and all other merchandise, materials and supplies to be used, consumed or resold by the Sellers.

"**IP Lease**" means that certain real property Lease Agreement between the Company as landlord and CSX IP, LLC as tenant, dated as of March 9, 2009.

"**Leases**" has the meaning set forth in <u>Section 3.05(d)</u> hereof.

"**Leased Real Property**" has the meaning set forth in <u>Section 3.05(d)</u> hereof.

"**Legal Requirement**" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, ordinance, by-law, principle of common law, regulation, rule, statute, or treaty.

"**Liability**" with respect to any Person, means any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"**Liquor Licenses**" has the meaning set forth in <u>Section 7.03(a)</u> hereof.

"**Losses**" means any and all direct and indirect Liabilities, judgments, claims, suits, proceedings, settlements, losses, damages, fees, Encumbrances, Taxes, penalties, interest obligations, expenses (including costs of investigation and defense and reasonable attorney and other professional advisor and consulting fees and expenses) incurred or suffered by any Person.

"**Manager**" means the manager or operating lessee under a Hotel Management Agreement.

"**Marriott**" means Marriott International, Inc., a Delaware corporation.

"**Marriott Acceleration Event**" means the occurrence of any one or more of the following events (regardless of the reason therefor): (a) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Marriott, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Marriott or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 75 days or an order or decree approving or ordering any of the foregoing shall be entered; (b) Marriott shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (a) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Marriott or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; (c) Marriott shall become unable, admit in writing its inability or fail generally to pay its debts as they become due; (d) Marriott shall expressly contest the validity or enforceability of the Marriott Guaranty in any Proceeding, or Marriott shall deny in writing that it has any further liability or obligation thereunder and such denial is not retracted in writing by Marriott within ten (10) Business Days after receiving notice from the Sellers requesting such retraction; or (e) Marriott or an Affiliate of Marriott shall cease to be the Manager or cease to otherwise operate and manage the Hotel (except, in either case, as a result of Hotel Abandonment); provided, however, that no "Marriott Acceleration Event" shall be deemed to have occurred under this clause (e) for a period of up to ninety (90) days if Marriott's or its Affiliate's rights under the Hotel Management Agreement have been terminated by the owner of the Hotel and Marriott or its Affiliate is contesting such termination in good faith pursuant to appropriate proceedings, provided that following such ninety (90) day period, a "Marriott Acceleration Event" shall be deemed to have occurred under this clause (e) if Marriott or its Affiliate has not been successful in enjoining the termination.

"**Marriott Guaranty**" has the meaning set forth in <u>Section 2.03(e)</u> hereof.

"**Marriott Hotel System**" means the chain of full-service hotels and resorts located in the continental United States and Canada which chain is operated by Marriott (or one or more of

its Affiliates) as a distinctive group, and with which chain the Hotel is affiliated at the applicable time after the Closing Date.

"**Marriott Trademark**" means  (i) the name and mark "Marriott"; (ii) the "M" logo; and (iii) any word, name, device, symbol, logo, slogan, design, brand, service mark, Trade Name, other distinctive feature or any combination of the foregoing, whether registered or unregistered, and whether or not such term contains the "Marriott" mark, that is used in connection with the Hotel or by reason of extent of usage is associated with hotels in the Marriott Hotel System.

"**Material Adverse Effect**" means (a) a material adverse change in or a material adverse effect on the Business as currently conducted, or as conducted consistent with Sellers' past practices; and/or (b) a material adverse change in or a material adverse effect on the operations or condition (financial or otherwise) of the Sellers, taken as a whole; and/or (c) a material adverse change in or a material adverse effect on the Purchased Assets or the use thereof, taken as a whole; and/or (d) a material adverse impact on the ability of any Seller to consummate the transactions contemplated by this Agreement, or to perform under this Agreement or the Sellers Ancillary Agreements; and/or (e) a material adverse change in or a material adverse effect on the legality, validity, binding effect or enforceability of this Agreement or the Sellers Ancillary Agreements, in each case set forth in clauses (a) through (e), other than any event, occurrence or effect resulting from (i) conditions affecting the industry of the Sellers generally which do not disproportionately impact the Sellers, the Purchased Assets, the Assumed Liabilities, the Assumed Contracts and the Business when compared to other businesses in the same industry, (ii) the announcement of this Agreement, the transactions contemplated hereby or the identity of Purchaser, (iii) changes in applicable Legal Requirements after the date hereof, (iv) the fact that the Sellers will be operating as debtors-in-possession under the Bankruptcy Code, (v) any actions taken by any Seller at Purchaser's request or with Purchaser's prior consent, (vi) changes in economic, regulatory or political conditions generally, or (vii) the entry of the Sale Order and the filing and administration of the Chapter 11 Cases; and/or (f) any event, circumstance, occurrence, or act or failure to act related to the Purchased Assets that has resulted in, or would be reasonably likely to result in, the imposition of criminal liability on any Seller or the Purchaser, or any Affiliate thereof, for a felony.  For the avoidance of doubt, continued deterioration in the revenues or bookings of the Hotel, and any reasonable business decisions made with respect to such continued deterioration in revenues or bookings, shall not constitute a Material Adverse Effect for any purpose under this Agreement, provided, however, that Seller shall comply with the provisions of Section 5.02(a)(iv) hereof.

"**Material Sellers Contract**" means an executory Sellers Contract that:

(i)     is a material loan or credit agreement, indenture, note, debenture, mortgage, pledge, security agreement, capital lease or guarantee;

(ii)     (A) involves or would reasonably be expected to involve aggregate annual payments after the date hereof by any Seller in excess of Fifty Thousand Dollars ($50,000) or its foreign currency equivalent as of the date of this Agreement or aggregate annual payments after the date hereof to any Seller in excess of Fifty Thousand Dollars ($50,000) or its foreign currency equivalent as of the date of this Agreement or (B) notwithstanding the foregoing clause (A), which involves or would reasonably be expected to involve aggregate annual payments after the date hereof to or by any Seller in excess of Twenty Five Thousand Dollars ($25,000) or its

foreign currency equivalent as of the date of this Agreement and is not terminable without penalty on thirty (30) days or less notice by any Seller;

    (iii)  has a term in excess of two (2) years after the date hereof;

    (iv)  has a term in excess of one (1) year after the date hereof and is not terminable without penalty on thirty (30) days or less notice by and Seller;

    (v)  is required to be filed with any Governmental Authority;

    (vi)  by its terms restricts the conduct of any line of business by any Seller or, after the Closing Date, would by its terms restrict the conduct of any line of business by the Purchaser or the Manager or any of their respective Affiliates;

    (vii)  provides for or otherwise relates to a joint venture, partnership, strategic alliance or similar arrangement;

    (viii)  is an agreement with an Affiliate;

    (ix)  is an employment, retention, severance or similar agreement;

    (x)  is a collective bargaining agreement or labor agreement;

    (xi)  is a management agreement;

    (xii)  is a material Lease;

    (xiii)  is a material equipment lease;

    (xiv)  relates to the Intellectual Property Rights owned or used by the Sellers; or

    (xv)  is a Third Party use agreement related to the use of the Hotel.

  "**MBS Systems**" means the processes developed by Marriott that consolidate, on a system-wide basis in the Marriott Hotel System, into one or more shared services centers, certain accounts payable, billing and accounts receivable, revenue capture subsidiary ledger, human resources management systems and related functions and procedures, or any similar or successor systems thereof.

  "**Membership Interests**" means the membership interests in GSCD Company owned by the Company as of the date hereof, which membership interests constitute eighty percent (80%) of the equity in GSCD Company.

  "**Membership Interests Assignment**" means the Assignment of the Membership Interests from the Company to Purchaser in form and substance reasonably satisfactory to Purchaser.

  "**Mid-Term Test Rate**" has the meaning set forth in <u>Section 2.09(g)</u> hereof.

"**Minimum Amount**" means Sixty Million Dollars ($60,000,000), subject to <u>Section 2.03(d)(i)</u>.

"**Miscellaneous Hotel Assets**" means all general intangibles (including all Intellectual Property Rights therein) relating to design, development, operation and use of the Hotel, all rights and work product under construction, service, consulting, engineering, architectural and other contracts (including warranties contained therein), receipts, accounting and business records, books and files relating solely to ownership or operation of the Hotel other than the Confidential Materials, plans and specifications of any portion of the Hotel, and keys and lock and safe combinations relating to the Hotel.

"**Necessary Consents**" has the meaning set forth in <u>Section 3.02(b)</u> hereof.

"**Net Operating Profit**" means (whether the Hotel is then-owned by Purchaser or a third party) the amount by which Gross Revenues exceeds Deductions, as measured in any one Fiscal Year.

"**Non-Foreign Person**" means any Person that is a citizen or national of, or is organized under the laws of, the United States (including one of the fifty (50) states, the District of Columbia, or Puerto Rico), provided that such Person (i) is not an Affiliate of any foreign government, any agency of a foreign government, or any representative of a foreign government, (ii) is not Controlled by or under common Control with any Person organized under the laws of any country other than the United States (including one of the fifty (50) states, the District of Columbia, or Puerto Rico) or who is not a citizen or national of the United States, and (iii) has its headquarters or principal place of business in the United States (including one of the fifty (50) states, the District of Columbia, or Puerto Rico).

"**Objection Notice**" has the meaning set forth in <u>Section 2.07(b)</u> hereof.

"**Old White Transactions**" means (i) the consolidation of the respective homeowners associations for the Greenbrier Village and Creekside neighborhoods into one homeowners association, (ii) the conveyance of some or all of the common areas in such neighborhoods to such consolidated association, and (iii) transactions incidental to the foregoing.

"**Order**" means any final, non-appealable order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator, provided, however, that no order shall fail to be an Order solely because of the possibility that a motion pursuant to Federal Rule of Civil Procedure 60 or Federal Rule of Bankruptcy Procedure 9024 may be filed with respect to such order.

"**Other Filings**" has the meaning set forth in <u>Section 8.02</u> hereof.

"**Owned Real Property**" means the land described in <u>Schedule 3.05(c)</u>, together with all right, title and interest of Sellers in and to (i) all rights, ways, easements, privileges and appurtenances thereto, (ii) all strips and gores appurtenant thereto, (iii) any land lying in the bed of any streets, roads and alleys appurtenant thereto, and (iv) the Improvements located thereon.

"**Parent**" has the meaning set forth in the preamble.

"**Party**" has the meaning set forth in the preamble hereto.

"**Permitted Encumbrance**" means (i) Encumbrances for Taxes, assessments or other similar charges imposed by any Legal Requirement (such as carrier's, warehousemen's and mechanic's liens and other similar liens) that are not yet delinquent, that relate to pre-petition periods or that are being contested in good faith to the extent Sellers provide to Purchaser security, reasonably satisfactory to Purchaser, against loss or damage by reason of such contest, (ii) restrictions under applicable securities laws, or organizational documents or stockholder or similar agreements set forth in Schedule 1.01(c) hereof, (iii) any rights of Third Parties under the Assumed Contracts, (iv) the exceptions to title set forth in Schedule 1.01(d) hereof and any other matters disclosed as exceptions to title in Purchaser's commitment(s) for title insurance obtained from the Escrow Agent relating to the Owned Real Property, (v) matters existing on the date hereof and which would be disclosed by an accurate survey of the Owned Real Property, (vi) the Leases set forth on Schedule 3.05(d), (vii) the Old White Transactions and (viii) other Encumbrances or imperfections on Purchased Assets that would not reasonably be expected to have a Material Adverse Effect, provided, however, that no mortgage, delinquent real estate taxes, assessment, judgment against any Seller or other lien of a monetary nature secured by or affecting the Purchased Assets, other than any lien of a monetary nature referenced in clause (i) of this definition, shall be a Permitted Encumbrance.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or any government or any agency or political subdivision thereof.

"**Petition Date**" means the date of commencement of the Chapter 11 Cases.

"**Post-Closing Tax Period**" means (i) any taxable period beginning after the Effective Time and (ii) with respect to a Straddle Period, the portion of such taxable period beginning immediately after the Effective Time.

"**Pre-Closing Tax Period**" means (i) any taxable period ending on or before the Effective Time and (ii) with respect to a Straddle Period, the portion of such taxable period ending at the Effective Time.

"**Proceeding**" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private).

"**Project Expenditures**" means all lawful expenditures made for the benefit of the Purchased Assets, including operations, sales and marketing, payment of Deductions, repair and maintenance, procurement, improvements, expansions, renovations, conversion to a Marriott brand, expenditures customarily made at or by Marriott Hotel System resort hotels and any other such expenditures of any kind or nature whatsoever made for the benefit of the Purchased Assets; provided, however, that all Project Expenditures shall be made for the benefit of the Hotel, except for Project Expenditures up to an amount of Seven Million Dollars ($7,000,000) that may be spent on operating losses associated with GSCD Company.

"**Property Taxes**" means personal property taxes, real property taxes and occupancy taxes imposed with respect to the operation of the Business and the ownership of the Purchased Assets.

"**Purchase Price**" has the meaning set forth in <u>Section 2.03(a)</u> hereof.

"**Purchased Assets**" has the meaning set forth in <u>Section 2.01</u> hereof.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Acceleration Event**" means the occurrence of any one or more of the following events (regardless of the reason therefor): (a) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Purchaser, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Purchaser or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 75 days or an order or decree approving or ordering any of the foregoing shall be entered; (b) Purchaser shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (a) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Purchaser or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; (c) Purchaser shall become unable, admit in writing its inability or fail generally to pay its debts as they become due; or (d) Hotel Abandonment.

"**Purchaser Ancillary Agreements**" has the meaning set forth in <u>Section 4.02</u> hereof.

"**Purchaser Indemnified Parties**" has the meaning set forth in <u>Section 13.02</u> hereof.

"**Purchaser Representatives**" has the meaning set forth in <u>Section 5.07</u> hereof.

"**Purchaser's Business**" means the business conducted by the Purchaser, or its successors and permitted assigns, following the Closing Date with respect to the operation of the Hotel and other Purchased Assets.

"**Purchaser's Knowledge**" means the actual knowledge of Michael E. Dearing, Richard S. Hoffman and the individuals on the date of this Agreement and/or on the Closing Date who are a part of the Development Asset Management Group of Marriott and are assigned by Purchaser to supervise the integration and implementation of the transactions contemplated under this Agreement.

"**Qualified Bid**" has the meaning set forth on Exhibit 1 to the Bidding Procedures Order.

"**Qualified Bidder**" has the meaning set forth on Exhibit 1 to the Bidding Procedures Order.

"**Real Property**" has the meaning set forth in Section 3.05(h) hereof.

"**Record**" means any information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"**Reduction**" has the meaning set forth in Section 2.07(d)(iii).

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing, disposing of or migrating into or through the environment or any natural or man-made structure.

"**Remediation**" means investigation, cleanup, removal, containment, disposal, restoration or other remedial activities to correct conditions at the Owned Real Property or real property owned by GSCD Company, as applicable, as required by Environmental Law.  Remediation shall include any monitoring or sampling activities required by any Environmental Law, regardless of whether any such remediation activities are required by any Governmental Authority.

"**Replacement Collective Bargaining Agreements**" has the meaning set forth in Section 5.05(f) hereof.

"**Requested Amount**" has the meaning set forth in Section 2.08 hereof.

"**Requested Information**" means, to the extent in any Seller's possession and to the extent it is not deemed to be Confidential Materials, (i) any surveys (including land and as built) of all or any portion of the Purchased Assets involving real property and the improvements thereon; (ii) any covenants, conditions, restrictions, reciprocal easement agreements and other similar agreements which affect or will affect or be binding on all or any portion of the Purchased Assets; (iii) any appraisals, property condition assessments, soils, engineering, environmental, geotechnical, traffic or other studies, reports, notices and information pertaining to all or any portion of the Real Property; (iv) any zoning variances, licenses and permits, authorizations, approvals, development agreements, and any correspondence with any Governmental Authority regarding all or any portion of the Purchased Assets; (v) all leases, concession agreements, service contracts, vendor contracts, and other contracts and agreements related to the Hotel, including all Sellers Contracts; (vi) all reasonably available financial and operational information relating to the Purchased Assets or Assumed Liabilities, none of which shall be deemed Confidential Materials; (vii) information related to any intercompany loans from or to Sellers that are contemplated to be Purchased Assets or Assumed Liabilities, (viii) any Phase I or Phase II environmental report and property condition report (i.e., a report on the condition of the Hotel's structural, mechanical, electrical and plumbing systems) and all other information related to the environmental condition of the Real Property or of the Hotel's compliance with any Environmental Laws, and (ix) any other pertinent information concerning the Purchased Assets or Assumed Liabilities that any Seller may have in its possession.

"**Resolution Period**" has the meaning set forth in Section 2.07(b) hereof.

"**Retained Liabilities**" has the meaning set forth in <u>Section 2.04(b)</u> hereof.

"**Sale Motion**" means the motion or motions, consistent with and incorporating all of the terms of this Agreement and the Bidding Procedures Order, filed by Sellers in accordance with <u>Section 8.1</u> hereof, pursuant to the provisions of Sections 363 and 365 of the Bankruptcy Code, among other things, to obtain the Sale Order, approve the transactions contemplated by this Agreement, authorize the Sellers' assumption and assignment of the Assumed Contracts to, and assumption thereof by, Purchaser and obtain the Bidding Procedures Order.

"**Sale Order**" means an order of the Bankruptcy Court, granting the Sale Motion filed by Sellers, substantially in the form attached as <u>Exhibit B</u> hereto, which order as entered shall be in form and substance reasonably acceptable to Purchaser.

"**Sale Transaction**" means (a) the sale of the Hotel or all or substantially all of the Sellers' assets, or (b) a merger, consolidation, equity purchase or similar transaction that results in a change of Control of the Company.

"**Schedule Delivery Date**" means ten (10) days after the entry of the Bidding Procedures Order.

"**Second Mortgage**" means the second priority Mortgage executed by Purchaser in favor of Marriott in the form attached hereto as <u>Exhibit K</u>, dated as of the Closing Date.

"**Seller**" or "**Sellers**" has the meaning set forth in the preamble.

"**Seller Indemnified Parties**" has the meaning set forth in <u>Section 13.01</u> hereof.

"**Seller Loan**" has the meaning set forth in <u>Section 2.09(b)</u> hereof.

"**Seller Loan Advances**" has the meaning set forth in <u>Section 2.09(c)</u> hereof.

"**Sellers Ancillary Agreements**" means all agreements to which a Seller is or will be a party that are required to be executed pursuant to or in connection with this Agreement.

"**Sellers Contract**" means any Contract:  (a) to which any Seller is a party; or (b) by which any Seller or any of its assets or properties is bound or subject to any obligation, including Leases, but excluding the Employee Plans.

"**Sellers' Plan**" means the joint chapter 11 plan to be proposed by Sellers in the Chapter 11 Cases seeking, among other things, Bankruptcy Court approval of the transactions contemplated by this Agreement, as such plan may be amended from time to time in accordance with the Bankruptcy Code and consistent with this Agreement.

"**Stand-Alone Plan**" means a plan of reorganization for Sellers that does not involve a Sale Transaction.

"**Straddle Period**" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"**Survey**" has the meaning set forth in <u>Section 10.08(a)</u> hereof.

"**Survival Period**" has the meaning set forth in <u>Section 13.03</u> hereof.

"**Tangible Personal Property**" means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories and Furnishings) of every kind owned or leased by a Person (wherever located and whether or not carried on such Person's books), together with any express or implied warranty by the manufacturers or the Sellers or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

"**Taxes**" means (a) any and all federal, state, local, foreign and other taxes, assessments and other governmental charges, fees, levies, tariffs, duties, impositions and Liabilities relating to taxes, including taxes based upon or measured by gross receipts, income, profits, alternative or add-on minimum, estimated, net worth, sales, use, occupation, value added, ad valorem, transfer, gains, windfall profits, capital stock, franchise, license, registration, recording, documentary, stamp, withholding, wage, payroll, recapture, employment, social security, disability, workers' compensation, unemployment, severance, unclaimed property, escheat, excise and property (real and personal) taxes, together with all interest, penalties and additions imposed with respect to such amounts, (b) any Liability for payment of any amounts of the type described in clause (a) as a result of being a member of an affiliated, consolidated, combined or unitary group, and (c) any Liability for amounts of the type described in clauses (a) and (b) as a result of any express or implied obligation to indemnify another Person or as a result of any obligations under any agreements or arrangements with any other Person with respect to such amounts and including any Liability for Taxes of a predecessor entity.

"**Tax Returns**" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"**Terminable Breach**" has the meaning set forth in <u>Section 5.01</u> hereof.

"**Termination Date**" has the meaning set forth in <u>Section 11.01(a)(iii)</u> hereof.

"**Third Party**" means a Person that is not (i) a party to this Agreement or (ii) an Affiliate of a party to this Agreement.

"**Transaction Proposal**" has the meaning set forth in <u>Section 5.09</u> hereof.

"**Transfer Taxes**" has the meaning set forth in <u>Section 8.06(b)</u> hereof.

"**Transferred Employees**" has the meaning set forth in <u>Section 5.05(a)</u> hereof.

"**True-Up**" has the meaning set forth in <u>Section 12.01(b)</u> hereof.

"**Uniform System of Accounts**" shall mean the *Uniform System of Accounts for the Lodging Industry*, Tenth Revised Edition, 2006, as published by the American Hotel & Lodging Educational Institute, as revised from time to time to the extent such revision has been or is in the process of being generally implemented within the Marriott Hotel System.

"**Unions**" shall mean the labor organizations that represent employees of the Company and which are party to Collective Bargaining Agreements with the Company as of the date of the this Agreement.

"**VDR**" means the Sellers' virtual data room hosted by Intralinks.

"**WARN Act**" means collectively, all federal, state and local plant closing laws, including the Worker Adjustment Retraining and Notification Act (29 U.S.C. § 2101, *et seq.*), as amended.

1.02    Usage.

(a)    Interpretation.    In this Agreement, unless a clear contrary intention appears:

(i)    the singular number includes the plural number and vice versa;

(ii)    references to any Person includes such Person's successors and assigns but, if applicable, only if such succession and assignment is not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

(iii)    reference to any gender includes each other gender;

(iv)    reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

(v)    reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement and reenactment of such section or other provision; provided, however, that the foregoing shall not apply in instances in which the Legal Requirement refers to a specific date, time or period;

(vi)    "**hereunder**", "**hereof**", "**hereto**" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision thereof;

(vii)    "**including**" (and with correlative meaning "**include**") means including without limiting the generality of any description preceding such term;

(viii)    "**or**" is used in the inclusive sense of "**and/or**";

(ix)    with respect to the determination of any period of time, "**from**" means "from and including" and "**to**" means "to but excluding";

(x)     references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto; and

(xi)     all references to "**dollars**" or "**$**" shall mean U.S. dollars.

(b)     <u>Accounting Terms and Determinations</u>.   Unless otherwise specified herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with the Uniform System of Accounts.

## ARTICLE II

## SALE AND TRANSFER OF PURCHASED ASSETS; CLOSING

2.01     <u>Purchased Assets</u>.   Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Effective Time, Sellers shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances, and Purchaser shall purchase and acquire from Sellers, Sellers' right, title and interest in and to all of the Sellers' property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located related to the Business, consisting solely of the following:

(a)     all of the Sellers' interests in the Real Property;

(b)     all Tangible Personal Property of the Sellers, except as excluded under Section 2.02(c);

(c)     the Hotel, including all Inventories and Consumables of the Sellers;

(d)     the Guest Ledger;

(e)     all Sellers Contracts set forth on <u>Schedule 2.01(e)</u> (collectively, the "**Assumed Contracts**");

(f)     to the extent transferable, all Governmental Authorizations relating to the Business or the Purchased Assets and all pending applications therefor or renewals thereof referred to in <u>Section 3.03(c)</u>;

(g)     all data and Records related to the operations of the Business (other than the Confidential Materials), including client and customer lists and Records, referral sources, equipment logs, operating guides and manuals, financial and accounting Records, Tax Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records (all in the state in which such records and information currently exist) and, subject to Legal Requirements, copies of all personnel Records and other Records described in <u>Section 2.02(g)</u>;

(h)     to the extent transferable, all of the intangible rights and property owned or licensed by the Sellers, including Intellectual Property Rights (including the right to sue and recover for past infringement), goodwill, and further including all files, correspondence, records or other documentation associated therewith, except as excluded under <u>Section 2.02(p)</u>;

(i)    to the extent transferable, all insurance benefits of the Sellers, including rights and proceeds, arising from or relating to the Purchased Assets or the Assumed Liabilities prior to the Effective Time, except as excluded under Section 2.02(e);

(j)    all rights of the Sellers relating to deposits and prepaid expenses, claims for refunds, indemnification rights and rights to offset relating to the Purchased Assets;

(k)    all security or other deposits relating to the Real Property and any equipment owned or leased by the Sellers;

(l)    to the extent within any Seller's possession, all customer lists and sales invoices related to the Business, whether generated by, or used by, any of the Sellers or any Affiliate of the Sellers;

(m)    the Sellers' claims, causes of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance action under any other applicable provisions of the Bankruptcy Code with respect to the Assumed Liabilities, the Assumed Cure Amounts and the Assumed Contracts, as well as all other claims, causes of action and rights of recovery of Sellers with respect to the Assumed Liabilities;

(n)    all proceeds of the foregoing and all other property of the Sellers of every kind, character or description, tangible and intangible, known or unknown, wherever located, or similar to the properties described above except for the Excluded Assets; and

(o)    subject to Section 10.08(d) hereof, the Membership Interests.

All of the foregoing property and assets are herein referred to collectively as the "**Purchased Assets**".

Notwithstanding the foregoing, the transfer of the Purchased Assets pursuant to this Agreement shall not include the assumption of any Liability in respect thereof unless the Purchaser expressly assumes such Liability pursuant to Section 2.04(a).

2.02    Excluded Assets.  Notwithstanding anything to the contrary contained in Section 2.01 or elsewhere in this Agreement, all of Sellers' property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, that are not related to the Business are not part of the sale and purchase contemplated hereunder, are excluded from the Purchased Assets, and shall remain the property of the Sellers after the Closing (collectively, the "**Excluded Assets**").  Excluded Assets shall include the following:

(a)    all of the Sellers Contracts that are not Assumed Contracts (the "**Excluded Contracts**");

(b)    all rights of the Sellers under this Agreement and the Sellers Ancillary Agreements;

(c)    the personal property and assets expressly set forth on Schedule 2.02(c);

(d)    the Sellers' claims, causes of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance action under any other applicable provision of the Bankruptcy Code that is not a Purchased Asset;

(e)    all rights under insurance policies to the extent relating to claims for losses related to any Excluded Asset or Retained Liability or that are non-assignable as a matter of law or Contract;

(f)    the Sellers' corporate seals, stock Record books, corporate Record books containing minutes of meetings of directors and stockholders, and such other Records having to do solely with the Sellers' organization or stock capitalization or Excluded Assets or Retained Liabilities;

(g)    all personnel Records and other Records that the Sellers are required by law to retain in their possession and all Confidential Materials;

(h)    assets, rights, privileges, claims, contracts and properties owned or held by Employee Plans;

(i)    all cash, cash equivalents and short-term investments (including all restricted cash and cash deposits to or for the benefit of utilities), including any cash deposits maintained in escrow and, except as included in Section 2.01(d) or Section 12.02(a), all Accounts Receivable for all periods prior to the Apportionment Time;

(j)    non-transferrable deposits such as utility deposits;

(k)    any interest in and to any Tax refunds and credits to the extent relating to time periods prior to the Closing Date, including Tax refunds from Affiliates of any Seller;

(l)    the Purchase Price and Accelerated Payment;

(m)    any equity interest in any of the Sellers;

(n)    all contracts of employment, whether written or oral, with any current or former employee, independent consultant or other service provider of or to the Sellers or any of their Affiliates;

(o)    all assets, rights, privileges, claims, contracts and properties in the possession of Sellers that are related to the assets, rights, privileges, claims, contracts and properties of Parent's direct stockholder and not otherwise related to the  lawful operation of the Business;

(p)    all Intellectual Property Rights using, and all goodwill related to, the name or mark "CSX" and all files, correspondence, records or other documentation related solely to Parent's direct stockholder;

(q)     any inter-company receivables due to the Sellers from any Affiliate of any Seller;

(r)     all licenses issued to any of the Sellers from the State of West Virginia's Office of West Virginia Alcohol Beverage Control Commissioner, except as listed on <u>Schedule 3.02(b)</u>;

(s)     any assets or reserves maintained pursuant to Employee Plans or other employee benefit plans (as defined under Section 3(3) of ERISA) or payroll practices regarding benefits or compensation earned through the Closing Date (for this purpose, Purchaser acknowledges that the assets of the three qualified employee benefit plans maintained by the Company for the benefit of the Sellers' eligible employees are not Purchased Assets); and

(t)     all Contracts, and all rights to services, set forth on <u>Schedule 3.05(e)</u>; and

(u)     all of Sellers' rights, demands, claims (as defined in the Bankruptcy Code) and causes of action arising with respect to the assertion or defense of claims against the Sellers under Sections 502 and 503 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 3007 and any other applicable Legal Requirement.

2.03   <u>Consideration</u>.

(a)     Subject to the terms and conditions hereof, in reliance upon the representations and warranties of Sellers and the covenants of Sellers herein set forth and as consideration for the sale and purchase of the Purchased Assets, Purchaser shall purchase the Purchased Assets and shall assume the Assumed Liabilities in exchange for an amount equal to five (5) times the Average Net Operating Profit (the "**Purchase Price**"), which Purchase Price, as adjusted pursuant to <u>Section 2.03(f)</u> hereof, shall be paid by Purchaser to the Company no later than fifteen (15) days following the final determination of the Average Net Operating Profit in accordance with the provisions of <u>Section 2.07</u>; <u>provided</u>, <u>however</u>, that in no event shall the Purchase Price, prior to and without taking into account any adjustment thereto pursuant to <u>Section 2.03(f)</u> (solely for purposes of this proviso), be less than the Minimum Amount or more than One Hundred Thirty Million Dollars ($130,000,000).

(b)     Upon execution of this Agreement, Purchaser shall deliver to First American Title Insurance Company, Washington DC NBU, as escrow agent (the "**Escrow Agent**"), a deposit (together with the interest accrued thereon, the "**Deposit**") in the sum of $3,000,000. The Deposit shall be held by the Escrow Agent and shall be placed in an interest-bearing escrow account in accordance with the terms of this Agreement. All fees related to the Escrow Agent shall be paid one-half by Purchaser and one-half by Sellers. On the Closing Date, the Purchaser and the Company shall direct the Escrow Agent to deliver the Deposit to the Company, provided that the Company shall retain the Deposit, and shall not make any distribution to any Seller or Affiliate thereof or any other Third Party with respect to the Deposit, until after any payments with respect to the True-Up have been made in accordance with this Section <u>2.03(b)</u>. Any amount, up to the amount of the Deposit, that Company is determined to owe Purchaser as a result of the True-Up shall be paid by Company, by wire transfer of immediately available funds to such account(s) as Purchaser may direct, within five (5) days

following the True-Up.   Any amount above the amount of the Deposit that Company is determined to owe Purchaser as a result of the True-Up shall result in a dollar for dollar reduction in each of the Purchase Price and the Fixed Payoff Amount.   Any amount, up to the amount of the Deposit, that Purchaser is determined to owe Company as a result of the True-Up shall result in a dollar for dollar increase in each of the Purchase Price and the Fixed Payoff Amount.   Any amount above the amount of the Deposit that Purchaser is determined to owe Company as a result of the True-Up shall be paid by Purchaser, by wire transfer of immediately available funds to such account(s) as Company may direct, within five (5) days following the True-Up.

(c)     At the Closing, Purchaser shall pay the Assumed Cure Amounts to the Company.   Sellers shall be responsible for, and shall pay to the applicable Assumed Contract counterparties either at the Closing or at such later date as may be authorized by the Bankruptcy Court, all Cure Amounts.

(d)     (i) Purchaser may, at its election and sole option, on or at any time prior to the last Business Day in Fiscal Year 2013, pay to the Company the Fixed Payoff Amount in immediately available funds in lieu of the then-remaining portion of the Purchase Price, and in full satisfaction of, all of Purchaser's payment obligations under this Section 2.03, provided, however, that if Purchaser elects to pay, and pays, the Fixed Payoff Amount in Fiscal Year 2012, the Minimum Amount shall be increased to Sixty Four Million Five Hundred Thousand Dollars ($64,500,000) and if Purchaser elects to pay, and pays, the Fixed Payoff Amount in Fiscal Year 2013, the Minimum Amount shall be increased to Sixty Nine Million Three Hundred Thirty Seven Thousand Dollars ($69,337,000).

(ii) Company may, at its election and sole option, on or at any time prior to January 31, 2016, require Purchaser to pay to the Company the Fixed Payoff Amount, in immediately available funds in lieu of the then-remaining portion of the Purchase Price, and in full satisfaction of all of Purchaser's payment obligations under this Section 2.03, if a Marriott Acceleration Event shall have occurred and be continuing, provided that, if Marriott, or an Affiliate of Marriott, is not the Purchaser at the time of the Marriott Acceleration Event, the Purchaser shall have One Hundred Twenty (120) days to pay the Company the Fixed Payoff Amount before the Company is able to exercise its rights pursuant to this Section 2.03(d)(ii).

(iii) If (A) a Purchaser Acceleration Event shall have occurred and be continuing and the Purchase Price is not otherwise due pursuant to Section 2.03(a) above, and (B) at such time Marriott, or an Affiliate of Marriott, is not the owner of the Hotel, the Company shall have the right, but not the obligation, to require Purchaser to pay to the Company the Fixed Payoff Amount in immediately available funds in lieu of the then-remaining portion of the Purchase Price, and in full satisfaction of all of Purchaser's payment obligations under this Section 2.03, provided that in such circumstances the Company shall not be entitled to exercise its rights under the Marriott Guaranty except as otherwise provided in this Section 2.03(d)(iii). Following a Purchaser Acceleration Event, the Company shall have the right, but not the obligation, to exercise any or all of its rights and remedies with respect to the First Mortgage and, if after foreclosing on, and liquidating, the Mortgaged Property (as defined in the First Mortgage) and converting it into cash, the net proceeds generated thereby do not result in full payment to the Company of the Fixed Payoff Amount in cash, then the Company shall have the

right, but not the obligation, with respect to any Purchaser Acceleration Event other than as set forth in clause (d) of the definition of Purchaser Acceleration Event, to make demand under and exercise its rights with respect to the Marriott Guaranty; provided, however, that following a Purchaser Acceleration Event where Marriott, or an Affiliate of Marriott, is not the owner of the Hotel, before the Company is permitted to exercise its rights with respect to the First Mortgage pursuant to this Section 2.03(d)(iii), Marriott shall have had the opportunity to exercise its rights under Section 7(a) of the Intercreditor Agreement.  If following a Purchaser Acceleration Event the Company elects not to exercise its rights with respect to the First Mortgage, the Company shall nonetheless use commercially reasonable efforts to preserve any claims it may have with respect to the Mortgaged Property.  Except as expressly set forth in this Section 2.03(d)(iii), the Company's rights with respect to the Marriott Guaranty shall not be altered in any respect in the event of a Purchaser Acceleration Event and the Company shall not be deemed to have waived any rights or elected any remedies thereunder, and in all instances following a Purchaser Acceleration Event, the Company reserves the right to make demand under the Marriott Guaranty after the earlier of (A) the occurrence of a Marriott Acceleration Event, (B) January 31, 2016, and (C) such earlier time as permitted in accordance with the terms of this Section 2.03(d)(iii).  For the avoidance of doubt, if at any time following a Purchaser Acceleration Event the Purchase Price becomes due pursuant to Section 2.03(a), then the Company's rights with respect to the Marriott Guaranty shall not be prejudiced in any respect, notwithstanding that the Company may not have exercised its rights under the First Mortgage as provided above.  To the extent this Section 2.03(d)(iii) conflicts with the provisions of the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall prevail.

(e)     At Closing the Purchase Price shall be secured by (i) a corporate guaranty from Marriott in favor of the Sellers in the form attached hereto as Exhibit G (the "**Marriott Guaranty**"), and (ii) a perfected first priority security interest in, and lien on, the Purchased Assets (other than the Membership Interests, if the Current Member has not consented thereto, which consent shall be obtained, if at all, by the Sellers at their sole cost and expense after the GSCD Company Consent has been executed, to the extent not included in the GSCD Company Consent) in the form attached hereto as Exhibit H (the "**First Mortgage**") in favor of the Company, as collateral agent for the Sellers.  The Marriott Guaranty shall remain in place until the earlier of the payment of the Purchase Price or the Accelerated Payment (as the case may be) or the full funding under the Marriott Guaranty, at which point the Marriott Guaranty shall automatically terminate without the necessity of further action by any party.  Subject to the terms of the Intercreditor Agreement, the First Mortgage shall remain in place until the earlier of the payment of the Purchase Price or the Accelerated Payment (as the case may be), at which point the First Mortgage shall be immediately released by the Sellers.  The Sellers hereby consent to the execution and recordation of the Second Mortgage among the land records of Greenbrier County, West Virginia.

(f)     The Purchase Price or Fixed Payoff Amount that is payable pursuant to this Section 2.03 shall in all instances be (i) reduced by the amount of the Deposit, (ii) reduced by the amount of any indemnification due Purchaser under Section 3.07 and Section 13.07, (iii) reduced by the amount of any contribution due Purchaser under Section 13.08, (iv) reduced by the amount of any credit due Purchaser under Section 12.02(k), (v) reduced by the amount due Purchaser but not funded under Section 2.08, and (vi) adjusted, as applicable, pursuant to Sections 2.03(b) and (d).

(g)     The provisions of this Section 2.03 shall survive the Closing.

2.04     <u>Liabilities</u>.

(a)     <u>Assumed Liabilities</u>.  As of the Closing Date, Purchaser shall assume only the Liabilities set forth on <u>Schedule 2.04(a)</u> (the "**Assumed Liabilities**") and the Assumed Cure Amounts, and no other Liabilities of the Sellers whatsoever.

(b)     <u>Retained Liabilities</u>.  The Retained Liabilities shall remain the sole responsibility of, and shall be retained by, the Sellers.  "**Retained Liabilities**" shall mean every Liability of the Sellers other than the Assumed Liabilities, including (in each instance, other the Assumed Liabilities):

(i)     any Liability not set forth on <u>Schedule 2.04(a)</u>;

(ii)     any Liability accrued on the Sellers' most recent financial statements;

(iii)     any Liability arising out of or relating to services or products of the Sellers to the extent provided or sold prior to the Effective Time;

(iv)     any Liability for Taxes incurred or related to a period on or prior to the Closing Date, including any Taxes arising as a result of the Sellers' operation of the Business or ownership of the Purchased Assets on or prior to the Closing Date;

(v)     any Liability under any Excluded Contracts and including any such Liability arising out of or relating to any maintenance contract, credit facilities, trade payables, indebtedness for borrowed money, amounts due to Affiliates or any security interest related thereto;

(vi)     any Liability arising under or relating to Environmental Law, including any Environmental Claims, in each case to the extent relating to a fact, circumstance, condition or activity existing or occurring prior to the Effective Time relating to the Sellers, their predecessors or Affiliates, the Hotel, the operation of the Business, or the leasing, ownership or operation of any Real Property, including any such Liabilities related to any Real Property set forth on <u>Schedules 3.05(c) and (d)</u>;

(vii)     any Liability of any Seller or any ERISA Affiliate under the Employee Plans or other "employee benefit plan" (within the meaning of Section 3(3) of ERISA);

(viii)     any Liability, including any WARN Act liability, arising or related to time periods prior to the Effective Time in respect of any current or former employees of any Seller, or, relating to employment or termination of employment, including, relating to payroll, discrimination, harassment, workers' compensation or wrongful termination, and any WARN Act liability of the Sellers described in <u>Section 5.05(g)</u> hereof;

(ix)    any Liability of any Seller to any Affiliate thereof, except to the extent of Assumed Liabilities with respect to Assumed Contracts;

(x)    any Liability arising or related to time periods prior to the Effective Time to pay, indemnify, reimburse or advance amounts to any officer, director, employee, consultant or agent of any Seller or any Affiliate, or to make any severance, bonus, change of control, sales incentive or other similar payments to any director, officer, employee, consultant or agent of any Seller or any Affiliate; provided, however, that any Liability for (a) payments arising from or relating to the employment of any Transferred Employee after the Effective Time, and (b) severance payments arising from or relating to the termination of any Transferred Employee's employment after the Effective Time shall not be Retained Liabilities;

(xi)    any Liability to distribute or otherwise apply all or any part of the consideration received hereunder;

(xii)    any Liability arising out of any Proceeding pending as of the Effective Time and any facts, circumstances, acts or omissions occurring prior to the Effective Time;

(xiii)    any penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by any Seller of any Legal Requirement prior to the Effective Time, whether or not set forth in the Disclosure Schedules;

(xiv)    any Liability associated with any and all indebtedness for borrowed money of any Seller; and

(xv)    any Liability of any Seller based upon its respective acts or omissions occurring after the Effective Time.

2.05    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Arnold & Porter LLP, at 555 12th Street, N.W., Washington, DC, commencing at 10:00 a.m. local time on the first Friday following the first (1st) Business Day after satisfaction or waiver of all conditions to the obligations of the parties hereto to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective parties will take at the Closing itself) or such other date as Purchaser and Sellers may mutually determine (the "**Closing Date**").  The parties hereto shall use commercially reasonable efforts to consummate the transactions contemplated hereby on the first Friday following the first (1st) Business Day after the Bankruptcy Court has entered both the Sale Order and the Confirmation Order approving the sale of the Purchased Assets to Purchaser.

2.06    Condition of Purchased Assets.

(a)    Purchaser acknowledges that (i) assuming Purchaser does not terminate this Agreement in accordance with Article XI, Purchaser will be deemed to confirm as of the Closing Date that Purchaser has been given a reasonable opportunity to inspect and investigate the Hotel and all other Purchased Assets, all improvements thereon and all aspects relating thereto, including all of the physical, environmental and operational aspects of the Hotel and all other Purchased Assets, either independently or through agents and experts of Purchaser's

choosing, and (ii) Purchaser will acquire the Hotel and all other Purchased Assets based solely upon Purchaser's own investigation and inspection thereof and the representations, warranties and covenants of Sellers expressly set forth in this Agreement and the Sellers Ancillary Agreements. **SELLERS AND PURCHASER AGREE THAT, EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT AND THE SELLERS ANCILLARY AGREEMENTS, (I) THE HOTEL AND ALL OTHER PURCHASED ASSETS SHALL BE SOLD AND PURCHASER SHALL ACCEPT POSSESSION OF THE HOTEL AND ALL OTHER PURCHASED ASSETS ON THE CLOSING DATE "AS IS," "WHERE IS," AND "WITH ALL FAULTS," WITH NO RIGHT OF SET-OFF OR REDUCTION IN THE PURCHASE PRICE; AND (II) SUCH SALE SHALL BE WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING ANY WARRANTY OF INCOME POTENTIAL, OPERATING EXPENSES, USES, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND SELLERS HEREBY DISCLAIM AND RENOUNCE ANY SUCH REPRESENTATION OR WARRANTY.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE SELLERS ANCILLARY AGREEMENTS, SELLERS SHALL BE UNDER NO DUTY TO MAKE ANY AFFIRMATIVE DISCLOSURE REGARDING ANY MATTER WHICH MAY BE KNOWN TO SELLERS OR THEIR OFFICERS, DIRECTORS, CONTRACTORS, AGENTS OR EMPLOYEES, AND THAT IT IS RELYING SOLELY UPON ITS OWN INSPECTION OF THE HOTEL aND ALL OTHER PURCHASED ASSETS AND NOT UPON ANY REPRESENTATIONS MADE TO IT BY ANY PERSON WHOMSOEVER ON ANY SELLER'S BEHALF.**

(b)     Except with respect to any Losses arising out of (i) any Breach of any representation, warranty or covenant set forth in this Agreement or any Sellers Ancillary Agreements, or (ii) any Retained Liabilities, Purchaser hereby waives, releases and forever discharges each Seller and its stockholders, and its and their respective officers, directors and employees, from any and all Losses, whether known or unknown, which Purchaser has or may have in the future, arising out of or in connection with the Hotel and all other Purchased Assets, including the physical, environmental, governmental, economic or legal condition of the Hotel and all other Purchased Assets or the operation thereof.  For the foregoing purposes, Purchaser hereby specifically waives the provisions of any Legal Requirement, the import of which is as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

(c)     The provisions of this Section 2.06 shall survive the Closing indefinitely.

(d)     Purchaser acknowledges that it has carefully reviewed this Section 2.06 and discussed it with legal counsel and that this Section 2.06 is a material part of this Agreement.

2.07     Calculation of Average Net Operating Profit

(a)     Unless Purchaser theretofore has tendered the Accelerated Payment as contemplated in Section 2.03(d) above, no later than ninety (90) days following the end of each of Fiscal Years 2010, 2011, 2012 and 2013, Purchaser shall deliver to the Company, or such

Affiliate of the Company that the Company shall request in writing that Purchaser deliver such notice to (with any such Affiliate being referred to as the "Company" for all purposes of this Section 2.07), a detailed calculation of the Net Operating Profit for such Fiscal Year, and Purchaser or Manager shall make an appropriate person available to respond to all reasonable inquiries from the Company with respect to such calculation, provided that the Company shall not have any further audit rights with respect to such calculations.  Unless Purchaser theretofore has tendered the Accelerated Payment as contemplated in Section 2.03(d) above, no later than March 31, 2016, Purchaser shall deliver to the Company a notice (the "**Average Net Operating Profit Notice**") setting forth a detailed calculation of the Average Net Operating Profit.  The Company shall have ninety (90) days to review the Average Net Operating Profit Notice after receiving the same from Purchaser.  For the purposes of such review, the Company and its agents, auditors and advisors shall have reasonable access during normal business hours to all books of control and account pertaining to the operations of the Hotel, excluding Deductions for services not provided at the Hotel ("**Above Property Deductions**").  Manager shall provide, upon Seller's request, materials reasonably sufficient to determine that Above Property Deductions have been calculated on a fair and consistent basis among JW Marriott Hotels and Resorts in the continental United States and Canada or such other brand with which Purchaser may affiliate the Hotel.  If the Hotel Management Agreement in effect in Fiscal Year 2014 or 2015 includes "Deductions" that, taken as a whole, are more favorable to the owner of the Hotel than the Deductions described in this Agreement are to the Sellers, then the Deductions described in the Hotel Management Agreement, taken as a whole, shall be used in the calculation of Average Net Operating Profit.  Purchaser shall notify Sellers if the Hotel Management Agreement provides for a more favorable definition of "Deductions"; such notice shall include a true and correct listing of all "Deductions" provided for in the Hotel Management Agreement.  If the Company concurs with such Average Net Operating Profit Notice, or does not object to any such notice by delivering an Objection Notice (as defined below) to Purchaser in the manner as set forth herein, the calculation of Average Net Operating Profit shall be deemed to be final and conclusive and shall be binding on the Company and Purchaser.

(b)     If the Company disagrees with the calculations set forth in the Average Net Operating Profit Notice, then the Company shall, within ninety (90) days after receipt of the Average Net Operating Profit Notice, deliver a notice (an "**Objection Notice**") to Purchaser setting forth the Company's calculation of Average Net Operating Profit or the reasons for the Company's disagreement.  Purchaser and the Company will attempt in good faith to resolve any disagreements as to the calculation of the Average Net Operating Profit. If Purchaser and the Company do not obtain a final resolution regarding the calculation of the Average Net Operating Profit within thirty (30) days after Purchaser has received the Objection Notice (the "**Resolution Period**"), then the parties shall determine all amounts remaining in dispute pursuant to Section 2.07(c).

(c)     If the parties are unable to obtain a final resolution regarding the calculation of the Average Net Operating Profit before the expiration of the Resolution Period, then the Average Net Operating Profit shall be determined in accordance with the following procedures:

(i)     Within ten (10) days after the expiration of the Resolution Period, the Company and Purchaser shall each select a nationally recognized accounting firm and, if

required by its accounting firm, execute a reasonable engagement letter.  Purchaser and the Company shall each provide to the accounting firms the detailed calculation of the Average Net Operating Profit, the detailed calculation of the Net Operating Profit for calendar years 2010, 2011, 2012 and 2013 and all other relevant materials used by such party in its determination of the Average Net Operating Profit. Purchaser and the Company will cooperate with the accounting firms during their engagement; provided, however, that the Company's accounting firm shall have no greater rights of access to books of control and account than those granted to the Company in this <u>Section 2.07</u>.

(ii)     Within a commercially reasonable period after their selection, each accounting firm shall provide to the Purchaser and the Company a written determination of the Average Net Operating Profit; provided, however, that each accounting firm shall endeavor to provide such written determination within thirty (30) days of its selection, and in no event shall such determination be made later than sixty (60) day after its selection.  The party appointing each accounting firm shall be obligated, promptly after receipt of the written determination prepared by the accounting firm by such party, to deliver a copy of the written determination to the other parties to this Agreement. In making its determination, each accounting firm shall (A) be bound by the terms and conditions of this Agreement, including, the definition of Average Net Operating Profit and the terms of this <u>Section 2.7</u>, and (B) not assign any value with respect to a disputed amount that is greater than the highest value for such amount claimed by either Purchaser or the Company or that is less than the lowest value for such amount claimed by either Purchaser or the Company.

(iii)     If the Average Net Operating Profit determined by the accounting firm designated by the Company is within two percent (2%) of the Average Net Operating Profit determined by the accounting firm designated by the Purchaser, then the Average Net Operating Profit determined by the accounting firm designated by the Purchaser will be conclusive and binding upon Purchaser and the Company.

(iv)     If the Average Net Operating Profit determinations of the two accounting firm vary by more than two percent (2%), then an Audit Firm shall be selected by the initial two accounting firms within ten (10) days after the initial two determinations of the Average Net Operating Profit have been delivered to the parties.  If an Audit Firm is appointed, the Audit Firm shall review the reports of the initial two accounting firms and shall select the one of the initial two reports that the Audit Firm determines more accurately reflects the Average Net Operating Profit in accordance with the terms and conditions of this Agreement, including, the definition of Average Net Operating Profit and the terms of this <u>Section 2.7</u>.  The Audit Firm shall promptly deliver a written report of its determination to each of the parties to this Agreement.

(v)     Each of Purchaser and the Company shall be entitled to make a presentation to the Audit Firm only regarding the items and amounts that Purchaser and the Company are unable to resolve. All presentations to or communications with the Audit Firm shall be made in such a fashion that all parties to this Agreement receive copies of any written communications or materials.  Neither Purchaser nor any Seller, nor any of their respective Affiliates or representatives, shall have any substantive, oral ex parte communications with the Audit Firm.

(vi)    Absent fraud or manifest error, the determination of the Audit Firm will be conclusive and binding upon Purchaser and the Company.

(vii)    The expenses of each of the first two accounting firms appointed under this Section 2.7 shall be borne by the party appointing such accounting firm.  The expenses of the Audit Firm appointed under this Section 2.7 shall be paid one-half (1/2) by Purchaser and one-half (1/2) by the Company.

(d)    During the period from the Closing Date until the earlier of December 31, 2015, or the date on which Purchaser tenders the Accelerated Payment, as the case may be, Purchaser shall, and Marriott Hotel Services, Inc. (to the extent that Marriott Hotel Services, Inc. has not been terminated as Manager under the Hotel Management Agreement, which termination would be in breach of Section 2.07(d)(iv) hereof) shall:

(i)    Maintain, or cause to be maintained, a financial reporting system in accordance with the Uniform System of Accounts that will separately account for Net Operating Profit for the Purchaser's Business as a discrete business unit and account for Gross Revenues and Deductions on a fair and consistent basis in accordance with the Uniform System of Accounts;

(ii)    Conduct, or cause to be conducted, the operation of and manage, or cause to be managed, the Hotel in the usual and ordinary course of business and in a manner reasonably consistent with the operation of resort hotels managed by Marriott or its Affiliate under the same brand of hotel as the Hotel subsequent to the Closing Date (JW Marriott Hotels and Resorts in the continental United States and Canada or such other brand with which the Purchaser may affiliate the Hotel, recognizing that the Hotel will be operated under the name The Greenbrier Resort);

(iii)    Not take any action, cause any action to be taken, or permit any action to be taken that is intended to result in a reduction of the amount of Purchase Price to be paid pursuant to the terms of this Agreement below that which would have been paid if such action had not been taken (a "**Reduction**"), or otherwise take any other action with the intent to reduce the amount of Purchase Price to be paid pursuant to the terms of this Agreement; provided, however, that actions taken which affect the Hotel but which are generally implemented after the Effective Time or in place as of the Effective Time on a brand wide basis in the United States with respect to other hotels operating under the same brand of hotel as the Hotel (JW Marriott Hotels and Resorts in the continental United States and Canada or such other brand with which the Purchaser may affiliate the Hotel, recognizing that the Hotel will be operated under the name The Greenbrier Resort) shall not constitute a breach under this Section regardless of whether such actions result in, or are likely to result in, a Reduction; and

(iv)    (A) In the case of Marriott Hotel Services, Inc., maintain control of the operations and management of the Hotel, and remain the employer of all the Hotel's employees, either through ownership and management of the Hotel by Marriott Hotel Services, Inc. or an Affiliate of Marriott Hotel Services, Inc. or pursuant to a Hotel Management Agreement, and (B) in the case of Purchaser, to the extent Marriott Hotel Services, Inc. or an Affiliate of Marriott Hotel Services, Inc. is not the Purchaser at such time, continue to engage

Marriott Hotel Services, Inc. or an Affiliate of Marriott Hotel Services, Inc. as Manager under the Hotel Management Agreement.

2.08    <u>Company Funding of Certain Hotel Costs</u>.  At the Closing, the Company shall pay, by wire transfer of immediately available funds to such account(s) of the Hotel as Purchaser may direct, Ten Million Dollars ($10,000,000) (the "**Requested Amount**"), which such amount shall be for the Purchaser's sole use and benefit, provided that such funds shall be used by the Purchaser solely for Project Expenditures. After the Closing Date, the Company shall pay, by wire transfer of immediately available funds to such account(s) of the Hotel as Purchaser may direct, the following amounts on the following days (unless any such day is not a Business Day, in which case such day shall refer to the next following Business Day), which such amounts shall be for the Purchaser's sole use and benefit, provided that such funds shall be used by the Purchaser solely for Project Expenditures; provided, however, that in the event that a Marriott Event (as defined in the Exit Term Loan Agreement) has occurred and is continuing, the Company's obligation to pay the amounts set forth in this <u>Section 2.08</u> shall be terminated, provided that such termination shall have no impact on the amount of the reduction required under <u>Section 2.03(f)(v)</u> hereof:

| DATE | AMOUNT |
|---|---|
| Closing Date plus 90 days | Seven Million Dollars ($7,000,000) |
| Closing Date plus 180 days | Seven Million Dollars ($7,000,000) |
| Closing Date plus 270 days | Six Million Dollars ($6,000,000) |
| Closing Date plus 365 days | Six Million Dollars ($6,000,000) |
| Closing Date plus 455 days | Four Million Dollars ($4,000,000) |
| Closing Date plus 545 days | Four Million Dollars ($4,000,000) |
| Closing Date plus 635 days | Three Million Dollars ($3,000,000) |
| Closing Date plus 730 days | Three Million Dollars ($3,000,000) |

2.09    <u>Tax Treatment of Deposit and Purchase Price</u>.

(a)    *Agreed Tax Treatment.*  Purchaser and Sellers shall execute and file all federal, state and local income tax returns in a manner consistent with this <u>Section 2.09</u> and shall not take any position with respect to federal, state or local income taxes before any governmental authority or in any judicial proceeding that is inconsistent with any such income tax returns, except (i) pursuant to a final "determination" (as defined in Section 1313(a) of the Code) or (ii) in accordance with a written opinion of legal counsel to the effect that failing to take such consistent position would more likely than not subject such party to tax penalties.  Except as expressly set forth in this <u>Section 2.09</u>, nothing in this <u>Section 2.09</u> shall be deemed to modify any of the other provisions of this Agreement relating to the rights and obligations of the parties.

(b)    *Bifurcation of Transaction for Tax Purposes.*  The transactions set forth in this Agreement shall be treated by the parties for tax purposes as (i) a loan from the Company to Purchaser in the maximum principal amount of $50 million (the "**Seller Loan**") and (ii) a sale by Sellers to Purchaser, and a purchase by Purchaser from Sellers, of the Purchased Assets (the "**Asset Purchase**").  <u>Section 2.09(c)</u> below shall govern the tax treatment of the Seller Loan, and

Sections 2.09(d), 2.09(e), 2.09(f) and 2.09(g) below shall govern the tax treatment of the Asset Purchase.

(c)      *Seller Loan.* Each payment by the Company pursuant to Section 2.08 shall be treated by the parties as an advance of principal from lender to borrower under the Seller Loan (collectively, "**Seller Loan Advances**"). If there is a reduction in the Purchase Price and Fixed Payoff Amount pursuant to clause (ii), (iii) or (iv) of Section 2.03(f), the amount of such reduction shall be treated as paid by the Company to Purchaser as a reduction in consideration for the Purchased Assets, and then immediately paid by Purchaser to the Company on account of the Seller Loan. If there is a reduction in the Purchase Price and Fixed Payoff Amount pursuant to clause (v) of Section 2.03(f), the amount of such reduction shall be treated as a Seller Loan Advance and then an immediate payment by Purchaser to the Company on account of the Seller Loan. Any payment by Purchaser of Purchase Price pursuant to Section 2.03(a), any payment by Purchaser of Accelerated Payment pursuant to Section 2.03(d), and any amount deemed paid by Purchaser to the Company on account of the Seller Loan under the two preceding sentences, shall be referred to as a "**Purchaser Payment**" for purposes of this Agreement. Each Purchaser Payment shall be treated as follows:

(i)      first, as a repayment of principal under the Seller Loan, until the amount of Purchaser Payments, in the aggregate, equals the aggregate amount of Seller Loan Advances made on or prior to the date of such payment;

(ii)      second, as a payment of interest on the Seller Loan, until the amount of Purchaser Payments, in the aggregate, equals Fifty Seven Million Dollars ($57,000,000) minus the interest included within the Deposit as of Closing; and

(iii)      thereafter, the excess, if any, shall be treated as Contingent Deferred Purchase Price as described in Section 2.09(d) below; it being understood that the Seller Loan shall be deemed to have been repaid in full upon the payment (or deemed payment) by Purchaser of Purchaser Payments in an aggregate amount equal to Fifty Seven Million Dollars ($57,000,000) minus the interest included within the Deposit as of Closing.

(d)      *Asset Purchase.* The aggregate "consideration" (as defined in Section 1060 of the Code and the Treasury Regulations thereunder, excluding for this purpose any required adjustments that are unique to Purchaser, on the one hand, or any or all of the Sellers, on the other hand) payable by Purchaser to Sellers in exchange for the Purchased Assets (collectively, the "**Aggregate Consideration**") shall consist of three mutually exclusive components, as follows: (i) the Deposit (including interest) that is delivered to Sellers on the Closing Date pursuant to Section 2.03(b); (ii) the Assumed Cure Amounts; and (iii) the amount of Purchaser Payments, if any, described in clause (iii) of Section 2.09(c) (the amount calculated pursuant to this clause (iii), "**Contingent Deferred Purchase Price**"). Notwithstanding the preceding sentence, to the extent that any portion of the Contingent Deferred Purchase Price paid by Purchaser to the Company is treated as interest pursuant to Section 2.09(g) below, such interest portion shall not be treated as part of the Aggregate Consideration.

(e)     *Deposit.*  The Deposit shall be treated as follows.  On the Closing Date, Purchaser shall be treated as making a cash payment to Sellers in the amount of the Deposit (including interest) as partial consideration for the Purchased Assets.

(f)     *True-Up Payment.*  Any payment by the Company to Purchaser, or by Purchaser to the Company, within five (5) days following the True-Up pursuant to Section 2.03(b), shall be treated as a reduction or increase, respectively, in the Aggregate Consideration if, as and when so paid.

(g)     *Contingent Deferred Purchase Price.*  The Contingent Deferred Purchase Price shall be treated as follows.  Purchaser's obligation to pay the Contingent Deferred Purchase Price pursuant to this Agreement shall be treated as the issuance by Purchaser to the Company, on the Closing Date, of a "debt instrument" (as defined in Treasury Regulations Section 1.1275-1(d)), which is a "contingent payment debt instrument" within the meaning of Treasury Regulations Sections 1.1274-2(g) and 1.1275-4(c).   Any payment of Contingent Deferred Purchase Price shall be treated as a payment of principal in an amount equal to the present value of the payment, determined by discounting the payment at the Mid-Term Test Rate from the date the payment is made to the Closing Date.  For purposes of this Agreement, the "**Mid-Term Test Rate**" shall be the lower of (A) 1.64%, compounded quarterly (i.e., the lowest mid-term applicable Federal rate in effect during the 3-month period ending with the month in which this Agreement is fully executed and delivered by the parties) and (B) the lowest mid-term applicable Federal rate in effect based on quarterly compounding during the 3-month period ending with the month in which the Closing occurs.  The amount of any such payment in excess of the amount treated as principal under the second preceding sentence shall be treated as a payment of interest.  The portion of any such payment treated as principal shall be treated by the parties as contingent additional consideration for the Purchased Assets if, as and when so paid by Purchaser to the Company.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each Seller hereby represents and warrants to Purchaser as of the date hereof and as of the Closing Date (or as of such other date as expressly provided herein) as follows:

3.01   Organization.  Each Seller is duly incorporated, validly existing and in good standing under the laws of the state of its incorporation or formation and has all requisite power and authority and all necessary governmental approvals to own, lease and operate its properties and assets and to carry on and conduct its business as it is now being conducted.

3.02   Power, Authorization and Non-Contravention.

(a)     Each Seller has the requisite corporate power, legal capacity and authority to:  (i) carry on its business as now conducted; (ii) own, operate and lease its properties and assets in the manner in which its properties and assets are currently owned, operated and leased; and (iii) subject to entry of the Bidding Procedures Order, the Sale Order and the Confirmation Order, enter into and perform its obligations under this Agreement and all Sellers

Ancillary Agreements to which it is a party.  The execution and delivery of this Agreement, the Sellers Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate and stockholder action on the part of each Seller.

(b)     No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person, is required to be obtained or made by any Seller in connection with the execution and delivery of this Agreement, the transfer of the Purchased Assets to Purchaser or the consummation of the other transactions contemplated hereby, except for:  (i) the Bidding Procedures Order, the Sale Order and the Confirmation Order; (ii) the consents set forth on <u>Schedule 3.02(b)</u>, but solely to the extent such consents, if any, are necessary pursuant to Section 365 of the Bankruptcy Code (as so modified, the "**Necessary Consents**"); and (iii) such other consents, authorizations, filings, approvals and registrations that if not obtained or made would not reasonably be expected to have a Material Adverse Effect.

(c)     Upon entry of the Bidding Procedures Order, the Sale Order and the Confirmation Order, this Agreement and the Sellers Ancillary Agreements to which it is a party are, or when executed and delivered by any Seller and the other parties thereto will be, valid and binding obligations of such Seller (to the extent a party thereto) enforceable against such Seller in accordance with their respective terms, except as enforceability against such Seller may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors rights generally.

3.03    <u>No Violations; Compliance with Legal Authorizations; Governmental Authorizations</u>.

(a)     Except as set forth on <u>Schedule 3.03(a)</u>, subject to receipt of the Necessary Consents, and upon entry of the Bidding Procedures Order, the Sale Order and the Confirmation Order, neither the execution and delivery of this Agreement or any Sellers Ancillary Agreement to which it is a party, nor the consummation of the transactions provided for herein or therein will (i) conflict with, or (with or without notice or lapse of time, or both) constitute or result in a termination, Breach, impairment or violation of any provision of any Assumed Contract, excluding conflicts, terminations, Breaches, impairments or violations that would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect; and/or (ii) result in a Breach, default or violation of any provisions of the organizational documents of any Seller.

(b)     Except as set forth on <u>Schedule 3.03(b)</u>:  (i) to the Company's Knowledge, each Seller is, and at all times since December 26, 2008 has been, in compliance with each Legal Requirement that is or was applicable to it or to the conduct of ownership, operation, management, leasing or use of any of the Purchased Assets; (ii) to the Company's Knowledge, no event has occurred or circumstance currently exists that (with or without notice or lapse of time, or both) constitutes or will result in a violation by any Seller of, or a failure on the part of any Seller to comply with, any applicable Legal Requirement; and (iii) no Seller has received, at any time since December 26, 2008, any written notice or other communication from

any Governmental Authority or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply by any Seller with, any applicable Legal Requirement.

(c)     The Sellers maintain and hold all rights to all Governmental Authorizations that are necessary to permit the Sellers to lawfully conduct and operate the Business, and to own and use the Purchased Assets, in the manner consistent with the past practices of the Sellers.  The Sellers have made available to Purchaser in the VDR an accurate and complete copy of each such required Governmental Authorization. Each such Governmental Authorization is valid and in full force and effect.  Except as set forth on Schedule 3.03(c):  (i) to the Company's Knowledge, each Seller is, and at all times since December 26, 2008 has been, in compliance with the terms and requirements of each such Governmental Authorization; and (ii) no notice of violation has been received from any Governmental Authority, no proceeding is pending or, to the Company's Knowledge, threatened to revoke or limit any such Governmental Authorization, and there is no basis for any such allegation or proceeding.

(d)     Except as set forth on Schedule 3.03(d), Sellers have not received written notice from any Third Party or Governmental Authority alleging a violation by any Seller of any Encumbrance or Legal Requirement that has not been fully corrected or otherwise fully resolved.

3.04    Litigation.  Except as set forth on Schedule 3.04, there is no Proceeding pending against any Seller, nor, to the Company's Knowledge, is any Proceeding threatened against any Seller, before any Governmental Authority or arbitrator.  There is no unsatisfied adverse Order of a Governmental Authority or arbitrator outstanding against any Seller.  There is no Proceeding pending as to which any Seller has received notice that in any manner could prevent, enjoin, alter or materially delay any of the transactions contemplated by this Agreement or which may have lis pendens effect against the Real Property.

3.05    Sufficiency of Purchased Assets; Title; Real Property.

(a)     Except as set forth on Schedule 3.05(a), the Purchased Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, used by the Sellers to operate the Business in a manner consistent with the past practices of the Sellers.

(b)     Each Seller, as applicable, has good and marketable title to all of the Purchased Assets, or with respect to leased Purchased Assets, valid leasehold interests in, or with respect to licensed Purchased Assets, valid licenses to use, and at the Closing will deliver the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).  The machinery, equipment and vehicles included in the Purchased Assets are in good working condition and repair, normal wear and tear excepted.

(c)     The Owned Real Property is all the real property owned by the Sellers. The Sellers, as applicable, have marketable fee simple title to the Owned Real Property free and clear of all Encumbrances, other than Permitted Encumbrances.

(d)     Schedule 3.05(d) sets forth an accurate and complete list of all leases, subleases, licenses, concessions and other agreements (written or oral) ("**Leases**"), pursuant to which (i) any Seller holds a leasehold or subleasehold estate in, or is granted a license,

concession, or other right to use or occupy, any land, buildings, improvements, fixtures or other interest in real property that are used in the operation of the Business (the "**Leased Real Property**") or (ii) any Seller leases, or grants a license, concession or other right to use or occupy, a portion of the Owned Real Property to a Third Party, a Seller or an Affiliate thereof, identifying in each case the lessor or lessee thereunder, the term thereof and the monthly base rent payable thereunder.  Sellers have made available for review by Purchaser in the VDR an accurate and complete copy of each of the Leases (including any and all amendments thereof), and in the case of any oral Lease, a written summary of the terms of such Lease.  Subject to entry of the Sale Order and receipt of any Necessary Consents, with respect to each of the Leases:  (i) such Lease is in full force and effect and is valid and binding on and enforceable against the applicable Seller(s), in accordance with its terms and, to the Company's Knowledge, on and against the other parties thereto, except as enforceability against any other party may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity; (ii) neither the applicable Seller(s) nor, to the Company's Knowledge, any other party to such Lease, is in Breach thereof, and no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a Breach thereof; (iii) each of the applicable Seller(s) and, to the Company's Knowledge, the other Person or Persons who are parties thereto has performed in all material respects all of its obligations required to be performed by it under such Lease; (iv) other than the Necessary Consents, the transactions contemplated by this Agreement do not require the consent of any other party, will not result in a Breach of such Lease, or otherwise cause such Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; and (v) no Seller has assigned, subleased, mortgaged, deeded in trust or otherwise transferred or encumbered such Lease or any interest therein.

(e)     The Sellers have made available for review by Purchaser in the VDR an accurate and complete copy of each of the Material Sellers Contracts (including any and all amendments thereof and including a written summary of the terms of any oral Material Sellers Contract), and have used good faith commercially reasonable efforts to make available for review by Purchaser in the VDR all other Sellers Contracts.  Except as indicated on Schedule 2.01(e) or as otherwise set forth on Schedule 3.05(e), neither CSX Corporation nor any Affiliate thereof, other than the Sellers, is a party to any executory contract related to the Hotel or the operation of the Business.

(f)     Subject to the provisions of the Bankruptcy Code, the entry of the Sale Order and receipt of any Necessary Consents, with respect to each of the Assumed Contracts (other than Leases):  (i) such Assumed Contract is in full force and effect and is valid and binding on and enforceable against the applicable Seller(s) in accordance with its terms and, to the Company's Knowledge, on and against the other parties thereto, except as enforceability against such other parties may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity; (ii) neither the applicable Seller(s) nor, to the Company's Knowledge, any other party to such Assumed Contract, is in Breach thereof, and no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a Breach thereof; (iii) each of the applicable Seller(s) and, to the Company's Knowledge, the other Person or Persons who are parties thereto has performed in all material respects all of its obligations required to be performed by it under such Assumed Contract; and (iv) no Seller has assigned, terminated or

otherwise transferred or encumbered such Assumed Contract or any interest therein except as permitted by this Agreement.

(g)      Schedule 3.05(g) sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets.  The Intellectual Property Rights being conveyed hereunder include: (i) all registered and unregistered trademarks, service marks, trade dress, logos and trade names used in connection with the Hotel (including all registrations and applications therefor), together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith and all applications, registrations, and renewals in connection therewith, and (ii) all copyrightable works, all copyrights, and applications, registrations, and renewals in connection therewith used in connection with the Hotel, except, in each case, as included in the Excluded Assets.  To the Company's Knowledge, there exist no outstanding or alleged challenges to the ownership and use of such Intellectual Property Rights by any Seller, nor any alleged infringements of such Intellectual Property Rights by Third Parties.

(h)      The Owned Real Property and the Leased Real Property (collectively, the "**Real Property**") comprise all of the real property owned, occupied, leased, operated or used by the Sellers, and there are no other leases, subleases, licenses, concessions, or other occupancy agreements in effect with respect to the Owned Real Property or subleases with respect to the Leased Real Property, other than the Leases.  Except as set forth on Schedule 3.05(h), (i) there are no deferred real or personal property Taxes or assessments with respect to the Real Property that may or will become due and payable as a result of the consummation of the transactions contemplated by the Agreement, (ii) there are no condemnation or eminent domain proceedings pending or, to the Company's Knowledge, threatened with respect to all or any part of the Owned Real Property;  (iii) to the Company's Knowledge, there are no condemnation or eminent domain proceedings pending or threatened with respect to all or any part of the Leased Real Property and (iv) no Seller has received any notice that the Improvements on each parcel of Real Property do not or will not, or that the Sellers' use thereof does not or will not, comply in all material respects with all applicable Legal Requirements, including any and all building, zoning, subdivision, traffic, parking, land use, occupancy, health and other Legal Requirements relating to the Real Property.

3.06    Absence of Certain Changes or Events.

(a)      Excluding the effect of the anticipated filing and administration of the Chapter 11 Cases, and actions taken consistent with the occupancy and booking levels of the Hotel in accordance with the terms and provisions of this Agreement, since December 26, 2008 the Sellers have carried on the Business in the ordinary course substantially in accordance with the procedures and practices in effect on December 26, 2008.

(b)      Except as set forth on Schedule 3.06, since December 26, 2008, there has not been with respect to the Sellers:

(i)      any change, event, circumstance or effect that, by itself or in conjunction with all other such changes, whether or not arising in the ordinary course of business, has had or would reasonably be expected to have a Material Adverse Effect;

(ii)       any Encumbrance placed on any of the assets or properties of the Sellers, except Permitted Encumbrances;

(iii)      any Liability incurred by the Sellers, other than trade accounts payable, Liabilities incurred in connection with preparation for the Chapter 11 Cases and other Liabilities arising in the ordinary course of business; or

(iv)      any purchase, license, sale or other disposition, or any agreement or other arrangement for the purchase, license, sale or other disposition, of any of the Purchased Assets, other than in the ordinary course of business and consistent with past practice.

3.07    <u>Brokers</u>.  Purchaser will not be responsible for any broker's, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement on account of any broker, investment banker or other Person retained by Sellers or any of their Affiliates. Sellers shall jointly and severally indemnify, defend, and hold Purchaser harmless from and against any and all Losses arising as a result of a Breach of this <u>Section 3.07</u>. Notwithstanding anything contained herein to the contrary, the indemnity contained in this <u>Section 3.07</u> shall survive the Closing or the earlier termination of this Agreement.

3.08    <u>Sufficiency of Funds</u>.

(a)       The Company will, as of the Closing Date, have access to sufficient funds under the Exit Term Loan Agreement to pay, when due and payable, all of its obligations pursuant to <u>Section 2.08</u> hereof.

(b)       Upon approval by the Bankruptcy Court, the Company will have access to funds up to Nineteen Million Dollars ($19,000,000) on the terms contained in and pursuant to the debtor-in-possession financing from CSX Corporation, as further described in the filings in the Chapter 11 Cases.

3.09    <u>Tax Returns</u>.  All privilege, gross receipts, excise, sales and use, personal property and franchise taxes payable with respect to the Hotel resulting from operations prior to the Effective Time have been or will be paid by Sellers prior to delinquency, and all tax returns for such taxes have been or shall be prepared and duly filed prior to delinquency.

3.10    <u>Environmental Matters</u>.  Other than as may be set forth in the reports described on <u>Schedule 3.10</u>, none of the Sellers have received written notice from any Governmental Authority or Third Party of any actual or potential violation of or failure to comply with any Environmental Laws with respect to the Hotel or Real Property which to Company's Knowledge remains uncorrected, or of any actual or threatened obligation to undertake or bear the cost of any Remediation with respect to the Hotel or Real Property which to Company's Knowledge remains unperformed.

3.11    <u>Organizations Lists</u>.  None of the Sellers is acting, directly or indirectly, for or on behalf of any Person named by the United States Treasury Department as a Specifically Designated National and Blocked Person, or for or on behalf of any Person designated in Executive Order 13224 as a Person who commits, threatens to commit, or supports terrorism. None of the Sellers is engaged in the transaction contemplated by this Agreement directly or

indirectly on behalf of, or facilitating such transaction directly or indirectly on behalf of, any such Person.

3.12    Membership Interests.

(a)    GSCD Company (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and (ii) has all requisite power and authority to own its assets and to operate its business as carried on immediately prior to Closing.  Attached hereto as Schedule 3.12(a) are true and complete copies of the GSCD Company Documents, and such GSCD Company Documents have not been further amended and remain in full force and effect and no other organizational documents of GSCD Company exist.  Subject to the receipt of the GSCD Company Consent, the consummation of the transaction contemplated by this Agreement will not result in a Breach of any of the GSCD Company Documents.

(b)    The Company is the sole legal and beneficial owner of the Membership Interests, and has not sold, transferred or encumbered the Membership Interests, and has the full and sufficient right at law and in equity, subject to approval of the Bankruptcy Court and the terms of the GSCD Company Documents, to assign and transfer the Membership Interests to Purchaser in accordance with this Agreement, free and clear of all right, title, or interest of any other party whatsoever, and except for the GSCD Company Consent and approval of the Bankruptcy Court, the Company is not required to obtain any other approval or consent in connection with the sale of the Membership Interests pursuant to this Agreement.  No options, warrants, or rights to acquire the Membership Interests are outstanding and the Membership Interests are not the subject of any voting trust agreement or agreement other than the GSCD Company Documents relating to the ownership of the Membership Interests or the rights of the Company in the Membership Interests.  Upon Closing and the Company's execution and delivery of the Membership Interests Assignment and subject to receipt of the GSCD Company Consent, Purchaser shall be immediately and unconditionally vested with full legal and beneficial title to and ownership of the Membership Interests, free and clear of any liens, encumbrances, security interests, or other ownership or contractual rights or interests arising through the Company whatsoever other than the GSCD Company Documents.

(c)    To the Company's Knowledge:

(i)    no Proceeding is pending or threatened against the GSCD Company, except as set forth on Schedule 3.12(c)(i);

(ii)    the GSCD Company has not (a) filed a petition in any bankruptcy, insolvency, reorganization, liquidation, dissolution or similar proceeding to take advantage of any law for the benefit of debtors and has not had a petition in any such proceeding filed against it; (b) made an assignment for the benefit of creditors; or (c) applied for, consented to, or been subjected to the appointment of a receiver, trustee, liquidator or other similar official for itself or for all or a substantial part of its assets;

(iii)    the GSCD Company has not received written notice from any Governmental Authority or any Third Party of any violation of any Legal Requirement with respect to the GSCD Company that has not been cured or remedied;

(iv)    the GSCD Company has filed any federal and state income and other tax returns which the GSCD Company has been required by law to file and paid all taxes (together with any applicable interest or penalties) due from the GSCD Company;

(v)    the GSCD Company has no subsidiaries and owns no assets other than the Greenbrier Sporting Club or other property and monetary assets in connection therewith. The GSCD Company does not own, control, or hold with power to vote, either directly or indirectly, any shares or capital stock or beneficial interest in any limited liability company, partnership, corporation, association, trust, or other entity;

(vi)    except as set forth on Schedule 3.12(c)(vi), and except as may relate to assessments shown on the tax bills for the Greenbrier Sporting Club, the GSCD Company has not received written notice from any Governmental Authority of special assessments imposed or to be imposed against the Greenbrier Sporting Club;

(vii)    no Seller has received any notice that the improvements on any parcel of real property owned by the GSCD Company does not or will not, or that the GSCD Company use thereof does not or will not, comply in all material respects with all applicable Legal Requirements, including any and all building, zoning, subdivision, traffic, parking, land use, occupancy, health and other Legal Requirements relating to the real property owned by the GSCD Company; and

(viii)    other than as may be set forth in the reports described on Schedule 3.12(c)(viii), none of the Sellers have received written notice from any Governmental Authority or any Third Party of any actual or potential violation of or failure to comply with any Environmental Laws with respect to the real property owned by the GSCD Company which remains uncorrected, or of any actual or threatened obligation to undertake or bear the cost of any Remediation with respect to the real property owned by the GSCD Company which remains unperformed.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser hereby represents and warrants to Sellers on the date hereof and as of the Closing Date as follows:

4.01    Organization.  Purchaser is a corporation duly incorporated and validly existing under the laws of the State of Delaware.

4.02    Power, Consents; Absence of Conflicts.  Purchaser has the requisite power and authority to enter into and perform its obligations under this Agreement and all agreements to which Purchaser is or will be a party that are required to be executed pursuant to this Agreement (the "**Purchaser Ancillary Agreements**").   The execution, delivery and performance by

Purchaser of this Agreement and the Purchaser Ancillary Agreements, and the consummation by Purchaser of the transactions contemplated by this Agreement and the Purchaser Ancillary Agreements:

       (a)      are within Purchaser's corporate powers and are not in contravention of the terms of its certificate of incorporate or bylaws, each as amended to date, and have been duly authorized by all necessary corporate action;

       (b)      except for the entry of a Sale Order and the Confirmation Order or as otherwise expressly provided in this Agreement, do not require any approval or consent of, or filing with, any Governmental Authority;

       (c)      do not conflict with or result in any breach or contravention of, any material agreement to which Purchaser is a party or by which it is bound; and

       (d)      do not violate any Legal Requirement to which Purchaser may be subject.

       4.03    <u>Binding Agreement</u>.  This Agreement and the Purchaser Ancillary Agreements are (or upon execution will be) valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with the respective terms hereof and thereof, except as enforceability against Purchaser may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

       4.04    <u>Brokers</u>.  No Seller will be responsible for any broker's, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement on account of any broker, investment banker or other Person retained by Purchaser or any of its Affiliates. Purchaser shall indemnify, defend, and hold Sellers harmless from and against any and all Losses arising as a result of a Breach of this <u>Section 4.04</u>.  Notwithstanding anything contained herein to the contrary, the indemnity contained in this <u>Section 4.04</u> shall survive Closing or the earlier termination of this Agreement.

       4.05    <u>Sufficiency of Funds</u>.  Purchaser has sufficient funds available to pay the Deposit immediately upon execution of this Agreement and the Purchase Price (less the Deposit), the Assumed Cure Amounts and all other amounts required pursuant to <u>Section 2.03</u> hereof when due and payable.

## ARTICLE V

## COVENANTS OF SELLERS

       5.01    <u>Advice of Changes</u>.  During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of <u>Article XI</u>, Sellers will promptly advise the Purchaser in writing (which may be pursuant to electronic mail to addressees designated by Purchaser in writing to Sellers) of the following, to the extent within the Company's Knowledge:

(a)    the discovery by Sellers of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that renders, or with the giving of notice or lapse of time or both would render, any representation or warranty by the Sellers contained in this Agreement untrue or inaccurate;

(b)    any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that renders, or with the giving of notice or lapse of time or both would render, any representation or warranty by Sellers contained in this Agreement, if made on or as of the date of such event or the Closing Date, untrue or inaccurate;

(c)    any breach of any covenant or obligation of Sellers pursuant to this Agreement or any Sellers Ancillary Agreement;

(d)    any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article X impossible or unlikely;

(e)    the receipt of notification from a Governmental Authority or other Third Party alleging a violation of any Legal Requirement that is or was applicable to any Seller or to the conduct of ownership, operation, management, leasing or use of any of the Purchased Assets or any of the real property owned by the GSCD Company;

(f)    the receipt of notification from a Governmental Authority or other Third Party alleging a violation of any Governmental Authorization or the threatened revocation or limitation of any Governmental Authorization; and

(g)    any Material Adverse Effect.

In the event Sellers advise the Purchaser in writing of any matters set forth in clauses (a) through (g) of this Section, and any such matter would result in the failure of any condition to Purchaser's obligations under this Agreement being satisfied (each, a "**Terminable Breach**"), the parties shall promptly meet to discuss the Terminable Breach and Sellers shall have a period of fifteen (15) days from the date Purchaser received notice from Sellers of the Terminable Breach during which to cure the Terminable Breach at Sellers' sole expense. If Sellers fail or elect not to cure the Terminable Breach, then Purchaser shall have the right to either (a) waive such Terminable Breach without reduction of the Purchase Price, in which case Purchaser may not thereafter refuse to consummate the transactions as contemplated hereby or claim any failure of Sellers' obligations hereunder because of any failure to cure the Terminable Breach; or (b) terminate this Agreement by written notification to Sellers within: (1) ten (10) Business Days after Sellers notify Purchaser of Sellers' failure, inability or election not to cure the Terminable Breach; or (2) if Sellers do not give Purchaser such a notice, ten (10) Business Days after the expiration of Sellers' fifteen (15) day curative period above, whereupon this Agreement shall terminate and the Escrow Agent shall promptly return the Deposit to Purchaser.  If Purchaser does not so timely elect to terminate this Agreement, Purchaser shall be deemed to have waived such Terminable Breach and shall proceed to Closing.

5.02    Conduct of Business.

(a)     During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI, the Sellers shall, subject to the effect of Force Majeure events and the effect of the filing and administration of the Chapter 11 Cases, and except as set forth on Schedule 5.02(a) or as contemplated by this Agreement, or to the extent that Purchaser shall otherwise consent in writing, use good faith commercially reasonable efforts to carry on the Business in the usual, regular and ordinary course, in substantially the same manner as heretofore conducted, consistent with the occupancy and booking levels of the Hotel and otherwise in compliance with the provisions of this Agreement, and in compliance in all material respects with all applicable Legal Requirements.  Subject to Orders of the Bankruptcy Court and otherwise to the requirements of the Bankruptcy Code, and the effect of the filing and administration of the Chapter 11 Cases, Sellers shall use good faith commercially reasonable efforts to (i) preserve intact its present business organization, (ii) make available the services of its present officers and employees consistent with past practices and policies and the occupancy and booking levels of the Hotel, (iii) preserve a positive relationship with customers, suppliers, licensors, licensees, distributors and others with which it has business dealings, (iv) maintain the Purchased Assets in good working condition and repair according to the standards of Sellers' past practices and procedures, subject only to ordinary wear and tear (including maintaining the intangible assets by making all filings and paying all renewal fees), (v) maintain Consumables, but not Inventories, at a level consistent with the occupancy and booking levels of the Hotel, (vi) only permit the reduction of Inventories in the ordinary course of business, (vii) cause to be paid prior to delinquency all ad valorem, occupancy and sales taxes due and payable with respect to the Real Property or the operation of the Business, (viii) cooperate with Purchaser in all reasonable respects (including provision of copies of documents and information) in connection with the transfer of existing Governmental Authorizations to Purchaser or the issuance of new Governmental Authorizations to Purchaser, effective no earlier than Closing, and (ix) file all Tax Returns in the ordinary course of business.

(b)     During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI, except as provided otherwise herein or as required by Order of the Bankruptcy Court (upon motion of a party other than any Seller or any Affiliate thereof) or as approved or recommended by the Purchaser in writing, no Seller will, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed (except in the case of subparagraph (iv) below, which prior written consent of Purchaser may be withheld in its sole and absolute discretion):

(i)     only to the extent such actions would bind Purchaser after the Effective Time, (A) materially revalue any of its assets, (B) except as required by GAAP, make any change in Tax accounting methods, principles or practices, except for any such action taken by Parent's stockholder at a consolidated level that affects Sellers and all of their Affiliates, (C) agree to any material audit assessment by any Tax authority, (D) enter into any closing agreement affecting any Tax Liability or refund, (E) settle or compromise any material Tax Liability or refund, (F) extend or waive the application of any statute of limitations regarding assessment or collection of any Tax, or (G) make, revoke or amend any Tax election, except for any such action taken by Parent's stockholder at a consolidated level that affects Sellers and all of their Affiliates;

(ii)     except in the ordinary course of business consistent with the occupancy and booking levels of the Hotel, enter into, terminate, modify or negotiate the terms of any Assumed Contracts affecting any of the Purchased Assets, provided, however, for the avoidance of doubt, that the Sellers may modify the Collective Bargaining Agreements, as governed by Section 5.05 hereof;

(iii)    acquire any assets for the Business outside the ordinary course of business or acquire for the Business (by merger, consolidation, or acquisition of equity interests, stock or assets or otherwise) any corporation, partnership, or other business organization or division thereof;

(iv)    remove, sell, transfer, assign or otherwise dispose of any of the Membership Interests, or grant or suffer any Encumbrance on the Membership Interests, except for Encumbrances imposed by any Legal Requirement or approved by the Bankruptcy Court, including any Encumbrance relating to debtor-in-possession financing in the Chapter 11 Cases;

(v)     remove, sell, transfer, assign or otherwise dispose of any of the other Purchased Assets, or grant or suffer any Encumbrance on any of the other Purchased Assets, except for Permitted Encumbrances or Encumbrances approved by the Bankruptcy Court, including, any Encumbrance relating to debtor-in-possession financing in the Chapter 11 Cases, other than the disposition of Tangible Personal Property and Inventories in the ordinary course of business;

(vi)    bring, settle, compromise or waive any claim or legal right included in the Purchased Assets affecting the validity of or value of the Purchased Assets;

(vii)   take any action inconsistent with this Agreement or with the consummation of the transactions contemplated hereby; or

(viii)  agree to do any of the things described in the preceding Sections 5.02(b)(i) through (vii).

(c)     During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI, the Sellers shall provide the Purchaser with (i) monthly operating statements for the Hotel within fifteen (15) days of the end of each applicable month, in the standard form as currently prepared by or on behalf of the Company, (ii) written notice of any call for capital contributions delivered to the Company pursuant to the GSCD Company Documents setting forth the amount of such call, and (iii) copies of any other operating reports or notices with respect to the GSCD Company that the Sellers receive.

(d)     Within thirty (30) days of this Agreement, the Sellers shall provide to Purchaser a schedule of Inventories generated by the Company in the ordinary course of business consistent with past practice, as of a date certain occurring during such period.

5.03   Necessary Consents.  If the assignment of any of the Purchased Assets requires the consent of any Third Party pursuant to Section 365 of the Bankruptcy Code or any other

Necessary Consent, then Sellers will use good faith commercially reasonable efforts to obtain such consents and will take such other actions as may be necessary or appropriate for Sellers to allow the consummation of the transactions provided for herein and to facilitate and allow the Purchaser to carry on the operation of the Hotel after the Closing Date, including the provision of required notices, and such consents shall be in full force and effect as of the Effective Time.

5.04   <u>Litigation</u>.   Sellers will notify Purchaser in writing promptly after obtaining Company Knowledge of any Proceeding by or before any Governmental Authority initiated or threatened against the GSCD Company or Sellers relating to the Business or the Purchased Assets or for the purpose or with the effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement.   If the Sellers obtain Company Knowledge that any Seller or the GSCD Company has become subject to a review by the Internal Revenue Service or any other Taxing agency or authority for periods prior to the Closing Date, and such review has the potential to materially affect the Liability of Purchaser or any of its Affiliates for any Taxes due with respect to a Taxable period ending after the Closing Date, Sellers shall keep Purchaser informed on a regular basis of the nature of such Proceedings and shall consider in good faith any recommendations made by Purchaser as to the conduct and settlement of such Proceedings.   In no event will the GSCD Company (to the extent Sellers can control such action) or Sellers enter into any settlement or other stipulation with respect to any such review without the written consent of the Purchaser, which consent will not be unreasonably withheld, conditioned or delayed.

5.05   <u>Employment Matters</u>.

(a)   The Sellers agree that, from and after the date hereof, Purchaser may offer employment, effective immediately following the Effective Time, to any Persons employed by the Company that are not represented by a labor organization.   During the period from the date of this Agreement until the Closing, the Sellers shall allow Purchaser to meet with and interview employees of the Company not represented by a labor organization (either individually or in groups) during breaks, outside of scheduled work hours, or during scheduled work hours following reasonable prior notice to the management of the Hotel, provided that such meetings and interviews shall not interfere unnecessarily with normal operations of the Business.   Any offers of employment by Purchaser will become effective immediately following the Effective Time and only if the Closing occurs.   Only if the Closing occurs, any such Person who accepts such an offer of employment with Purchaser shall be a "**Transferred Employee**" and shall be employed by Purchaser on such terms and conditions as Purchaser and each such Transferred Employee may mutually agree.   The Sellers shall have no liability with respect to Purchaser's decision to offer or not offer employment to the employees of the Company, other than any applicable Retained Liabilities, and the Sellers shall have no liability arising out of or relating to the employment of the Transferred Employees immediately following the Effective Time.

(b)   At Closing, Purchaser shall make available or establish such employee benefit plans, programs and policies for the benefit of the Transferred Employees and their eligible dependents as Purchaser shall elect to make available to the Transferred Employees.

(c)      The Company shall promptly notify Purchaser if the Sellers obtain Company Knowledge that any of the key personnel set forth on Schedule 5.05(c) intends to leave the Company's employ.

(d)      Purchaser agrees to offer employment to the Company's employees who are covered by the Replacement Collective Bargaining Agreements described in Section 5.05(f) hereof as of the Effective Time.

(e)      Purchaser and the Company shall work together to ensure that a sale of Purchased Assets under this Agreement complies with the successorship provisions, if any, in the Replacement Collective Bargaining Agreements.

(f)      Purchaser and the Company shall work together in good faith to negotiate amendments to, or replacements of, the Collective Bargaining Agreements (such amended or replaced Collective Bargaining Agreements, the "**Replacement Collective Bargaining Agreements**"), such that the Replacement Collective Bargaining Agreements are in place and are designated by Purchaser as Assumed Contracts and listed as such on Schedule 2.01(e) as of the Closing Date and are in form and substance satisfactory to Marriott Hotel Services, Inc., as determined by Marriott Hotel Services, Inc. it its sole discretion.  Without otherwise limiting what Marriott Hotel Services, Inc. might consider satisfactory in its sole discretion, the Replacement Collective Bargaining Agreements shall be deemed satisfactory to Purchaser, and shall be designated by Purchaser as Assumed Contracts, if they, in the aggregate, substantially include the changes included in the Company's proposals served on the Unions dated January 27, 2009 and February 12, 2009 (or substantially achieve, in the aggregate, comparable cost savings and work rule revisions).  Nothing in this provision alters the Company's sole authority to bargain with the Unions and negotiate any changes in, or replacements for, the Collective Bargaining Agreements.  Effective as of the Closing Date, Purchaser shall (i) recognize the applicable labor organizations that are parties to the Replacement Collective Bargaining Agreements as the respective exclusive bargaining representatives of the employees of Purchaser covered by those Agreements; (ii) as provided in the Replacement Collective Bargaining Agreements, recognize each such employee's prior service with the Company for all purposes under the Replacement Collective Bargaining Agreements, such that each such employee's seniority date and years of service remain intact after Closing; and (iii) assume each of the Replacement Collective Bargaining Agreements, and become the employer of such employees as if there had been no change in their employer.

(g)      In the event that, following the Effective Time, Purchaser terminates any employees in such a manner, or takes any other action, so as to cause the application of the WARN Act to the transactions described in this Agreement, then Purchaser shall be solely responsible for any WARN Act liability so incurred; provided that any WARN Act liability with respect to any employees whose employment was subject to any furloughs or other temporary cessation of employment prior to the Closing Date shall be the sole responsibility of the Sellers.  This Section 5.05(g) shall survive Closing indefinitely.

(h)      Sellers agree to provide Purchaser with an updated list of employees as of March 1, 2009, within two (2) weeks of the date of this Agreement.

(i)      The parties hereto acknowledge and agree that all provisions contained in this Section 5.05 are included for the sole benefit of the parties hereto, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any employee or former employee of the Company (including the Transferred Employees), any participant in any employee benefit plan maintained by Purchaser or any of its Affiliates, or any dependent or beneficiary thereof, or (ii) to continued employment with Purchaser or any of its Affiliates.

5.06     Satisfaction of Closing Conditions.  Upon the terms and subject to the conditions of this Agreement, Sellers will use good faith commercially reasonable efforts to satisfy or cause to be satisfied all of the conditions precedent that are set forth in Article IX and Article X, to the extent within Sellers' control, on or before the Termination Date.   Subject to the terms and conditions of this Agreement, Sellers will use good faith commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated and, without limiting the generality of the foregoing, except as set forth on Schedule 5.06, to obtain all Necessary Consents and required authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on their part in order to effect the transactions contemplated hereby.   Nothing in this Section 5.06 shall in any way modify or amend any conflicting terms and conditions set forth in Article IX and Article X.

5.07     Access to Information.  During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI, subject to the terms and conditions hereof relating to the confidentiality and use of confidential and proprietary information, and subject to compliance with applicable Legal Requirements, Sellers will provide Purchaser and its representatives and agents (collectively, "**Purchaser Representatives**"), upon reasonable prior notice, with reasonable access, during regular business hours, to the Hotel and other Real Property, files, books, records and offices of the Sellers, including any and all Requested Information and other information relating to Taxes, commitments, Sellers Contracts, licenses, real, personal and intangible property (including any Intellectual Property Rights, but excluding any Confidential Materials), and financial condition (collectively, "**Inspection Activities**"), subject to the following conditions:

(a)      All Inspection Activities shall be at the sole cost and expense of Purchaser and at Purchaser's sole risk;

(b)      In undertaking the Inspection Activities, Purchaser shall (and shall cause Purchaser Representatives to) comply with all applicable Legal Requirements;

(c)      At the Company's option, Purchaser Representatives shall be accompanied by a representative of the Company during any such entry upon the Hotel or any other Real Property;

(d)      Purchaser agrees that all Inspection Activities shall be subject to the rights of tenants of the Hotel, and shall be conducted in a manner not unreasonably disruptive to tenants, guests, or invitees at the Hotel or otherwise to the operation of the Hotel or any other Real Property;

(e)     Purchaser Representatives shall not make any contact or communication with any tenant or employees at the Hotel without reasonable prior notice to the Company and without the prior consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), and shall not make any contact or communications with Hotel guests;

(f)     Purchaser shall not make any contact or communication with any Governmental Authority regarding the Hotel or any other Real Property without reasonable prior notice and without the prior consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed;

(g)     Purchaser shall indemnify, defend, and hold Sellers harmless from and against any and all Losses arising from any Inspection Activities undertaken by Purchaser, any Purchaser Representative or any other party acting at the direction of or with the authorization of Purchaser;

(h)     Prior to entry upon any Real Property, Purchaser shall provide the Company with copies of certificates of insurance evidencing comprehensive general liability insurance policies (naming the Company as an additional insured) which shall be maintained by Purchaser in connection with its Inspection Activities, with limits, coverage and insurers under such policies as are reasonably satisfactory to the Company;

(i)     In no event shall Purchaser make any intrusive physical testing (environmental, structural or otherwise) at the Real Property (such as soil borings, water samplings or the like) without the prior consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed (and Purchaser shall in all events promptly return the Real Property to its prior condition and repair thereafter) and which may be further conditioned upon, among other things, the approval by the Company of the following:  (i) the insurance coverage of the contractor who will be conducting such testing; (ii) the scope and nature of such testing to be performed by such contractor; and (iii) a written confidentiality agreement by such contractor in form reasonably satisfactory to the Company.  In addition, Purchaser shall be responsible for and pay any and all liens by contractors, subcontractors, materialmen, or laborers performing the inspections or any other work for Purchaser Representatives on or related to the Hotel or any other Real Property;

(j)     Before the Closing, Purchaser shall keep all information or data received or discovered in connection with any of the Inspection Activities strictly confidential, except for disclosures to representatives, investors, lenders, counsel and agents, provided such disclosures are on an as needed basis for Purchaser's acquisition of the Purchased Assets, and such persons are instructed to keep the information strictly confidential, except for such disclosures that are necessary to comply with applicable Legal Requirements or to enforce this Agreement.  The provisions of this Section 5.07 shall survive any termination of this Agreement.

5.08     Casualty.

(a)     If prior to Closing, (i) condemnation proceedings are commenced against all or any portion of the Hotel, and such proceedings do not materially adversely affect the continued operation of the Business in substantially the same manner as the Business has been

historically operated, or (ii) the Hotel is damaged by fire or other casualty to the extent that the cost of repairing such damage is reasonably estimated by the Company and Purchaser, each acting reasonably and in good faith, to be One Million Dollars ($1,000,000) or less, then this Agreement shall continue in full force and effect and the Purchase Price shall not be reduced except as hereinafter set forth, but Purchaser shall be entitled to an assignment of all of the proceeds payable to the Company of fire or other casualty insurance (other than those proceeds expended by or on behalf of the Company prior to Closing to restore the Hotel), all business interruption insurance proceeds (if any) payable with respect to the period from and after Closing, and all condemnation awards payable to the Company (other than any portion of the award in respect of income lost prior to Closing or expended by or on behalf of the Company prior to Closing to restore the Hotel or in connection with the collection of the award), as the case may be, and the Company shall have no obligation to repair or restore the Hotel; provided, however, that in the case of any insured casualty, the Purchase Price shall be reduced by the "deductible" applied by the Company's insurer with respect to such fire or casualty and not paid by the Company prior to Closing.  For purposes of this <u>Section 5.08(a)</u>, "deductible" shall mean the first Five Hundred Thousand Dollars ($500,000) of any casualty loss, plus that amount of casualty loss that is between Five Million Dollars ($5,000,000) and Twenty Five Million Dollars ($25,000,000).

(b)     If prior to Closing, (i) condemnation proceedings are commenced against all or any material portion of the Hotel and such proceedings are not covered by <u>Section 5.08(a)</u> or (ii) the Hotel is damaged by fire or other casualty and such damage is not covered by <u>Section 5.08(a)</u>, Purchaser shall have the right, upon notice in writing to the Company delivered within ten (10) days after the Company gives Purchaser notice of such matter as described in this <u>Section 5.08(b)</u>, to terminate this Agreement, whereupon this Agreement shall terminate, Escrow Agent shall return the Deposit to Purchaser and neither party to this Agreement shall thereafter have any further rights or liabilities under this Agreement other than those that expressly survive termination of this Agreement.  If Purchaser does not timely elect, or is not entitled, to terminate this Agreement as set forth above, the Purchase Price shall not be reduced except as hereinafter set forth, but Purchaser shall be entitled to an assignment of all of the proceeds payable to the Company of fire or other casualty insurance (other than those proceeds expended by or on behalf of the Company prior to Closing to restore the Hotel), all business interruption insurance proceeds (if any) payable with respect to the period from and after Closing, and all condemnation awards payable to the Company (other than any portion of the award in respect of income lost prior to Closing or expended by or on behalf of the Company prior to Closing to restore the Hotel or in connection with the collection of the award), as the case may be, and the Company shall have no obligation to repair or restore the Hotel; provided, however, that in the case of any insured casualty, the Purchase Price shall be reduced by the "deductible" applied by the Company's insurer with respect to such fire or casualty and not paid by the Company prior to Closing.

(c)     If necessary to allow Purchaser the full ten (10) day period described in <u>Section 5.08(b)</u>, the Closing Date shall be automatically extended until three (3) Business Days after Purchaser has made, or has or is deemed to have waived, its election pursuant to <u>Section 5.08(b)</u>.

5.09    Transaction Proposals.  From the date hereof until the earliest of (a) the date that is sixty (60) days from the date hereof, (b) the date that this Agreement is terminated, and (c) the Petition Date (the "**Exclusivity Period**"), no Seller shall authorize or permit its officers, directors, consultants, employees, stockholders, Affiliates, investment bankers, attorneys, advisors, auditors, representatives or agents to, directly or indirectly, (i) solicit, initiate or encourage the submission of inquiries, proposals or offers from any Person or group of Persons relating to any acquisition or purchase of any Purchased Assets of, or any equity interest in, any Seller, or any tender or exchange offer, merger, consolidation, business combination, recapitalization, restructuring, spin-off, liquidation, dissolution or similar transaction involving, directly or indirectly, any Seller (each a "**Transaction Proposal**"), (ii) participate in any discussions or negotiations regarding any Transaction Proposal, or (iii) accept, approve or authorize, or enter into any agreement concerning any Transaction Proposal or dispose of any equity interest in the Sellers.  Each Seller shall, as applicable, cause its officers, directors, consultants, employees, stockholders, Affiliates, investment bankers, attorneys, advisors, auditors, representative or agents to abide by the terms of this Section 5.09. To the extent a Transaction Proposal is received by any Seller during the Exclusivity Period, such Seller shall promptly provide notice of the Transaction Proposal to Purchaser.

5.10    Corporate Name Changes.  Promptly following the Closing Date, each Seller that has the word "Greenbrier" in its corporate name shall change its corporate name to delete the word "Greenbrier", or any word confusingly similar thereto, from such corporate name, and shall promptly request the Bankruptcy Court to cause its new name to be used in all filings and for all other purposes relating to the Chapter 11 Cases.  This provision shall survive Closing.

## ARTICLE VI

## COVENANTS OF PURCHASER

6.01    Advice of Changes.  During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI, Purchaser will promptly advise the Company in writing, to the extent of Purchaser's Knowledge, of:  (i) the discovery by Purchaser of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Purchaser contained in this Agreement untrue or inaccurate in any material respect; (ii) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Purchaser contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that the representations and warranties that are confined to a specific date shall speak only as of such date), untrue or inaccurate in any material respect; (iii) any Breach of any covenant or obligation of the Purchaser pursuant to this Agreement or any Purchaser Ancillary Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article IX or Article X impossible or unlikely; and (v) any material adverse effect on Purchaser's ability to consummate the transactions contemplated hereunder.

6.02    Litigation.  Purchaser will notify the Company in writing promptly after learning of any Proceeding threatened or pending for the purpose or with the probable effect of enjoining

or preventing the consummation of any of the transactions contemplated by this Agreement, or that would be reasonably expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereunder.

6.03    Satisfaction of Conditions Precedent.    Upon the terms and subject to the conditions of this Agreement, Purchaser will use commercially reasonable efforts to satisfy or cause to be satisfied all of the conditions precedent that are set forth in Article IX and Article X, to the extent within Purchaser's control, on or before the Termination Date.  Upon the terms and subject to the conditions of this Agreement, Purchaser will use commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on its part in order to effect the transactions provided for herein.  Nothing in this Section 6.03 shall in any way modify or amend any conflicting terms and conditions set forth in Article IX and Article X.

6.04    Due Diligence Reports.    To the extent that Purchaser has obtained a Phase II environmental report, as contemplated by Section 10.08(c) hereof, and such report reveals a condition or conditions the Remediation of which reasonably would be expected to cause Losses totaling, in the aggregate, more than Two Million Dollars ($2,000,000), then Purchaser shall provide the Company with written notice of such condition or conditions.  If this Agreement is validly terminated pursuant to its terms and Purchaser has received payment in full of the Expense Reimbursement and all other amounts due to Purchaser hereunder, including, solely with respect to the Survey, payment required pursuant to Section 8.05 hereof, then Purchaser shall provide the Company, without representation or warranty of any kind, with true and complete copies of any and all documents obtained by Purchaser pursuant to Section 10.08 hereof, including any title insurance commitment, the Survey and Phase II environmental report, it being understood that such documents may be provided to any Third Party by the Company following such termination.  The provisions of this Section 6.04 shall survive any termination of this Agreement.

## ARTICLE VII

## ADDITIONAL COVENANTS

7.01    Further Assurances.    Sellers agree that if, at any time before or after the Effective Time, Purchaser considers or is advised that any further deeds, assignments, assurances or other actions are reasonably necessary or desirable to vest, perfect or confirm Purchaser's acquisition and assumption of the Purchased Assets and Assumed Liabilities, Sellers shall, at Purchaser's request and expense, execute and deliver all such proper deeds, assignments and assurances and do all other things reasonably necessary to vest, perfect or confirm title to such property or rights in Purchaser and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement.  In addition, from and after the Closing Date, Sellers agree that they will (i) remit to Purchaser all checks or payments received by them to which Purchaser is entitled in connection with Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities and (ii) collect any and all insurance proceeds arising from or relating to the Purchased Assets or the Assumed Liabilities prior to the Effective Time and remit such sums

directly to Purchaser, subject to the Company's use of any such proceeds in accordance with the provisions of <u>Section 5.08</u> hereof.  Purchaser agrees that if, at any time before or after the Effective Time, Sellers consider or are advised that any further instruments of assumption or assurances are reasonably necessary or desirable to confirm Purchaser's assumption of the Assumed Liabilities, Purchaser shall, at the Sellers' request and expense, execute and deliver all such proper instruments and assurances and do all other things reasonably necessary to confirm Purchaser's assumption of the Assumed Liabilities, and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement.  The provisions of this <u>Section 7.01</u> shall survive the Closing.

7.02   <u>Confidentiality</u>.   The Confidentiality Agreement dated September 25, 2008 between Purchaser and Goldman Sachs & Co., on behalf of CSX Corporation (the "**Confidentiality Agreement**") shall be deemed incorporated herein as if set forth in full and all documents, materials and other information that Purchaser shall have obtained regarding the Business and Sellers during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents shall be deemed to be provided pursuant to such Confidentiality Agreement and shall be deemed Confidential Information (as such term is defined in the Confidentiality Agreement). After the Closing, Purchaser may use or disclose any Confidential Information included in the Purchased Assets or otherwise reasonably related to the Purchased Assets or the business conducted therewith.

7.03   <u>Liquor License</u>.

(a)   Within ten (10) days following the date hereof, Purchaser, at its sole cost and expense, shall make all necessary applications for, and shall thereafter diligently pursue, issuance of all licenses and approvals required under any Legal Requirements for the continued sale of alcoholic beverages at the Hotel from and after the Closing Date (including temporary permits, to the extent available) consistent with the practices and procedures in effect as of the date hereof (collectively, "**Liquor Licenses**").  Purchaser shall keep the Company informed of the status of such applications, and shall promptly respond to the Company's inquiries regarding the status of the same.

(b)   If the Liquor Licenses have not been issued as of the date that Closing is otherwise required to occur under this Agreement, then at Closing the Company shall enter into an interim liquor agreement ("**Interim Liquor Agreement**") that will permit Purchaser to continue the sale of alcoholic beverages at the Hotel from and after the Closing Date consistent with the practices and procedures in effect as of the date hereof, provided that the Interim Liquor Agreement is, in the judgment of the Company and Purchaser, each acting reasonably and in good faith, permitted by applicable Legal Requirements and local custom or practice.  The Interim Liquor Agreement shall (i) be in form and substance reasonably satisfactory to the Company and Purchaser, (ii) provide for the indemnification by Purchaser of the Sellers and their Affiliates and their respective directors, officers and employees with respect to all liabilities related to the sale or consumption of alcoholic beverages at the Hotel from and after the Closing Date, and (iii) expire on the earlier to occur of issuance of the Liquor Licenses or the date that is one hundred twenty (120) days after the Closing Date.

7.04   <u>Checked Baggage</u>.  On the Closing Date, representatives of the Company and Purchaser shall make a written inventory of all baggage and similar items left in the care of the Hotel (collectively, "**Inventoried Baggage**").  Purchaser shall be responsible for, and shall indemnify the Sellers and their Affiliates and their respective directors, officers and employees, against, any Losses incurred by any of them with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory, and any other baggage or similar items left in the care of the Hotel on or after the Closing Date which was not inventoried.  The Company shall be responsible for, and shall indemnify the Purchaser against, any Losses incurred by Purchaser with respect to any theft, loss or damage to any Inventoried Baggage prior to the time of such inventory, and any other baggage or similar items left in the care of the Hotel prior to the Closing Date which was not inventoried.

7.05   <u>Safe Deposit Boxes</u>.  On or before the Closing Date, the Company shall notify all guests who are then using a safe deposit box at the Hotel advising them of the pending change in the management of the Hotel and requesting them to conduct an inventory and verify the contents of such safe deposit box.  All inventories by such guests shall be conducted under, to the extent practicable, the joint supervision of representatives of the Company and Purchaser.  At Closing, all safe deposit boxes which are then in use but not yet inventoried by the depositor shall be opened in the presence of representatives of the Company and Purchaser, and the contents thereof shall be inventoried.  Following the inventory of each safe deposit box, the Company shall deliver to Purchaser all keys, receipts and agreements for such box.  Purchaser shall be responsible for, and shall indemnify the Sellers and their Affiliates and their respective directors, officers and employees, against, any Losses incurred by any of them with respect to any theft, loss or damage to the contents of any safe deposit box from and after the time such safe deposit box is inventoried.  The Company shall be responsible for, and shall indemnify Purchaser against, any Losses incurred by Purchaser with respect to any theft, loss or damage to the contents of any safe deposit box prior to the time such safe deposit box is inventoried.

# ARTICLE VIII

# BANKRUPTCY PROCEDURES, ETC.

8.01   <u>Filing of Sale Motion; Entry of Bidding Procedures Order; Sellers' Plan</u>.

(a)     Promptly following, but no later than two (2) Business Days after the later of (i) the date of this Agreement or (ii) the Petition Date, Sellers shall file the Sale Motion and such other motions as are necessary to implement the transactions contemplated by this Agreement.  Sellers shall request a prompt hearing relative to, and shall use commercially reasonable efforts to obtain, entry of the Bidding Procedures Order.

(b)     Sellers shall file the Sellers' Plan, and a Disclosure Statement with respect thereto, within thirty (30) days of the Petition Date.  Sellers shall request a prompt hearing relative to the approval of the Disclosure Statement and confirmation of the Sellers' Plan, and shall use commercially reasonable efforts to obtain entry of the Confirmation Order.

8.02   <u>Other Filings</u>.  The parties agree that, based upon the current facts known to them, no Other Filings (as hereinafter defined) are required in order for the parties to consummate the

transactions contemplated by this Agreement.  Notwithstanding the foregoing, in the event that Other Filings are required, as promptly as practicable after the date of this Agreement, each of Sellers and Purchaser will prepare and file any other filings required to be filed by them under any Legal Requirements relating to the transactions contemplated by this Agreement (the "**Other Filings**").  Sellers and Purchaser each shall promptly supply the other with any information that may be required in order to effectuate any filings pursuant to this Section 8.02.

8.03    Assumed Contracts; Rejected Contracts.

(a)    Assumed Contracts.  Subject to the approval of the Bankruptcy Court and pursuant to the Executory Contract Assumption and Assignment Order and Confirmation Order, the Assumed Contracts will be assumed by Sellers and assigned to Purchaser on the Closing Date under Section 365 of the Bankruptcy Code.  In the Sale Motion, or in such additional or subsequent motions as may be appropriate, Sellers will seek authority to assume and assign the Assumed Contracts to Purchaser in accordance with Section 365 of the Bankruptcy Code.  All Assumed Contracts as set forth on Schedule 2.01(e), as amended as of the Closing Date, shall be assigned to and assumed by Purchaser at the Closing.  The final determination of which Sellers Contracts shall be Assumed Contracts shall be within the sole discretion of Purchaser (provided, however, that the IP Lease shall be an Assumed Contract).  At the Closing, the Cure Amounts shall be paid in accordance with the provisions of Section 2.03(c).

(b)    Rejected Contracts.  Schedule 8.03(b) will be delivered by Sellers on or prior to the Schedule Delivery Date and will contain an initial, non-exclusive schedule of Sellers Contracts that Sellers propose not be assigned to Purchaser.  On or prior to the day that is three (3) Business Days prior to the Bid Deadline, Purchaser may, by written notice to Sellers, (i) designate additional Sellers Contracts (other than the IP Lease and the Replacement Collective Bargaining Agreements) from Schedule 2.01(e) that will not be assigned to Purchaser, and (ii) designate Sellers Contracts on Schedule 8.03(b) as Assumed Contracts.  Upon any such designation, Schedule 8.03(b) and Schedule 2.01(e) shall be amended accordingly.  During the period subsequent to the date that is three (3) Business Days prior to the Bid Deadline through the Closing Date, Purchaser may, by written notice to Sellers, designate such additional Sellers Contracts (other than the IP Lease and the Replacement Collective Bargaining Agreements) from Schedule 2.01(e) that will not be assigned to Purchaser. On the Closing Date, Schedule 8.03(b) and Schedule 2.01(e) shall be amended accordingly.  Only Sellers Contracts listed on Schedule 2.01(e), as amended, as of the Closing Date, shall be assumed and assigned to Purchaser.  After the Effective Time, Sellers shall have the right in their discretion to reject any Sellers Contract other than any Assumed Contract.

8.04    Bankruptcy Court Approval.

(a)    Sellers shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the Sale Order which, among other things, will contain findings of fact and conclusions of law (i) finding that this Agreement was proposed by the parties in good faith and represents the highest and/or best offer for the Purchased Assets; (ii) finding that Purchaser is a good faith purchaser under Section 363(m) of the Bankruptcy Code; (iii) authorizing and directing Sellers to consummate the transactions contemplated by this Agreement and sell only the Purchased Assets to Purchaser pursuant to this Agreement and Sections 363 and 365 of the

Bankruptcy Code, free and clear of all interests within the meaning of Section 363(f) of the Bankruptcy Code; (iv) approving the assignment and assumption of the Assumed Contracts; (v) authorizing and directing Sellers to execute, deliver, perform under, consummate and implement, this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; and (vi) finding that the sale of the Purchased Assets does not constitute a sub rosa plan of reorganization (to the extent the sale is not sought to be approved in connection with a plan of reorganization).

(b)     Sellers shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the Executory Contract Assumption and Assignment Order.

(c)     Sellers shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the Bidding Procedures Order that, among other things, (i) approves the Break-Up Fee and Expense Reimbursement, if due and payable hereunder, (ii) provides that Purchaser's claim to the Break-Up Fee and Expense Reimbursement, shall, in the event Sellers elect to consummate a Sale Transaction with a Third Party as set forth in Section 8.05 hereof, be paid out of the deposit or cash proceeds of the sale to such Third Party, (iii) establishes a date by which initial Qualified Bids must be submitted, (iv) establishes the procedures for an auction at which only Qualified Bidders who have previously submitted a Qualified Bid may bid, and (v) requires Sellers to promptly provide a copy of any Qualified Bid to Purchaser and to any Qualified Bidder who has submitted a Qualified Bid.  For the avoidance of doubt, a Sale Transaction shall include consummation of a Qualified Bid by a Qualified Bidder.

(d)     Sellers shall promptly make any filings, take all actions, and use their commercially reasonable efforts to obtain approval of the Confirmation Order and any and all other approvals and Orders necessary or appropriate, or as otherwise reasonably requested by Purchaser, for consummation of the transactions contemplated by this Agreement, subject to their obligations to comply with any Order of the Bankruptcy Court and the Bankruptcy Code.

(e)     In the event an appeal is taken, or a stay pending appeal is requested, from the Sale Order, the Executory Contract Assumption and Assignment Order, the Bidding Procedures Order or the Confirmation Order, Sellers shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser within one (1) Business Day a copy of the related notice of appeal or order of stay.  Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from any of such Orders.

(f)     Purchaser shall cooperate in providing such information and evidence as is reasonably necessary to obtain the Orders described in this Section 8.04.

8.05   Break-Up Fee; Expense Reimbursement; Deposit.   If within six (6) months following termination of this Agreement by Sellers pursuant to Section 11.01(a)(ii)(B), Section 11.01(a)(iii) or Section 11.01(a)(v) or by Purchaser pursuant to Section 11.01(a)(ii), Section 11.01(a)(iii), Section 11.01(a)(iv)(A), Section 11.01(a)(iv)(B), or Section 11.01(a)(iv)(C), either (A) Sellers consummate a Sale Transaction with a Third Party, (B) Sellers consummate a Stand-Alone Plan that contemplates the continued operation of the Hotel rather than a liquidation thereof, or (C) in the event the Chapter 11 Cases are converted to Chapter 7 of the Bankruptcy Code and a Sale Transaction by the Chapter 7 trustee is consummated with a Third Party, then in

each such case, the Company will pay to Purchaser, in cash, an amount equal to Two Million Dollars ($2,000,000) (the "**Break-Up Fee**") from the cash proceeds of such transaction. In the event Purchaser becomes entitled to the Break-Up Fee under this Section 8.05, then upon presentation of a statement setting forth with specificity the nature and amount thereof, the Company shall reimburse Purchaser for reasonable out-of-pocket expenses actually incurred by Purchaser after February 19, 2009 in connection with this Agreement in cash in an aggregate amount not to exceed Six Hundred Thousand Dollars ($600,000) (the "**Expense Reimbursement**") from the cash proceeds of such transaction. Additionally, in the event Sellers terminate pursuant to Section 11.01(a)(ii)(B), Section 11.01(a)(iii) or Section 11.01(a)(v) or Purchaser terminates this Agreement pursuant to Section 11.01(a)(ii) and Sellers do not consummate a Sale Transaction with a Third Party within six (6) months following such termination, or in the event Sellers terminate pursuant to Section 11.01(a)(ii)(B), Section 11.01(a)(iii) or Section 11.01(a)(v) or Purchaser terminates this Agreement pursuant to Section 11.01(a)(ii) or Section 11.01(a)(iv)(B) and the Stand-Alone Plan contemplates the liquidation of the Hotel and not the continued operation thereof, then Purchaser shall be entitled to receive the Expense Reimbursement (but not the Break-Up Fee) from the cash proceeds from the sale at liquidation of the Sellers' assets. Any Break-Up Fee or Expense Reimbursement that becomes payable hereunder shall constitute a superpriority claim with priority over any and all administrative expense claims of the kind specified in sections 503(b) and 507 of the Bankruptcy Code. In the event of a termination of this Agreement by Sellers pursuant to Section 11.01(a)(ii) as a result of a Breach by Purchaser, the Company shall be entitled to retain the Deposit as liquidated damages, with such retention serving as the sole and exclusive remedy of Sellers for any termination hereof. Prior to consummating a Qualified Bid by a Qualified Bidder other than the Purchaser, such Qualified Bidder shall have the right, subject to the prior payment to the Escrow Agent by such Qualified Bidder for the cost of the Survey, up to an amount equal to Three Hundred Fifty Thousand Dollars ($350,000), to receive the Survey from the Purchaser; provided, however, that if a Sale Transaction is consummated with such Qualified Bidder, the Escrow Agent shall release such payment to the Purchaser. If a Sale Transaction is consummated with a Third Party other than such Qualified Bidder, a Stand-Alone Plan is consummated or a liquidation occurs, Purchaser shall instruct the Escrow Agent to refund such payment to such Qualified Bidder following any such event. The provisions of this Section 8.05 shall survive the Closing or the earlier termination of this Agreement.

      8.06   Certain Tax Matters.

      (a)   Cooperation. Purchaser and Sellers shall, and shall cause their respective Affiliates, officers, employees, agents, auditors and representatives reasonably to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the conduct of any audit by any taxing authority, and the prosecution of any defense or claim, suit or proceeding relating to any Tax. Purchaser and Sellers shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

      (b)   Transfer Taxes. Notwithstanding Section 8.06(c), except as hereinafter provided, any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary

stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) (collectively, "**Transfer Taxes**") which may be payable, if any, by reason of the transfer of the Purchased Assets shall be divided equally between Sellers, on the one hand, and Purchaser, on the other, and shall be timely paid by Sellers and Purchaser when due, and Purchaser shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Legal Requirements, Sellers shall, and shall cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.  Sellers shall prepare and file in a timely manner, all applicable forms and returns necessary to allow the transfer of the Purchased Assets on the Closing Date to be exempt, to the extent possible under applicable Legal Requirements, from the payment of Transfer Taxes.

(c)      Apportionment of Taxes.  Except as provided in Section 8.06(b):

(i)      Sales and use Taxes with respect to the Purchased Assets relating to a Straddle Period shall be apportioned in the following manner:  the amount of sales and use Taxes allocated to the Pre-Closing Tax Period or Post-Closing Tax Period included in the Straddle Period shall be determined by closing the books of the Sellers as of the close of business on the Closing Date and by treating each of such Pre-Closing Tax Period and Post-Closing Tax Period as a separate taxable period.

(ii)      Property Taxes relating to a Straddle Period shall be apportioned in the following manner:  the amount of Property Taxes allocated to the Pre-Closing Tax Period included in a Straddle Period shall be equal to the total amount of such Property Taxes for the Straddle Period multiplied by a fraction, the numerator of which is the number of days in the Pre-Closing Tax Period included in the Straddle Period and the denominator of which is the total number of days in the Straddle Period.  The amount of Property Taxes attributable to the Post-Closing Tax Period included in a Straddle Period shall be equal to the total amount of Property Taxes for the Straddle Period less the amount of Property Taxes attributable to the Pre-Closing Tax Period included in the Straddle Period.

(iii)      Sellers shall be liable for (and shall promptly reimburse Purchaser to the extent Purchaser shall have paid) that portion of sales, use and Property Taxes relating to, or arising in respect of, Pre-Closing Tax Periods.

## ARTICLE IX

## CONDITIONS TO OBLIGATIONS OF SELLERS

Sellers' obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Sellers, but only in writing signed on behalf of Sellers):

9.01      Accuracy of Representations and Warranties; Performance of Covenants.  Each of the representations and warranties of Purchaser set forth in Article IV of this Agreement shall be true and correct at and as of the Closing Date, with the same force and effect as if made as of the Closing Date (other than such representations and warranties as are made as of another date,

which shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to materiality or material adverse effect set forth therein) would not have a material adverse effect on Purchaser's ability to perform its obligations under this Agreement.  Purchaser shall have performed and complied in all material respects with all of its covenants, agreements and conditions required to be performed, satisfied or complied with by it hereunder on or prior to the Closing.

9.02    Compliance with Law.  There shall be no Order by any Governmental Authority that would prohibit or render illegal the transactions contemplated by this Agreement.

9.03    Government Consents.  There shall have been obtained at or prior to the Closing Date such Governmental Authorizations from, and there shall have been taken such other actions, as may be required to consummate the sale of Purchased Assets by, any Governmental Authority having jurisdiction over the parties hereto and the actions herein proposed to be taken.

9.04    Bankruptcy Orders.  The Bankruptcy Court shall have entered the Sale Order,  the Executory Contract Assumption and Assignment Order, the Bidding Procedures Order and the Confirmation Order, and such orders shall not have been rescinded, reversed, modified or stayed and the time period allowing for such action have expired.

9.05    Replacement Collective Bargaining Agreements.  The Replacement Collective Bargaining Agreements with all of the Unions shall be in place as of the Closing, Purchaser shall have agreed to assume such agreements as Assumed Contracts, and Purchaser shall have agreed to comply with the requirements of the successorship provisions, if any, in the Replacement Collective Bargaining Agreements.

9.06    GSCD Company.   The Company shall not be obligated to purchase the membership interests in the GSCD Company owned by the Current Member as a result of any of the transactions contemplated hereunder.

9.07    Other Deliveries.  Purchaser shall have delivered or caused to be delivered the following to the Company:

(a)    the Assumed Cure Amounts and the Deposit;

(b)    an assumption agreement, duly executed by Purchaser, in form and substance reasonably acceptable to Purchaser and Sellers, pursuant to which Purchaser shall assume the payment and performance of the Assumed Liabilities;

(c)    an assignment and assumption agreement, duly executed by Purchaser, in form and substance reasonably acceptable to Purchaser and Sellers, pursuant to which Sellers shall assign and convey and Purchaser shall accept and assume the Assumed Contracts (the "**Assumed Contracts Assignment**");

(d)    any Interim Liquor Agreement to the extent required pursuant to Section 7.03(b), duly executed by Purchaser;

(e)      copies of resolutions duly adopted by the board of directors of Purchaser authorizing and approving Purchaser's execution and delivery of this Agreement and consummation of the transactions contemplated by this Agreement, certified as true and in full force and effect as of the Closing Date by an appropriate officer of Purchaser;

(f)      the Marriott Guaranty, duly executed by Marriott, and the First Mortgage, duly executed by Purchaser, in accordance with Section 2.03(e) hereof, in forms attached hereto as Exhibit G and Exhibit H, respectively;

(g)      the Intercreditor Agreement, in the form attached hereto as Exhibit L, duly executed by Marriott;

(h)      the Consent and Agreement, in the form attached hereto as Exhibit M, duly executed by Purchaser or Marriott, as applicable;

(i)      certificates of the duly authorized President or a Vice President of Purchaser certifying the fulfillment of the conditions set forth in Section 9.01;

(j)      certificates of incumbency for the officer(s) of Purchaser executing this Agreement and other Closing documents, dated as of the Closing Date;

(k)      a final list of the employees of the Company who will become Transferred Employees as of the Closing Date;

(l)      such other documents and instruments as are customary and as may be reasonably requested by Escrow Agent to effectuate the transactions contemplated by this Agreement; and

(m)      certification that Purchaser is not a foreign Person, dated as of the Closing Date and in the form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code so that Sellers are exempt from withholding any portion of the Purchase Price thereunder.

## ARTICLE X

## CONDITIONS TO OBLIGATIONS OF PURCHASER

Purchaser's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Purchaser, but only in a writing signed on behalf of Purchaser):

10.01   Accuracy of Representations and Warranties; Performance of Covenants.  Each of the representations and warranties of the Sellers set forth in Article III shall be true and correct at and as of the Closing Date, with the same force and effect as if made as of the Closing Date, except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to materiality or Material Adverse Effect set forth therein) either individually or in the aggregate would not have a Material Adverse Effect.  Sellers shall have performed and complied in all material respects with all of their covenants, agreements and

conditions required to be performed, satisfied or complied with by them hereunder on or prior to the Closing.

10.02   Absence of Material Adverse Effect.  Since December 26, 2008 there shall have been no event, occurrence or effect that has had or would reasonably be likely to have, individually, or when taken as a whole with any other events, occurrences or effects, a Material Adverse Effect.

10.03   Compliance with Law.  There shall be no Order by any Governmental Authority that would prohibit or render illegal the transactions contemplated by this Agreement.

10.04   Government Consents; No Injunction.  There shall have been obtained at or prior to the Closing Date such Governmental Authorizations from, and there shall have been taken such other actions, as may be required to consummate the sale of Purchased Assets by, any Governmental Authority having jurisdiction over the parties and the actions herein proposed to be taken.

10.05   Third-Party Consents; Assignments; Other Documents.  If the assignment of any of the Purchased Assets requires the consent of any Third Parties pursuant to Section 365 of the Bankruptcy Code or otherwise, then Sellers shall have obtained, and Purchaser shall have received from Sellers, duly executed copies of all Necessary Consents and all other approvals, assignments, waivers, authorizations, permits or certificates, where the failure to have received the same would reasonably be expected to have a Material Adverse Effect.

10.06   [Omitted]

10.07   Bankruptcy Orders.  The Bankruptcy Court shall have entered the Sale Order,  the Executory Contract Assumption and Assignment Order, the Bidding Procedures Order and the Confirmation Order, and such orders shall not have been rescinded, reversed, modified or stayed and the time period allowing for such action have expired.

10.08   Title Insurance; Survey; Phase II.

(a)   Purchaser shall have received, at Purchaser's sole cost and expense, a compiled plat of survey or modified ALTA survey (the "**Survey**") of the Owned Real Property and such Survey shall not reveal any matters or deficiencies that individually or in the aggregate reasonably would be expected to result in a Material Adverse Effect.

(b)   Purchaser shall have received a commitment for an ALTA owner's title insurance policy issued by the Escrow Agent with respect to the Owned Real Property, obtained at Purchaser's sole cost and expense, pursuant to which the Escrow Agent has agreed to issue such policy insuring Purchaser that, upon satisfaction of the applicable conditions set forth in this Article X and other requirements of the Escrow Agent (and all such conditions and requirements shall have been satisfied as of the Closing Date), fee simple title to the Owned Real Property will be vested in Purchaser free and clear of all Encumbrances that individually or in the aggregate reasonably would be expected to result in a Material Adverse Effect, insurable at standard rates in the State of West Virginia.

(c)       Purchaser shall have received from an engineer selected by Purchaser, at Purchaser's sole cost and expense, a Phase II environmental report related to the Owned Real Property, and such Phase II environmental report shall not reveal any condition or conditions the Remediation of which reasonably would be expected to cause Losses totaling, in the aggregate, more than Two Million Dollars ($2,000,000).

(d)       If Purchaser shall have received from an engineer selected by Purchaser, at Purchaser's sole cost and expense, a Phase II environmental report related to the real property owned by the GSCD Company, and such Phase II environmental report reveals any condition or conditions the Remediation of which reasonably would be expected to cause Losses totaling, in the aggregate, more than Two Million Dollars ($2,000,000), then Purchaser shall have the option, exercisable in its sole discretion, not to acquire the Membership Interests, such that the Membership Interests would become Excluded Assets for purposes of this Agreement upon the exercise of such option and the Operating Agreement for GSCD Company would not be an Assumed Contract.

(e)       The conditions to Closing set forth in Sections 10.08(a) through 10.08(d) shall be deemed to have been waived and Purchaser's right to terminate this Agreement pursuant to Section 11.01(a)(iii) for failure of any of the conditions precedent set forth in such sections shall lapse and expire if not exercised by delivery of written notice to Sellers on or before the date that is ninety (90) days after the date of this Agreement.

10.09   Other Deliveries.   Sellers shall have delivered or caused to be delivered to Purchaser the following:

(a)       deeds containing special warranties of title and, where applicable, assignments of lease, in form and substance reasonably acceptable to Purchaser, duly executed by the Sellers in recordable form, conveying to Purchaser good and marketable fee title to the Owned Real Property, in each case free and clear of all Encumbrances other than Permitted Encumbrances;

(b)       assignments, in form and substance reasonably acceptable to Purchaser and duly executed by the Sellers, conveying valid leasehold title to the Leased Real Property;

(c)       any Seller's title to any motor vehicles included among the Purchased Assets and bills of sale and assignment, duly executed by the Sellers, in form and substance reasonably acceptable to Purchaser, conveying to Purchaser good and valid title to all Purchased Assets other than the Real Property, free and clear of all Encumbrances other than Permitted Encumbrances, which bill of sale and assignment shall include an itemized inventory of all firearms including the description and serial numbers of all such firearms;

(d)       the Assumed Contracts Assignment, duly executed by the Sellers;

(e)       unless Purchaser shall have exercised its rights under Section 10.08(d), the Membership Interests Assignment, duly executed by the Company;

(f)       assignments to Marriott or its Affiliate designee, or instruments of assignment in the form prepared by Marriott or its Affiliate designee, of all Intellectual Property

Rights of the Sellers and included in the Purchased Assets and customary separate assignments of all related registered trademarks, servicemarks, patents and copyrights, and all applications therefor, duly executed by the Sellers;

(g)        the Requested Amount in accordance with the provisions of <u>Section 2.08</u>;

(h)        any Interim Liquor Agreement to the extent required pursuant to <u>Section 7.03(b)</u>, duly executed by the Company;

(i)        the Exit Term Loan Agreement, duly executed by Sellers and CSX Business Management, Inc.;

(j)        the Exit Term Loan Guaranty, duly executed by CSX Corporation;

(k)        the Intercreditor Agreement, duly executed by the Company;

(l)        certification that each Seller is not a foreign Person, dated as of the Closing Date and in the form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code;

(m)        certificates of the duly authorized President or Vice President or similar officer of each Seller certifying the fulfillment of the conditions set forth in <u>Section 10.01</u>;

(n)        certificates of incumbency or evidence of appropriate power of attorney for the respective directors or officers of each Seller executing this Agreement, the Sellers Ancillary Agreements and other Closing documents, dated as of the Closing Date; and

(o)        a list of the individuals, if any, holding the following positions (or if such positions have been discontinued, their closest functional equivalent) on the Closing Date: President and Managing Director; Chief Financial Officer; Director of Finance; Vice President for Sales and Marketing; Director of Engineering; Vice President for Human Resources and Labor Relations; and General Manager of the Hotel, which such list shall be added to the list of individuals set forth on <u>Schedule 1(b)</u> hereof.

10.10    <u>Replacement Collective Bargaining Agreements</u>.    The Replacement Collective Bargaining Agreements shall be in form and substance satisfactory to Marriott Hotel Services, Inc., as determined by Marriott Hotel Services, Inc. in its sole discretion, consistent with the provisions of <u>Section 5.05(f)</u> hereof.

10.11    <u>GSCD Company Consent</u>.  The Purchaser shall have obtained the GSCD Company Consent, provided, however, that the GSCD Consent shall not be required to be obtained if Purchaser exercises its option not to acquire the Membership Interests pursuant to <u>Section 10.08(d)</u> hereof.

## ARTICLE XI

## TERMINATION; REMEDIES

11.01   <u>Termination of Agreement</u>.

(a)      Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, upon notice by the terminating party to the other parties:

(i)      at any time before the Closing, by mutual written consent of Purchaser and Sellers;

(ii)      at any time before the Closing, by Purchaser on the one hand, or Sellers on the other hand, (A) in the event of a Breach of this Agreement by the non-terminating party that remains uncured following fifteen (15) days notice from the terminating party of such Breach and that would result in the failure of any condition to the terminating party's obligations under this Agreement being satisfied or (B) if the satisfaction of any condition to such party's obligations under this Agreement has failed or becomes impossible or impracticable with the use of commercially reasonable efforts and the failure of such condition to be satisfied is not the result of a Breach by the terminating party;

(iii)      at any time following the date that is ninety-two (92) days following the date hereof (the "**Termination Date**"), by either party if the transactions contemplated by this Agreement have not been consummated on or before such date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 11.01(a)(iii)</u> shall not be available to a party if such party is in Breach of <u>Section 5.06</u> or <u>Section 6.03</u>, as applicable; <u>provided</u>, <u>further</u>, <u>however</u>, that the Termination Date shall be automatically extended by a period of twenty-eight (28) days following the Termination Date if the conditions precedent set forth in <u>Section 10.10</u> and Section <u>10.11</u> have been satisfied or waived as of the Termination Date;

(iv)      by Purchaser:  (A) if the Bankruptcy Court approves a Qualified Bid by a Qualified Bidder other than Purchaser or if Sellers accept a Qualified Bid by a Qualified Bidder other than Purchaser; (B) if Sellers file with the Bankruptcy Court a Stand-Alone Plan; or (C) if the Chapter 11 Cases are converted to Chapter 7 of the Bankruptcy Code and the Bankruptcy Court approves a sale by the Chapter 7 Trustee pursuant to a Qualified Bid by a Qualified Bidder other than Purchaser; or

(v)      by Sellers if, to the extent Purchaser shall have received a Phase II environmental report related to the Owned Real Property in accordance with <u>Section 10.08(c)</u> hereof, and such Phase II environmental report shall reveal any condition or conditions, the Remediation of which reasonably would be expected to cause Losses totaling, in the aggregate, more than Four Million Dollars ($4,000,000); provided, however, that Sellers' right to terminate this Agreement pursuant to this <u>Section 11.01(a)(v)</u> shall lapse and expire if not exercised by delivery of written notice to Purchaser by the earlier to occur of (A) fifteen (15) days following notice from Purchaser of such condition or conditions requiring Remediation, as required by <u>Section 6.04</u> hereof, and (B) the Termination Date.

(b)     If this Agreement is validly terminated pursuant to this <u>Section 11.01</u>, this Agreement will be null and void, and there will be no Liability on the part of any party (or any of such party's shareholders, Affiliates and its and their respective officers, directors, trustees, employees, agents, consultants or other representatives) except for the obligations of such party hereunder that expressly survive the termination of this Agreement.

(c)     If this Agreement is terminated for any reason, other than a termination by Sellers pursuant to <u>Section 11.01(a)(ii)</u> as a result of a Breach by Purchaser, the Escrow Agent shall return the Deposit to Purchaser.

(d)     If this Agreement is terminated by Sellers pursuant to <u>Section 11.01(a)(ii)</u> as a result of a Breach by Purchaser, the Escrow Agent shall deliver the Deposit to the Company.

(e)     To the extent Purchaser is entitled to receive the Break-Up Fee and/or the Expense Reimbursement pursuant to <u>Section 8.05</u> hereof, the Company shall pay to Purchaser the Break-Up Fee and/or Expense Reimbursement by wire transfer of immediately available funds to an account designated by Purchaser upon the consummation of, and from the deposit or cash proceeds of, the transaction or liquidation, as applicable, referred to in <u>Section 8.05</u>.

(f)     Upon any termination of this Agreement, receipt of the Break-Up Fee, Expense Reimbursement and/or the Deposit, as applicable, pursuant to this <u>Section 11.01</u>  and <u>Section 8.05</u> herein shall be the sole and exclusive remedy of the party receiving such amounts for any termination hereof.

(g)     The provisions of this <u>Article XI</u> shall survive the termination of this Agreement.

## ARTICLE XII

## PRORATIONS

12.01   <u>Prorations Generally</u>.

(a)     Except as otherwise expressly set forth in this ARTICLE XII, all items of income and expense of the Sellers with respect to the period prior to the Apportionment Time shall be for the account of the Sellers, and all items of income and expense of the Sellers with respect to the period after the Apportionment Time shall be for the account of Purchaser but only with respect to the Purchased Assets and Assumed Liabilities.  Except as otherwise expressly set forth in this ARTICLE XII, all prorations shall be on an accrual basis in accordance with GAAP, and based on the actual number of days in the applicable period.

(b)     Within ninety (90) days following the Closing Date, Purchaser shall prepare and issue the final accounting of all income and expenses described in this ARTICLE XII as of the Apportionment Time ("**Final Accounting**").  Purchaser and the Company shall each have the right to have their respective accountants review drafts of the Final Accounting such that the Final Accounting accurately reflects the operations of the Business as of the Apportionment Time and review all books of control and account pertaining to the Final Accounting, subject to the limitations set forth in <u>Section 2.07(a)</u> hereof.  If Purchaser and the

Company are not able to agree on the Final Accounting, then the dispute shall be resolved in accordance with the dispute resolution procedures set forth in <u>Section 2.07</u> hereof.  A final determination of all income and expenses ("**True-Up**") shall occur on the date that is thirty (30) days after the Final Accounting has been agreed to, and following the True-Up, as set forth in, and subject to, <u>Section 2.03(b)</u> hereof, the Company or Purchaser, as the case may be, shall pay to the other the amount required by the True-Up.  The True-Up shall be final and except as otherwise expressly set forth in this Agreement there shall be no further adjustment between the Company and Purchaser for income and expenses.

(c)    Within thirty (30) days after the date of this Agreement, Sellers shall provide Purchaser with a written estimate and itemization as of the date of this Agreement of the following:

(i)    Accounts Receivable;

(ii)    deposits made by or on behalf of the Sellers as security under any Assumed Contract, utility, public service or other arrangement;

(iii)    prepaid expenses under Sellers Contracts and with respect to prepaid fees for assignable permits;

(iv)    charges and credit, if any, for water, sewer, fuel, electricity, gas and other utilities;

(v)    deposits or advance payments in respect of the occupancy or use of rooms, suites, banquet and meeting rooms, convention facilities and other facilities in the Hotel, or catering, food service and other services performed at the Hotel;  and

(vi)    all accounts payable owing for goods and services furnished.

12.02    <u>Rules for Specific Items of Income and Expense</u>.

(a)    The Company shall receive a credit for all cash in the cash registers, vaults, safes (other than that belonging to guests), petty cash boxes, vending machines and coin-operated devices at the Hotel as of the Apportionment Time.

(b)    The final night's room revenue (revenue from rooms occupied on the evening preceding the Closing Date), any taxes thereon, and any in-room telephone, movie and similar charges for such night, shall be allocated 50% to the Company and 50% to Purchaser.

(c)    The final night's revenue from food, beverage and other restaurant, bar and similar revenue, and taxes thereon, to the closing hours of facility operations which commenced on the day prior to the Closing Date shall be allocated to the Company.

(d)    The Company shall receive a credit for, and Purchaser shall purchase from the Company, the Guest Ledger.  Such credit shall equal the amount of the Guest Ledger

(or 50% thereof in the case of the final night's room revenue), less credit card charges, travel company charges and similar commissions.

(e)        Intentionally omitted.

(f)        Except as set forth in <u>Section 12.02(d)</u>, all Accounts Receivable for all periods prior to the Apportionment Time shall remain the property of the Company.  From the Closing Date until the date which is six (6) months after the Closing Date, Purchaser shall use commercially reasonable efforts (in no event to include bringing legal action or engaging a collection agent) to collect in the ordinary course of business all such Accounts Receivable (other than Accounts Receivable from credit card companies that shall be collected directly by the Company).  With regard to any collection made from any Person that is indebted to the Hotel with respect to Accounts Receivable incurred both prior to and from and after the Apportionment Time, such collection shall be applied to the most recent Accounts Receivable first unless the payor designates otherwise in writing.  Periodically (but no less frequently than monthly), Purchaser shall submit to the Company all amounts received in respect of such Accounts Receivable net of any reasonable costs incurred by Purchaser in connection with such collection efforts, together with an itemization of such Accounts Receivable.  Promptly following the date which is six (6) months after the Closing Date, Purchaser shall deliver to the Company an itemization of such Accounts Receivable which remain unpaid, together with copies of the files pertaining to such Accounts Receivable.  In the event Purchaser receives any amounts in respect of such Accounts Receivable after such date, Purchaser shall promptly remit the same to the Company.

(g)        The Company shall receive a credit (based upon the original net invoice price paid, net of non-invoiced allowances, rebates or other discounts received by the Company) for all full, unopened Consumables at the Hotel as of the Apportionment Time.  For this purpose, an individual container shall not be considered opened if the container itself is not opened but the crate, box or pallet including such container and other similar containers shall have been opened.  The amount of such credit shall be based on an actual inventory of such Consumables by the Company's and Purchaser's representatives.

(h)        The Company shall receive a credit for all deposits made by or on behalf of the Company as of the Apportionment Time as security under any Assumed Contract, utility, public service or other arrangement to the extent the same remains on deposit for the benefit of Purchaser.

(i)        The Company shall receive a credit for prepaid expenses as of the Apportionment Time under Assumed Contracts and with respect to prepaid fees for assignable permits.

(j)        Rent and all other amounts actually received from tenants under any space leases or licenses shall be apportioned between the Company and Purchaser as of the Apportionment Time.  If any arrearage exists under any space lease or license as of the Closing Date, any amounts collected on or after the Closing Date with respect to such space lease or license shall be applied first to amounts then due and payable under such space lease or license with respect to the period from and after the Closing Date, and thereafter to any amounts then

due and payable under such space lease or license with respect to periods prior to the Closing Date.

(k)     All sales, use, rooms, occupancy, excise and similar Taxes, personal property Taxes, ad valorem real estate Taxes, and other Taxes, levies and assessments (other than sales and use taxes payable in respect of the transfer of any Purchased Assets to Purchaser, which shall be paid by Purchaser) shall be apportioned between the Company and Purchaser as of the Apportionment Time.  If the exact amount of such Taxes cannot be determined at Closing, such apportionment shall be based upon the Company's and Purchaser's reasonable estimates of such Taxes, subject to readjustment upon the later of (i) the True-Up and (ii) the date that actual taxes can be determined. For so long as any portion of the Purchase Price remains outstanding, Purchaser shall receive a credit against the then-outstanding portion of the Purchase Price (or Fixed Payoff Amount, as the case may be) for all liabilities incurred by Purchaser resulting from audits by any Governmental Authority for sales, use, rooms, occupancy and similar Taxes arising from the operations of the Hotel during the period prior to the Effective Time; provided, however, that the Company, or any Affiliate of the Company, shall have the opportunity to participate in the defense of any such audit, and Purchaser shall not agree to settle any such audit without the Company's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(l)     All amounts owed by, or to be paid to, the Sellers under the Assumed Contracts shall be apportioned between the Company and Purchaser as of the Apportionment Time.

(m)     Charges and credit, if any, for water, sewer, fuel, electricity, gas, and other utilities shall be apportioned between the Company and Purchaser as of the Apportionment Time.

(n)     Purchaser shall receive a credit for all deposits or advance payments received by the Company prior to the Closing Date in respect of the occupancy or use, after the Apportionment Time, of rooms, suites, banquet and meeting rooms, convention facilities and other facilities in the Hotel, or catering, food service and other services performed at the Hotel.

(o)     Purchaser shall receive a credit for all accounts payable owing for goods and services furnished prior to the Apportionment Time.  Purchaser shall pay all accounts payable relating to goods and services for which orders have been placed but, as of the Apportionment Time, such goods and services have not yet been delivered or provided.

(p)     Purchaser shall receive a credit (based upon the original net invoice price paid, net of non-invoiced allowances, rebates or other discounts received by the Company) for all Inventories removed from the Hotel between the period commencing on the date of this Agreement and ending at the Apportionment Time in breach of the provisions of Section 5.02(a)(vi).

(q)     All other expenses incurred in the ordinary course of business customarily prorated in the sale of a hotel shall be prorated at Closing and thereafter assumed by Purchaser.

12.03  <u>Interest</u>.  If either the Company or Purchaser shall fail to pay any amount due pursuant to this ARTICLE XII by the date the same is due and payable, interest shall accrue on the unpaid portion from the due date therefor at the rate of 10% per annum until paid in full.

12.04  <u>Revenue Contracts and Reservations</u>.  From and after Closing, Purchaser shall honor all revenue contracts and reservations relating to the Hotel that have been entered into as of the Closing Date.

12.05  <u>Survival</u>.  This ARTICLE XII shall survive Closing.

## ARTICLE XIII

## INDEMNIFICATION

13.01  <u>Purchaser Indemnity</u>. From and after Closing, Purchaser shall indemnify and defend Sellers and each of their respective directors, officers and employees, partners, members and affiliates (collectively, "**Seller Indemnified Parties**"), and shall hold Seller Indemnified Parties harmless from and against, any and all Losses paid or incurred by Seller Indemnified Parties due to:

(a)  any breach of any representation or warranty made by Purchaser in this Agreement; and

(b)  the Assumed Liabilities.

13.02  <u>Sellers Indemnity</u>.  From and after Closing, Sellers shall jointly and severally indemnify and defend Purchaser and its respective directors, officers, employees, partners, members and affiliates (collectively, "**Purchaser Indemnified Parties**"), and shall hold Purchaser Indemnified Parties harmless from and against, any and all Losses paid or incurred by Purchaser Indemnified Parties due to:

(a)  any breach of a representation or warranty by any Seller set forth in Section 3.03(b); Section 3.03(d); Section 3.04; Section 3.05(a); Section 3.05(b), specifically excluding a breach of a representation or warranty related to Real Property; Section 3.09; Section 3.10; Section 3.12(b); Section 3.12(c)(i); Section 3.12(c)(iii); Section 3.12(c)(iv); Section 3.12(c)(vi); and Section 3.12(c)(viii); and

(b)  the Retained Liabilities.

13.03  <u>Survival Period</u>.  The "**Survival Period**" for the representations and warranties described in Section 13.01 and Section 13.02 above (collectively, the "**Indemnified Representations**") shall be the period commencing on the Closing Date and ending on the date that the Purchase Price or the Accelerated Payment, as the case may be, is paid in full to Sellers in accordance with this Agreement.

13.04  <u>Notice of Claim</u>.  Whenever either party shall learn through the filing of a claim or the commencement of a proceeding or otherwise of the existence of any liability for which the other party is or may be responsible under this <u>Article XIII</u>, the party learning of such liability

shall notify the other party promptly and furnish such copies of documents (and make originals thereof available) and such other information as such party may have that may be used or useful in the defense of such claims.  The indemnified party shall afford the indemnifying party full opportunity to defend such claims, using counsel reasonably acceptable to the indemnified party, in the name of the indemnified party and generally shall cooperate with the indemnifying party in the defense of such claim, provided that no such matter shall be settled without the prior written consent of the indemnified party.  The indemnifying party and its counsel shall keep the other party fully advised as to its conduct of such defense.

13.05   Limitations.

(a)    The period during which a claim for indemnification may be asserted under this Agreement by any party shall begin on the Closing Date and shall terminate on the last day of the Survival Period.

(b)    Notwithstanding anything herein to the contrary but subject to the provisions of Section 13.05(g), (i) the liability of the Purchaser pursuant to claims for indemnification asserted under this Agreement shall not exceed, in the aggregate, Four Million Dollars ($4,000,000), and (ii) the liability of the Sellers pursuant to claims for indemnification asserted under this Agreement shall not exceed, in the aggregate, (A) with respect to the first Two Million Dollars ($2,000,000) of Losses in excess of the Deductible, One Million Dollars ($1,000,000), it being agreed and understood that with respect to the first Two Million Dollars ($2,000,000) of Losses in excess of the Deductible, such Losses shall be divided equally between Sellers, on the one hand, and Purchaser, on the other, and (B) with respect to the next Three Million Dollars ($3,000,000) of Losses in excess of the Deductible, Three Million Dollars ($3,000,000), it being agreed and understood that in no event shall the aggregate liability of the Sellers pursuant to claims for indemnification asserted under this Agreement exceed Four Million Dollars ($4,000,000).

(c)    The parties shall have no right of indemnification hereunder unless and until, with respect to any individual Loss for which such party would otherwise be entitled to indemnification, such Loss exceeds the De Minimus Amount, and unless the aggregate amount of Losses (that each exceed the De Minimus Amount) for which such party would otherwise be entitled to indemnification exceeds, in the aggregate, the Deductible, and, in such event, such right of indemnification shall be only for Losses (that each exceed the De Minimus Amount) which, in the aggregate, are in excess of the Deductible, subject to the limitation set forth in Section 13.05(b).  Further, Purchaser shall have no right of indemnification with respect to any Losses incurred in connection with a Retained Liability described in Section 2.04(b)(vi) or the Indemnified Representation set forth in Section 3.10, unless such Losses relate to Third Party claims or Remediation.  For the avoidance of doubt, with respect to determining whether an "individual Loss" with respect to any claim for indemnification under this Article XIII exceeds the De Minimus Amount, such Loss shall include all Losses incurred to address a specific event or condition, or a series or group of substantially identical events or conditions having a common or related origin, on an aggregated basis.

(d)    No party shall be entitled to indemnification for any breach or inaccuracy of any Indemnified Representation if such party knew of the breach or inaccuracy at or before

Closing, provided, however, that the defense under this <u>Section 13.05(d)</u> shall not apply with respect to claims for indemnification under <u>Section 13.02(b)</u>.

(e)     The amount of final Losses for which any party shall be entitled to recover hereunder shall be reduced by the actual amount of any insurance proceeds actually paid to, and any tax benefits accruing to, such party as a result of the matter giving rise to such Losses.

(f)     The obligations of Purchaser under <u>Section 13.01</u> and of Sellers under <u>Section 13.02</u> shall not extend to (a) any consequential or punitive damages, (b) any loss or diminution of value in the Hotel, or (c) any Losses that are not payable to third parties (except in the case of a breach of an Indemnified Representation).

(g)     Notwithstanding anything herein to the contrary, the provisions of this <u>Section 13.05</u> shall not apply to, and shall in no way limit, the indemnification obligations set forth in <u>Section 3.07</u> and <u>Section 4.04</u>.

13.06   <u>Exclusive Remedy</u>.  Except for actions grounded in fraud, the sole and exclusive remedy for any breach or inaccuracy, or alleged breach or inaccuracy, of any Indemnified Representation shall be indemnification in accordance with this <u>Article XIII</u>.  As used in this Section, fraud shall not include any claims grounded in an allegation that an Indemnified Representations was false, inaccurate or incomplete.  In order to prove fraud, it shall be the burden of the party alleging fraud to establish that the acts alleged were committed and with the specific intent to defraud the other. This Section shall not apply to a breach of an Indemnified Representation for which the non-breaching party had actual knowledge of such breach at any time prior to the date on which the Indemnified Representation was made.

13.07   <u>Satisfaction of Claims</u>. All payments required to be made under this <u>Article XIII</u> by any Seller to the Purchaser shall be made by offsetting and reducing the then-outstanding portion of the Purchase Price or the Fixed Payoff Amount, as the case may be, and such offset shall be Purchaser's sole and exclusive remedy with respect thereto.  All payments required to be made under this <u>Article XIII</u> by Purchaser to any Seller shall be paid by Purchaser, by wire transfer of immediately available funds to such account(s) as such Seller may direct.

13.08   <u>Contribution</u>. If the indemnifications provided for in this Article XIII shall for any reason be unavailable to or insufficient to hold Purchaser harmless in respect of any Loss, then Seller shall, in lieu of indemnifying Purchaser, contribute to the amount paid or payable by Purchaser as a result of such Loss in such proportion as shall be appropriate to reflect the relative fault of Seller on the one hand and Purchaser on the other, subject in all instances to the limitations set forth in <u>Section 13.05</u> hereof and the payment provisions of <u>Section 13.07</u> hereof. If the indemnifications provided for in this Article XIII shall for any reason be unavailable to or insufficient to hold Sellers harmless in respect of any Loss, then Purchaser shall, in lieu of indemnifying Sellers, contribute to the amount paid or payable by Sellers as a result of such Loss in such proportion as shall be appropriate to reflect the relative fault of Purchaser on the one hand and Sellers on the other, subject in all instances to the limitations set forth in <u>Section 13.05</u> hereof and the payment provisions of <u>Section 13.07</u> hereof.

13.09  <u>Survival</u>.  The indemnification obligations provided under this <u>Article XIII</u> shall survive the Closing.

## ARTICLE XIV

## SELLERS' AGENT

14.01  <u>Appointment and Reliance</u>.   Each Seller hereby irrevocably appoints the Company as its agent (the "**Agent**") for the purpose of performing and consummating the transactions contemplated by this Agreement and the Ancillary Agreements (including executing the Mortgage and the Intercreditor Agreement and holding liens on the Purchased Assets as the "collateral agent" for the Sellers).  The Agent is hereby authorized and directed to perform and consummate on behalf of the Sellers all of the transactions contemplated by this Agreement and the Ancillary Agreements.  Purchaser shall be entitled to rely, without inquiry, upon instructions from, actions taken and documents executed or delivered by the Agent on behalf of the Sellers as if such instructions, actions or documents were made, taken, executed or delivered directly by the Sellers and shall have no liability to the Sellers for any action taken in accordance with such instructions or actions, or in reliance on such documents.

14.02  <u>Authority and Limitation of Liability</u>.  Not by way of limiting the authority of the Agent, each and all of the Sellers, for themselves and their respective successors and assigns, hereby authorize the Agent to:

(a)  waive any provision of this Agreement which the Agent deems necessary or desirable;

(b)  execute and deliver on the Sellers' behalf all documents and instruments which may be executed and delivered pursuant to this Agreement, excluding any deeds or conveyances of title, which shall not be signed by Agent on any Seller's behalf;

(c)  calculate, negotiate and agree to any adjustments to the Purchase Price or Accelerated Payment;

(d)  make and receive notices and other communications pursuant to this Agreement and service of process in any legal action or other proceeding arising out of or related to this Agreement and any of the transactions contemplated hereunder;

(e)  (i) contest, negotiate, defend compromise or settle any dispute, claim, action, suit or proceeding (collectively, "**Actions**") related to this Agreement or any of the transactions hereunder through counsel selected by the Agent and solely at the cost, risk and expense of the Sellers, (ii) authorize a reduction of the Purchase Price or the Accelerated Payment, as the case may be, in satisfaction of any indemnification amounts owned pursuant to the terms herein, (iii) agree to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such indemnification obligations or Actions, (iv) resolve any Actions arising from the Sellers' indemnification obligations hereunder, and (v) take any actions in connection with the resolution of any dispute relating hereto or to the transactions contemplated hereby by arbitration, settlement or otherwise;

(f)      appoint or provide for successor agents;

(g)      select, retain, hire and consult with legal counsel, independent public accountants and other experts, solely at the cost and expense of the Sellers;

(h)      pay expenses incurred which may be incurred by or on behalf of the accountants and other experts, solely at the cost and expenses of the Sellers; and

(i)      take or forego any or all actions permitted or required of any Seller or necessary in the judgment of the Agent for the accomplishment of the foregoing and all of the other terms, conditions and limitations of this Agreement.

Each Seller agrees that the Agent shall have no liability to the Sellers, jointly or severally, for any act or omission by the Agent as permitted under this Section 14.02, excepting only actions taken in bad faith, and each Seller hereby irrevocably waives and releases any claims it may have against the Agent for its acts and omissions hereunder other than any actions taken in bad faith.

**EACH SELLER UNDERSTANDS AND ACKNOWLEDGES THAT IT IS:  (A) AUTHORIZING THE AGENT TO ACT FOR THE SELLERS, COLLECTIVELY AND INDIVIDUALLY, WITH BROAD POWERS; AND (B) AGREEING THAT THE AGENT WILL NOT BE LIABLE TO THE SELLERS, COLLECTIVELY OR INDIVIDUALLY, UNLESS THE AGENT ACTS IN BAD FAITH.**

14.03    Disputes.  Any Action or Proceeding, whether in law or equity, to enforce any right, benefit or remedy granted to the Sellers under this Agreement may be asserted, brought, prosecuted or maintained only by the Agent.  Any Proceeding, whether in law or equity, to enforce any right, benefit or remedy granted to Purchaser under this Agreement, including without limitation any right of indemnification provided in Article XIII hereof, may be asserted, brought, prosecuted or maintained by Purchaser against the Sellers or the Agent by service of process on the Agent and without the necessity of serving process on, or otherwise joining or naming as a defendant in such Action or Proceeding, any Seller.  With respect to any matter contemplated by this Section 14.03, the Sellers shall be bound by any determination in favor of or against the Agent or the terms of any settlement or release to which the Agent shall become a party.

## MISCELLANEOUS

15.01    Entire Agreement.  This Agreement, the Ancillary Agreements and the Disclosure Schedules hereto constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the parties with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

15.02    Assignment; Binding Upon Successors and Assigns.  The rights and obligations of any party under this Agreement shall not be assignable by such party hereto without the prior written consent of the others, except that:  (a) any rights and obligations of Purchaser hereunder

may be assigned in whole from time to time without the consent of any other parties to any Non-Foreign Person, and upon the written assumption of all rights and obligations of Purchaser hereunder by such assignee, Purchaser shall be released from all liability as Purchaser hereunder as of the Closing, provided, however, that Marriott shall remain liable under the Marriott Guaranty and Marriott Hotel Services, Inc. shall remain liable under Section 2.07(d) hereof; and (b) the Sellers may, without the consent of any other party, assign all of their rights, title and interests in and to this Agreement (including the Sellers' right to receive the Purchase Price or Accelerated Payment, as applicable), the Marriott Guaranty, the First Mortgage and the Intercreditor Agreement, and any and all other documents delivered to the Sellers pursuant to Section 2.03(e) of this Agreement, or otherwise, (i) as collateral security for any loan made to the Company for the purpose of funding the Company's obligations under Section 2.08 of this Agreement or the expenses of the Chapter 11 Cases, (ii) to any Affiliate (as of the date of this Agreement) of any Seller, and (iii) to any liquidating trust(s).  Each party shall provide prompt notice to the other parties of any such assignment made pursuant to this Section.  To the extent permitted by applicable Legal Requirements, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  The successors and permitted assigns hereunder shall include, in the case of Purchaser, any permitted assignee (including lenders and investors) as well as the successors in interest to such permitted assignee (whether by merger, liquidation or otherwise), so long as any such successor or permitted assignee is a Non-Foreign Person.

15.03   No Third Party Beneficiaries.  No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee of any party hereto or any other Person unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the parties to this Agreement.

15.04   No Joint Venture.  Nothing contained in this Agreement will be deemed or construed as creating a joint venture or partnership between the parties hereto.  No party is by virtue of this Agreement authorized as an agent, employee or legal representative of any other party.  No party will have the power to control the activities and operations of any other, and the parties' status is, and at all times will continue to be, that of independent contractors with respect to each other.  No party will have any power or authority to bind or commit any other.  No party will hold itself out as having any authority or relationship in contravention of this Section 15.04.  The provisions of this Section 15.04 are qualified in their entirety by reference to Article XIV.

15.05   Severability.  If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to affect the intent of the parties hereto.  The parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the invalid or unenforceable provision.

15.06   Section Headings.  A reference to an Article, Section or Schedule will mean an Article or Section in, or a Schedule to, this Agreement, unless otherwise explicitly set forth.  The titles and headings in this Agreement are for reference purposes only and will not in any manner

limit the construction of this Agreement.  For the purposes of such construction, this Agreement will be considered as a whole.

15.07  <u>Amendment, Extension and Waivers</u>.  At any time prior to the Effective Time, Purchaser and Sellers may, to the extent legally allowed:  (a) extend the time for performance of any of the obligations of the other party; (b) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such party contained herein.  Any term or provision of this Agreement may be amended.  Any agreement to any amendment, extension or waiver will be valid only if set forth in writing and signed by the party to be bound.  The waiver by a party of any Breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding Breach or default.  The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions, except as otherwise expressly set forth herein.  This Agreement may be amended by the parties hereto at any time.

15.08  <u>Survival of Representations, Warranties and Covenants</u>.  All representations, warranties and covenants in this Agreement or in any Ancillary Agreement shall expire on, and be terminated and extinguished at, the Effective Time, other than covenants that by their terms are to survive or be performed after the Effective Time or except as otherwise expressly set forth herein.

15.09  <u>Public Announcement</u>.  Except to the extent required to comply with the provisions of this Agreement, no party hereto shall issue any press release or otherwise make any statements to any Third Party with respect to this Agreement or the transactions contemplated hereby other than with the prior written consent of the other parties, which consent shall not be unreasonably withheld, conditioned or delayed.  Prior to the issuance of any announcement of this Agreement and the transactions contemplated hereby by any party, such party will consult with the other parties regarding the content of such announcement and obtain such other parties' reasonable approval of any related and proposed press release.  Notwithstanding the foregoing, any party may issue such announcements, and make such other disclosures regarding this Agreement or the transactions contemplated hereby, as it determines are required under applicable Legal Requirements or any listing or trading agreement concerning its publicly traded securities.

15.10  <u>Governing Law</u>.  The validity of this Agreement, the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties to this Agreement will be exclusively governed by and construed in accordance with the internal laws of the Commonwealth of Virginia as applied to agreements entered into solely between residents of and to be performed entirely in the Commonwealth of Virginia, without reference to that body of law relating to conflicts of law or choice of law.

15.11  <u>Jurisdiction; Venue; Waiver of Jury Trial</u>.

(a)     Each of the parties to this Agreement hereby agrees that, prior to the Petition Date, the federal or state courts for Henrico County, Virginia, and following the Petition

Date, the Bankruptcy Court, shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining directly or indirectly to this Agreement, and all documents, instruments and agreements executed pursuant hereto or thereto, or to any matter arising herefrom (unless otherwise expressly provided for herein or therein).   To the extent permitted by applicable Legal Requirement, each party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by any of the other parties hereto in such court, and agrees that service of summons and complaint or other process or papers may be made by registered or certified mail addressed to such party at the address to which notices are to be sent pursuant to this Agreement.   Each of the parties waives any claim that such court is an inconvenient forum or an improper forum based on lack of venue. The choice of forum set forth in this Section 15.11 shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

(B)   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENT, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 15.11.

15.12   Notices.   Any notice or other communication required or permitted to be given under this Agreement will be in writing, will be delivered personally, by facsimile (confirmed on the date the facsimile is sent by one of the other methods of giving notice provided for in this Section) or by nationally recognized overnight delivery service, and will be deemed given upon actual delivery or upon the date of rejection as indicated in the return receipt therefor, addressed as follows:

If to Purchaser:

Marriott Hotel Services, Inc.
c/o Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland 20817
Mergers, Acquisitions and Business Development Department 30/921.07
Attention:   Executive Vice President
Facsimile:   (301) 380-7004

with copies to (which will not constitute notice):

Marriott Hotel Services, Inc.
c/o Marriott International, Inc.

10400 Fernwood Road
Bethesda, Maryland 20817
Law Department 52/923
Attention:      Dorothy Ingalls
Facsimile:      (301) 380-6727

with copies to (which will not constitute notice):

Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Attention:      Courtney G. Capute
Facsimile:      (410) 244-7742

with copies to (which will not constitute notice):

Venable LLP
8010 Towers Crescent Drive
Suite 300
Vienna, VA  22182
Attention:      Lawrence A. Katz
Facsimile:      (703) 821-8949

If to any Seller:

Greenbrier Hotel Corporation
c/o CSX Corporation
500 Water Street
Jacksonville, FL 32202
Attention:      Fredrik Eliasson
Facsimile:      (904) 359-1404

with copies to (which will not constitute notice):

Arnold & Porter LLP
555 12th Street, NW
Washington, DC 20004
Attention:      Steven Kaplan
Facsimile:      (202) 942-5999

with copies to (which will not constitute notice):

CSX Business Management, Inc.
500 Water Street
C110
Jacksonville, Florida 32202

Attention:    David A. Boor
Facsimile:    (904) 245-2949

with copies to (which will not constitute notice):

McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
Attention:    Dion Hayes
Facsimile:    (804) 698-2078

or to such other address as the party in question may have furnished to the other parties by written notice given in accordance with this Section 15.12.

15.13   Counterparts.   This Agreement may be executed in counterparts, each of which will be an original as regards any party whose name appears thereon and all of which together will constitute one and the same instrument.   This Agreement or any counterpart may be executed via facsimile or other electronic transmission, and any such executed facsimile or other electronic copy shall be treated as an original.   This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all parties reflected hereon as signatories.

15.14   Costs and Expenses.   Except as otherwise expressly set forth in this Agreement, all expenses of the negotiation and preparation of this Agreement and related to the transactions contemplated hereby, including legal counsel, accounting, brokerage and investment advisor fees and disbursements, shall be borne by the respective party incurring such expense, whether or not the transactions contemplated hereby are consummated.   Purchaser shall pay the cost of its owner's title insurance policies.   Purchaser shall pay the cost of the Survey, environmental, engineering, and other professional studies undertaken by Purchaser with respect to the Real Property.

15.15   Escrow Agent Provisions.

(a)   The Parties hereto covenant and agree that in performing any of its duties under this Agreement, Escrow Agent shall not be liable for any loss, costs or damage which it may incur as a result of serving as Escrow Agent hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence.   Accordingly, Escrow Agent shall not incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (ii) any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in this Agreement, including the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons.

(b)   Sellers and Purchaser hereby agree to indemnify and hold harmless Escrow Agent against any and all losses, claims, damages, liabilities and expenses, including

without limitation, reasonable costs of investigation and attorneys' fees and disbursements which may be imposed upon or incurred by Escrow Agent in connection with its serving as Escrow Agent hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence.

(c)     In the event of a dispute between any of the parties hereto sufficient in the sole discretion of Escrow Agent to justify its doing so, Escrow Agent shall be entitled to tender unto the Bankruptcy Court all money or property in its hands held under the terms of this Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the date first above written.

MARRIOTT HOTEL SERVICES, INC.

By: _____
Name: _____
Title: _____

GREENBRIER IA, INC.

By: _____
Name:
Title:

GREENBRIER HOTEL CORPORATION

By: _____
Name:
Title:

OLD WHITE CLUB CORPORATION

By: _____
Name:
Title:

THE GREENBRIER RESORT AND CLUB MANAGEMENT COMPANY

By: _____
Name:
Title:

THE OLD WHITE DEVELOPMENT CORPORATION

By: _____
Name:
Title:

GREENBRIER GOLF & TENNIS CLUB CORPORATION

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the date first above written.

MARRIOTT HOTEL SERVICES, INC.

By:_____
Name:
Title:

GREENBRIER HOTEL CORPORATION

By: _____
Name: Michael McGovern
Title: Chief Financial Officer

THE GREENBRIER RESORT AND CLUB MANAGEMENT COMPANY

By: _____
Name: Michael McGovern
Title: Chief Financial Officer

GREENBRIER GOLF & TENNIS CLUB CORPORATION

By: _____
Name: Michael McGovern
Title: Chief Financial Officer

GREENBRIER IA, INC.

By: _____
Name: Michael McGovern
Title: Chief Financial Officer

OLD WHITE CLUB CORPORATION

By: _____
Name: Michael McGovern
Title: Chief Financial Officer

THE OLD WHITE DEVELOPMENT CORPORATION

By: _____
Name: Michael McGovern
Title: Chief Financial Officer

## JOINDER OF ESCROW AGENT

Escrow Agent joins in the execution hereof solely for the purposes of evidencing its acknowledgment of, and agreement to, the terms of the foregoing Asset Purchase Agreement applicable to Escrow Agent.

**FIRST AMERICAN TITLE INSURANCE
COMPANY, WASHINGTON DC NBU**

By: _____

Name: _____

Title: _____