Dion W. Hayes (VSB No. 34304)
Patrick L. Hayden (VSB No. 30351)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Greenbrier Hotel Corporation, <u>et al.</u>, | : | Case No. 09-31703 (KRH) |
| | : | |
| Debtors. | : | Jointly Administered |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION OF DEBTORS PURSUANT TO BANKRUPTCY CODE SECTIONS
305(a)(1) AND 1112(b)(1) AND BANKRUPTCY RULES 1017, 2002(a)(4), AND 9006(c)(1)
TO (I) DISMISS BANKRUPTCY CASES, AND (II) SHORTEN NOTICE OF HEARING**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"**<u>Debtors</u>**") hereby move (the "**<u>Motion</u>**") for entry of an order, pursuant to sections 305(a)(1) and

1112(b)(1) of Title 11 of the United States Code (the "**<u>Bankruptcy Code</u>**") and Rule 1017 of the

Federal Rules of Bankruptcy Procedures (the "**<u>Bankruptcy Rules</u>**"), dismissing the Debtors'

above-captioned bankruptcy cases (collectively, the "**<u>Bankruptcy Cases</u>**"), and, pursuant to

Bankruptcy Rule 9006(c)(1), shortening the notice period for hearing on the Motion prescribed

by Bankruptcy Rule 2002(a)(4).  In support of the Motion, the Debtors respectfully represent as

follows:

## PRELIMINARY STATEMENT

The Debtors commenced these Bankruptcy Cases for one purpose:  to facilitate a sale or restructuring transaction that would ensure The Greenbrier continues operating as a going concern under new ownership for the benefit of all parties in interest.  Because that purpose has now been achieved through a stock transaction outside the purview of the Bankruptcy Court, and because the Debtors' new owner will ensure that the Debtors satisfy their existing third-party debt in the ordinary course of business, the Bankruptcy Cases no longer serve any necessary restructuring purpose.  The interests of the Debtors and their creditors would be better served by dismissal of these Bankruptcy Cases.  Accordingly, the Debtors respectfully request that the Court dismiss the Bankruptcy Cases.

## JURISDICTION

1.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.       The statutory predicates for the relief requested herein are sections 305(a)(1) and 1112(b)(1) of the Bankruptcy Code and Bankruptcy Rules 1017, 2002(a)(4), and 9006(c)(1).

## BACKGROUND

3.       On March 19, 2009 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4.       The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee or examiner has been appointed in these chapter 11 cases.  On March 20, 2009, the Bankruptcy Court granted the Debtors' request to be treated as small business debtors as such term is defined in 11 U.S.C. § 101(51).  In connection with the Bankruptcy Court's determination that the Debtors should be

treated as small business debtors, the Bankruptcy Court also ordered that no statutory committee should be appointed in these Bankruptcy Cases.

5.      As set forth in the Affidavit of Michael McGovern, Chief Financial Officer of Greenbrier Hotel Corporation, in Support of  Chapter 11 Petitions and First Day Pleadings [Docket No. 19] (the "**McGovern Affidavit**"), the Debtors' ultimate parent company as of the Petition Date was CSX Corporation ("**CSX**").  Specifically, as of the Petition Date, CSX was the 100% owner of The Greenbrier Resort and Club Management Company ("**GRCMC**"), a Debtor herein.  GRCMC is the 100% owner of Greenbrier Hotel Corporation ("**GHC**"), another Debtor herein.  GHC is the 100% owner of each of the other Debtors.

6.      Prior to the Petition Date, commencing in August 2008, the Debtors—in consultation with CSX and CSX's financial advisor, Goldman, Sachs & Co. ("**Goldman Sachs**")—undertook an extensive marketing effort to sell the Debtors or their assets to a party willing to operate The Greenbrier as a going concern.  Prior to the Petition Date, no party expressed any interest in acquiring CSX's stock in GRCMC.  Rather, the only parties to express any interest in a transaction sought to acquire the Debtors' assets in connection with a restructuring of certain of the Debtors' debts and contractual obligations.  The Debtors engaged in extensive prepetition negotiations with potentially interested parties and ultimately selected Marriott Hotel Services, Inc. ("**Marriott**") as a stalking horse bidder, subject to the approval of the Court.

7.      On March 23, 2009, the Debtors filed their Motion Pursuant to 11 U.S.C. §§ 105(a), 363, 365 and Fed. R. Bankr. P. 2002, 6004, 6006 for (I) Entry Of An Order (A) Establishing Bidding and Auction Procedures Related to the Sale of Substantially All of the Debtors' Assets; (B) Approving Bid Protections; (C) Scheduling an Auction and Sale Approval

Hearing for the Sale of the Debtors' Assets; (D) Establishing Notice Procedures for Cure Related

to Executory Contracts and Unexpired Leases; (E) Approving Form and Manner of Notice of All

Procedures, Protections, Schedules and Agreements; and (F) Granting Certain Related Relief;

and (II) Entry of an Order (X) Approving the Sale of Debtors' Assets Free and Clear of All

Liens, Claims, Encumbrances and Interests; and (Y) Authorizing the Assumption and

Assignment of Executory Contracts and Unexpired Leases [Docket No. 61] (the "**Sale**

**Motion**").[1]

8.      In the Sale Motion, the Debtors sought authority to sell substantially all of their

assets to Marriott under the terms and conditions set forth in the Asset Purchase Agreement

attached thereto as Exhibit A (the "**Marriott Stalkinghorse APA**").  Among other things,

subject to approval from the Bankruptcy Court and upon satisfaction of numerous conditions, the

Marriott Stalkinghorse APA contemplates that the Debtors will:  (i) sell their assets to Marriott

free and clear of liens and interests pursuant to section 363 of the Bankruptcy Code, (ii) obtain

replacement collective bargaining agreements with the Debtors' unions prior to closing that are

acceptable to Marriott, and (iii) provide seller financing in an amount up to $50 million to

facilitate the sale.

9.      On April 10, 2009, the Court entered its Order (a) Approving Bid Procedures

Related to Sale of Purchased Assets, (b) Establishing Procedures for the Assumption and

Assignment of, and Determining Cure of, Executory Contracts and Unexpired Leases, (c)

Scheduling Hearing to Approve Sale, (d) Approving Form and Manner of Notice of Sale by

Auction, and (e) Granting Related Relief [Docket No. 135] (the "**Bidding Procedures Order**").

Pursuant to the Bidding Procedures Order, the Debtors were authorized to conduct an auction

process to determine the highest or best offer for the assets sought to be purchased by Marriott

---

[1]      Contemporaneous with the filing of this Motion, the Debtors are withdrawing the Sale Motion.

under the Marriott Stalkinghorse APA.  In the event the Marriott Stalkinghorse APA is

terminated, Marriott is entitled under certain circumstances to a Break-Up Fee, its Deposit, and

Expense Reimbursement (all as defined in the Marriott Stalkinghorse APA) under the terms set

forth in the Marriott Stalkinghorse APA.  *See* Bidding Procedures Order ¶ 12.  The Marriott

Stalkinghorse APA further contemplates that the Break-Up Fee and Expense Reimbursement

shall be the sole remedy of Marriott if the Marriott Stalkinghorse APA is terminated under

circumstances where the Break-Up Fee and Expense Reimbursement are payable.  *See* Marriott

Stalkinghorse APA § 11.01(f); *see also* Bidding Procedures Order ¶ 12.

10.     On April 17, 2009, the Debtors filed the Disclosure Statement for Joint Plan of

Greenbrier Hotel Corporation and Its Related Debtors Under Chapter 11 of the Bankruptcy Code

[Docket No. 151] (the "**Disclosure Statement**") for the Joint Plan of Greenbrier Hotel

Corporation and Its Related Debtors Under Chapter 11 of the Bankruptcy Code [Docket No.

150] (the "**Plan**").[2]  The Plan and Disclosure Statement contemplated confirmation of the Plan in

connection with a sale of the Debtors' assets to a prevailing bidder.  The Debtors' Plan also

contemplated that the Debtors' prepetition owner—CSX—would receive a release under the

Plan and would also provide exit financing to the Debtors to, among other things:  (i) satisfy the

Debtors' seller-financing obligations (but only in the context of a sale to Marriott), (ii) fund

distributions to unsecured creditors, and (iii) satisfy the costs of liquidating the Debtors' estates

and resolving claims.

11.     In late April 2009, Goldman Sachs was approached by representatives of James

C. Justice II ("**Mr. Justice**"), James C. Justice III, and Jillean L. Justice (collectively, and

together with certain entities owned or controlled by the foregoing, the "**Justice Family**

---

[2]     Contemporaneous with the filing of this Motion, the Debtors are withdrawing the Plan and Disclosure
Statement.

**Group**") regarding a potential stock transaction involving the Debtors.  A summary biography of

Mr. Justice is attached hereto as Exhibit A.

12.     Prior to engaging in any sale discussions with the Justice Family Group, Goldman

Sachs and CSX reviewed the Justice Family Group's financial qualifications.  The Justice Family

Group owns various companies, including Bluestone Coal Corp., a West Virginia-based coal

production and processing company.  A copy of a press release describing a recent sale of certain

of Bluestone Coal Corp.'s assets is attached hereto as Exhibit B.  After this review, which

established that the Justice Family Group was well-qualified financially, and after execution of a

confidentiality agreement, CSX commenced discussions and negotiations with the Justice Family

Group regarding the terms of a possible stock transaction.

13.     On May 6, 2009 (the "**Stock Sale Closing**"), CSX and Justice Family Group,

LLC (the "**New Parent**") contemporaneously executed and closed that certain Stock Purchase

Agreement (the "**Stock Purchase Agreement**"), pursuant to which CSX transferred to the New

Parent its 100% ownership of a newly created entity, The Chesapeake and Ohio Traveler, Inc.

("**C&O Traveler**"), to which CSX had previously transferred its stock in GRCMC.  Members of

the New Parent guaranteed New Parent's obligations under the Stock Purchase Agreement.

Under the Stock Purchase Agreement, the New Parent agreed to, *inter alia*, (i) generally continue

operating The Greenbrier for at least two (2) years after closing at standards consistent with

maintaining a AAA Five Diamond rating, (ii) cause the Debtors to satisfy their existing third

party debt in the ordinary course of the Debtors' business, and (iii) cause the Debtors to return

Marriott's Deposit and pay Marriott the Break-Up Fee and Expense Reimbursement upon

termination of the Marriott Stalkinghorse APA.  In addition, under the Stock Purchase

Agreement, CSX assigned to C&O Traveler all of its prepetition claims against the Debtors, and,

subject to Court approval, agreed to assign to the New Parent CSX's right, title, and interest in

the debtor-in-possession financing provided by CSX (the "**DIP Financing**"), which facility had a

zero balance as of the Stock Sale Closing.  In addition, under the Stock Purchase Agreement,

CSX is effectively assuming the Debtors' pension obligations accrued as of the Stock Sale

Closing (in a manner similar to what was proposed in the Plan), and CSX has agreed to

reimburse New Parent for certain professional fees incurred by the Debtors during the pendency

of these cases.[3]  A copy of the press release describing the transaction is attached hereto as

Exhibit C.

## RELIEF REQUESTED

14.     By this Motion, the Debtors request that the Court enter an order dismissing the

Debtors' Bankruptcy Cases pursuant to sections 305(a)(1) and 1112(b)(1) of the Bankruptcy

Code and Bankruptcy Rule 1017.  In addition, to permit the Debtors' Motion to be heard on May

19, 2009, the Debtors request that the Court shorten notice concerning the hearing on the Motion

pursuant to Bankruptcy Rule 9006(c)(1) from the twenty (20) day period required under

Bankruptcy Rules 1017 and 2002(a)(4).

## BASIS FOR RELIEF

**A.     The Debtors' Bankruptcy Cases No Longer Serve Any Restructuring Purpose.**

15.     The Debtors' Bankruptcy Cases no longer serve any meaningful purpose.  As a

result of the recent change in ownership, the Debtors no longer have any need or desire to pursue

an asset sale or the restructuring of their debt or contractual obligations in bankruptcy.  The

Debtors now have the financial resources and available capital to satisfy their existing

unaffiliated debt in the ordinary course of business outside of the bankruptcy process.  As such,

---

[3]     The Debtors are not parties to the Stock Purchase Agreement.  Any explanation of the Stock Purchase
Agreement herein is summary only, and is qualified in its entirety by the terms of the Stock Purchase
Agreement.

the Debtors have no need to seek to confirm or consummate the Plan, which contemplated an

asset sale that is no longer desirable, beneficial, or in the best interests of the Debtors or their

creditors.

16.     Absent dismissal of the Bankruptcy Cases, the Debtors will be forced to prosecute

these Bankruptcy Cases for several more months to achieve confirmation of some yet-to-be-

drafted stand-alone chapter 11 plan—which would simply seek the reinstatement of all debt

obligations in the ordinary course and thus would not provide a better result for creditors than

dismissal.  Given that dismissal brings the same result as a stand-alone chapter 11 plan in

substantially less time, pursuing such a plan process would be a meaningless exercise and would

waste the resources of this Court and the Debtors.  The Debtors' restructuring goals have been

achieved without need for a chapter 11 plan.  As such, there is simply no reason for the Debtors

to continue operating under the Bankruptcy Code, and dismissal is appropriate under the

circumstances.

17.     Notably, continuation of the Debtors' chapter 11 cases is not a mere

administrative inconvenience for the Debtors; rather, it is an expensive and prejudicial business

interruption.  Maintaining The Greenbrier's reputation for quality and excellence is critical to

success in the highly competitive luxury resort industry.  Operating under the stigma of

bankruptcy inevitably drives away potential guests and places The Greenbrier at a competitive

disadvantage.  Moreover, the uncertainties associated with the bankruptcy process severely

undermine the Debtors' ability to attract and retain future group and conference reservation

business, which is often booked years in advance and which generates a substantial portion of the

Debtors' income.  Prospective groups and trade associations can be uneasy about committing a

large conference to a resort operating under chapter 11.  While these business disruptions may

have been a necessary and acceptable tradeoff at the beginning of the cases to obtain the benefits

of chapter 11, the Debtors no longer have any need for the restructuring benefits provided by the

Bankruptcy Code that make such disruptions acceptable.  As such, the significant business

disruptions resulting from operating a luxury resort in bankruptcy proceedings are not

ameliorated by any commensurate benefits.

18.    Apart from the business disruptions associated with the unnecessary continuation

of these Bankruptcy Cases, the Debtors also face substantial administrative costs and burdens

imposed by the Bankruptcy Code.  Operating under chapter 11 requires substantially increased

professional expenses and reporting obligations that—while ordinarily palatable in light of the

restructuring flexibility provided by chapter 11—are unjustifiable when the Debtors no longer

have any need to utilize the restructuring benefits of chapter 11.  There are no meaningful

benefits to continuation of the Debtors' Bankruptcy Cases.  Rather, such continuation would

only result in a delay in satisfying the claims of the Debtors' creditors.

**B.    Dismissal Will Not Prejudice the Debtors, Their Creditors, or Other Parties in Interest.**

19.    Creditors will not be prejudiced by dismissal of the Bankruptcy Cases.  To the

contrary, the interests of all creditors will benefit from dismissal.  Creditors will resume the same

legal status as existed prior to the Petition Date, will not be barred by operation of the

Bankruptcy Code from asserting any claims against the Debtors that existed prepetition, and will

in fact be paid in full in the ordinary course of business.  Given the New Parent's extensive

resources and willingness to finance the Debtors' ongoing operations in the ordinary course,

creditors of the Debtors will actually be *better off* upon dismissal.  The New Parent has

committed under the Stock Purchase Agreement to ensure that the Debtors satisfy in full their

third party debts in the ordinary course of the Debtors' business.  Administrative expenses of the

Bankruptcy Cases, including professional fees and U.S. Trustee fees, will also be satisfied by the

Debtors in the ordinary course of business.  Accordingly, the Debtors' limited outstanding third-

party debt will be satisfied in the ordinary course without the need for creditors to wait for

consummation of a confirmed chapter 11 plan, which could require months of additional delay.

20.    Any creditors holding unliquidated or contingent claims against the Debtors will

also benefit from dismissal.  Because such creditors' rights and remedies under applicable

nonbankruptcy law will be reinstated upon dismissal, such creditors can liquidate and determine

their claims against the Debtors, if any, in the ordinary course.  Absent dismissal, these

unliquidated and contingent claims could be subject to estimation or other remedies, and such

claims may not have been paid in full under a chapter 11 plan.

21.    Marriott will not be prejudiced by dismissal because, upon termination of the

Marriott Stalkinghorse APA, Marriott will be entitled to receive the Break-Up Fee and Expense

Reimbursement and the return of its Deposit—which is what Marriott bargained for in the

Marriott Stalkinghorse APA.  Payment of the Break-Up Fee and Expense Reimbursement and

return of Marriott's Deposit represent Marriott's sole and exclusive termination remedies under

the Marriott Stalkinghorse APA and the Bidding Procedures Order.  *See* Marriott Stalkinghorse

APA § 11.01(f); Bidding Procedures Order ¶ 12.  The Debtors are willing and able to satisfy

these obligations to Marriott.  As such, to avoid uncertainty, the Debtors request that any order

dismissing these Bankruptcy Cases also deem the Marriott Stalkinghorse APA to be

terminated—given that the transaction contemplated under the Marriott Stalkinghorse APA will

not be consummated—and confirm that the Break-Up Fee, Expense Reimbursement, and

Deposit constitute Marriott's sole and exclusive remedies.

22.    Dismissal of the cases will also benefit other parties in interest in these

Bankruptcy Cases.  For example, the Debtors are no longer seeking relief under Section 1113 of

the Bankruptcy Code.[4]  Likewise, parties to executory contracts will benefit as the Debtors will

once again be obligated to perform under such contracts without possibility of rejection.

Furthermore, because New Parent agreed in the Stock Purchase Agreement to generally continue

operating The Greenbrier for at least two (2) years after closing at standards consistent with

maintaining a AAA Five Diamond rating, the Debtors' employees, prospective guests, the local

community, and the entire State of West Virginia will unquestionably benefit from the

continuation of The Greenbrier in its current form.[5]

23.    In sum, dismissal of these Bankruptcy Cases is in the best interests of not just the

Debtors, but also of the Debtors' creditors and other parties in interest.[6]  Thus, the Debtors'

request for dismissal is fully consistent with and in furtherance of their fiduciary duties.  Cause

exists to dismiss these cases.

## APPLICABLE AUTHORITY

**A.    Dismissal Pursuant to Section 305(a)(1) Is Appropriate.**

24.    "Pursuant to 11 U.S. C. § 305, the Court may dismiss a case or may suspend all

proceedings in a case at any time if the interests of creditors and the debtor would be better

served by such dismissal or suspension.  11 U.S.C. § 305.  The decision whether to dismiss a

---

[4]    Contemporaneous with the filing of this Motion, the Debtors are withdrawing their pending Motion of
Greenbrier Hotel Corporation for Rejection of Collective Bargaining Agreements Pursuant to Section 1113
of the Bankruptcy Code [Docket No. 121].

[5]    At the hearing on this Motion, the Debtors will be prepared, if necessary, to present evidence demonstrating
the ability and willingness of the New Parent to satisfy these commitments.

[6]    Any motions filed by any third parties pending as of the date of the dismissal order should be denied as
moot, except as may be set forth by the Debtors at the hearing on the Motion.  Considering that all rights
and remedies available under applicable nonbankruptcy law will be reinstated, such denial will not
prejudice any such movants.

case pursuant to § 305 lies solely within the discretion of the Bankruptcy Court." In re

Williamsburg Suites, Ltd., 117 B.R. 216, 218 (Bankr. E.D. Va. 1990).  Pursuant to section 305(c)

of the Bankruptcy Code, an order dismissing a case under section 305(a) is not appealable to a

court of appeals.  11 U.S.C. § 305(c).

25.     While section 305 is more frequently applied to dismiss a bankruptcy case when a

preexisting state court insolvency proceeding is adequate to ensure equitable distribution of the

debtor's assets, the existence of an antecedent state court proceeding is not a requirement for

dismissal under section 305.  See In re Beacon Reef Ltd. Partnership, 43 B.R. 644, 646-47

(Bankr. S.D. Fla. 1984) (dismissing bankruptcy case where state law remedies sufficient

notwithstanding that no state law proceeding was then pending).  In determining whether

dismissal under section 305 is appropriate, courts generally consider:

> (1) the motivation of the parties seeking bankruptcy jurisdiction;
> (2) whether another forum is available to protect the interests of both parties
>      or there is already a pending proceeding in state court;
> (3) the economy and efficiency of administration; [and]
> (4) the prejudice to the parties.

In re Spade, 258 B.R. 221 (Bankr. D. Colo. 2001) (citing authority).

26.     Here, those factors weigh heavily in favor of dismissal.  The parties originally

seeking the Bankruptcy Court's jurisdiction—here, the Debtors—no longer desire to operate

under the jurisdiction of the Bankruptcy Court.  As such, there are potentially no parties in these

proceedings seeking the continued exercise of bankruptcy jurisdiction over the Debtors and their

estates.  Upon dismissal, claims of creditors of the Debtors will be satisfied in the ordinary

course of business and will resume their legal status as of the Petition Date.  Thus, with respect

to any disputes between the Debtors and such claimants, all remedies (and alternative forums)

will remain available to establish and liquidate such claims and otherwise protect such creditors.

Furthermore, as described above, economy and efficiency strongly support dismissal. The interests of the Debtors and other parties in interest will thus be better served by dismissal than by the continuation of these Bankruptcy Cases.

27.    Where, as here, a bankruptcy case serves no legitimate restructuring purpose, dismissal under section 305(a)(1) is appropriate and warranted. *See* 2 COLLIER ON BANKRUPTCY ¶ 305.02 (15th ed.) ("The absence of a true bankruptcy purpose (*e.g.*, debt adjustment, breathing spell from creditors, and need for discharge and fresh start) is a significant factor in favor of granting section 305(a)(1) relief."). Accordingly, the Debtors request dismissal of the Bankruptcy Cases.

**B.    Dismissal Pursuant to Section 1112(b)(1) Is Also Appropriate.**

28.    To the extent the Court declines to dismiss the Bankruptcy Cases pursuant to section 305(a)(1), the Court should still dismiss the cases pursuant to section 1112(b)(1) of the Bankruptcy Code. As the Fourth Circuit has described this statutory provision:

> Section 1112(b) of the Code provides that "the [bankruptcy] court may convert a case under [Chapter 11] to a case under Chapter 7 of this title or *may dismiss a case under [Chapter 11]*, whichever is in the best interest of creditors and the estate, *for cause* . . . .' 11 U.S.C. § 1112(b) (emphasis supplied). The provision then sets out a non-exhaustive list of circumstances in which conversion or dismissal might be appropriate, including the manifest absence of a "reasonable likelihood of rehabilitation," the debtor's apparent "inability to effectuate a plan [of reorganization]," or an "unreasonable delay by the debtor that is prejudicial to creditors." Id. §§ 1112(b)(1)-(3).

Carolin Corp. v. Miller, 886 F.2d 693, 698-99 (4th Cir. 1989) (modifications in original). "In order to avoid the costs of chapter 11 in cases in which they are not justified, section 1112(b) was designed to provide the court with a powerful tool to weed out inappropriate chapter 11 cases at the earliest possible stage." 7 COLLIER ON BANKRUPTCY at ¶ 1112.04[3].

29.      Here, "cause" plainly exists to dismiss the Bankruptcy Cases.[7]  As described above, the Debtors have already achieved their restructuring goals, and requiring the Debtors to continue down a path towards confirmation of a plan would be a futile and empty exercise.  Such exercise, however, would come at great burden and expense to the Debtors, and would result in a plan that reinstates all prepetition debt—which is no better than the result achieved by dismissal.  Denying dismissal would also prejudice creditors by requiring them to await confirmation of a plan before they can receive payment, whereas, upon dismissal, the Debtors can promptly begin payments to prepetition creditors in the ordinary course of business.

30.      Cause exists for dismissal of the Bankruptcy Cases pursuant to section 1112(b)(1) of the Bankruptcy Code.

### REQUEST TO SHORTEN NOTICE

31.      Bankruptcy Rules 1017 and 2002(a)(4) generally require twenty (20) days' notice of a hearing on a motion to dismiss a bankruptcy case.  Pursuant to Bankruptcy Rule 9006(c)(1), however, the Court may reduce this twenty (20) day period for cause shown.  Here, given that the Stock Sale Closing has already occurred and the Bankruptcy Cases no longer serve any restructuring purpose, the Debtors submit that cause exists to shorten notice of the hearing on the Motion.  Accordingly, the Debtors' request that the Court shorten notice of the hearing to permit the Motion to be heard on May 19, 2009.  The Debtors will serve a copy of this Motion and the proposed order by U.S. mail upon all of the Debtors' creditors and other parties in interest.

---

[7]      Clearly, conversion of the Debtors' cases to chapter 7 is not in the best interests of *any* party.  The Debtors are prepared to pay creditors in the ordinary course and to continue operating outside of bankruptcy.  Conversion to chapter 7 would result in a significantly reduced distribution to creditors, along with the loss of jobs and going-concern enterprise value that would be preserved by dismissal.

## NO PRIOR REQUEST

32.    No previous motion for the relief sought herein has been made to this or any other

court.

## WAIVER OF MEMORANDUM OF LAW

33.    Pursuant to Local Rule 9013-1(G), and because there are no novel issues of law

presented in the Motion and all applicable authority is set forth in the Motion, the Debtors

request that the requirement that all motions be accompanied by a separate written memorandum

of law be waived.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form annexed hereto as Exhibit D, dismissing the Debtors' bankruptcy cases

and granting such other and further relief as the Court deems just and proper.


Dated:  May 8, 2009                          Respectfully submitted,
        Richmond, Virginia


                                             _/s/  Dion W. Hayes_____
                                             Dion W. Hayes (VSB No. 34304)
                                             Patrick L. Hayden (VSB No. 30351)
                                             McGUIREWOODS LLP
                                             One James Center
                                             901 East Cary Street
                                             Richmond, Virginia 23219-4030
                                             (804) 775-1000

                                             Attorneys for Debtors and
                                             Debtors in Possession

## **EXHIBIT A**

(James C. Justice II Biography)

JAMES C. JUSTICE, II was born April 27, 1951 to James Conley Justice and Edna Ruth Perry Justice.  He attended Raleigh County Schools, graduated from Woodrow Wilson High School in 1969, attended Greenbrier Military Academy as a post graduate, University of Tennessee and received his BS and MBA Degrees from Marshall University in Huntington, WV.

Jim married his wife Cathy in 1976 in Beckley.  Cathy is the daughter of Leigh and Ruth Comer and is a graduate of Marshall University with BA Degree in Secondary Education.

Jim joined the family business in 1976 and as a result of his strong interest in agriculture he started Bluestone Farms in 1977, currently operating as Justice Family Farms, LLC. Under his direction, Justice Farms grew to be the largest cash grain operation on the East Coast.  In 2008, they farmed over 50,000 acres of corn, wheat and soybeans in West Virginia, Virginia, North Carolina and South Carolina.  The operation also includes commercial grain storages, a John Deere farm equipment dealership, timber interests, cotton warehouses, land companies, a Christmas Tree farm and two commercial turf farms.  Jim has been an active member of the National Corn Growers Association and has won six national yield championships. He has also developed Stoney Brook Plantation, a 15,000 acre hunting and fishing preserve in Monroe County, WV.  The Plantation is currently being used as one of the amenities of the Greenbrier Sporting Club.

After the death of Jim's dad in 1993, he became President and CEO of Bluestone Industries, Inc. and Bluestone Coal Corporation. Throughout the late 1990's, Jim focused Bluestone on a massive growth program acquiring tens of thousands of acres of quality coal reserves along with production skyrocketing. In 2003 Jim founded the James C. Justice Companies, Inc. to further expand the coal reserve base and acquire additional mining operations.  The business moved into Kentucky in 2007 with the acquisition of Sequoia Energy, LLC, a surface and deep mining company based in Middlesboro, KY, then into Tennessee in 2008 with the addition of Premium Coal Co. and S&H Mining, and most recently into Virginia when A&G Coal Corporation of Wise County, VA was acquired.

During late 2008 and early 2009,  Jim successfully negotiated the sale of Bluestone Industries, Inc. and affiliated companies, which comprised all of the family's West Virginia active  coal mines, to Mechel, OAO,  a major global company in mining and metals.

The Justice's Kentucky, Tennessee and Virginia coal operations and the West Virginia, Virginia, North and South Carolina agricultural operations continue today under the parent James C. Justice Companies, Inc.

Jim has carried on his family's tradition of being major supporters of youth programs in Southern West Virginia.  Since 1992 he has been President of Beckley Little League.  His participation has helped the program expand to over 1,000 kids playing on 80 teams. He has coached basketball teams of all ages for the past 25 years and is currently the head girls basketball coach at Greenbrier East High School in Lewisburg, WV

As part of his involvement with the West Virginia Coal Association, Jim was asked to become Tournament Director of the Mountain State Coal Classic Basketball Tournament.  The Classic was moved to Beckley in 1995 and has enjoyed tremendous success by providing over $300,000 in scholarships and over $325,000 in direct support to participating schools.  Jim will always be remembered for bringing such sports greats as Hot Rod Hundley, Terry Bradshaw, Dick Vitale, Jerry West, Joe Theisman, Kareem Abdul Jabbar,  Dr. "J" Julius Erving, Bo Jackson, Rich Rodriquez, Quincy Wilson, Bob Pruett, Chad Pennington, Lou Holtz,  Larry Bird, Bill Walton, John Elway, Bill Stewart and Pat White to Beckley as guest speakers for the Classic.  The Tournament will become even bigger and better in 2010 and will be known as The Big Atlantic Classic Basketball Tournment.

Jim was the 1998 Recipient of the Beckley-Raleigh County Chamber of Commerce's Community Service Award as a result of his involvement with youth programs in the area, the 1998 Recipient of the "Spirit of Beckley" Award from the Beckley-Raleigh County YMCA, and the 2000 recipient of the City of Hope Medical Center's "Spirit of Life" award.

In August of 1997 he was elected Chairman of the West Virginia Mining and Reclamation Association and still serves on the WV Coal Association's Board of Directors.  He has the distinction of being the first member of the second generation of coal people to serve as Chairman of the Association.  Jim Justice, Sr., was Chairman in 1974-75.

Jim attended the University of Tennessee on a golf scholarship, later transferring to Marshall University where he was captain of the golf team his last two years.

In April of 2000, Jim purchased Saddlebred Golf Club and Community in Beckley, WV, and has completely redesigned the 18-hole course.  The community now has over 200 home sites for upscale houses.  It has been renamed "The Brier Patch Golf Links".

Just like his father, Jim is an active supporter of Duke University Children's Hospital and has served on the National Board of Advisors.

Jim and Cathy have two children, James C., III (Jay) and Jill.  Jay is a 2003 Graduate of Virginia Tech.  He currently serves as Executive Vice President of James C. Justice Companies, Inc. and is thoroughly engaged in all of the company's business ventures.
Jill attended Clemson University and Marshall University on a full Division I Basketball Scholarship.  She graduated from Marshall University and is now in medical school at Virginia Tech.

## **EXHIBIT B**

(Press Release Regarding Bluestone Coal Corp.)



Mechel Home Page >> **News**

**Mechel Announces Closing Of a Deal to AcquireCoking Coal Assets of Bluestone Coal Corp.**

*Moscow, Russia – May 08, 2009 – Mechel OAO (NYSE: MTL), one of the leading Russian mining and metals companies, today announced that its subsidiaries have closed the acquisition, which was reported on April 22 2009, of U.S. entities Bluestone Industries, Inc., a West Virginia corporation, Dynamic Energy, Inc., a West Virginia corporation, JCJ Coal Group, LLC, a Delaware limited liability company and some of its West Virginia affiliates (together "Bluestone"), privately-held West Virginia-based coal businesses engaged in the mining, processing and sale of premium quality hard coking coal. The aggregate merger consideration is $436 million paid in cash (including $36 million interest paid), approximately 83.3 million preferred shares, plus the assumption of approximately $132 million of net debt. Other business activities conducted by the owners of Bluestone Coal Corp., including steam coal operations in Kentucky and other non-coal operations, were not included in the transaction.*

\* \* \*

Mechel OAO
Ilya Zhitomirsky
Phone: + 7 495 221 88 88
ilya.zhitomirsky@mechel.com

\* \* \*

Mechel is one of the leading Russian companies. Its business includes four segments: mining, steel, ferroalloy and power. Mechel unites producers of coal, iron ore concentrate, nickel, steel, ferrochrome, ferrosilicon, rolled products, hardware, heat and electric power. Mechel products are marketed domestically and internationally.

\* \* \*

Some of the information in this press release may contain projections or other forward-looking statements regarding future events or the future financial performance of Mechel, as defined in the safe harbor provisions of the U.S. Private Securities Litigation Reform Act of 1995. We wish to caution you that these statements are only predictions and that actual events or results may differ materially. We do not intend to update these statements. We refer you to the documents Mechel files from time to time with the U.S. Securities and Exchange Commission, including our Form 20-F. These documents contain and identify important factors, including those contained in the section captioned "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements" in our Form 20-F, that could cause the actual results to differ materially from those contained in our projections or forward-looking statements, including, among others, the achievement of anticipated levels of profitability, growth, cost and synergy of our recent acquisitions, the impact of competitive pricing, the ability to obtain necessary regulatory approvals and licenses, the impact of developments in the Russian economic, political and legal environment, volatility in stock markets or in the price of our shares or ADRs, financial risk management and the impact of general business and global economic conditions.

08.05.2009

**<u>EXHIBIT C</u>**

(Press Release Regarding Stock Sale Closing)

## NEWS FROM



Telephone: 304.536.1110
Facsimile 304.536.7893
www.greenbrier.com

*300 WEST MAIN STREET  *  WHITE SULPHUR SPRINGS  *  WEST VIRGINIA 24986*

**FOR IMMEDIATE RELEASE**

### Justice Family Group Purchases The Greenbrier;
### West Virginia Owner will Seek Dismissal of Bankruptcy

WHITE SULPHUR SPRINGS, West Virginia (May 7, 2009) -- West Virginia businessman Jim Justice today announced that his company has purchased The Greenbrier resort and 80 percent of The Greenbrier Sporting Club.  The purchase by the Justice Family Group, LLC was made through the acquisition of the stock of The Greenbrier's holding company.

"I am very excited to become part of one of America's finest traditions," said Justice.  "The Greenbrier is uniquely 'West Virginian,' and I look forward to working with the team to build on its legacy."

Mr. Justice also plans to seek dismissal of the bankruptcy of The Greenbrier.

"Our near-term goal is to give The Greenbrier a fresh start," said Justice.  "Even though the current economy is taking its toll on the resort, we are going to take a long-term view by focusing on reclaiming our five-star status and making the right investments for future growth."

Michael Ward, chairman, president and chief executive officer of CSX, commented, "While this is an entirely different kind of transaction than expected, this is a great result for The Greenbrier, its employees, the community, and CSX.   Mr. Justice has made his passion and enthusiasm for The Greenbrier very clear."

The Greenbrier, residing on 6,500-acres of lush landscape in West Virginia's Allegheny Mountains, is an award-winning resort which has been offering a welcoming home to its guests since 1778. The Greenbrier Sporting Club is an upscale private residential development located at the resort.

###

*Justice photo and bio available upon request.*

Contact:
Lynn Swann
Director of Public Relations
The Greenbrier
304-536-7857

# **EXHIBIT D**

(Proposed Order)

Dion W. Hayes (VSB No. 34304)
Patrick L. Hayden (VSB No. 30351)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Greenbrier Hotel Corporation, et al., | : | Case No. 09-31703 (KRH) |
| | : | |
| Debtors. | : | Jointly Administered |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER DISMISSING DEBTORS' BANKRUPTCY CASES**

Upon the motion (the "**Motion**")[1] of the Debtors for entry of an order, under sections 305(a)(1) and 1112(b)(1) of the Bankruptcy Code and Bankruptcy Rules 1017, 2002(a)(4) and 9006(c)(1), dismissing the Debtors' above-captioned bankruptcy cases and shortening notice for the hearing on the Motion; and this Court having fully considered the record before it; and after due deliberation thereon,

**IT IS HEREBY FOUND AND DETERMINED that**:

A.      Good and sufficient notice of the Motion was provided, and no other or further notice of the Motion is necessary or warranted.

B.      Cause exists to shorten the notice period for hearing on the Motion.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

C.      The Bankruptcy Cases no longer serve any necessary restructuring or reorganizational purpose, and requiring the Debtors to exit bankruptcy through confirmation of a chapter 11 plan would not provide any meaningful benefits to the Debtors or other parties in interest.

D.      The expense and burden of continued operation of the Debtors under the jurisdiction of the Court substantially outweigh any benefits that continued exercise of bankruptcy jurisdiction could provide.

E.      The Debtors' creditors and other parties in interest are adequately protected by applicable nonbankruptcy law and other available forums, particularly in light of the Debtors' ability and expressed willingness to satisfy the Debtors' existing debt in the ordinary course of business.

F.      The Debtors, their creditors, and other parties in interests will be best served by dismissal of the Bankruptcy Cases in accordance with 11 U.S.C. § 305(a)(1).

G.      Good and sufficient also cause exists for dismissal of the Bankruptcy Cases pursuant to 11 U.S.C. § 1112(b)(1).

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that**:

1.      The Motion is GRANTED in its entirety.

2.      Pursuant to Bankruptcy Rule 9006(c)(1), the Debtors' request to shorten the notice period for hearing on the Motion is hereby GRANTED.

3.      Pursuant to Bankruptcy Code section 305(a)(1), the Bankruptcy Cases are hereby DISMISSED.

4.      Pursuant to Bankruptcy Code section 349(b)(3), all of the property of the Debtors' estates is hereby revested in the entity in which such property was vested immediately before commencement of the Bankruptcy Cases.

5.      The Debtors' commencement of the Bankruptcy Cases shall not be deemed to have any effect on the Debtors' contractual relationships existing immediately prior to the Petition Date.

6.      All motions filed by any non-Debtor party pending in the Bankruptcy Cases as  of the date hereof are hereby denied as moot.  Any pleadings filed by the Debtors pending as of the date hereof are deemed withdrawn as moot.

7.      To the extent not already terminated in accordance with its terms, the Marriott Stalkinghorse APA is hereby deemed terminated as of the date of this Order.  Marriott's sole and exclusive remedies for termination of the Marriott Stalkinghorse APA shall be payment of the Break-Up Fee and Expense Reimbursement and the return of Marriott's Deposit.

8.      The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.


Dated:   Richmond, Virginia
         May __, 2009          _____
                               HON. KEVIN R. HUENNEKENS
                               UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

  /s/   Dion W. Hayes
Dion W. Hayes (VSB No. 34304)
Patrick L. Hayden (VSB No. 30351)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

Attorneys for the Debtors and
Debtors in Possession

### CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by all necessary parties.

  /s/   Dion W. Hayes
Dion W. Hayes (VSB No. 34304)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

\8978971